UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

REYNALDO PABON,

                              Plaintiff,

                                                        9:20-CV-1503
v.                                                      (DNH/TWD)

NELSON, et al.,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:
REYNALDO PABON
  *Plaintiff, pro se*
15-B-0448
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

HON. LETITIA JAMES                        BRENDA T. BADDAM
New York State Attorney General           Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

       In this action brought pursuant to 42 U.S.C. § 1983, *pro se* Plaintiff Reynaldo Pabon

claims Raymond Nelson, John Doe, and Jane Doe (collectively, "Defendants") were deliberately

indifferent to prison conditions in violation of the Eighth Amendment.  (Dkt. No. 1; *see also* Dkt.

No. 7 at 5, 8-9.)  Defendant Nelson now moves for summary judgment under Federal Rule of

Civil Procedure 56.  (*See* Dkt. No. 21.)  For the following reasons, the undersigned recommends

that the Court dismiss the Doe defendants and grant Nelson's motion.  *See id.*

## I.    BACKGROUND

### A.    Procedural History

Pabon initiated this action *pro se* in late 2020.  (*See* Dkt. No. 1.)  He signed his

Complaint on November 26, 2020, and it was postmarked for mailing on December 1, 2020.  *See*

*id.* at 1, 6; *see also* Dkt. No. 1-4.  On December 7, 2020, this Court received Pabon's Complaint,

as well as his application to proceed *in forma pauperis* ("IFP Application"), and an Inmate

Authorization Form.  (Dkt. Nos. 1-3.)  Pabon's IFP Application was incomplete, so Senior

District Judge David N. Hurd ordered the case administratively closed until Pabon submitted the

full filing fee or a complete IFP Application.  (*See* Dkt. No. 4.)  Pabon subsequently filed a

complete IFP Application, and Judge Hurd ordered the case re-opened.  (*See* Dkt. Nos. 5, 6.)

On February 12, 2021, Judge Hurd granted Pabon's IFP Application and conducted an

initial review of the Complaint pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A.  (Dkt.

No. 7.)  Judge Hurd accepted for filing Plaintiff's Eighth Amendment claim against defendants

Nelson, John Doe, and Jane Doe, but dismissed all remaining claims and defendants.  *See id.* at

14-15.  Judge Hurd ordered the Clerk to serve Nelson with Pabon's Complaint, and urged Pabon

to "take reasonable steps through discovery to ascertain the identity of defendants John Doe and

Jane Doe."  *Id.*  However, Judge Hurd warned Pabon that his "failure to timely serve" the Doe

defendants "will result in dismissal of the claims asserted against them and termination of those

defendants from the action."  *Id.* at 15.  Pabon never identified or served the Doe defendants.

On December 8, 2021, Nelson moved for summary judgment.  (Dkt. No. 21.)  Pabon

filed his response after the undersigned granted several extensions.  (Dkt. Nos. 24, 26, 28, 30, 32,

33.)  Nelson did not file a reply.

### B.    Pabon's Eighth Amendment Deliberate Indifference Claim

Pabon claims the Defendants, corrections officers at Clinton Correctional Facility,

violated the Eighth Amendment by being deliberately indifferent to unsafe prison conditions.

(*See* Dkt. No. 1 at 5-6; *see generally* Dkt. No. 7 at 5.)  Specifically, Pabon alleges Defendants

were deliberately indifferent to the dangers of forcing him—an individual who experiences

random fainting spells—to use stairs to access the law library.   (Dkt. No. 1 at 5-6.)  According

to Pabon, his injuries resulted from Defendants' failure to comply with medical accommodations

that involved avoiding the use of stairs.  *Id.*; *see generally* Dkt. No. 1-1 at 21.  Pabon asserts

Defendants' "refus[al] to permit special accommodations for law library," as well as their alleged

"inactions" caused him to fall down the stairs while he was being escorted to the law library on

December 1, 2017, resulting in several injuries.  (Dkt. No. 1 at 5-6.)

### C.    The Parties' Arguments

Through his summary judgment motion, Nelson claims he is entitled to judgment as a

matter of law because: (A) Pabon's claim is barred by the applicable statute of limitations, (B)

Pabon produced no evidence that he was personally involved in the alleged Eighth Amendment

violation, (C) Pabon failed to exhaust his administrative remedies, and (D) Pabon cannot satisfy

the objective or subjective prongs of the deliberate indifference test.  (Dkt. No. 21-1.)

Pabon failed to respond to Nelson's Statement of Material Facts.  (*Compare* Dkt. No. 21-

9, *with* Dkt. No. 33.)  He also offered no response to Nelson's arguments that his claim is

untimely and unsupported by any evidence of Nelson's personal involvement in the alleged

Eighth Amendment violation.  (*See* Dkt. No. 33.)  Rather, Pabon argues he exhausted his

remedies, and Nelson was deliberately indifferent.  *See id.* at 3, 5.

## II.    SUMMARY JUDGMENT STANDARD

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).[1] "A material fact is one capable of influencing the case's outcome under governing substantive law, and a genuine dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Selevan v. New York Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013). "The moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016).

The party moving for summary judgment bears the initial burden of identifying "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see generally* Fed. R. Civ. P. 56(c)(1). "Where, as here, the burden of persuasion at trial would be on the non-moving party . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential

---

[1] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted. *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).

On a motion for summary judgment, "the evidence of the non-movant is to be believed, all permissible inferences are to be drawn in [his] favor, and the court must disregard all evidence favorable to the moving party that the jury is not required to believe." *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012); *see also S. Katzman Produce Inc.*, 999 F.3d at 877; *see generally Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (explaining the jury is not required to believe contradicted evidence or impeached testimony).[2] "[I]n reviewing the evidence and considering what inferences may reasonably be drawn, the court may not make credibility determinations or weigh the evidence." *S. Katzman Produce Inc.*, 999 F.3d at 877. Moreover, "[t]he evaluation of ambiguous acts is a task for the jury, not for the judge on summary judgment." *Redd*, 678 F.3d at 174. "In sum, summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict . . . *i.e.*, it is quite clear what the truth is." *Id.*; *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010).

---

[2] The Court is mindful of the Second Circuit's instruction that a party's *pro se* pleading—including a written opposition to a motion for summary judgment—must be construed liberally and interpreted to raise the strongest arguments that it suggests. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

## III.    DISCUSSION

At the outset, the undersigned concludes the Doe defendants should be dismissed and Nelson's Statement of Material Facts is undisputed.  First, the Doe defendants should be dismissed because Pabon failed to ascertain their identities and timely serve them.  *See* Fed. R. Civ. P. 4(m); NDNY LR 4.1(b).  Judge Hurd warned Pabon that if he "fails to ascertain the identity of the Doe defendants so as to permit timely services of process, all claims against those individuals will be dismissed."  (Dkt. No. 7. at 9; *see also id.* at 15 ("Plaintiff's failure to timely serve those defendants will result in dismissal of the claims asserted against them and termination of those defendants from the action.").)  Because Pabon failed to serve the Doe defendants, the undersigned recommends dismissing those defendants from this action.  Fed. R. Civ. P. 4(m); *see, e.g.*, *Berman v. Durkin*, No. 9:13-CV-0136 (LEK) (DJS), 2017 WL 1215814, at *4 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 440-41 (N.D.N.Y. 2009).

Second, Nelson's Statement of Material Facts is undisputed.  (*Compare* Dkt. No. 21-9, *with* Dkt. No. 33.)  On initial review, Judge Hurd specifically warned the parties they must "comply with Local Rule 7.1 of the Northern District of New York in filing motions."  (Dkt. No. 7 at 15.)  Among other requirements, that rule provides "[a]ny motion for summary judgment shall include a Statement of Material Facts, and any opposition shall contain a response to the Statement of Material Facts."  NDNY LR 7.1(b)(3).  Pabon failed to file a response to Nelson's Statement of Material Facts, and did not controvert Nelson's evidence with citations to his own evidence.  (*See* Dkt. No. 33.)  Under Local Rule 56.1(b), "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  NDNY LR 56.1(b); *see also Frantti v. New York*, 850 F. App'x 17,

19 (2d Cir. 2021) (approving the adoption of an unopposed Statement of Material Facts); *Marino v. Schult*, 764 F. App'x 73, 74 (2d Cir. 2019) ("If a non-moving party fails to comply with local rules governing summary judgment, a district court may rely on a moving party's statement of undisputed facts as long as those facts are supported by the record").  Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  Because Pabon failed to respond to Nelson's Statement of Material Facts and did not controvert his factual assertions, the undersigned regards those factual assertions as undisputed.  Fed. R. Civ. P. 56(e)(2); NDNY LR 56.1(b).[3]

A.      **Pabon's Eighth Amendment Claim is Timely**

"The statute of limitations for claims brought under Section 1983 is governed by state law, and, in this case, is the three-year period for personal injury actions under New York law." *Middlebrooks v. Bradt*, 794 F. App'x 72, 74 (2d Cir. 2019); *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009).  "A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm."  *Shomo v. City of New York*, 579 F.3d at 181; *Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) (Sotomayor, Circuit Judge).  In this case, the statute of limitations on Pabon's Eighth Amendment deliberate indifference claim began to run on December 1, 2017, the date of the incident, and expired three years later on December 1,

---

[3] "Proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment."  *Zuk v. Onondaga Cnty.*, No. 5:07-CV-732 (GTS) (GJD), 2010 WL 3909524, at *3 (N.D.N.Y. Sept. 30, 2010), *aff'd*, 471 F. App'x 70 (2d Cir. 2012); *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 234-35 (N.D.N.Y. 2008).  This includes complying with the procedural requirements of the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court.  *White v. Drake*, No. 9:10-CV-1034 (GTS) (DRH), 2011 WL 4478921, at *8 n.14 (N.D.N.Y. Sept. 26, 2011); *Christman v. Utica Nat. Ins. Grp.*, Inc., No. 606-CV-1392 (GTS) (GHL), 2009 WL 838128, at *6 n.2 (N.D.N.Y. Mar. 27, 2009), *aff'd*, 375 F. App'x 106 (2d Cir. 2010).

2020.  (*See* Dkt. No. 1; *see, e.g.*, *Jones v. City of New York*, No. 18-CIV-1937 (VSB) (GWG), 2021 WL 5562694, at *7 (S.D.N.Y. Nov. 29, 2021); *Gutek v. Borchardt*, No. 9:17-CV-00471 (BKS) (TWD), 2020 WL 2336187, at *3 (N.D.N.Y. May 11, 2020).)

"Under the prison mailbox rule, a *pro se* prisoner's complaint is deemed filed upon its delivery to prison authorities for transmittal to the district court."  *Griffith v. Troy*, No. 9:19-CV-00354 (MAD) (ML), 2021 WL 4437584, at *4 (N.D.N.Y. Sept. 28, 2021); *see also Houston v. Lack*, 487 U.S. 266, 276 (1988); *Hardy v. Conway*, 162 F. App'x 61, 62-63 (2d Cir. 2006). "That date of delivery is presumed to be the date that the inmate signs his or her complaint." *Griffith*, 2021 WL 4437584, at *4; *see also Hardy*, 162 F. App'x at 62-63 ("Indeed, in the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing.") (collecting cases); *see, e.g.*, *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 328 n.4 (W.D.N.Y. 2005); *Pack v. Artuz*, 348 F. Supp. 2d 63, 67 n.2 (S.D.N.Y. 2004). "If the complaint is not signed, the date of the postmark is the date the petition is presumed filed." *Griffith*, 2021 WL 4437584, at *4; *see, e.g.*, *Alexander v. Superintendent*, No. 9:07-CV-00680, 2009 WL 762108, at *2 (N.D.N.Y. Mar. 19, 2009).

Nelson claims Pabon's claim is untimely because he "filed this action with his initial complaint on December 7, 2020." (Dkt. No. 21-2 at 11; *but see* Dkt. No. 21-10 at 120 ("Q: You filed this on November 26th, 2020, correct? A: Yes, ma'am.").) However, Pabon signed his Complaint on November 26, 2020. (Dkt. No. 1 at 6.) Under the mailbox rule, Pabon's complaint is deemed filed upon its delivery to prison officials, which—unless there is contrary evidence—is presumed to be the date he signed his complaint. *See Griffith*, 2021 WL 4437584, at *4. The evidence demonstrates Pabon delivered his complaint to prison officials on the day he signed it, November 26, 2020. (*See* Dkt. No. 1 at 6; Dkt. No. 21-10 at 120; *see, e.g.*, *Corrigan*,

371 F. Supp. 2d at 328 n.4; *Alexander*, 2009 WL 762108, at *2.)  The undersigned accordingly

concludes Pabon timely filed his Eighth Amendment claim.[4]

### B.     No Evidence of Nelson's Personal Involvement

Sometime before August 28, 2017, Pabon was diagnosed with "syncope," a medical

diagnosis characterized by sudden and unpredictable fainting.  (Dkt. No. 21-5 at 2; Dkt. No. 21-

10 at 24-26.)  Due to this condition, on August 28, 2017, Pabon requested certain

accommodations, including "medical showers, phone calls in the block and to be transferred to a

facility that specialized in his medical condition."  (Dkt. No. 21-5 at 2, 5; Dkt. No. 21-6 at 2, 7.)

Pabon's request was received by the appropriate authorities, and referred to Vonda Johnson,

M.D.  (Dkt. No. 21-5 at 2; Dkt. No. 21-6 at 2-3.)  Dr. Johnson opined Pabon suffered "from

syncope of unknown etiology."  (Dkt. No. 21-5 at 2.)  Dr. Johnson accordingly imposed several

accommodations for Pabon, including "protective head gear, flat housing and block showers."

*Id.* at 2, 5.  Although Dr. Johnson indicated Pabon should "avoid stairs," Dr. Johnson opined "a

transfer was not necessary," because, in relevant part, Pabon could access the mess hall, the yard,

and the phone without using stairs.  *Id.*; *see also* Dkt. No. 21-6 at 3.  Pabon was subsequently

---

[4] Judge Hurd's administrative closure of the case due to an incomplete IFP Application does not change the date of filing for purposes of the mailbox rule and the statute of limitations.  *See Vangundy v. Haque*, No. 17-CV-0024(LJV), 2017 WL 1274318, at *2 n.5 (W.D.N.Y. Jan. 20, 2017) ("Administrative termination is not a dismissal for purposes of the statute of limitations.  Rather, if the case is re-opened pursuant to the terms of this order, it is not subject to the statute of limitations time bar as long as it originally was timely filed"); *Leitner v. I.R.S.*, No. 13-MC-6010CJS, 2013 WL 2385169, at *1 n.3 (W.D.N.Y. May 24, 2013) (same); *see, e.g.*, *Burroughs v. Petrone*, No. 9:15-CV-0818 (DNH) (ATB), 2016 WL 5376371, at *4 (N.D.N.Y. July 15, 2016), *report and recommendation adopted*, 2016 WL 5374126 (N.D.N.Y. Sept. 26, 2016); *see generally McDowell v. Delaware State Police*, 88 F.3d 188, 191 (3d Cir. 1996) ("Although a complaint is not formally filed until the filing fee is paid, we deem a complaint to be constructively filed as of the date that the clerk received the complaint—as long as the plaintiff ultimately pays the filing fee or the district court grants the plaintiff's request to proceed *in forma pauperis*.").

"advised to limit his use of the stairs due to the unpredictable nature of his syncopal episodes." (Dkt. No. 21-5 at 3.)

On the morning of December 1, 2017, Pabon left his cell for a scheduled visit at the law library. (Dkt. No. 21-10 at 63.) At that time, Pabon had no indication that he was going to have a syncopal episode—he was not feeling sick or dizzy, and he had no chest pains. *See id.* at 65, 68. On his way to the law library, Pabon told Nelson, who was working in the "Bubble," that he did not want to go to the law library. *Id.* at 66-67, 71-72; *see also* Dkt. No. 21-7 at 3. Pabon indicated he did not want to take the stairs to the law library because he was "feeling a little lightheaded." (Dkt. No. 21-10 at 67, 74; *see also* Dkt. No. 21-7 at 3.) Nelson explained to Pabon that if he wanted to be excused from his scheduled library visit, "he would have to speak directly with a representative from the law library." (Dkt. No. 21-7 at 3.) Nelson also explained that, pursuant to policy, a misbehavior report would be filed if Pabon was not excused from the scheduled library visit. (Dkt. No. 21-10 at 63, 66-67, 72; *see also* Dkt. No. 21-7 at 1-2.)

According to Pabon, he was not having a medical emergency in that moment— he was simply feeling "a little lightheaded." (Dkt. No. 21-10 at 67-68.) However, as he began descending the stairs with an unknown escort officer, Pabon suffered a syncopal episode, fainted, and tumbled down the stairs. *Id.* at 65-69; *see also* Dkt. No. 21-7 at 2-3. As a result of the fall, Pabon suffered pain and bruises to his back, groin, and knees. (Dkt. No. 21-10 at 84-85.) Pabon later testified the syncopal episode "came out of nowhere." *Id.* at 68.

Nelson was aware of Pabon's diagnosis, but on the morning of December 1, 2017, he was unaware Pabon "was suffering from a syncopal episode which would result in [his] fall down a flight of stairs." (Dkt. No. 21-7 at 3; *accord* Dkt. No. 21-10 at 68 ("it just came out of nowhere because I can't tell that it is coming").) At the time of Pabon's fall, Nelson was not escorting

him down the stairs—he was in the "Bubble." (Dkt. No. 21-10 at 71-72; Dkt. No. 21-7 at 2-4.)

According to Nelson, "[t]he officers located in the 'Bubble' are not responsible for escorting

individuals," rather, they monitor access to and from the housing dorm from a station (i.e., the

"Bubble") located in the center of multiple housing dorms. (Dkt. No. 21-7 at 3; *accord* Dkt. No.

21-10 at 71-72.) Nelson believed he did not have the authority to cancel Pabon's scheduled law

library visit, but "a representative from the law library" did. (Dkt. No. 21-7 at 3-4; *see also id.* at

6 (providing the Law Library Administrator "shall receive and respond to requests for special

access to the Law Library.").)

### 1.    *The Parties' Arguments*

Nelson argues he is entitled to judgment as a matter of law because Pabon failed to allege

he was personally involved in the incident on December 1, 2017. (Dkt. No. 21-1 at 12.) Nelson

further argues he is entitled to judgment as a matter of law because the evidence demonstrates he

"did not have any supervisory authority over the escort officers [who walked Pabon down the

stairs], nor did he have the authority to cancel Plaintiff's scheduled call-out to the law library."

*Id.* at 13. In the alternative, Nelson argues Pabon cannot satisfy the objective and subjective

elements of his Eighth Amendment unsafe prison conditions claim. *Id.* at 21-24.

In his opposition to Nelson's motion for summary judgment, Pabon offered no rejoinder

to the argument that Nelson was not personally involved in the incident on December 1, 2017.

(*See* Dkt. No. 33.) Rather, Pabon argues Nelson was deliberately indifferent to unsafe prison

conditions because he knew Pabon suffered from fainting spells, but forced him to take the stairs

by explaining to Pabon that failure to visit the law library at the scheduled time would result in a

misbehavior report. *Id.* at 3-5.

2.    *Legal Standards*

"Section 1983 authorizes a court to grant relief when a party's constitutional rights have been violated by a state or local official or other person acting under color of state law." *Washington*, 373 F.3d at 315; *see generally* 42 U.S.C. § 1983.  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove (1) that defendant deprived him of a federal right, and (2) that the defendant acted under color of state law.  *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005); *see also Washington*, 373 F.3d at 315; *Bridges v. Corr. Servs.*, No. 17-CV-2220 (NSR), 2022 WL 1500633, at *3 (S.D.N.Y. May 12, 2022).

Moreover, "to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Durr v. Slator*, 558 F. Supp. 3d 1, 25 (N.D.N.Y. 2021).  It follows that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see, e.g.*, *Veloz v. New York*, 339 F. Supp. 2d 505, 520 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).  Rather, to establish liability under 42 U.S.C. § 1983, a claimant "must directly plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Tangreti v. Bachmann*, 983 F.3d 609, 612 (2d Cir. 2020); *see also Keyes v. Venettozzi*, No. 9:18-CV-0372 (GTS) (DJS), 2022 WL 991402, at *7-8 (N.D.N.Y. Mar. 31, 2022).  Stated differently, a claimant must establish that the defendant violated his rights through the defendant's own conduct, not through the defendant's supervision of others who may have committed the violation.  *McCluskey v. Roberts*, No. 20-4018, 2022 WL 2046079, at *3 (2d Cir. June 7, 2022); *Tangreti*, 983 F.3d at 618.

To establish an Eighth Amendment claim against a prison official based on conditions of confinement, a plaintiff must prove: "(1) objectively, the deprivation [he] suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020). To meet the objective element, the claimant must show the conditions "objectively posed an unreasonable risk of serious damage to his health so as to deny him the minimal civilized measure of life's necessities." *Cintron v. Doldo*, 688 F. App'x 44, 45 (2d Cir. 2017); *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("Thus, prison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions."). "When considering these conditions, a court should assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Cintron*, 688 F. App'x at 45. "To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence." *Walker*, 717 F.3d at 125; *see generally Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (concluding plaintiff stated an Eighth Amendment claim where the alleged conduct "involve[d] more than ordinary lack of due care for the prisoner's interests or safety"). "To constitute deliberate indifference, the prison official must know of, and disregard, an excessive risk to inmate health or safety." *Walker*, 717 F.3d at 125; *see also Cintron*, 688 F. App'x at 45 ("The defendant must have known of the condition that posed an excessive risk to inmate health and chosen to disregard it.").

      3.    *Analysis*

For the following reasons, the undersigned concludes no reasonable juror could find that Nelson was personally involved in Pabon's fall down the stairs on December 1, 2017. *See Figueroa*, 825 F.3d at 98; *see also Tangreti*, 983 F.3d at 612. The undersigned further concludes Pabon's choice to walk down the stairs did not pose an unreasonable risk of serious damage to his health, and Nelson did not act with deliberate indifference to Pabon's health by telling him he could either walk down the stairs to the library, call the library to request an excused absence, or go back to his cell. *See McCray*, 963 F.3d at 117. The undersigned accordingly concludes Nelson is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

First, based on the evidence before the Court, no reasonable juror could find that Nelson was personally involved in the alleged Eighth Amendment violation on December 1, 2017. *See Figueroa*, 825 F.3d at 98; *see also Tangreti*, 983 F.3d at 612. On the day of the incident, Nelson was working in the "Bubble," he was not working as an escort. (Dkt. No. 21-7 at 2-3; Dkt. No. 21-10 at 66, 71-72.) Although Nelson was nearby when Pabon fell, he did not physically force Pabon to walk down the stairs, nor did he physically escort Pabon down the stairs. (Dkt. No. 21-7 at 2-3; Dkt. No. 21-10 at 66, 71-72.) Evidence that Nelson was nearby when Pabon fell, without more, does not give rise to a reasonable inference that Nelson is personally responsible for the fall. *See, e.g.*, *Oles v. Sauer*, No. 19-CV-8865 (NSR), 2022 WL 1204862, at *4-5 (S.D.N.Y. Apr. 22, 2022) ("Merely alleging that the Kitchen Defendants work in the kitchen and that he receives inadequate meals is insufficient for a constitutional claim."); *Williams v. Mangano*, No. 17-CV-2667 (RRM) (AKT), 2021 WL 84280, at *4 (E.D.N.Y. Jan. 11, 2021) (concluding "Mathewson is entitled to summary judgment," even though he was "present at the

scene" of the alleged constitutional violation, because "Williams has not alleged that Mathewson was personally involved").

Moreover, the evidence indicates Nelson did not compel Pabon to walk down the stairs. (*See* Dkt. No. 21-7 at 3-4.)  Under New York State Department of Corrections and Community Services Directive 4483, it is the Law Library Administrator—not the officer in the Bubble— who "shall receive and respond to requests for special access to the Law Library." *Id.* at 6; *see also id.* at 4 ("On December 1, 2017, I did not have the authority to cancel Plaintiff's scheduled call-out to the law library.").  When Pabon indicated he did not want to use the stairs to visit the law library, Nelson told him "he would have to speak directly with a representative from the law library to be excused from" the visit.  *Id.* at 3.  Nelson further explained that, pursuant to policy, a misbehavior report would be filed if Pabon was not excused from the scheduled library visit. (Dkt. No. 21-10 at 63, 66-67, 72; *see also* Dkt. No. 21-7 at 1-4.)  In response, Pabon chose to try his luck on the stairs rather than calling the law library or facing a misbehavior report.  Nelson did not compel Pabon to make this choice—he simply told Pabon that he did not have the authority to cancel the law library visit, he indicated who did have that authority, and he explained the consequences of failing to attend his scheduled visit.  (*See* Dkt. No. 21-7 at 1-4; Dkt. No. 21-10 at 63, 66-67, 72.)  This evidence demonstrates that Nelson did not, by his "own individual actions," cause Pabon's injuries.  *See Tangreti*, 983 F.3d at 612; *see, e.g.*, *Bryant v. Miller*, No. 9:18-CV-494 (GTS) (CFH), 2021 WL 5095284, at *20 (N.D.N.Y. July 22, 2021), *report and recommendation adopted*, 2021 WL 4272396 (N.D.N.Y. Sept. 21, 2021) (reviewing defendant's job responsibilities and concluding he played "no personal role" in the alleged violation); *accord Gutierrez-Pinto v. Annucci*, No. 20-CV-4490 (CS), 2022 WL 523628, at *4 (S.D.N.Y. Feb. 22, 2022) ("Plaintiff provides no facts plausibly showing that Annucci . . . was in

15

a position to prevent an accident like the one that occurred."); *Hall v. Dep't of Corr. Med. Dep't*, No. 18-CV-6892 (NSR), 2021 WL 2894646, at *8 (S.D.N.Y. July 8, 2021) ("At best, Plaintiff alleges that Defendants Ferdous and Ezekwe could have engaged in actions to expedite his surgery.  However, such allegations are insufficient to plausibly allege personal involvement.").  Furthermore, no reasonable juror could conclude that by explaining these policies to Pabon, Nelson was personally responsible for Pabon's decision to walk down the stairs.  *See Figueroa*, 825 F.3d at 98; *see also McCluskey*, 2022 WL 2046079, at *3.

Second, the condition of the stairs was not "sufficiently serious that [Pabon] was denied the minimal civilized measure of life's necessities." *McCray*, 963 F.3d at 117.  Pabon has failed to demonstrate that when he began descending the stairs on December 1, 2017, it was clear to Nelson that Pabon's use of the stairs "objectively posed an unreasonable risk of serious damage to his health so as to deny him the minimal civilized measure of life's necessities." *Cintron*, 688 F. App'x at 45.  According to Pabon, at the time he began descending the stairs, he was not having a medical emergency, he was not feeling sick or dizzy, he had no chest pains, and he had no indication that he was going to have a syncopal episode.  (Dkt. No. 21-10 at 65, 67-68.)  Indeed, Pabon explained the ensuing syncopal episode "came out of nowhere." *Id.* at 68.

On these facts, the stairs were simply stairs—they were not the dangerous gauntlet Pabon makes them out to be.  Even if a reasonable juror could conclude that Pabon's diagnosis rendered the stairs a slip-and-fall hazard, the existence of such a hazard, standing alone, cannot satisfy the objective prong of an Eighth Amendment conditions-of-confinement claim. *See Allen v. Stringer*, No. 20-3953, 2021 WL 4472667 (2d Cir. Sept. 30, 2021) (concluding the existence of "broken stairs alone cannot satisfy the objective prong of a conditions-of-confinement claim."); *Martinez v. Schriro*, No. 14-CIV-3965 (KMW) (RLE), 2017 WL 87049, at *5 (S.D.N.Y. Jan. 9,

2017) ("As courts in this circuit have regularly found, wet floor conditions that cause a prisoner to slip and fall do not constitute an Eighth Amendment violation.") (collecting cases); *accord Cintron*, 688 F. App'x at 45 (concluding "the placement of the chair on the baseball field did not constitute a deprivation sufficiently serious that Cintron was denied the minimal civilized measure of life's necessities").

Moreover, because neither Pabon nor Nelson knew a syncopal episode was imminent, (Dkt. No. 21-7 at 3; Dkt. No, 21-10 at 65, 67-68), Pabon's fall down the stairs is best described as an accident. "Courts in this Circuit routinely find that an accident, even if arising from a risky condition, does not rise to the level of a sufficiently serious deprivation." *Gutierrez-Pinto v. Annucci*, No. 20-CV-4490 (CS), 2022 WL 523628, at *5 (S.D.N.Y. Feb. 22, 2022) (collecting cases). Pabon has accordingly failed to satisfy the objective prong of his Eighth Amendment claim.

Finally, Nelson did not act with deliberate indifference to an objectively unsafe prison condition. *See McCray*, 963 F.3d at 117. When Pabon told Nelson he did not want to take the stairs, Nelson explained to Pabon that he could either go forward with the law library visit, skip the visit and receive a misbehavior report, or contact the law library and request to be excused. (Dkt. No. 21-7 at 1-4; Dkt. No. 21-10 at 66-67, 71-74.) Although Nelson was aware of Pabon's "sudden and unpredictable medical condition," he had no idea that in the ensuing moments, Pabon would "suffer[] from a syncopal episode which would result in [his] fall down a flight of stairs." (Dkt. No. 21-7 at 3; *accord* Dkt. No. 21-10 at 68 ("it just came out of nowhere because I can't tell that it is coming"); *see generally Patterson v. Colon*, No. 20-CV-9317 (CS), 2022 WL 563860, at *5 (S.D.N.Y. Feb. 24, 2022) (explaining "a correction officer ordering an inmate to complete a task that the inmate does not want to complete hardly shows that the officer was

17

aware that the order would present a substantial risk of serious harm.").)  At worst, Nelson may have been negligent for failing to foresee that Pabon would face *some risk* of fainting while descending the stairs.  *See, e.g.*, *Salahuddin*, 467 F.3d at 281-82 (concluding plaintiff failed to prove the subjective prong of his medical indifference claim where defendant's belief that he was in "no immediate danger" of serious harm "leads only to a finding of unactionable negligence"). However, to meet the subjective element of his Eighth Amendment claim, Pabon must show that Nelson "acted with more than mere negligence."  *Walker*, 717 F.3d at 125; *see, e.g.*, *Abernathy v. Comm'r of Correction*, No. 3:20-CV-628 (VAB), 2020 WL 5097566, at *6 (D. Conn. Aug. 28, 2020) (concluding allegations of negligence did not amount to deliberate indifference).  Rather, Pabon must demonstrate Nelson knew of, and disregarded "an excessive risk to [his] health or safety."  *Walker*, 717 F.3d at 125.  Pabon has failed to do so.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned concludes: (1) the Doe Defendants should be dismissed; (2) Pabon timely filed his Eighth Amendment Claim; (3) no reasonable juror could find that Nelson was personally involved in Pabon's injury on December 1, 2017; (4) Pabon failed to demonstrate the condition of the stairs was sufficiently serious to satisfy the first prong of his Eighth Amendment claim; and (5) Pabon failed to demonstrate Nelson acted with deliberate indifference.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that the Court *sua sponte* dismiss the Doe defendants pursuant to Federal Rule of Civil Procedure 4(m); and it is further

**RECOMMENDED** that Nelson's motion for summary judgment (Dkt. No. 21) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[5]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 21, 2022
          Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[5] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 20 of 261
Berman v. Durkin, Not Reported in Fed. Supp. (2017)
2017 WL 1215814

2017 WL 1215814
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,

v.

Charles DURKIN, et al., Defendants.

Civ. No. 9:13-CV-0136 (LEK/DJS)
|
Signed 03/10/2017

**Attorneys and Law Firms**

BARRY BERMAN, 20 Glenn Cove Rise, Rochester, New York 14617, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: JOSHUA E. McMAHON, ESQ., Assistant Attorney General, Attorney General of the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

## REPORT-RECOMMENDATION and ORDER

Daniel J. Stewart, U.S. Magistrate Judge

 **\*1** *Pro se* Plaintiff Barry Berman commenced this civil rights action on February 1, 2013. Dkt. No. 1, Compl. The following claims remain: (1) an Eighth Amendment excessive force claim against Defendants Correction Officer ("C.O.") Devereaux, Sergeant ("Sgt.") King, and John Does ## 1-3 and # 5 arising from an alleged assault on May 27, 2010; (2) an Eighth Amendment excessive force claim and a First Amendment retaliation claim against Defendants C.O. Mitchell and Sgt. Durkin arising from an alleged assault on June 13, 2010 that occurred in retaliation when Plaintiff reported the May 27, 2010 incident; and (3) Eighth Amendment deliberate medical indifference claims against Defendant Drs. Ramineni and Mannava. *See* Dkt. No. 127, Am. Compl.

Presently before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 190, Defs.' Mot. Summ. J. Defendants argue that: (1) Plaintiff's claims against the unidentified John Doe Defendants should be dismissed; (2) Plaintiff failed to exhaust his administrative remedies with respect to his claims arising from the incidents alleged to have occurred on May 27, 2010 and June 13, 2010; and (3)

Defendants are entitled to summary judgment on each of Plaintiff's claims. *Id.* Despite being granted two extensions of time to file a response, Plaintiff has not filed a response. Dkt. Nos. 194 & 198. For the reasons that follow, the Court recommends that Defendants' Motion be **granted in part and denied in part**.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist." *Colon v. Coughlin*, 58 F.3d at 872.

 **\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be

2017 WL 1215814

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)). "In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). However,

the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that the court may in its discretion opt to conduct a review of the entire record even where one of the parties has failed to file a 7.1 statement. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed. Exp.*, 766 F.3d at 194 (noting that "the court may rely on other evidence in the record even if uncited" in determining the undisputed material facts). Due to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. The Court will cite to the facts as set forth in Defendants' Rule 7.1 Statement of Facts only when properly supported by the record. Dkt. No. 190-16, Defs.' Rule 7.1. Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## II. MAY 27, 2010 AND JUNE 13, 2010 EXCESSIVE FORCE INCIDENTS

### A. Background

**\*3** The Court here summarizes Plaintiff's allegations and sets forth the undisputed material facts regarding the alleged assaults that occurred on May 27 and June 13, 2010, when he was incarcerated at Clinton Correctional Facility ("Clinton").

On May 27, 2010, Plaintiff was going to the yard when he was stopped by Defendant C.O. Devereaux for a pat frisk. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 15. Plaintiff stated that there was nothing in his pockets, but alleges that he forgot that he was carrying a pencil. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 16. As C.O. Devereaux searched Plaintiff, he reached into Plaintiff's right front pocket and pricked his finger on the pencil. Defs.' SMF at ¶ 38. Plaintiff alleges that he returned to his cell and that C.O. Devereaux later came and discussed the incident. Am. Compl. at ¶ 17. Plaintiff apologized and explained that he was taking medication and C.O. Devereaux stated that he would meet with his supervisor regarding whether to issue a misbehavior report. *Id.*

2017 WL 1215814

Approximately ten minutes after his conversation with C.O. Devereaux, Plaintiff claims that C.O. Devereaux, Defendant Sgt. King, and John Does ## 1-3 came and ordered him to exit his cell. *Id.* at ¶ 18. The Defendants ordered Plaintiff to face and grab the cell bars, which Plaintiff did. *Id.* at ¶ 19. Plaintiff was then punched repeatedly in his head, sides, and back. *Id.* Plaintiff collapsed, but was ordered to get up, and when he did, was again punched repeatedly in his head, sides, and back. *Id.* at ¶¶ 21-23. Plaintiff attempted to look at one of the John Doe Defendant's name tags, but was ordered to look away. *Id.* at ¶ 23. The Defendants warned Plaintiff that if he reported the assault, they would return and "it would be worse." *Id.* at ¶ 24. No Unusual Incident Report was filed regarding the alleged assault. Defs.' SMF at ¶ 45. Defendants C.O. Devereaux and Sgt. King deny that they assaulted Plaintiff on any occasion. *Id.* at ¶¶ 51-52. [1]

[1]     Defendants' Motion papers do not include affidavits of the correctional officer Defendants, but rather contain unsworn statements taken during investigation of Plaintiff's allegations. *See* Dkt. No. 190-5, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. D, at pp. DEF000473-486.

On May 28, 2010, the following day, Plaintiff went to sick call. Am. Compl. at ¶ 25. Plaintiff claims that he was accompanied by C.O. Bushey who threatened him not to report the assault. *Id.* Plaintiff complained of pain on his right side and stated that he had fallen down some stairs. Dkt. No. 190-1, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. A, [2] at p. 413. No bruising or marks were noted and Plaintiff was observed getting onto and off of the exam table without signs of pain or discomfort. *Id.*

[2]     Exhibit A to the McMahon Declaration is at Docket Number 190-2.

As a result of the pat frisk conducted by C.O. Devereaux, Plaintiff was issued a misbehavior report, which charged him with making false statements, refusing a direct order, and refusing a search or frisk. Defs.' SMF at ¶ 40. A Tier II Disciplinary Hearing was held on June 1, 2010. *Id.* at ¶ 41. Plaintiff testified at the hearing, but was found guilty of the charges and assessed with fifteen days loss of recreation, phone, packages, and commissary. *Id.* at ¶ 43. Plaintiff appealed the determination and it was affirmed. Dkt. No. 190-3, McMahon Decl., Ex. B, [3] at p. 23.

[3]     Exhibit B to the McMahon Declaration is at Docket Number 190-3.

**\*4**  On June 8, 2010, Plaintiff sent a complaint concerning the alleged assault to the New York Inspector General ("IG"). McMahon Decl., Ex. D, [4] at pp. DEF000511-000514. In his Amended Complaint, Plaintiff alleges that Defendant Sgt. Durkin acquired a copy of the letter to the IG and attempted to instigate other inmates to retaliate against Plaintiff for being a "snitch." Am. Compl. at ¶ 29. Plaintiff claims that on June 13, 2010, Defendants Sgt. Durkin and C.O. Mitchell came to his cell and escorted him to a room at the front of the block. *Id.* at ¶ 30. Sgt. Durkin then told Plaintiff that he was going to ask him questions about his letter to the IG and that whenever he gave a wrong answer, C.O. Mitchell would punch him in the face. *Id.* Sgt. Durkin proceeded to ask Plaintiff questions and C.O. Mitchell punched Plaintiff at least ten times in the face. *Id.*

[4]     Exhibit D to the McMahon Declaration is at Docket Numbers 190-5, 190-6, 190-7, and 190-8.

Defendants then escorted Plaintiff to Sgt. Durkin's office. *Id.* at ¶ 31. Prior to entering the office, Sgt. Durkin ordered Plaintiff to face and grab the bars in order to be searched. *Id.* While Plaintiff was holding the bars, C.O. Mitchell repeatedly punched Plaintiff in his head, back, and sides. *Id.* Plaintiff was then taken into the office and further questioned. *Id.* at ¶ 32. The Defendants accused Plaintiff of having contraband tattoo guns and threatened him not to report the incident. *Id.* at ¶¶ 33 & 35. Again, no Unusual Incident Report was filed regarding this alleged assault. Defs.' SMF at ¶ 45. Plaintiff was not taken to medical following the incident and next went to sick call on June 24, 2010, where he again did not report any assault by staff. *Id.* at ¶ 36. Plaintiff alleges that, on June 17, 2010, photographs were taken of the "visible injuries" to his face. [5] Am. Compl. at ¶ 38.

[5]     These photographs are not in the record.

Following the alleged incidents on May 27 and June 13, Plaintiff alleges that Sgt. Durkin continued to harass and threaten him. Plaintiff alleges that Sgt. Durkin moved Plaintiff's cell twice and confiscated some of his legal papers, envelopes, and toilet paper. *Id.* at ¶¶ 46, 48, & 52. Sgt. Durkin allegedly threatened Plaintiff to not talk about the incidents. *Id.* at ¶ 47. Plaintiff also claims that Sgt. Durkin stated that he planned to "set [P]laintiff up" by submitting a memo identifying Plaintiff as a drug dealer. *Id.* at ¶ 49. Plaintiff

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 23 of 261

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

alleges that he suffered lasting abdominal pain following the alleged assaults. *Id.* at ¶ 71.

## B. John Doe Defendants

Defendants first move to dismiss Plaintiff's claims against the unidentified John Doe Defendants, who allegedly participated in the May 27, 2010 assault. Dkt. No. 190-15, Defs.' Mem. of Law at pp. 2-3. In the District Court's initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), Plaintiff was advised that he must "take reasonable steps through discovery to ascertain the identity of any Doe Defendants and, if appropriate, file a motion to amend his Amended Complaint ... to add any such individual." Dkt. No. 17 at p. 11. Through discovery, Plaintiff was able to identify "John Doe # 4" as Sgt. King, but was unable to identify any of the other Doe Defendants. *See* Dkt. No. 112 at pp. 28-29. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York,* 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010). Dismissal of an unidentified Doe Defendant is appropriate pursuant to FED. R. CIV. P. 41(b), which permits a court to dismiss an action for failure to prosecute or to comply with a court order, and FED. R. CIV. P. 4(m), under which a court must dismiss, absent a showing of "good cause," claims against a defendant who is not served within ninety days of the filing of the complaint. *See Cusamano v. Sobek,* 604 F. Supp. 2d 416, 501-02 (N.D.N.Y. 2009). Therefore, because discovery is closed and Plaintiff has not identified Defendant John Does ## 1-3 and John Doe # 5, the Court recommends that Plaintiff's claims against those Defendants be **dismissed**.

## C. Exhaustion

**\*5** Defendants argue that Plaintiff's claims arising from the May 27, 2010 and June 13, 2010 incidents should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or

any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake,* 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord,* 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).[6]

> 6    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. *See* Dkt. Nos. 143 at ¶ 14 & 170 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett,* 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. at 524); *see also Neal v. Goord,* 267 F.3d

2017 WL 1215814

116, 121 (2d Cir. 2001), *overruled on other grounds by* Porter v. Nussle, 534 U.S. 516.

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

 **\*6** If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the IG's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also* Perez v. Blot, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See* Perez v. Blot, 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

*2. Plaintiff's Failure to Exhaust Administrative Remedies*

The record establishes that Plaintiff did not file grievances with the IGP at Clinton relative to his claims arising from the May 27, 2010 and June 13, 2010 incidents. In the records provided by Defendants, it appears that the Clinton IGP received seven grievances filed by Plaintiff, all of which concerned Plaintiff's medical problems. *See* McMahon Decl., Ex. B. These seven grievances do not complain of the alleged assaults or of injuries that Plaintiff incurred in such assaults. *See id.* Plaintiff only appealed five of these grievances to CORC. *See* Dkt. No. 190-19, Decl. of Jeffery Hale, dated Aug. 17, 2016, Ex. B.

Normally, the absence of records of an appeal to CORC would be sufficient to establish Plaintiff's failure to exhaust his administrative remedies. However, in addition to the seven grievances received by the Clinton IGP, the record contains numerous other letters sent by Plaintiff, which require further discussion. These letters include the following:

- Two letters addressed to legal aid attorneys, dated June 3, 2010 and June 6, 2010, in which Plaintiff complains of the May 27 assault and numerous other assaults allegedly occurring in Clinton. McMahon Decl., Ex. D, at pp. DEF000491-495 & DEF000497-499.

- Three letters addressed to Superintendent LaValley and Deputy Superintendent Racette, dated July 11, 2010, July 12, 2010, and July 13, 2010, requesting protective custody on account of fear of assaults by staff. *Id.* at pp. DEF000528-529 & DEF000538-539.

- A letter addressed to the IG's office, dated June 8, 2010, complaining of the May 27 assault. *Id.* at pp. DEF000511-514.

- Grievance letters addressed to the supervisor of the IGP, dated June 4, 2010 and June 30, 2010, complaining, respectively, of the May 27 and June 13 assaults. *Id.* at pp. DEF000533-536. These letters are notated as "received" in the upper right corners, but are not stamped as received by the IGP and do not have assigned grievance numbers. *Id.*

- A letter addressed to Superintendent LaValley, dated July 6, 2010, claiming that Plaintiff's grievances were not being processed. *Id.* at p. DEF000545.

 **\*7** The record also includes Grievance No. MS-20123-10, which was filed on July 28, 2010 at Mid-State. Hale Decl., Ex. C. In MS-20123-10, Plaintiff claims that he filed grievances following the May 27 and June 13 incidents that were

2017 WL 1215814

never processed. *Id.* at p. DEF000611. MS-20123-10 was denied because there were no grievances on record at Clinton alleging staff misconduct. Hale Decl., Ex. C at p. DEF000610. Additionally, in his Amended Complaint, Plaintiff alleges, in conclusory terms, that grievances filed against corrections officers at Clinton would not be processed; Plaintiff claims that he attempted to file several grievances that were either not processed or accepted. Am. Compl. at ¶¶ 58 & 61.

Many of the letters noted above—in particular, the letters addressed to the Superintendent requesting protective custody and raising other complaints and the letter requesting investigation by the IG's office—are insufficient to satisfy the exhaustion requirement. Generally, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro,* 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico,* 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk,* 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures."). Thus, Plaintiff's informal complaints outside of the grievance process, even if they might have had the effect of providing notice of his claims, are insufficient to exhaust his administrative remedies.

However, a different conclusion follows from the two grievances addressed to the IGP and MS-20123-10. Together, this record evidence indicates (1) that Plaintiff attempted to raise his assault complaints by filing grievances with the IGP, (2) that Clinton staff notated/stamped the grievances as "received," and (3) that his grievances were never processed or filed with the IGP. This record evidence creates an issue of fact as to whether administrative remedies were available to Plaintiff. Specifically, although both grievances are noted as "received," it is unclear how or if they were processed. Were these grievances simply not processed? Or were they treated as harassment grievances and investigated by the Superintendent's office (the June 4 grievance is stamped as received by the Superintendent's office)? Notably, Defendants do not provide an affidavit of either the inmate grievance supervisor at Clinton or any other individual with personal knowledge of how these grievances were processed. As the Court describes below, the failure to resolve such questions

creates an issue of fact as to whether administrative remedies were available to Plaintiff.

Defendants' argument as to the unfiled grievances is that even if the grievances were never processed, Plaintiff was nonetheless obligated under DOCCS regulations to appeal and complete the grievance process when he did not receive a response. *See* Defs.' Mem. of Law at p. 8 (citing *Goodson v. Silver,* 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012)). This, however, is no longer an accurate statement of the law after the Second Circuit's decision in *Williams v. Priatno,* 829 F.3d 118 (2d Cir. 2016).

*Williams* was issued following the Supreme Court's decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016), in which the Supreme Court clarified the circumstances in which a failure to exhaust may be excused. As the *Ross* Court stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." 136 S. Ct. at 1858. The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

 **\*8** In *Williams,* after the district court granted the defendants' motion to dismiss on non-exhaustion, the Second Circuit considered whether administrative remedies had actually been "available" to the plaintiff, applying the "unavailability" inquiry outlined in *Ross.* [7] *Williams v. Priatno,* 829 F.3d at 123. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and he alleged that it was never filed by the correction officer to whom he had given it. *Id.* It was undisputed that he never appealed the grievance. *Id.*

[7]    The Circuit recognized that *Ross* "supplant[ed]" the inquiry which had been set forth in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), excusing the failure to exhaust when: "(1) administrative

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 26 of 261

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d at 686).

The defendants argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (emphasis added); *see also Juarbe v. Carnegie*, 2016 U.S. Dist. LEXIS 140241, at *19 n.13 (N.D.N.Y. Oct. 7, 2016) (explaining that *Williams* appears to draw a distinction between an "unfiled and unanswered" grievance and a simply "unanswered" grievance, insofar as the regulations provide that an inmate may appeal an unanswered grievance), *report and recommendation adopted by*, 2016 U.S. Dist. LEXIS 162262, 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016).

Returning to the case at hand, the Court finds that the record, viewed in the light most favorable to Plaintiff, suggests that Plaintiff's grievances were unfiled and unanswered, creating an issue of fact as to the availability of administrative remedies under *Williams*. Defendants' failure to provide an affidavit explaining how Plaintiff's grievances were processed is insufficient to carry their burden of proving the affirmative defense on the present record. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's claims arising from the May 27 and June 13 incidents be **denied**. If this recommendation is accepted, the Court recommends that an exhaustion hearing be scheduled prior to any trial of this case.

### D. Whether Summary Judgment is Appropriate on Plaintiff's Excessive Force Claims

Under the Eighth Amendment's prohibition on "cruel and unusual punishment," "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In the context of an inmate's excessive force claim, the core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 302-21 (1986)). To assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) an objective component focusing "on the harm done in light of contemporary standards of decency," and (2) a subjective component showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. at 8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

**\*9** With respect to the objective component, the inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." *Hudson v. McMillian*, 503 U.S. at 9 (citation omitted). Nonetheless, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual punishment' necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to a conscience of mankind.' " *Id.* at 9-10 (quoting *Whitley v. Albers*, 475 U.S. at 327). In this regard, "[t]he extent of injury may ... provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "Injury and force, however, are only imperfectly correlated, and it is the latter

2017 WL 1215814

that ultimately counts." *Id.* at 38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian,* 503 U.S. 7.

To determine whether defendants acted maliciously or wantonly at the subjective prong, a court must consider:

> the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Romano v. Howarth,* 998 F.2d 101 at 105 (citing *Hudson v. McMillian,* 503 U.S. at 7). As stated by the Second Circuit, "*Hudson* simply makes clear that excessive force is defined as force not applied in a 'good faith effort to maintain or restore discipline.' " *Blyden v. Mancusi,* 186 F.3d at 263 (quoting *Hudson v. McMillian,* 503 U.S. at 7).

In this case, Plaintiff asserts excessive force claims arising out of the May 27, 2010 and June 13, 2010 incidents. On both occasions, Plaintiff alleges that he was "repeatedly" punched, without provocation, in his head, back, and sides. *See* Am. Compl. at ¶¶ 21 & 30. The basis of Defendants' Motion is that (1) under *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir. 2005), no reasonable jury could credit Plaintiff's version of events and (2) Plaintiff's medical records establish that he suffered only minor injuries and therefore, Defendants, at most, applied *de minimis* force. Defs.' Mem. of Law at pp. 10-13. For the reasons stated below, the Court recommends that Defendants' Motion be **denied**.

Defendants argue that Plaintiff's allegations are not credible because: (1) he did not seek medical attention immediately following the May 27 incident; (2) he did not mention an assault when he was seen at sick call on May 28, June 1, and June 7, but instead claimed that he had fallen down stairs; (3) he did not request medical attention immediately following the June 13 incident and was not seen in sick call until June 24, and he again did not report that he had been assaulted; (4) Plaintiff testified at the Tier II Disciplinary Hearing for the May 27 misbehavior report but did not mention the assault; and (5) the IG's investigation of Plaintiff's allegations found

that they could not be proven. *Id.* Defendants rely on *Jeffreys,* where the Second Circuit held that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' ... without making some assessment of the plaintiff's account." *Jeffreys v. City of New York,* 426 F.3d at 554 (citation omitted).

The Court does not agree that the "rare circumstance" described in *Jeffreys* applies here. Although it is correct that Plaintiff's claims are almost exclusively based on his own allegations in his verified Amended Complaint, in order for *Jeffreys* to apply, Plaintiff's accounts must be "contradictory and incomplete." *Id.* at 554. In *Jeffreys,* for example, the plaintiff claimed that several police officers had beaten him and thrown from a third story window. *Id.* at 551. However, before he filed his federal action, he had confessed on at least three occasions that he had jumped out of the window. *Id.* at 552. Furthermore, he was unable to identify or even describe any of the officers who allegedly participated in the attack. *Id.* Here, by contrast, Plaintiff's account of the events has been entirely consistent; there are no significant discrepancies between the allegations in the verified Amended Complaint and Plaintiff's claims in his grievances and other complaint letters. *Compare* Am. Compl. at ¶¶ 15-35 *with* McMahon Decl., Ex. D, at pp. DEF000492-493, DEF000498, DEF000511-512, & DEF000533-536. Defendants do not identify any contradictory account or explain how Plaintiff's account is incomplete.

**\*10** Instead of pointing to any inconsistencies in Plaintiff's account, Defendants focus on evidence in the record that undermines Plaintiff's account—namely, the minimal medical evidence. However, the "narrow exception" in *Jeffreys* applies where the plaintiff's account is "so lacking in credibility that no reasonable juror could find for the plaintiff." *Blake v. Race,* 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Although the minimal medical evidence may tend to undercut Plaintiff's credibility, it does not render it so thoroughly unbelievable that the Court should reject it as a matter of law. Defendants ignore certain allegations and record evidence that the Court must consider in viewing the evidence in the light most favorable to Plaintiff. First, Plaintiff claims that he was threatened not to report the assaults and was accompanied by a corrections officer to sick call. Am. Compl. at ¶¶ 24-26 & 35. He alleges that he reported that he injured himself falling down the stairs in order to

Case 9:20-cv-01503-DNH-TWD Document 34 Filed 06/21/22 Page 28 of 261

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

avoid retaliation. *Id.* at ¶ 26. Second, Plaintiff's medical records show that he reported pain in his ribs, consistent with his allegations of the assaults, for several weeks. *See* Hale Decl., Ex. C at pp. DEF000627-628 & DEF000633. Plaintiff also received x-rays of his ribs on May 28, 2010, *id.* at p. DEF000624, although he claims that the x-rays were of the wrong area, *id.* at p. DEF000611. Thus, the medical records provide some corroboration for Plaintiff's version of the events. Furthermore, even in the absence of medical evidence, "[c]ourts in this district have not required that injuries caused by the alleged use of excessive force be corroborated by medical records." *Ninortey v. Shova*, 2008 WL 4067107, at *12 (S.D.N.Y. Sept. 2, 2008).

Considering all of the evidence,[8] the Court finds that Plaintiff's account of the events is not so implausible that it may be rejected as a matter of law. The evidence pointed to by Defendants essentially goes to Plaintiff's credibility, and "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

[8]     The Court again notes that Defendants have not offered affidavits from any of the officers accused of using excessive force contradicting Plaintiff's version of events. The only evidence offered by Defendants are unsworn statements. McMahon Decl., Ex. D at pp. DEF000473-486. Under *Jeffreys*, the defendant "still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d at 554.

Defendants next argue that even if the Court accepts Plaintiff's allegations at true, his medical records establish that he suffered, at most, minor and temporary injuries and therefore any forced applied was necessarily *de minimis*. Defs.' Mem. of Law at pp. 13-14. Defendants' contention fails because while "[t]he extent of injury may ... provide some indication of the amount of force applied ... it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. at 37-38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Plaintiff's alleges more than a *de minimis* application of force: namely, that Defendants "repeatedly" punched him in his head, ribs, and back in order to cause him harm on two occasions. Am. Compl. at ¶¶ 22 & 30-31. Plaintiff's

medical records document that he complained of pain in his ribs consistent with his excessive force allegations for several weeks following the assaults. The medical records do not disclose injuries that are so minor that the Court can conclude that Defendants applied *de minimis* force.

Accordingly, for the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's excessive force claims be **denied**.

### E. Whether Summary Judgment is Appropriate on Plaintiff's Retaliation Claim

Defendants also move for summary judgment on Plaintiff's retaliation claim against Defendants Sgt. Durkin and C.O. Mitchell. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). Briefly stated, Plaintiff's retaliation claim is that (1) he engaged in a protected conduct by sending a complaint letter to the IG's office and (2) after Sgt. Durkin obtained a copy of the letter, he and C.O. Mitchell assaulted Plaintiff. *See* Am. Compl. at ¶¶ 29-35. Defendants argue that summary judgment is appropriate on Plaintiff's retaliation claim on the same ground that they argued for summary judgment on his excessive force claim: that is, "no reasonable jury could conclude that Plaintiff was subjected to the adverse action." Defs.' Mem. of Law at p. 15. Since the Court has found a disputed issue of fact on whether Plaintiff was subjected to excessive force, the Court therefore recommends that Defendants' Motion also be **denied** as to Plaintiff's retaliation claim.

### III. PLAINTIFF'S MEDICAL INDIFFERENCE CLAIMS

#### A. Legal Standard

2017 WL 1215814

**\*11** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### B. Analysis

**\*12** The basis of Plaintiff's Eighth Amendment claims against Defendants Dr. Ramineni and Dr. Mannava is that he was denied adequate medical treatment for his complaints of headaches, fungus on his hands and feet, sinus problems, abdominal pain, back pain, left shoulder pain, right elbow pain, high cholesterol, and a wart on his right finger. Am. Compl. at ¶¶ 96 & 111-17. The record, however, documents that Plaintiff received extensive treatment for his medical conditions. Between July 16, 2010 and June 14, 2013, Plaintiff was seen by medical personnel at Mid-State approximately 250 times. Defs.' SMF at ¶ 55. Based on the voluminous medical records provided by Defendants, and for the reasons set forth below, the Court recommends that summary judgment be **granted** on Plaintiff's deliberate medical indifference claims.

#### 1. Shoulder Pain

Plaintiff repeatedly complained of left shoulder pain, which was incident to acromioplasty surgery that he had five years earlier. *See* Ramineni Decl. at ¶ 22 (citing dates on which Plaintiff complained of shoulder pain at pp. DEF000362, DEF000365, DEF000366, DEF000390,

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 30 of 261

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

DEF000391, DEF000392, DEF000393, DEF000394, DEF000396, DEF000397, DEF000434, DEF000436, and DEF000438). "[C]hronic pain can be a serious medical condition." *Price v. Reilly*, 697 F. Supp. 2d 344, 363 (E.D.N.Y. 2010) (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)). Furthermore, courts have found allegations of "severe pain" and "reduced mobility" in the shoulder sufficient to raise issues of fact as to whether a "shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard." *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006). However, based on its review of the record, the Court finds that there is nothing that suggests that Plaintiff's shoulder injury was a sufficiently serious condition to satisfy the objective prong of the Eighth Amendment analysis. Even if Plaintiff was able to show that his shoulder injury was sufficiently serious, he is also unable to show that Defendants deprived him of adequate care in response to his complaints of shoulder pain.

Despite Plaintiff's complaints of pain, on examination Plaintiff did not have an "obvious deformity" or "muscle wasting", *id.* at p. DEF000394 and was noted to have a good range of motion in his shoulder, *id.* at p. DEF000378. For treatment, Dr. Ramineni prescribed Motrin 600mg three times daily and referred Plaintiff to physical therapy. Pl.'s AHR at p. DEF000397. In his evaluation for physical therapy, Plaintiff's physical therapist assessed him with "residual [rotator cuff] weakness from old injury" and "possible AC [joint] separation." Pl.'s AHR at p. DEF000438. The physical therapist opined that Plaintiff did not have "much potential for significant improvement" due to "heavy muscle build and workout lifestyle." *Id.* at p. DEF000438. Plaintiff attended two sessions of physical therapy, but did not tolerate the exercises and reported increasing pain. *Id.* at pp. DEF000433-434. Although he did not the tolerate physical therapy, *id.* at p. DEF000433, Plaintiff continued to lift weights throughout the relevant time period on a daily basis, *see id.* at pp. DEF000378, DEF000392, & DEF000438. Dr. Ramineni determined that there was no indication to refer Plaintiff to an orthopedic specialist. *See id.* at pp. DEF000390 & DEF000394. Throughout Plaintiff's complaints, Dr. Ramineni "found nothing other than discomfort arising from earlier surgery or resulting from his continued weight lifting." Ramineni Decl. at ¶ 31. Dr. Ramineni attests that shoulder pain is common following acromioplasty surgery. *Id.* at ¶ 23.

Here, even viewed in the light most favorable to Plaintiff, the record does not suggest that Plaintiff's shoulder injury was "a condition of urgency that [could] result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. The record documents that Plaintiff retained a normal range of motion in his shoulder and was able to lift weights on a daily basis. There is no evidence that Plaintiff suffered "severe pain." Dr. Ramineni determined that Plaintiff was experiencing normal discomfort incident to acromioplasty surgery. Under the objective prong, "an assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need." *Evan v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (citation omitted). Furthermore, even if Plaintiff's shoulder pain was a serious medical need, the record establishes that the treatment Defendants provided him—over-the-counter pain medication and a referral to physical therapy—was adequate. Plaintiff's claim that he should have been referred to an orthopedic specialist, *see* Am. Compl. at ¶ 112, is insufficient to establish that Defendants acted with deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *See Chance v. Armstrong*, 143 F.3d at 703; *see also Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

**\*13** The record also contains complaints of an injury Plaintiff sustained to his right shoulder lifting weights. Pl.'s AHR at p. DEF000366. Dr. Ramineni determined that it was a muscle strain and x-rays were taken that showed minor degenerative changes in Plaintiff's acromioclavicular joint. *Id.* at pp. DEF000317 & DEF000365. A month after the injury, Plaintiff was noted to be in no significant discomfort. *Id.* at p. DEF000362. Based on this record, there is nothing that suggests that Plaintiff's injury to his right shoulder was a sufficiently serious injury.

*2. Sinusitis*

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 31 of 261
Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Plaintiff repeatedly complained of nasal and sinus congestion, which caused difficulty breathing, pain, and bleeding. *See* Ramineni Decl. at ¶ 45 (citing dates on which Plaintiff complained of sinus problems at Pl.'s AHR at pp. DEF000370, DEF000371, DEF000380, DEF000385, & DEF000394); Mannava Decl. at ¶¶ 16, 22, & 28. Plaintiff had sinus surgery in the past and Dr. Ramineni observed that Plaintiff had thickening of the sinus lining on a past x-ray. Pl.'s AHR at p. DEF000394.

Plaintiff's medical records establish that he cannot show that his sinus problems were a serious medical need or that he was deprived of adequate care. Throughout his incarceration at Mid-State, Plaintiff was provided with over-the-counter NACL nasal spray and prescriptions for Nasacort AQ and Claritin for sinus irritation and allergies. Ramineni Decl. at ¶¶ 13 & 43; Mannava Decl. at ¶ 16. On occasions when he complained of sinus infections, Plaintiff was prescribed Augmentin 875mg twice daily. Pl.'s AHR at pp. DEF000292 and DEF000394. Plaintiff was examined for complaints of difficulty breathing, but his nasal passages were found to be normal and without inflammation. *Id.* at pp. DEF000380 & DEF000385. Plaintiff also once claimed that he was bleeding from his nose, but Dr. Ramineni did not observe any blood or yellow discharge. *Id.* at p. DEF000380. On August 9, 2011, x-rays were taken that showed no evidence of sinusitis; Plaintiff had some post-surgical changes in the mandible, some soft tissue swelling over the nasal region, but no convincing air fluid level indicative of sinusitis. *Id.* at p. DEF000319.

Even viewed in the light most favorable to Plaintiff, Plaintiff's nasal congestion does not amount to a condition that could "result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Furthermore, the record demonstrates that Defendants appropriately responded to Plaintiff's complaints of sinus problems, providing over-the-counter nasal sprays, prescription allergy medication, antibiotics for sinus infections, and referring him for x-rays. Plaintiff's claim that Defendants should have referred him to an Ear, Nose, and Throat specialist, *see* Am. Compl. at ¶ 113, amounts to a mere dispute over the proper course of treatment and is insufficient to establish that Defendants acted with deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703.

*3. Headaches*

In late 2012, Plaintiff began complaining of headaches and other symptoms that he believed were indicative of a stroke, including numbness, the feeling of "pins and needles" in his left arm, pain in his left biceps extending to his armpit and chest, and slowness of gait and confusion. *See* Pl.'s AHR at p. DEF000282. In his Amended Complaint, Plaintiff alleges that his headaches were "severe," occurred "almost daily," and interfered with his daily activities. Am. Compl. at ¶¶ 77, 90, & 100.

Contrary to Plaintiff's claims that Defendants ignored a possible stroke, the record shows that Defendants evaluated Plaintiff's symptoms and found no symptoms indicative of a stroke. Plaintiff first expressed that he thought he suffered a stroke on September 12, 2012. Pl.'s AHR at p. DEF000285. He stated that he had a headache for four days and his arm felt "weird and trembly" *Id.* The nurse noted that Plaintiff did not appear to be in acute distress, had a normal gait, spoke clearly, and had actively been going to the law library and gym. *Id.* Plaintiff saw Dr. Ramineni two days later, who noted that Plaintiff had a normal gait and was fully oriented. *Id.* Dr. Ramineni found no evidence that Plaintiff had suffered a stroke or that he was at an elevated risk of suffering one. Ramineni Decl. at ¶ 73. Plaintiff raised similar complaints to Dr. Mannava three months later, who similarly found no symptoms indicative of a stroke. Mannava Decl. at ¶¶ 21 & 24. Specifically, Plaintiff denied nausea, vomiting, burning, tingling, and weakness in his extremities; was alert and fully oriented; had no tenderness or masses on his head; his pupils equally reacted to light; he could move his extremities well with good strength; and had no sensory or motor deficits. *Id.* at ¶ 21. Dr. Mannava ordered blood tests, which came back normal. *Id.* at ¶¶ 21-22. With respect to his numbness in his left arm, an electromyogram was completed on November 28, 2012, which showed mild C7 radiculopathy, chronic C5 radiculopathy, and early, mild neuropathy of the median nerve. *Id.* at ¶ 20. Thus, Plaintiff's concern that he had suffered a stroke was unfounded and provides no basis for an Eighth Amendment claim.

*14 As to Plaintiff's headaches, the record contains numerous complaints of chronic and severe headaches beginning in September 2012. *See generally* Pl.'s AHR at pp. DEF000252-285. Painful and debilitating headaches may constitute an objectively serious medical need. *See Peterson v. Miller*, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007). However, even assuming for the purposes of this Motion that Plaintiff's headaches were a sufficiently serious condition, Plaintiff is unable to show that Defendants

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

denied him adequate treatment. Based on his assessment that Plaintiff's headaches were either tension headaches or psychogenic, Dr. Mannava directed Plaintiff to take ibuprofen for his headaches. Mannava Decl. at ¶¶ 14, 21-22, 25, & 29. Dr. Mannava also referred Plaintiff for an eye exam as a result of which new glasses were ordered. Pl.'s AHR at pp. DEF000257 & DEF000265. The record therefore demonstrates that Defendants reasonably responded to Plaintiff's complaints of headaches. See Peterson v. Miller, 2007 WL 2071743, at *10 (finding that migraine headaches were appropriately treated with pain relief medication). To the extent that Plaintiff claims that Defendants should have prescribed a stronger pain medication or ordered a CT scan, "disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment." Wright v. Genovese, 694 F. Supp. 2d 137, 155 (N.D.N.Y. Mar. 9, 2010).

### 4. Fungus

Plaintiff complains of a fungal infection that spread along his right hand and on his toe nails. Am. Compl. at ¶¶ 94 & 106. Plaintiff claims that the infection "consumed" a fingernail and caused his fingers to bleed. Id. Plaintiff claims the fungus caused him severe pain and exposed him to the risk of other infections. Id. at ¶ 111. The medical records contradict Plaintiff's claims that his fungal infection was a serious medical condition, and further demonstrate that Defendants provided adequate treatment and were not deliberately indifferent towards the condition.

Plaintiff complained twice to Dr. Ramineni of a fungal infection on his toenail, but on examination, Dr. Ramineni determined that it was a dystrophic nail, and no intervention was necessary. Pl.'s AHR at pp. DEF000306 & DEF000400. Plaintiff also complained of fungus on his fingernails and was given an over-the-counter fungal cream. Id. at p. DEF000305. Plaintiff complained to Dr. Mannava of "scaling and pimply" skin on his feet and right hand and deformed toenails and a right finger nail. Id. at p. DEF000279. Dr. Mannava assessed Plaintiff with onychomycosis and athlete's foot, but referred him for a dermatology consult before determining a treatment plan. Id. The dermatology consult confirmed the diagnoses of dystrophic finger and toenails and onychomycosis. Id. at p. DEF000271. Dr. Mannava put in a request for a prescription for Lamisil 250mg daily, but the request was denied because the treatment was considered "cosmetic."

Id. at pp. DEF000268 & DEF000271. Plaintiff continued to complain that the fungus on his hands was spreading, but no changes were observed. Id. at pp. DEF000254 & DEF000264. A nurse noted that Plaintiff was complaining about the "same small areas" that he had previously complained of, and that the condition was neither "acute" or "consuming." Id. at p. DEF000264. Later, a nurse noted peeling skin on Plaintiff's palm, but no fungus. Id. at p. DEF000254.

Based on these records, there is nothing that suggests that Plaintiff's fungal infections were an objectively serious medical need. See Thompson v. Carlsen, 2010 WL 3584409, at *6 (N.D.N.Y. Aug. 16, 2010) (finding that "dry, cracked, and itchy skin" did not amount to an objectively serious medical condition); Scott v. Laux, 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008) ("Fungal infections of the feet have not been found to constitute serious medical needs in federal court."). Furthermore, the records evidence that Defendants provided appropriate treatment and were not deliberately indifferent towards Plaintiff's fungal infections.

### 5. Abdominal Pain

Plaintiff made repeated complaints of right abdominal pain. Pl.'s AHR at pp. DEF000380, DEF000389, DEF000390, DEF000395, DEF000400, & DEF000402. On different occasions, Plaintiff expressed concern that the pain indicated problems with his liver, pancreas, and gall bladder. Id.

**\*15** However, the record shows that Plaintiff's concern about his abdominal pain was unfounded. On repeated examinations, Plaintiff's abdomen was soft, non-tender, and without any masses. Id. at pp. DEF000380, DEF000390, DEF000400, & DEF000402. Plaintiff had multiple negative liver function tests and a negative Hepatitis C test. Id. at pp. DEF000390 & DEF000389. Thus, there was no objective evidence to support Plaintiff's complaints of abdominal pain. See Ramineni Decl. at ¶ 42. In January 2011, after Plaintiff made undocumented complaints of vomiting and doubling over in pain, Pl.'s AHR at p. DEF000389, he was admitted to the infirmary for observation for one week, during which time he was not observed to have any episodes of abdominal pain, vomiting, or nausea. Id. at p. DEF000346. On this record, there is nothing indicating that Plaintiff's abdominal pain was an objectively serious medical condition. See Thomas v. Nassau Cty. Correctional Ctr., 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003) ("[S]ubjective complaints of pain are not sufficient to satisfy [the objective prong].").

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 33 of 261

Berman v. Durkin, Not Reported in Fed. Supp. (2017)

2017 WL 1215814

Furthermore, Plaintiff cannot show that Defendants failed to adequately respond to his complaints, as they conducted physical examinations and ordered Hepatitis C and liver function tests.

### 6. Right Elbow Pain

Throughout the Summer of 2012, Plaintiff complained of pain in his right elbow, which he believed to be bursitis. Pl.'s AHR at pp. DEF000288, DEF000290, DEF000293, DEF000297, DEF000298, & DEF000299. Plaintiff repeatedly requested that his elbow be drained or that he receive a cortisone shot, and, on August 17, 2012, requested surgery. *Id.* at pp. DEF000288 & DEF00297.

The record again does not evidence that Plaintiff's elbow pain was an objectively serious medical condition, or that Defendants failed to adequately respond to his complaints. During his examinations, Dr. Ramineni observed that Plaintiff's elbow moved normally and without discomfort and that there was no bursal swelling. Ramineni Decl. at ¶ 56. His assessment was that Plaintiff had mild musculoskeletal pain. Pl.'s AHR at p. DEF000298. He found no indication for intervention since there was no evidence of bursitis. *Id.* at p. DEF000297. He did, however, note a small bony projection on Plaintiff's elbow and ordered x-rays. *Id.* at pp. DEF000290 & DEF000297. The x-rays showed a small spur on the olecranon that Dr. Ramineni determined was clinically insignificant. *Id.* at p. DEF000298. Dr. Ramineni recommended that Plaintiff use an elbow brace if he continued to experience pain. *Id.* Thus, there is nothing in the record that demonstrates that Plaintiff's elbow pain was a condition that could result in "degeneration or extreme pain." Nor does the record suggest that Defendants failed to appropriately respond to Plaintiff's complaints.

### 7. Plaintiff's Remaining Medical Conditions

In his Amended Complaint, Plaintiff also complains of back pain, a wart on his finger, and high cholesterol. However, a review of the record shows that none of these conditions amounted to an objectively serious medical condition.

Plaintiff complained to Dr. Ramineni of his back pain on a single occasion; Dr. Ramineni noted that x-rays of Plaintiff's spine showed minimal changes, that Plaintiff's gait was normal, and that there was no tingling in Plaintiff's legs.

Pl.'s AHR at p. DEF000402. Dr. Ramineni recommended that Plaintiff take NSAIDs as needed and complete back exercises to strengthen the area. *Id.* While severe back pain can amount to a serious medical need, nothing in the record suggests that Plaintiff's back caused him extreme pain. *See Nelson v. Rodas,* 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002).

Plaintiff's complaints of a wart on his finger are similarly insufficient. Plaintiff complained of a wart on his right index finger on several occasions. Pl.'s AHR at pp. DEF000293, DEF000300, DEF000301, DEF000310, DEF000357, & DEF000359. Dr. Ramineni observed a pinhead sized wart, which did not have the characteristics of a true wart. *Id.* at pp. DEF000357 & DEF000359. He prescribed Plaintiff Condylox gel for treatment. *Id.* at pp. DEF000301 & DEF000357. The record does not suggest that Plaintiff's wart was a serious medical condition. *See Whitfeld v. O'Connell,* 2010 WL 1010060, at *8 (S.D.N.Y. Mar. 18, 2010) ("Warts do not constitute a serious medical need under the Eighth Amendment.").

**\*16** Finally, as to Plaintiff's high cholesterol, it is undisputed that Plaintiff's prescriptions for Lipitor 60mg and Lopid 600mg twice daily were continued when he arrived at Mid-State. Ramineni Decl. at ¶ 13. Lab work was ordered on July 28, 2010, in order that Plaintiff's medications could be adjusted if he was not within the target cholesterol range. Pl.'s AHR at p. DEF000403. On July 14, 2011, Dr. Ramineni noted that results of Plaintiff's cholesterol lab work and ordered that Plaintiff's Lipitor be increased and that Plaintiff be placed on a low cholesterol diet. *See id.* at pp. DEF000365, DEF000370, & DEF000374. Thus, Plaintiff's high cholesterol is insufficient to give rise to an Eighth Amendment claim.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) be **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Dr. Ramineni and Dr. Mannava who should be dismissed as Defendants to this action; and **GRANTED** as to the Doe Defendants who should also be dismissed as Defendants to this action; and **DENIED** in all other respects; and it is further

**RECOMMENDED**, that if the Court's recommendations are accepted, that this matter be deemed trial ready and an exhaustion hearing should be scheduled prior to such trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**</u> *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1215814

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 35 of 261
Berman v. Durkin, Not Reported in Fed. Supp. (2017)
2017 WL 1207834

2017 WL 1207834
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Barry BERMAN, Plaintiff,
v.
Charles DURKIN, et al., Defendants.

9:13-CV-0136 (LEK/DJS)
|
Signed 03/31/2017

**Attorneys and Law Firms**

Barry Berman, Rochester, NY, pro se.

Joshua E. McMahon, Maria E. Lisi-Murray, New York State Attorney General, Albany, NY, for Defendants.

## ORDER

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on March 10, 2017, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 200 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug.

25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. Docket. Thus, the Court has reviewed the Report-Recommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 200) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against defendants Dr. Ramineni and Dr. Mannava and as to the claims against the Doe Defendants, and **DENIED** in all other respects; and it is further

**ORDERED**, that the Clerk of the Court terminate Dr. Ramineni, Dr. Mannava, and the Doe Defendants from this action; and it is further

**ORDERED**, that this matter is trial ready and an exhaustion hearing conducted by the magistrate judge shall be held before trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1207834

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

850 Fed.Appx. 17
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Travis Jarrett FRANTTI, Plaintiff-Appellant,
v.
State of NEW YORK, Susan Knapp, Mary Beth
Labate, Karen Davis, Karen Orcutt, Christopher
Amado, Robert Mujica, Defendants-Appellees.

19-3999-cv
|
March 9, 2021

**Synopsis**
**Background:** Former state employee, who had severe
gastrointestinal illness, brought action against employer
alleging discrimination and retaliation under Americans
with Disabilities Act (ADA) and discrimination under
Rehabilitation Act. The United States District Court for
the Northern District of New York, David N. Hurd, J.,
414 F.Supp.3d 257, granted summary judgment in favor of
employer. Former employee appealed.

**Holdings:** The Court of Appeals held that:

[1] District Court did not abuse its discretion when it adopted
employer's statement of undisputed material facts pursuant to
local court rule;

[2] employee failed to make prima facie case of disability
discrimination based on failure to accommodate;

[3] employee abandoned retaliation claim;

[4] email that employee sent requesting reassignment to
different division did not constitute protected activity for
purposes of his retaliation claim; and

[5] disability discrimination complaints filed by employee
were not causally connected to adverse employment actions.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (5)

[1]    **Federal Civil Procedure**  ⚷ Employees and
       Employment Discrimination, Actions Involving

       District Court did not abuse its discretion when
       it adopted employer's statement of undisputed
       material facts pursuant to local court rule, on
       motion for summary judgment on claims by
       former state employee alleging discrimination
       and retaliation under ADA and discrimination
       under Rehabilitation Act; former employee
       failed to properly oppose employer's statement,
       and District Court reviewed summary judgment
       record and found statement to be properly
       supported. Rehabilitation Act of 1973 § 504,
       29 U.S.C.A. § 794; Americans with Disabilities
       Act of 1990 § 2, 42 U.S.C.A. § 12101 et seq.;
       U.S.Dist.Ct.Rules N.D.N.Y., Rule 7.1(a)(3).

[2]    **Civil Rights**  ⚷ Particular cases

       Former state employee failed to make prima
       facie case of disability discrimination under
       ADA and Rehabilitation Act based on failure to
       accommodate, since suggested accommodation
       in form of being allowed to work remotely
       from home or alternative work schedule was
       not reasonable, given that employee's job
       required him to perform involved analysis on
       complex, collaborative projects that unfolded
       over long periods of time that involved
       communicating with co-workers and other
       parties, and employee's gastrointestinal illness

was so severe that he could not work with regularity, even with suggested accommodation. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(b)(5)(A).

3 Cases that cite this headnote

**[3]    Federal Civil Procedure** 🔑 Matters considered

Former state employee abandoned retaliation claim against employer under ADA, where he did not brief retaliation claim in opposition to employer's motion for summary judgment. Americans with Disabilities Act of 1990 § 2, 42 U.S.C.A. § 12101 et seq.

2 Cases that cite this headnote

**[4]    Civil Rights** 🔑 Activities protected

**Public Employment** 🔑 Protected activities

**States** 🔑 Appointment or employment and tenure of agents and employees in general

Email that state employee, who had severe gastrointestinal illness, sent requesting reassignment to different division did not constitute protected activity for purposes of his retaliation claim against employer under ADA; email did not contain any complaints of disability discrimination or requests for accommodations. Americans with Disabilities Act of 1990 § 2, 42 U.S.C.A. § 12101 et seq.

3 Cases that cite this headnote

**[5]    Civil Rights** 🔑 Causal connection; temporal proximity

**Public Employment** 🔑 Causal connection; temporal proximity

**States** 🔑 Appointment or employment and tenure of agents and employees in general

Disability discrimination complaints filed by state employee, who had severe gastrointestinal illness, were not causally connected to denial of salary increase, below-expectations performance evaluation, and docking of pay following undocumented work absences, precluding his

retaliation claim against employer under ADA; employer applied same absence and tardiness policies to employee before and after his complaints. Americans with Disabilities Act of 1990 § 2, 42 U.S.C.A. § 12101 et seq.

1 Cases that cite this headnote

**\*18**  Appeal from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court entered on October 30, 2019 is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Allen A. Shoikhetbrod, Tully Rinckey, PLLC, Albany, NY.

FOR DEFENDANTS-APPELLEES: Joseph M. Spadola, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Andrea Oser, Deputy Solicitor General; on the brief), for Letitia James, Attorney General for the State of New York, Albany, NY.

PRESENT: José A. Cabranes, Reena Raggi, Circuit Judges, Lewis A. Kaplan, District Judge. *

*          Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

**SUMMARY ORDER**

Travis Frantti ("Frantti") sued his former employer, the State of New York, and various employees and officials at the State Division of Budget and the Division of Criminal Justice Services (jointly, "New York"), alleging discrimination and retaliation under Titles I and V of the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12101 *et seq.*, and discrimination under Section 504 of the Rehabilitation Act, *see* 29 U.S.C. § 794. The District Court granted summary judgment to New York because, (1) as to Frantti's discrimination claim, no reasonable accommodation would

have enabled him to perform the essential functions of his job; and, (2) as to Frantti's retaliation claim, he failed to oppose **\*19** New York's motion for summary judgment, and, in any event, there was no record evidence that New York had taken an "adverse action" against him. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review a grant of summary judgment de novo. *See Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir. 2000). In doing so, we "view the record in the light most favorable [to the non-moving party]." *Jackson v. Fed. Express*, 766 F.3d 189, 192 (2d Cir. 2014). "Summary judgment may be granted only if there is no genuine issue of material fact to be tried and the moving party is therefore entitled to judgment as a matter of law." *Winter v. United States*, 196 F.3d 339, 346 (2d Cir. 1999) (citing Fed. R. Civ. P. 56(a)).

### A. Local Rule 7.1(a)(3)

 **[1]**  On appeal, Frantti argues that the District Court abused its discretion when it adopted New York's statement of undisputed material facts as true when Frantti, represented by counsel, "failed to properly oppose the statement ... in accordance with Local Rule 7.1(a)(3)." SPA 43. That rule states, in relevant part, "The opposing party shall file a response to the [movant's] Statement of Material Facts." N.D.N.Y. R. 7.1(a)(3) (2019). The rule also warns that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.* (emphasis in original). But we have held that district courts have "considerable latitude [to] fashion[ ] rules that will assist them in determining whether summary judgment is appropriate." *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 471 (2d Cir. 2002). Such rules serve the interests of judicial economy, "streamlin[ing] the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001). While "[r]eliance on a party's statement of undisputed facts may not be warranted where those facts are unsupported by the record," *N.Y. State Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005), the District Court here undertook its own thorough review of the summary judgment record and found the defendants' summary judgment filing to be "properly supported," SPA 45. Accordingly, we cannot find that the

District Court abused its discretion when it adopted New York's statement of undisputed material facts.

### B. Disability Discrimination Claim

In employment discrimination cases, "the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). ADA and Rehabilitation Act claims are governed under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Both the ADA and the Rehabilitation Act require employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a prima facie case for failure to accommodate, a plaintiff must show (1) he is a "person with a disability;" (2) "an employer covered by the statute had notice of his disability;" (3) "with reasonable accommodation, [he] could perform the essential functions of the job;" and (4) "the employer ... refused to make such accommodations." *Id.* at 97.

 **\*20**  Not all accommodations are reasonable, however. As the quoted language indicates, an accommodation "is not reasonable if it, in essence, requires an employer to eliminate an essential function of a job." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 120 (2d Cir. 2004). "Although the term 'essential functions' is not defined by the ADA, regulations promulgated by the Equal Employment Opportunity Commission ... indicate that it encompasses 'the fundamental job duties of the employment position.' " *McBride*, 583 F.3d at 98 (quoting 29 C.F.R. § 1630(2) (n)(1)). "In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (internal quotation marks and alterations omitted). It may also consider as evidence "written job descriptions, the amount of time spent on the job performing the function, and the consequences of not requiring the plaintiff to perform the function." *Rodal*, 369 F.3d at 120–21.

 **[2]**  Assuming that Frantti has established that (1) he has a disability and (2) New York had notice of his disability,

our review of the record reveals that Frantti has not raised a genuine issue of material fact with respect to his ability to perform the essential functions of his job even with reasonable accommodations. In his brief, Frantti identifies as reasonable accommodations being allowed to work remotely from home or an alternative work schedule. Appellant's Br. at 42-45. But, as the District Court noted, the undisputed evidence indicated that Frantti's job required him "to perform involved analysis on complex, collaborative projects that unfolded over long periods of time." SPA 49 (internal quotation marks omitted). He also needed to be "in the office and available on a consistent basis, for assignments" and to communicate with co-workers and other parties. *Id*. His employer, the Division of Criminal Justice Services, could not technically accommodate remote work—quaint as that may seem to us now during this extraordinary era of pandemic-necessitated remote work. Moreover, record evidence of Frantti's extensive absences from work and his incapacitation even at home, indicates that his gastrointestinal illness was so severe that he could not work with regularity, even with his suggested accommodations.

Finally, we can find no evidence in the record that Frantti requested these accommodations from his employer. We have held that "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Costabile v. N.Y.C. Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020). In his brief, Frantti points to an email he sent to Human Resources "to explore the possibility of a modified work schedule," but he identifies nothing in the record showing that he followed up after Human Resources directed him to online information about New York's policies and provided him with a copy of the application. Appellant's Br. at 29. Later, after Frantti identified the psychological root of his gastrointestinal symptoms, he resigned instead of seeking accommodations. Accordingly, Frantti has also failed to raise a genuine issue of material fact with respect to whether New York "refused" to make accommodations. *McBride*, 583 F.3d at 97.

## C. Retaliation

Finally, Frantti argues both that he did not abandon any retaliation claim before the District Court and that he established a *prima facie* case of retaliation. We disagree with respect to both arguments.

**[3]** First, Frantti did not brief his retaliation claim in opposition to New York's motion for summary judgment. "[I]t is a **\*21** well-established rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). While we may exercise our discretion to consider forfeited arguments, the circumstances "normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quotation marks and alterations omitted).

But even if we were to consider Frantti's retaliation claim, it would fail. Like discrimination claims, retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001). To establish a prima facie case of retaliation, Frantti must show that: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate non-retaliatory reason for the challenged employment action. If the defendant meets the burden, the plaintiff must adduce evidence "that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id.* at 721.

**[4]** **[5]** In support of his retaliation claim, Frantti cites as an example of protected activity a January 2014 email he sent seeking reassignment to the Division of Budget. The email does not constitute a "protected" activity, however, because Frantti there neither complains of discrimination nor seeks an accommodation. *See, e.g.*, *id.* at 720 ("[A]ttempts to assert [ ] rights against discrimination are protected activities"); *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002) ("[S]eeking reasonable accommodation ... constitutes protected activity under Section 504/ADA."). Because the January 2014 email was not a protected activity, the two adverse actions Frantti cites—a "disciplinary meeting" in January 2014 and Frantti's placement on "documentation status" in March 2014—cannot support his claim because the "causal connection needed for a proof of retaliation claim" requires "showing that the protected activity was ... *followed in time* by the adverse action." *Cifra v. G.E. Co.*,

252 F.3d 205, 217 (2d Cir. 2001) (quotation marks omitted) (emphasis added). Frantti also identifies discrimination complaints that he filed from May to September 2015 as protected activities. There is no triable issue, however, regarding whether the adverse actions Frantti complains of from 2015—including (1) the denial of his "General Salary Increase and Performance Advance," (2) his "below-expectations performance evaluation," and (3) the docking of his pay following undocumented work absences—are causally connected to these 2015 complaints. As the District Court correctly observed, Frantti's employer applied the same absence and tardiness policies to him before and after his 2015 complaints. Moreover, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (rejecting retaliation claim where allegedly adverse actions "were both part, and the ultimate product, of an extensive period of progressive discipline, which began ... a full five months prior to [plaintiff's] filing **\*22** of the EEOC charges" (quotation marks and emphasis omitted)). Accordingly, Frantti has also failed to raise a genuine issue of material fact as to his retaliation claim.

## CONCLUSION

We have reviewed all of the arguments raised by Frantti on appeal and find them to be without merit. For the foregoing reasons, we **AFFIRM** the October 30, 2020 judgment of the District Court.

**All Citations**

850 Fed.Appx. 17

---

**End of Document**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  5

764 Fed.Appx. 73 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Vincent Michael MARINO, Plaintiff-Appellant,

v.

Deborah G. SCHULT, Warden BOP/DOJ,
Sepanek, Counselor BOP/DOJ, Lucas, Case
Manager BOP/DOJ, Defendants-Appellees. [1]

[1]    The Clerk of the Court is directed to amend the
caption as above.

18-997-pr
|
April 4, 2019

Appeal from a judgment of the United States District Court
for the Northern District of New York (Mordue, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of said District Court be and it hereby is
**AFFIRMED**.

**Attorneys and Law Firms**

For Appellant: Vincent Michael Marino, pro se, Fort Dix, N.J.

For Appellees: Karen Folster Lesperance, Assistant United
States Attorney for Grant C. Jaquith, United States Attorney
for the Northern District of New York, Albany, N.Y.

PRESENT: ROSEMARY S. POOLER, DENNY CHIN,
Circuit Judges, ERIC N. VITALIANO, [*] District Judge.

[*]    Judge Eric N. Vitaliano, United States District
Court for the Eastern District of New York, sitting
by designation.

**\*74 SUMMARY ORDER**

Appellant Vincent Marino, proceeding pro se, appeals the
district court's grant of summary judgment in favor of
defendants with respect to his *Bivens* [2] claims. We assume the
parties' familiarity with the underlying facts, the procedural
history of the case, and the issues on appeal. We do not decide
whether there is a *Bivens* remedy for the constitutional claims
Marino has alleged.

[2]    *Bivens v. Six Unknown Named Agents of Fed.
Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999,
29 L.Ed.2d 619 (1971).

We review a grant of summary judgment de novo,
"resolv[ing] all ambiguities and draw[ing] all inferences
against the moving party." *Garcia v. Hartford Police Dep't*,
706 F.3d 120, 126–27 (2d Cir. 2013). "Summary judgment is
proper only when, construing the evidence in the light most
favorable to the non-movant, 'there is no genuine dispute as
to any material fact and the movant is entitled to judgment as
a matter of law.' " *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d
Cir. 2011) (quoting Fed. R. Civ. P. 56(a) ). To establish that a
fact is genuinely in dispute, the nonmoving party "cannot rely
on allegations in the complaint, but must counter the movant's
affidavits with specific facts showing the existence of genuine
issues warranting a trial." *McKenna v. Wright*, 386 F.3d 432,
436 (2d Cir. 2004).

Marino first argues that the district court erred in deeming
admitted the defendants' statement of undisputed facts
without first granting him additional time to respond because,
he contends, he never received a copy of the statement. If a
non-moving party fails to comply with local rules governing
summary judgment, a district court may rely on a moving
party's statement of undisputed facts as long as those facts
are supported by the record. *N.Y.S. Teamsters Conference
Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640,
649 (2d Cir. 2005). The district court reasoned that Marino
received clear notice of the consequence of failure to properly
respond, that Marino referred to the statement of material
facts in his responses to the motion for summary judgment,
and that Marino did not claim that he had not received the

statement until the second time the magistrate judge deemed those facts admitted based on his failure to identify **\*75** specific facts in dispute. The district court did not err in deeming defendants' facts admitted to the extent they were supported by the evidence. *See id.*; *McKenna*, 386 F.3d at 436.

Marino also argues that he raised a material question of fact as to whether Schult, Sepanek, and Lucas retaliated against him for exercising his First Amendment rights. The First Amendment protects a prisoner's right to be free from retaliation for exercising his right to petition for redress of grievances. *See Espinal v. Goord*, 558 F.3d 119, 128-29 (2d Cir. 2009). To state a claim for First Amendment retaliation, a plaintiff "must show (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 128 (internal quotation marks omitted) (stating the standard for pleading a claim under 42 U.S.C. § 1983); *see also Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995) ("[F]ederal courts have typically incorporated § 1983 law into *Bivens* actions."). In addition, "[b]ecause the doctrine of *respondeat superior* does not apply in *Bivens* actions," plaintiffs must demonstrate that each "individual defendant was personally involved in the constitutional violation." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). If the plaintiff establishes each of these elements, the defendants may nonetheless avoid liability by demonstrating that they would have taken the adverse action "even in the absence of the improper reason." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

The parties do not dispute that Marino engaged in protected speech by filing an affidavit in support of a fellow inmate's lawsuit. Marino alleges that, in retaliation for this speech, Schult, Sepanek, and Lucas took the following adverse actions against him: they (1) confiscated his legal work and law book while he was held in the Special Housing Unit ("SHU") at FCI Ray Brook, (2) falsified his security level, (3) transferred him to USP Pollock, and (4) arranged for him to be repeatedly transferred and deprived of his legal work and mail while in transit.

An adverse action in a retaliation claim is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) ). The actions that Marino alleged may under some circumstances constitute adverse actions under this standard. *See, e.g.,*

*Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (Although inmates have "no liberty interest in remaining at a particular correctional facility, ... prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.") (citation omitted). [3] However, Marino did not establish that confiscation of his law book while he was held at the FCI Ray Brook SHU constituted an adverse action because he did not refute the defendants' evidence that inmates at the FCI Ray Brook SHU had access to a law library on request. Loss of a book under these circumstances would not deter a person of ordinary firmness from exercising his rights. *See Goord*, 320 F.3d at 353. There is no evidence in the record to support Marino's claim that the defendants lost or destroyed his legal documents and **\*76** mail while he was in the SHU; to the contrary, Marino filed three legal documents in the First Circuit during this period. *See United States v. Marino*, 1st Cir. 09-1854, docs. 115995376, 115999325, 116004221. Marino has thus failed to establish a genuine dispute regarding his claims related to his access to legal books and documents at the FCI Ray Brook SHU.

[3]     These actions may also in some circumstances constitute an unconstitutional denial of access to the courts. However, to establish such a claim, a plaintiff must show an actual injury. *See Goord*, 320 F.3d at 351. Marino has not satisfied this requirement; during his deposition, he could not identify any claim that he was unable to pursue due to loss of access to his legal documents.

As to Marino's other claims, the evidence does not suggest a causal connection between his protected speech and Schult, Sepanek, and Lucas's actions. There is no evidence that Lucas was aware of the affidavit when he requested a transfer based on a recommendation of a Special Investigative Supervisor following a disciplinary hearing to address Marino's gambling operation. Further, the discovery of Marino's gambling operation while imprisoned showed that Schult, Sepanek, and Lucas would have taken these actions even if Marino had not engaged in protected speech, and thus defeats a retaliation claim. *See Lowrance*, 20 F.3d at 535. Marino also fails to contest Schult, Sepanek, and Lucas's evidence that they were not personally involved in deciding that Marino would be assigned to USP Pollock, where and how long he was held while in transit, or what access he would have to legal documents after he left FCI Ray Brook. The district court therefore properly granted summary judgment on these claims. *See id.*; *Espinal*, 558 F.3d at 129; *Thomas*, 470 F.3d at 496. Because the district court properly granted

summary judgment, Marino's request for a new judge and magistrate judge is moot.

We have considered the remainder of Marino's arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

764 Fed.Appx. 73 (Mem)

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   3

794 Fed.Appx. 72
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Curtis MIDDLEBROOKS, Plaintiff-Appellant,

v.

M. BRADT, Superintendent, Attica Correctional Facility,
Szramka, Correctional Officer, Berry, Correctional
Officer, Gregg, Correctional Officer, Page, Correctional
Officer, Lowinski, Correctional Sergeant, Brown,
Correctional Sergeant, Defendants-Appellees. [*]

[*]    The Clerk of Court is respectfully directed to
amend the caption as set forth above.

18-1561
|
December 19, 2019

**Synopsis**
**Background:** Inmate filed § 1983 action against corrections
officers for deprivation of his First and Eighth Amendment
rights arising from the alleged failures of officers to deliver
meals to inmate's cell in accordance with his feed-in-cell
status. The United States District Court for the Western
District of New York, Richard J. Arcara, Senior District
Judge, granted summary judgment in favor of corrections
officers. Inmate appealed.

**[Holding:]** The Court of Appeals held that tolling of inmate's
claim ended more than three years before his action was filed,
rendering it untimely.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (1)

**[1]**    **Limitation of Actions**    Pendency of Action
or Other Proceeding

Tolling of inmate's § 1983 action alleging that
corrections officers deprived him of his First
and Eighth Amendment rights by allegedly
failing to deliver meals to inmate's cell in
accordance with his feed-in-cell status ended
when Inmate Grievance Program Central Office
Review Committee (CORC) sent inmate a letter
informing him that his appeal of superintendent's
denial of inmate's third and final grievance as
to these missed meals was untimely, rendering
inmate's § 1983 claim, filed more than three years
after date of that letter, untimely, as inmate was
no longer actively exhausting his administrative
remedies at time of letter from CORC, which
inmate acknowledged he received. U.S. Const.
Amends. 1, 8; 42 U.S.C.A. § 1983.

Appeal from a judgment of the United States District Court
for the Western District of New York (Arcara, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Valdi Licul (Yannick A. Grant, on the
brief), Vladeck, Raskin & Clark, P.C., New York, NY

For Defendant-Appellee: Jennifer L. Clark, Assistant
Solicitor General (Barbara D. Underwood, Solicitor General,
Jeffrey W. Lang, Deputy Solicitor General, on the brief), for
Letitia James, Attorney General, New York, NY.

Present: Barrington D. Parker, Debra Ann Livingston, Joseph
F. Bianco, Circuit Judges.

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**\*73  SUMMARY ORDER**

Plaintiff-Appellant Curtis Middlebrooks ("Middlebrooks") appeals from a May 4, 2018 order of the United States District Court for the Western District of New York (Arcara, *J.*) denying his motion for reconsideration of a March 22, 2018 opinion and a March 23, 2018 judgment granting summary judgment in favor of Defendants as to the entirety of Middlebrooks's complaint under 42 U.S.C. § 1983 for deprivation of his First and Eighth Amendment rights. [1] We review grants of summary judgment *de novo*, "construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor." *Burns v. Martuscello*, 890 F.3d 77, 83 (2d Cir. 2018). We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

[1]    In light of Middlebrooks's *pro se* status before the district court and his clear intention to appeal the district court's prior grant of summary judgment, we liberally construe his notice of appeal as an appeal of both the denial of reconsideration and the judgment. *See Marvin v. Goord*, 255 F.3d 40, 42 n.1 (2d Cir. 2001).

Beginning on June 17, 2011, Middlebrooks, an inmate at Attica Correctional Facility ("Attica"), was subject to a Therapeutic Diet Order which granted him feed in cell ("FIC") status, "a medical designation designed to allow inmates who cannot attend mess hall, due to a physical condition or ailment, to be fed in their cell." J.A. 360. Middlebrooks testified that his FIC order was unrelated to a physical inability to walk to the mess hall, and record evidence indicates that he was able to walk to the mess hall throughout the relevant time period. Based on a determination that Middlebrooks had no medical reason to receive FIC meals, Dr. Abbasey, an Attica physician, rescinded the FIC memorandum on August 15, 2011. Middlebrooks acknowledges receiving the rescission memorandum; however, he maintains that it was forged because the copy he received bore only Dr. Abbasey's signature and no stamp. At all times within the relevant period, Middlebrooks's meals were available to him in the mess hall.

In July 2011, while Middlebrooks's FIC designation was still active, Middlebrooks testified that he did not receive approximately ten FIC meals. On August 1, 2011, Middlebrooks filed the first of three inmate grievances regarding the denial of meals. The Inmate Grievance Program ("IGP") Superintendent (the "Superintendent") denied the grievance on August 26, 2011, and Middlebrooks did not appeal the denial. Subsequently, between August 13 and September 4, 2011, Middlebrooks testified that he was not given approximately thirty meals. Middlebrooks filed a second grievance regarding additional missed meal deliveries on September 1, 2011. On September 16, 2011, the Superintendent denied this grievance. Middlebrooks appealed the denial to the next level of review, the IGP Central Office Review Committee ("CORC"). On January 18, 2012, CORC denied the appeal. Between January 3 and January 24, 2012, Middlebrooks testified that he was again deprived of meals, estimating that he did not receive approximately thirty meals. He filed his third and final grievance as to these missed meals on January 24, 2012. The Superintendent denied the grievance on February 16, 2012. Middlebrooks appealed to CORC, noting in his appeal statement a date of February 20, 2012. In a November  **\*74**  2, 2012 letter responding to Middlebrooks's inquiry regarding his appeal to CORC, Karen Bellamy ("Bellamy"), the IGP Director, stated that Middlebrooks "did not appeal until April 2012" and that he had been "sent a letter dated April 9, 2012 that indicated the appeal was not filed within the timeframes" required for proper exhaustion of his administrative remedies. J.A. 43. Middlebrooks acknowledged in his testimony that he received the April 9, 2012 letter. J.A. 438. Nearly three years later, on September 14, 2015, Middlebrooks wrote to CORC, stating that Bellamy's position that he did not appeal until April 2012 was incorrect and pointing out that the top of the appeal form stated "sent to CORC 2/20." J.A. 45. Subsequently, Middlebrooks filed suit pursuant to 42 U.S.C. § 1983 (the "Complaint") against Attica Superintendent Bradt; Correctional Officers Szramka, Berry, Gregg, Page, and Victor; and Correctional Sergeants Lowinski and Brown (together, "Defendants"), alleging deprivations of his Eighth Amendment and First Amendment rights. The parties dispute the date on which the Complaint was filed, with Middlebrooks maintaining that the Complaint was effectively filed on November 2, 2015, and Defendants arguing that Middlebrooks did not submit the Complaint to be mailed until December 10, 2015.

Defendants argue that the district court's entry of summary judgment in their favor should be affirmed, *inter alia*, on the basis that none of Middlebrooks's claims are timely. Though the district court did not rely upon this ground, "[i]t is well-

settled that we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." *Holcomb v. Lykens*, 337 F.3d 217, 223 (2d Cir. 2003) (citation omitted). We agree with Defendants that, regardless of whether the Complaint was filed in November or December 2015, the claims are untimely, and therefore affirm.

The statute of limitations for claims brought under Section 1983 is governed by state law, and, in this case, is the three-year period for personal injury actions under New York law. *See Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). The limitations period "must be tolled while a prisoner completes the mandatory exhaustion process" under the Prison Litigation Reform Act ("PLRA"). *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011) (citation omitted). "The statute of limitations, however, is *only* tolled during the period when a prisoner is 'actively exhausting' his administrative remedies." *Melendez v. Greiner*, 477 F. App'x 801, 803 (2d Cir. 2012) (quoting *Gonzalez*, 651 F.3d at 322 n.2).

Middlebrooks argues that his claims were timely because his lawsuit was filed on November 2, 2015, exactly three years after the date of the letter from Bellamy stating that CORC had previously denied the appeal of Middlebrooks's third grievance as untimely. However, the record shows that Middlebrooks was no longer "actively exhausting" his administrative remedies as of April 9, 2012, when CORC informed him by letter that his third grievance had been denied as untimely. [2] *Gonzalez*, 651 F.3d at 324. The April 9, 2012 date is reflected in Bellamy's November 2, 2012 letter, and Middlebrooks acknowledged in his testimony that he

received the April 9, **\*75** 2012 letter. Because, on the record before the Court, there is no genuine dispute that tolling of Middlebrooks's claim ended on April 9, 2012 and his lawsuit was filed more than three years later in either November or December 2015, summary judgment in favor of Defendants is warranted on the basis that his claims are untimely.

[2]     On appeal, Middlebrooks argues that Defendants are bound to their position, maintained at earlier stages of this litigation, that November 2, 2012 was the date of the final administrative action on Middlebrooks's third grievance. However, the position taken by a party prior to discovery, where testimony during discovery further developed the factual record, cannot bind this Court to an erroneous view as to the administrative tolling period—a mixed question of law and fact. Moreover, the parties have had ample notice and opportunity to be heard on the question in the wake of the magistrate judge's April 17, 2017 Report and Recommendation, which first raised the possibility that the third grievance was administratively final as of April 9, 2012.

We have considered Middlebrooks's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

794 Fed.Appx. 72

---

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3909524
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vladimir ZUK, also known as Walter Zuk, Plaintiff,
v.
ONONDAGA COUNTY; Kevin E. Walsh, Sheriff,
Onondaga County, in his Official Capacity; and
Esteban Gonzalez, Captain, Onondaga County
Justice Center, in his Official Capacity, Defendants.

No. 5:07–CV–732 (GTS/GJD).
|
Sept. 30, 2010.

**Attorneys and Law Firms**

Vladimir Zuk, Camillus, NY, pro se.

Gordon J. Cuffy, Onondaga County Attorney, Karen A. Bleskoski, Esq., Deputy County Attorney, of Counsel, Syracuse, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action, filed by Vladimir Zuk ("Plaintiff") against Onondaga County, Onondaga County Sheriff Kevin E. Walsh, and Onondaga County Undersheriff Esteban Gonzalez ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 59) For the reasons set forth below, Defendants' motion is granted, and Plaintiff's Second–Amended Complaint is dismissed with prejudice.

# TABLE OF CONTENTS

I.  RELEVANT BACKGROUND .......... ..............3

 A. **Plaintiff's Claims**............................................... **3**

 B. **Defendants' Motion for Summary Judgment**............................ **5**

 C. **Plaintiff's Cross–Motion to File a Third–Amended Complaint**. **7**

II.  RELEVANT LEGAL STANDARDS .......... ..............7

 A. **Motion for Summary Judgment**................................... **7**

 B. **Motion to File an Amended Complaint**...................................... **9**

III.  UNDISPUTED MATERIAL FACTS .......... ............10

 A. **Overview of OCSO Policies and Procedures**........................... **10**

 B. **Plaintiff's Employment at OCSO**............................................... **16**

 C. **Plaintiff's Work–Related Concerns**........................................... **19**

 D. **Plaintiff's Lack of Promotion**...................................................... **22**

 E. **Plaintiff's Grievances**................................................................ **24**

IV.  ANALYSIS

A. **Plaintiff's Claim of National–Origin Discrimination Under Title VII Due to Issuance of Reprimand and Denial of Promotion**...................................................................................... 26

B. **Plaintiff's Claim of Hostile Work Environment Under Title VII Due to Verbal Harassment**............................................................ 35

C. **Plaintiff's Claim of Retaliation Under Title VII Due to Issuance of Reprimand and Denial of Promotion**.................... 38

D. **Plaintiff's Claim of Denial of Right to Free Speech Under 42 U.S.C. § 1983 and First Amendment**.......................................... 44

E. **Plaintiff's Cross–Motion to File a Third–Amended Complaint**. 46

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Plaintiff's Second–Amended Complaint asserted nine causes of action against Defendants. (Dkt. No. 35.) However, on July 22, 2008, the Honorable David N. Hurd issued a Decision and Order dismissing the following causes of action from that Second–Amended Complaint: (1) Plaintiff's claim pursuant to the Age Discrimination in Employment Act for failure to file a timely complaint with Equal Employment Opportunity Commission ("EEOC"); and (2) Plaintiff's claims under the New York State Executive Law for failure to file a timely Notice of Claim. (Dkt. No. 49.) In addition, Judge Hurd dismissed Plaintiff's claims against Defendant Walsh as Joint Public Employer, as well as Plaintiff's claim for punitive damages. (Id.) As a result, the current Decision and Order address only those portions of Plaintiff's Second–Amended Complaint that survive Judge Hurd's Decision and Order of July 22, 2008.

Construed with the utmost of special leniency, the surviving portions of Plaintiff's Second–Amended Complaint alleges that, between 2003 and 2007, Defendants violated his civil rights under 42 U.S.C. §§ 1981, 1983, and 2000e, while he was working as a deputy in the Onondaga County Sheriff's Office ("OCSO") Custody Department, by disciplining him and denying him promotional opportunities. (Dkt. No. 35.) More specifically, Plaintiff, a naturalized citizen born in Brazil, claims as follows: (1) Defendants discriminated against him based on his national origin, in violation of 42 U.S.C. § 2000e (hereinafter "Title VII"), by issuing him an unjustified written reprimand (for failing to submit his time sheets) and by wrongfully denying him a promotion to Deputy–Sheriff Sergeant on ten separate occasions; (2) Defendants subjected him to a hostile work environment, in violation of Title VII, by verbally harassing

him, or permitting him to be verbally harassed, on multiple occasions; (3) Defendants retaliated against him, in violation of Title VII, by issuing him an unjustified written reprimand and by wrongfully denying him a promotion to Deputy–Sheriff Sergeant; and (4) Defendant Gonzalez unjustifiably suppressed his speech, in violation of 42 U.S.C. § 1983 and the First Amendment. (Id.)

**\*2** The Court notes that it cannot, even with the utmost of special leniency, construe Plaintiff's Second–Amended Complaint as asserting a cause of action under the Due Process Clause of the Fourteenth Amendment, because a civil servant does not have a property interest in being promoted. McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir.2001). Nor can the Court, even with the utmost of special leniency, construe Plaintiff's Second–Amended Complaint as asserting a cause of action under the Equal Protection Clause of the Fourteenth Amendment, because (1) he has failed to allege facts plausibly suggesting that (1) he was treated differently from other similarly situated individuals, and (2) any such disparate treatment was based on impermissible considerations such as national origin, or intent to inhibit or punish the exercise of constitutional rights . [1]

[1]    "The Equal Protection Clause requires that the government treat all similarly situated people alike." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir.2001). "To prevail on a claim of selective enforcement, plaintiffs in this Circuit traditionally have been required to show both (1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure

a person." *Harlen Assocs.,* 273 F.3d at 499 (internal quotation marks and citations omitted). In other words, "a plaintiff must 'prove purposeful discrimination directed at an identifiable or suspect class.' " *Spavone v. City of New York,* 420 F.Supp.2d 236, 240 (S.D.N.Y.2005) (quoting *Hart v. Westchester Dep't of Soc. Servs.,* 160 F.Supp.2d 570, 578 [S.D.N.Y.2001] ); *see also Essen v. Bd. of Educ. of the Ithaca City Sch. Dist.,* 92–CV–1164, 1996 WL 191948, at *9 (N.D.N.Y. Apr. 15, 1996) (Scullin, J.) ("[A]bsent a showing that the [d]istrict's policies served to discriminate against a particular class of disabled students, no equal protection cause of action exists.").

**B. Defendants' Motion for Summary Judgment**

On March 3, 2009, Defendants filed a motion for summary judgment. (Dkt. No. 59, Attach.95.) Included among their motion papers was a Rule 7.1 Statement of Material Facts that set forth, in 181 numbered paragraphs, each material fact about which Defendants contend there exists no genuine dispute, as required by Local Rule 7 .1(a)(3) of the Local Rules of Practice for this Court. (Dkt. No. 59, Attach. 5 [Defs.' Rule 7.1 Stmt.].)

Also included among their motion papers was a memorandum of law advancing seven arguments in support of their motion for summary judgment: (1) the claims against Kevin E. Walsh and Esteban Gonzalez, in their official capacity, should be dismissed because a suit against a municipal officer in his official capacity is functionally equivalent to a suit against the entity of which the officer is an agent; (2) Plaintiff failed to exhaust the mandatory administrative remedies before instituting this action in federal court, and therefore his Second–Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII are barred by the applicable statute of limitations, and therefore these claims should be dismissed; (4) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for national-origin discrimination, and therefore this claim should be dismissed; (5) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for retaliation under Title VII, and therefore this claim should be dismissed; (6) Plaintiff has failed to adduce admissible record evidence establishing a hostile work environment, and therefore this claim should be dismissed; and (7) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for a violation of his right to free speech under the First Amendment, and

therefore this claim should be dismissed. (Dkt. No. 59, Attach 95.)

On June 4, 2009, Plaintiff filed a response to Defendants' motion for summary judgment. (Dkt. No. 60.) Although Plaintiff generally complied with the requirements of Local Rule 7.1(a)(3), he included several qualifying statements in his responses. The Court notes that, although such qualifying statements are common practice in this jurisdiction, in many of Plaintiff's qualifying statements, he asserts additional facts. [2] This is improper. *See* N.D.N.Y. L .R. 7.1(a)(3) (noting that, when the non-movant chooses to allege additional facts that are in dispute, the non-movant must "set forth [these] additional facts ... in *separately numbered paragraphs"* ) (emphasis added).

2

    (*See, e.g.,* Dkt. No. 60, Attach. 1, at ¶¶ 34, 43, 45, 57, 60.)

**\*3** "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 05–CV–1528, 2007 WL 2071546, at *9 (E.D.N.Y. July 16, 2007). This includes complying with the procedural formalities of Local Rules, including Local Rule 7.1(a)(3). *Krug v. County of Rennselaer,* 559 F.Supp.2d 223, 235 n. 6 (N.D.N.Y.2008) (McAvoy, J.) (noting that "[t]he responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly"). [3] As a result, while the Court will not turn a blind eye to material facts asserted by Plaintiff that are clearly not in dispute, the Court also declines to *sua sponte* comb through the 1,542 pages of exhibits that Plaintiff has attached in an effort to verify the asserted material facts, which Defendants were unable to admit or deny (based on Plaintiff's failure to comply with Local Rule 7.1).

3

    *See also Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.); *see also Faretta v. California,* 95 S.Ct. 2525, 2541, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS,* 59 F.3d 5, 8 (2nd Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

## C. Plaintiff's Motion to File a Third–Amended Complaint

In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff states that he "planned to use the Fourteenth Amendment to assert [a] § 1983 policy and practice claim against Onondaga County" (specifically of denying individuals their due process and equal protection rights), but was denied permission to do so by Magistrate Judge Peebles. (Dkt. No. 60, at 32.) As a result, Plaintiff requests that the Court afford him an opportunity to amend his Second–Amended Complaint so as to assert this claim. (*Id.* at 34.) Out of special solicitude to Plaintiff, the Court will liberally construe this request as a motion to file a Third–Amended Complaint.

## II. RELEVANT LEGAL STANDARDS

### A. Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).

**\*4** As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [4] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [5]—even where the nonmoving party was a plaintiff in a civil rights case. [6]

---

[4]  *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at \*12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at \*1–4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

[5]  Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

[6]  *See, e.g., Hassig v. N.Y.S. Dep't of Envtl. Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at

*12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2–3; *Singleton v.. Caron,* 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023008, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96–CV–1634, 1998 WL 743710, at *1 n. 2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96–CV–1812, 1998 WL 566773, at *1 n. 2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a] [3] "to carry out the conduct of its business").

**B. Motion to Amend a Complaint**

A motion to amend a complaint is made pursuant to Fed.R.Civ.P. 15, which provides that leave to amend "should [be] freely give[n] ... when justice so requires." Fed. R. Civ. Proc. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3rd 1127, 1133 (2d Cir.1993). Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

> of amendment, etc.—the leave sought should ... be 'freely given.'

*Foman,* 371 U.S. at 182, *accord, Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

**III. UNDISPUTED MATERIAL FACTS**

Before the Court recites the undisputed material facts, one point bears mentioning. In his Amended Statement of Material Facts, Plaintiff admits (by "not disput[ing]") Paragraph 147 of Defendants' Statement of Material Facts. (Dkt. No. 72, at ¶ 147.) However, in so doing, Plaintiff also adds the following statement: "during a Federal Rules of Civil Procedure Rule 16 Conference [he] was informed that the Sheriff did not believe [he] would make a good supervisor and that [he] would not be promoted." (*Id.*) This statement, which is not part of the record, [7] is not something that the Court may consider in reviewing Defendants' motion for summary judgment. As a result, this statement, as well as any other that is based on discussions that occurred during any scheduling conferences, is stricken from the record. With this in mind, the Court now turns to a recitation of the undisputed material facts.

[7]    *See* N.D.N.Y. L.R. 7.1(a)(3) (noting that each material fact listed "shall set forth a specific citation to the record where the fact is established[, and] [t]he record for purposes of the Statement of Material Facts includes *pleadings, depositions, answers to interrogatories, admissions and affidavits"* ) (emphasis added).

**A. Overview of OCSO Policies and Procedures**

OCSO employees are required to follow the policies and procedures governing employee conduct, including, but not limited to, those set forth in the Onondaga County Employee Handbook and the OCSO Duty Manual. (*See generally* Dkt. No. 59, Attach. 5, at ¶¶ 1–42.) These policies and procedures address a variety of work-related issues, including promotions, disciplinary measures and procedures, and prohibited conduct such as discrimination, harassment and retaliation. (*Id.*) Furthermore, the OCSO often issues written directives regarding, among other things, promotions, the submission of time sheets, the documentation of employee

performance, harassment and retaliation, and disciplinary procedures. (*Id.*) [8]

[8]  Compliance with written directives issued pursuant to the authority of the Onondaga County Sheriff is mandatory under the OCSO Duty Manual. (*See* Dkt. No. 59, Attach. 29, at 5, Part 1.1 [Ex. R to Defs.' Rule 7.1 Stmt., attaching relevant portions of the OCSO Duty Manual, which notes that employees are to follow, among other things, orders and directives].)

### 1. Promotions of OCSO Employees

**\*5** Promotions of OCSO Custody Department deputies are governed by a multi-phased process. (*Compare* Dkt. No. 59, Part 5, at ¶ 3 *with* Dkt. No. 72, at ¶ 3 [Plf's Rule 7.1 Resp.].) First, to become eligible for promotion, candidates must pass the relevant civil service examination administered pursuant to New York State Civil Service Law. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 4 *with* Dkt. No. 72, at ¶ 4.) A list of the candidates eligible is then compiled according to their respective scores on the examination. (*Id.*) Candidates from the eligible list scoring higher than, or equal to, the third highest score on the examination may be considered for promotion. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 5 *with* Dkt. No. 72, at ¶ 5.) *See also* N.Y. CIV. SERV. § 61(1).

In choosing among those that satisfy the threshold qualifications, a panel of OCSO supervisors ("promotion panel") convenes and conducts interviews. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 5 *with* Dkt. No. 72, at ¶ 5.) [9] Generally, during the interview, the promotion panel asks questions concerning issues and hypothetical scenarios germane to the particular position. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 21 *with* Dkt. No. 72, at ¶ 21; *see also* Dkt. No. 59, Attach. 11, 12 [Sergeant's Promotional Review Board Forms].) [10] In addition, the promotion panel reviews and considers a candidate's disciplinary history, personnel file, [11] and supervisor's memorandum file. [12] (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 8, 15–20 *with* Dkt. No. 72, at ¶¶ 8, 15–20.)

[9]  Being on the list of candidates eligible for promotion is not a guarantee that a candidate will be promoted. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 6 *with* Dkt. No. 72, at ¶ 6; *see also Hatala v. McCaul,* 677 N.Y.S.2d 564 (N.Y.App.Div., 1st Dept.1998) (noting that the use of interviews to determine

which eligible candidate would be promoted was well within the authorization of Civil Service Law).

[10]  The updated 2007 promotional review board form (Dkt. No. 59, Attach.12), unlike its 2003 predecessor (Dkt. No. 59, Attach.11), does not allow a promotion panel to deduct points based on discipline or information contained in a candidate's personnel file or supervisor's memorandum file.

[11]  OCSO Human Resources Division maintains the personnel files of its employees. Each personnel file is multi-sectioned and is broken down into the following separate categories: (1) payroll issues and insurance forms; (2) personal information including employment application, birth certificate, driver's license, Social Security card, fingerprint card, and military records; (3) supervisory evaluations; (4) education; (5) discipline; and (6) miscellaneous. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 13 *with* Dkt. No. 72, at ¶ 13.)

[12]  The supervisor's memorandum file is maintained by department commanders, and contains an employee's supervisor's memorandum. (Dkt. No. 59, Attach. 7, at 6, 43–44.) Supervisor's memorandums are forms used by a supervisor to document discussions with employees about performance. (*Id.*) "The form may be used to highlight outstanding performance in an area or may be used as a training tool to document discussion regarding corrective actions for problem behavior." (Dkt. No. 59, Attach. 9, at 23.) Supervisor's memorandums do not have an expiration date. (Dkt. No. 59, Attach. 9, at 23.) However, the Court notes that the supervisor who issues the supervisor's memorandum may keep it in the file as long as he or she sees fit. (*Id.* at 25–26.)

After completing the interview, each promotion panel member scores the candidates. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 22 *with* Dkt. No. 72, at ¶ 22.) [13] Those individual scores are then tallied, and each candidate is ranked accordingly. (*Id.*) [14] The list ranking each candidate, along with the recommendations of the promotion panel, is then submitted to Defendant Walsh, who ultimately decides which candidate will be promoted. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 23, 24 *with* Dkt. No. 72, at ¶¶ 23, 24.) [15] Those candidates not selected for promotion are given the opportunity to speak with

a promotion panel member about ways to improve. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 25 *with* Dkt. No. 72, at ¶ 25.)

13    It is unclear whether the scores remain attached to a particular candidate until the expiration of the applicable civil service examination. Thus, construing the record in the light most favorable to the non-movant, the Court finds, for purposes of deciding Defendants' motion for summary judgment, that Plaintiff's ranking by the promotion panel (as well as the ranking of all other candidates), remained unchanged until the expiration of the applicable civil service examination.

14    The Court notes that Defendant has not provided Plaintiff with any documentation showing the promotion panel's ranking of Plaintiff, nor the promotion panel's ranking of those awarded the promotion. (Dkt. No. 60, Attach. 55, 25, at ¶ 19 [Defendant Walsh Interrogatories] ["[N]o documents which were known to be relevant to this litigation have been destroyed since the onset of litigation.... Any documents which may no longer exist were disposed of in the normal course of business prior to Defendants' knowledge of this litigation."].)

15    According to the record, Defendant Walsh seeks to promote those individuals best suited to supervise their colleagues. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 6 *with* Dkt. No. 72, at ¶ 6.) A candidate suited for a promotion to a supervisory position should possess qualities including, but not limited to, communication skills and flexibility in making decisions. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 7 *with* Dkt. No. 72, at ¶ 7.) The Court notes, however, that Defendant Walsh generally promotes those recommended by the promotion panel. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 24 *with* Dkt. No. 72, at ¶ 24.)

### 2. Submission of Time Sheets

County employees are required to account for the time they work by submitting time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 57 *with* Dkt. No. 72, at ¶ 57.) [16] Since 1970, the OCSO has maintained a policy requiring that time sheets be submitted for approval at the end of each two week pay period. (*Id.*)

16    OCSO deputies are paid according to the time logged on their time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 58 *with* Dkt. No. 72, at ¶ 58.) Those time sheets are also used to calculate overtime pay, sick leave, personal time, and vacations. (*Id.*)

The OCSO has repeatedly stressed the importance of the timely submission of time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 60, 74 *with* Dkt. No. 72, at ¶¶ 60, 74.) [17] Between 2003 and 2005, around eighteen (18) supervisor's memorandums were issued to employees who failed to timely submit their time sheets. (Dkt. No. 59, Attach. 5, at ¶ 72; Dkt. No. 59, Attach. 52.) [18] In addition, on September 2, 2004, Defendant Walsh further stressed the importance of complying with this policy by issuing a written directive, which required "[a]ll OCSO personnel ... to submit [time sheets to their supervisor] on the last day of the pay period." (Dkt. No. 59, Attach.53.)

17    On June 29, 2004, and July 14, 2004, OCSO Custody Department Chief Callisto requested that supervisor's memorandums be issued and/or formal discipline be sought for employees whose names were on a list of OCSO Custody Department personnel who had not submitted time sheets. (*See* Dkt. No. 59, Attach. 32 [email chain from Chief Callisto, dated June 29, 2004, and July 14, 2004].) Chief Callisto also requested that the time sheets be completed immediately. (*Id.*) Similar requests were made on September 23, 2004, and August 2, 2005. (*See* Dkt. No. 59, Attach. 33 [email chain from Chief Callisto, dated Sept. 23, 2004], 34 [email chain from Chief Callisto, dated Aug. 2, 2005].)

18    Generally, the supervisor's memorandums identified the recipient's failure to submit his or her time sheets in a timely manner, and noted that a continuation of such conduct would result in progressive discipline. (Dkt. No. 59, Attach.52.)

### 3. Policies and Procedures Regarding Discrimination, Harassment and Retaliation

 *6    National-origin discrimination and harassment, and other such discrimination and harassment, is prohibited by OCSO policy. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 42 *with* Dkt. No. 72, at ¶ 42.) [19] Generally, the OCSO defines national-origin harassment as "ethnic slurs, ethnic jokes or other intimidating, hostile or offensive verbal or physical conduct

relating to a person's race or national origin," and harassment as "unwelome physical or verbal actions ....“ (Dkt. No. 59, Attach. 19, at 3 [Relevant Portions of the Onondaga County Employee Handbook]; Dkt. No. 59, Attach. 25, at 2 [OCSO Written Directive Regarding Harassment].)

19    This policy is codified in both the Employee Handbook and the OCSO Duty Manual, and has been stressed in several written directives.

The OCSO maintains internal procedures for aggrieved employees to seek redress for such discrimination and harassment. (Dkt. No. 59, Attach.21–25.) The internal complaint procedure does not, however, interfere with an aggrieved employee's right to file complaints with the New York State Division of Human Rights or with the EEOC. (Dkt. No. 59, Attach. 20 [Harassment and Anti–Retaliation Policy], 21 [Onondaga County Discrimination/Harassment and Anti–Retaliation Complaint Policy].)

In addition to these policies, the OCSO also maintains an anti-retaliation policy. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 42 *with* Dkt. No. 72, at ¶ 42.) This policy prohibits adverse action against employees complaining of, or involved with proceedings concerning, workplace harassment. (Dkt. No. 59, Attach.20, 21, 25.)

### 4. Disciplinary Measures and Procedures

OCSO disciplinary measures and procedures are governed by a multi-phased process. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 30 *with* Dkt. No. 72, at ¶ 30.) The disciplinary process begins with a supervisor documenting his or her determination that an employee violated the OCSO Duty Manual. (*Id.*) The matter is then forwarded through several channels for an investigation and determination of whether disciplinary measures are warranted. (*Id* .) [20]

20    After a supervisor documents a violation, the matter is forwarded to the employee's department commander. The department commander then decides whether the matter should be forwarded to the Professional Standards Unit ("PPSU") for a complete investigation. Once forwarded, PSU compiles a factual report based on the investigation, and forwards that report to the Onondaga County Undersheriff, who determines whether progressive discipline is warranted. If the Undersheriff finds that progressive discipline

is warranted, the matter is then referred to the department chiefs for their recommendations as to whether discipline is warranted and, if so, what penalty, if any, should be imposed. The department chiefs then return the matter and their recommendations to the Undersheriff who, after reviewing the information, confers with the Sheriff for ultimate determination. (Dkt. No. 59, Attach. 5, at ¶ 30.)

In the event disciplinary action is sought, a due process hearing date is scheduled according to the availability of the Undersheriff, the department chief, the employee and his union representative, the Human Resources manager, and any other necessary personnel. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 33 *with* Dkt. No. 72, at ¶ 33.) At the due process hearing, the employee is presented with the Notice and Specification of Charges and explained his or her rights under the Collective Bargaining Agreement should the employee choose to oppose the disciplinary action. [21] (*Compare* Dkt. No. 59, Attach. 5, at ¶ 34 *with* Dkt. No. 72, at ¶ 34.)

21    If an employee opposes disciplinary action, he or she has the option of seeking a hearing, pursuant to Civil Service Law § 75, or binding arbitration. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 39 *with* Dkt. No. 72, at ¶ 39.) Though Plaintiff disputes paragraph 39 of Defendants' Rule 7.1 Statement, the Court finds that Plaintiff's basis for his denial is erroneous. In particular, Civil Service Law § 75(2) does not permit an immediate hearing if the employee requests representation. Instead, the employee is afforded a reasonable amount of time to obtain representation before having to respond to questions at the hearing. (Dkt. No. 60, Attach. 34, at 5 [Civil Service Law § 75].)

### B. Plaintiff's Employment at OCSO

Plaintiff has been employed by the OCSO as a Deputy–Sheriff since February of 1997. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 54 *with* Dkt. No. 72, at ¶ 54.) On more than one occasion during his employment, Plaintiff has engaged in conduct found to be in violation of OCSO policies and procedures. (*See generally* Dkt. No. 59, Attach. 5.) More specifically, on November 14, 2003, Plaintiff was issued a supervisor's memorandum for his repeated failure to observe OCSO policies regarding the submission of time sheets, and, on February 15, 2005, Plaintiff received a written reprimand for his continued failure to observe these policies. (*Compare*

Dkt. No. 59, Attach. 5, at ¶¶ 59–69 *with* Dkt. No. 72, at ¶¶ 59–69.) In addition, on July 26, 2006, Plaintiff was issued a supervisor's memorandum for engaging in conduct found to be unprofessional and offensive. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 107 *with* Dkt. No. 72, at ¶ 107.)

**1. Plaintiff's Submission of Time Sheets**

**\*7** Plaintiff failed to timely submit time sheets for two consecutive pay periods in September and October of 2003. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 59 *with* Dkt. No. 72, at ¶ 59; *see also* Dkt. No. 59, Attach. 31 [OCSO Supervisor's Memorandum].) As a result, on November 14, 2003, Plaintiff received a supervisor's memorandum ordering that he comply with OCSO policies regarding time sheets, and noting that similar conduct in the future will result in progressive discipline. (*Id.*)

In May and June of 2004, Plaintiff again failed to submit his time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 61 *with* Dkt. No. 72, at ¶ 6 1; *see also* Dkt. No. 59, Attach. 36 [OCSO Memorandum Requesting Progressive Discipline].) On June 30, 2004, Sergeant Banks sent a memo to Captain Albanese requesting progressive discipline for Plaintiff. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 61 *with* Dkt. No. 72, at ¶ 61.) On December 27, 2004, Undersheriff Darby recommended that Plaintiff receive a written reprimand. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 64 *with* Dkt. No. 72, at ¶ 64.) On February 15, 2005, Plaintiff was issued a written reprimand. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 67–69 *with* Dkt. No. 72, at ¶¶ 67–69.)

Plaintiff objected to the written reprimand, filed a grievance regarding the reprimand, and requested that the issue be decided by an arbitrator. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 70 *with* Dkt. No. 72, at ¶ 70.) On August 25, 2005, the arbitrator held that the OCSO had just cause to impose progressive discipline and denied the grievance. (*Id.; see also* Dkt. No. 59, Attach. 47, at 7 [Arbitration Award].)

**2. Plaintiff's Contact with Melody Holmes**

On July 12, 2006, Plaintiff was delegated the responsibility of responding to an email inquiry from the Director of Jail Ministry, Melody Holmes. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 90, 91 *with* Dkt. No. 72, at ¶¶ 90, 91.) [22] Plaintiff was ordered to inform Ms. Holmes that her request could not be accommodated and provide an explanation as to why. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 92 *with* Dkt. No. 72, at ¶ 92.)

[22]    Ms. Holmes requested that an inmate be transferred to the Clean and Sober Unit. (Dkt. No. 59, Attach. 10, at 13.)

On July 18, 2006, Plaintiff sent Ms. Holmes a response email. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 93 *with* Dkt. No. 72, at ¶ 93.) [23] Later that day, Ms. Holmes emailed Plaintiff seeking further clarification about his email. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 95 *with* Dkt. No. 72, at ¶ 95.) Without consulting his superiors, Plaintiff responded to Ms. Holmes's email. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 96 *with* Dkt. No. 72, at ¶ 96.) In that response, Plaintiff advised Ms. Holmes that the Jail Ministry's recommendations would be "given little consideration" and that its efforts would better be served by not becoming involved in the matter. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 97 *with* Dkt. No. 72, at ¶ 97.) On July 19, 2006, Ms. Holmes sent an email to Plaintiff, Defendant Gonzalez, and Sergeant Powlina, which contained Plaintiff's response email from the previous day. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 98 *with* Dkt. No. 72, at ¶¶ 98.) Gonzalez and Powlina found Plaintiff's email to be offensive and unprofessional. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 99, 100 *with* Dkt. No. 72, at ¶¶ 99, 100.) [24]

[23]    Plaintiff carbon copied one of his superiors as a recipient of this email.

[24]    Gonzalez also met with Sergeant Banks concerning Plaintiff's email, and he too agreed that the language used in the email was unprofessional. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 100 *with* Dkt. No. 72, at ¶ 100.)

**\*8** On July 26, 2006, Plaintiff was issued a supervisor's memorandum as a result of his email to Ms. Holmes. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 106 *with* Dkt. No. 72, at ¶ 106.) Defendant Gonzalez directed that the memorandum be issued in order to correct conduct that he and others viewed as inappropriate. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 107 *with* Dkt. No. 72, at ¶ 107.) In addition to the supervisor's memorandum, Plaintiff was ordered to refrain from contacting Ms. Holmes until the investigation was completed. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 110 *with* Dkt. No. 72, at ¶ 110.)

On August 4, 2006, Plaintiff filed a grievance over the supervisor's memorandum. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 111 *with* Dkt. No. 72, at ¶ 111.) Although Plaintiff filed his grievance pursuant to Article 29 of the collective bargaining agreement, the grievance was dismissed because

2010 WL 3909524

supervisor's memorandums are not a specific and express term of the agreement, and are thus not subject to the grievance procedure. (*Id.*)

## C. Plaintiff's Work–Related Concerns

### 1. Plaintiff's Wife

Plaintiff married fellow OCSO employee Theresa Zuk, formerly Theresa Spaulding, on August 21, 2004. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 175 *with* Dkt. No. 72, at ¶ 175.) Ms. Zuk has been employed by the OCSO since 1994, and was promoted to Sergeant in December of 2000. (Dkt. No. 59, Attach. 15, at 7.) On more than one occasion during her career with the OCSO, Ms. Zuk has complained of gender harassment and discrimination. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 157–159, 167, 171–174 *with* Dkt. No. 72, at ¶¶ 157–159, 167, 171–174.) In particular, between 1996 and 1997, Ms. Zuk filed written complaints regarding the treatment of female inmates at the Justice Center, as well as the treatment that she encountered as an employee of OCSO. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 157–163 *with* Dkt. No. 72, at ¶¶ 157–163.) [25]

[25]　More specifically, on October 16, 1996, Ms. Zuk filed a written complaint concerning the manner in which female inmates were being treated at the Justice Center. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 157 *with* Dkt. No. 72, at ¶ 157.) On December 13, 1996, Ms. Zuk filed a written complaint, alleging harassment at the hands of then-Sergeant Benjamin O'Dell, with the Onondaga County Personnel Department. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 157, 158 *with* Dkt. No. 72, at ¶¶ 157, 158.) On March 24, 1997, Ms. Zuk sent a letter to Defendant Walsh indicating that she was being subjected to harassment at the Justice Center. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 157 *with* Dkt. No. 72, at ¶ 157.) On May 15, 1997, Ms. Zuk filed a Human Rights Complaint concerning Sergeant O'Dell's harassing behavior. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 160 *with* Dkt. No. 72, at ¶ 160.) Ms. Zuk subsequently brought a lawsuit against Onondaga County concerning gender discrimination and harassment. (Dkt. No. 59, Attach. 15, at 40.) On September 8, 1997, Sergeant O'Dell was terminated because of several incidents of misconduct. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 160 *with* Dkt. No. 72, at ¶

160.) Based on O'Dell's termination, Ms. Zuk discontinued her lawsuit and withdrew her Human Rights Complaint. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 162–163 *with* Dkt. No. 72, at ¶¶ 162–163.) On October 2, 2000, Deputy Veronica Casolare filed a federal lawsuit against the County of Onondaga and Sergeant O'Dell. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 164 *with* Dkt. No. 72, at ¶ 164.) Ms. Zuk was subpoenaed to testify in this lawsuit. (*Id.*) However, because the lawsuit was settled before trial, Ms. Zuk never testified. (*Id.*)

In 2003, Ms. Zuk also accused a subordinate of violating OCSO policy, though her accusation was ultimately determinated to be without merit. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 167, 168 *with* Dkt. No. 72, at ¶¶ 167, 168.) [26] Finally, in October 2003, Ms. Zuk filed complaints about another subordinate and the workplace environment. [27] (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 171–174 *with* Dkt. No. 72, at ¶¶ 171–174.)

[26]　In 2003, Ms. Zuk reported to her supervisor that she smelled alcohol on a deputy's breath. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 167 *with* Dkt. No. 72, at ¶ 167.) The deputy denied having consumed any alcohol, which was confirmed by an Alco–Sensor test. (*Id.*) The deputy grieved having to submit to an Alco–Sensor test and proceeded to arbitration. (*Id.*) The arbitrator directed the County and the Sheriff to post a public apology. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 168 *with* Dkt. No. 72, at ¶ 168.) On March 10, 2005, Assistant Chief Wasilewski issued a public apology to the deputy. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 169 *with* Dkt. No. 72, at ¶ 169.) Ms. Zuk was not found to have acted inappropriately in handling the matter, and was not issued any form of discipline or supervisor's memorandum. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 170 *with* Dkt. No. 72, at ¶ 170.)

[27]　In October of 2003, Ms. Zuk filed a report about a deputy's comments to Ms. Zuk's sister that she wished Ms. Zuk would hang herself. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 171 *with* Dkt. No. 72, at ¶ 171.) That deputy was subsequently disciplined. (*Id.*) In November of 2003, Ms. Zuk complained to, then-Lieutenant Brisson that appropriately trained deputies were not being assigned to work in the booking unit for overtime shifts. (*Compare* Dkt.

No. 59, Attach. 5, at ¶ 173 *with* Dkt. No. 72, at ¶ 173.) Lieutenant Brisson advised Ms. Zuk that many of the deputies working overtime shifts refused to work in booking because they did not want to be under Ms. Zuk's supervision, and stated that several deputies noted that she was too quick to write them up. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 173–174 *with* Dkt. No. 72, at ¶¶ 173–174.)

### 2. Ramadan

On September 22, 2006, Defendant Gonzalez issued a memorandum regarding meal times for inmates observing Ramadan. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 123 *with* Dkt. No. 72, at ¶ 123.) Upon receipt of the memorandum, Plaintiff entered specific meal times for the list of inmates who declared themselves Muslim. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 125 *with* Dkt. No. 72, at ¶ 125.) After seeking advice from others, Defendant Gonzalez decided that meal times should remain general. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 126 *with* Dkt. No. 72, at ¶ 126.) [28] As a result, Plaintiff was directed to remove the assigned meal times from the list.

[28]     Though Plaintiff disputes this fact, the Court notes that Plaintiff does not controvert any of the substance of Defendants' assertion. Rather, Plaintiff improperly circumvents Rule 7.1(a)(3) by asserting additional facts. (*See supra* Part I.B. of this Decision and Order.) Accordingly, the Court deems ¶ 126 admitted.

### 3. Inmate Statistics

**\*9** In 2006, Plaintiff was delegated the responsibility of compiling statistics regarding inmate population. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 130, 132 *with* Dkt. No. 72, at ¶¶ 130, 132.) When it was time to file the 2006 annual report, some items were missing. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 134 *with* Dkt. No. 72, at ¶ 134.) Plaintiff, who was on sick leave, received a telephone call from another deputy asking if he knew the whereabouts of the statistics. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 135–37 *with* Dkt. No. 72, at ¶¶ 135–137.) After informing the deputy what he had done with the statistics, Plaintiff had no further communication with anyone regarding the statistics. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 137 *with* Dkt. No. 72, at ¶ 137.)

### D. Plaintiff's Lack of Promotion

On or about February 7, 2005, Plaintiff became aware that he had passed civil service examination number 77036, and was eligible for a promotion to the position of Deputy–Sheriff Sergeant. (Dkt. No. 59, Attach. 40 [Relevant Pages of Onondaga County Dept. of Personnel Cert. of Eligibles, dated Feb. 7, 2005].) [29] Plaintiff's interview was scheduled to occur on February 16, 2005, the day after he was scheduled to have his disciplinary hearing concerning his late submission of time sheets. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 67 *with* Dkt. No. 59, Attach. 5, at ¶ 67.) [30] On February 16, 2005, Plaintiff interviewed for the promotion. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 75 *with* Dkt. No. 72, at ¶ 75.) During the interview, along with the other candidates, Plaintiff was asked about any supervisor's memorandums and prior discipline received during his employment. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 78, 79 *with* Dkt. No. 72, at ¶¶ 78, 79.) Plaintiff responded affirmatively and disclosed the 2004 written reprimand. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 79 *with* Dkt. No. 72, at ¶ 70.) Plaintiff was not chosen for the promotion. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 80 *with* Dkt. No. 72, at ¶ 80.) [31]

[29]     Plaintiff's score tied for third on the list of eligible candidates. (Dkt. No. 59, Attach.40.)

[30]     At his disciplinary hearing, Plaintiff waived his right to an immediate due process hearing and was presented with a written reprimand for the violations. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 67 *with* Dkt. No. 59, Attach. 5, at ¶¶ 69–70.) Plaintiff objected to the reprimand, and chose to proceed to arbitration. (*Id.*)

[31]     On February 26, 2005, Defendant Walsh promoted Deputy–Sheriff Joseph Bernardini, who had the same examination score as Plaintiff. (Dkt. No. 59, Attach.40.) Three days earlier, on February 23, 2005, an arbitrator issued a decision requiring Defendant Walsh to issue a public apology to the deputy whom Plaintiff's wife had accused of having alcohol in his system during work.

In August of 2005, another Deputy–Sheriff Sergeant position became available. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 81 *with* Dkt. No. 72, at ¶ 81.) Again, Plaintiff was not selected for the promotion. (*Id.*) Plaintiff subsequently met with a promotion panel member to discuss ways in which he could improve his chances for promotion. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 82 *with* Dkt. No. 72, at ¶ 82.)

In March of 2006, another Deputy–Sheriff Sergeant position became available. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 84 *with* Dkt. No. 72, at ¶ 84.) Plaintiff's score on the civil service examination was the second highest among eligible candidates. (Dkt. No. 59, Attach.57.) Plaintiff was not promoted. (Dkt. No. 59, Attach. 5, at ¶ 84 *with* Dkt. No. 72, at ¶ 84.) Instead, a candidate who's examination score was tied for third among the eligible candidates was promoted. (Dkt. No. 59, Attach.57.)

**\*10** In May of 2006, two more positions for promotion became available. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 85 *with* Dkt. No. 72, at ¶ 85.) Though Plaintiff's examination score was still second among eligible candidates, two of the three candidates chosen for promotion had lower scores on the examination than Plaintiff. (*Id.; see also* Dkt. No. 59, Attach. 59 [Relevant Pages of Onondaga County Dept. of Personnel Cert. of Eligibles, dated May 1, 2006].)

In June of 2007, another Deputy–Sheriff Sergeant position became available. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 139 *with* Dkt. No. 72, at ¶ 139.) Plaintiff was interviewed by the promotion panel for the position. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 140 *with* Dkt. No. 72, at ¶ 140.) [32] During the interview, the promotion panel asked Plaintiff to discuss his supervisor's memorandum related to Ms. Holmes. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 141 *with* Dkt. No. 72, at ¶ 141.) Plaintiff, however, refused to do so, and was denied this promotion as well. (*Id.*) [33] Subsequently, Defendant Gonzalez offered Plaintiff the opportunity to discuss ways in which he could improve his chances of being promoted, but Plaintiff refused to speak with him, and did not ask to speak to anyone else. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 143–145 *with* Dkt. No. 72, at ¶ 143–145.) In August 2007, another Deputy Sheriff Sergeant–Custody position became available, but Plaintiff was not selected for the promotion. (*Id.*)

[32]  This promotion panel was compromised of the following persons: Police Division Assistant Chief Botsford, Custody Division Chief Carbery, Assistant Chief Wasilewski, then-Lieutenant Brisson, and Captain Gonzalez. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 140 *with* Dkt. No. 72, at ¶ 140.)

[33]  Though Plaintiff disputes this fact, he acknowledges that he refused to discuss the topic any further in his deposition. (Dkt. No. 60, Attach. 24, at 135–136.)

The position of Deputy Sheriff Sergeant–Custody once again became available in October of 2007. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 146 *with* Dkt. No. 72, at ¶ 146.) Although Plaintiff was not selected for the promotion, he and certain other candidates were given the opportunity to interview for another Deputy Sheriff Sergeant–Custody position. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 147 *with* Dkt. No. 72, at ¶ 147.) As a result, Plaintiff and certain other candidates re-interviewed with the promotion panel in order to (1) provide the promotion panel with additional information not mentioned during the initial interview, and (2) advise the promotion panel on what they had been up to since originally interviewing for the position. (*Id.*) At his interview, Plaintiff did not provide any additional information in support of his qualifications for the promotion. (*Id.*) In December of 2007, May of 2008, and August of 2008, eligibility lists were certified, but Plaintiff was not selected for promotion. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 148, 149 *with* Dkt. No. 72, at ¶¶ 148, 149.)

### E. Plaintiff's Grievances

On April 5, 2007, Plaintiff filed a charge of discrimination with the EEOC, alleging national-origin discrimination and retaliation. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 179 *with* Dkt. No. 72, at ¶ 179.) [34] On April 13, 2007, the EEOC issued a Dismissal and Notice of Rights letter. (*Id.*)

[34]  More specifically, Plaintiff alleged as follows: (1) he is a Brazilian male; (2) the issuance of the supervisor's memorandum following the incident with Ms. Holmes was based on lies; (3) he was not promoted because of that supervisor's memorandum; and (4) he was not promoted in retaliation for complaining about the written reprimand in 2005. (Dkt. No. 59, Attach.90.)

**\*11** In June of 2007, Plaintiff filed an internal discrimination and harassment complaint, alleging that he was discriminated against and harassed because of his national origin. The harassment portion of the complaint concerned the 2005 written reprimand based on his submission of late time sheets, and alleged that Defendant Gonzalez lied to and harassed him. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 114, 115 *with* Dkt. No. 72, at ¶¶ 114, 115.)

Plaintiff met with Assistant Chief Wasilewski to discuss the complaint. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 117 *with* Dkt. No. 72, at ¶ 117.) Assistant Chief Wasilewski asked Plaintiff to provide specific details about the allegations in

order to enable him to conduct an investigation. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 118–119 *with* Dkt. No. 72, at ¶¶ 118–119 .)[35] Plaintiff, however, declined to do so, and instead requested that the matter be forwarded to the Division of Employee Relations. (*Compare* Dkt. No. 59, Attach. 5, at ¶¶ 119–120 *with* Dkt. No. 72, at ¶¶ 119–120.)

[35]    Assistant Chief Wasilewski needed more information because the written reprimand was issued when Plaintiff was under the supervision of Caption Albanese, who, at the time of the meeting, was deceased. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 118 *with* Dkt. No. 72, at ¶ 118.)

On September 5, 2007, Plaintiff met with the Director of the Division of Employee Relations. (*Compare* Dkt. No. 59, Attach. 5, at ¶ 121 *with* Dkt. No. 72, at ¶ 121.) However, Plaintiff chose not to proceed any further because (1) he was disappointed, (2) he had discussed with other employees how complaints were addressed, and (3) he had already commenced litigation. (*Id.*)

### IV. ANALYSIS

#### A. Plaintiff's Claim of National–Origin Discrimination Under Title VII Due to Issuance of Reprimand and Denial of Promotion

As stated above in Part I.A. of this Decision and Order, Plaintiff claims that Defendants discriminated against him based on his national origin, in violation of Title VII, by issuing him an unjustified written reprimand (for failing to submit his time sheets) and by wrongfully denying him a promotion to Deputy–Sheriff Sergeant on ten separate occasions.[36] In support of their motion, Defendants argue as follows: (1) the claims against Defendants Walsh and Gonzalez, in their official capacity, should be dismissed; (2) Plaintiff failed to exhaust the mandatory administrative remedies before instituting this action in federal court, and therefore his Second–Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII are barred by the applicable statute of limitations; and (4) Plaintiff has failed to adduce admissible record evidence establishing a cause of action for national-origin discrimination, and therefore this claim should be dismissed. (Dkt. No. 59, Attach. 95, at 9.) Based on the current record, the Court accepts Defendants' first and fourth arguments, and therefore need not, and does not, consider Defendants' two other grounds for dismissal.

[36]    Though Plaintiff's Second–Amended Complaint asserts that he was denied promotions on fourteen (14) separate occasions, the record reflects only ten (10) occasions on which Plaintiff was denied a promotion.

#### 1. Plaintiff's Claims Against Defendants Gonzalez and Walsh

"[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 n. 55 (1978). "To succeed on a claim against a municipal officer in their official capacity, the plaintiff 'must still show that a [municipal] custom, policy or practice was the moving force behind the alleged constitutional violations.' " *Carmody v. Village of Rockville Centre,* 661 F.Supp.2d 299, 329 (E.D.N.Y.2009) (quoting *Escobar v. City of New York,* 05–CV–3030, 2007 WL 1827414, at *3 [E.D.N.Y. June 24, 2007] ). As a result, "[a] suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself." *Escobar,* 2007 WL 1827414, at *3 (citations omitted). "Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as 'redundant and an inefficient use of judicial resources.' " *DeJean v. County of Nassau,* 06–CV–6317, 2008 WL 111187, at *5 (E.D.N.Y. Jan. 8, 2008) (quoting *Escobar,* 2007 WL 1827414) (citing cases).

**\*12** Because of the foregoing, Plaintiff's claims against Defendants Gonzalez and Walsh are "merely duplicative of the action against the [County]." *Escobar,* 2007 WL 1827414, at *3 (citing cases). For these reasons, Plaintiff's claims against these individual Defendants are dismissed. *See Carmody,* 661 F.Supp.2d at 329 (collecting cases).

#### 2. Plaintiff's Claim Against Onondaga County

Employment discrimination claims are analyzed under the same burden-shifting framework of *McDonnell Douglas*.[37] "To establish a *prima facie* case of employment discrimination under Title VII and the ADEA, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for his position; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination ." *Deluca v. Bank of Tokyo–Mitsubishi UFJ, Ltd.,* 06–CV–5474, 2008 WL

857492, at *5 (S.D.N.Y. Mar. 31, 2008) (citing, *inter alia*, *McDonnell Douglas v. Green,* 411 U.S. 792, 802 [1973] ). [38]

[37]   *See, e.g., Hurd v. New York City Health & Hosp. Corp.,* 07–CV–1250, 2008 WL 5120624, at *1 (2d Cir. Dec. 8, 2008).

[38]   "The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as 'minimal' and 'de minimis.' " *Zhao v. State Univ. of New York,* 472 F.Supp.2d 289, 307 (E.D.N.Y.2007) (citing *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 [2d Cir.2001] ).

"If the plaintiff meets his minimal burden of establishing a *prima facie* case, the burden of production then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for the adverse employment action." *Deluca,* 2008 WL 857492, at *5 (citations omitted). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v.. Burdine,* 450 U.S. 248, 253 (1981).

**a. Written Reprimand**

On February 15, 2005, progressive discipline was sought against Plaintiff for failing to submit his time sheets in violation of Part 1.1 and 1.11 of the OCSO Duty Manual. Plaintiff previously received instruction on submitting his time sheets in accordance with OCSO policy, and received a supervisor's memorandum indicating that his failure to properly submit his time sheets in the future would result in progressive discipline.

Plaintiff argues that the written reprimand was issued in a discriminatory manner based on the fact that (1) "no other deputy had ever received a written reprimand for receiving time sheets late," (2) "other deputies ... were similarly situated [to him,] but [he] was the only one of Brazilian nation[al] origin," and (3) the written reprimand was issued, pursuant to OCSO policy, at the time that he elected to pursue

arbitration, resulting in his "[attending] arbitration guilty as charged." (Dkt. No. 60, at 12, 17, 18.)

**\*13** As an initial matter, it is undisputed that Plaintiff is able to satisfy the first three prongs of his *prima facie* case for discriminatory discharge under the *McDonnell Douglas* analysis. Having said that, the Court finds that he has failed to establish a *prima facie* case of discrimination arising from Defendants' issuance of a written reprimand based on his failure to comply with OCSO's policy regarding time sheet submissions. Instead, Plaintiff has merely alleged, in conclusory fashion, that, because "no other deputy had ever received a written reprimand for receiving time sheets late," and he was the only deputy of Brazilian decent, his receipt of the written reprimand must have been because of his national origin. This is not enough. [39]

[39]   The Court is mindful of the fact that "[a] showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003). However, "[a] plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate, in applying the *McDonnell Douglas* test, that he was subject to an adverse employment action 'and that a similarly situated employee not in the relevant protected group received better treatment.' " *Carter v. New Venture Gear, Inc.,* 310 F. App'x 454 (2d Cir. Feb. 18, 2009) (quoting *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 [2d Cir.2001] ). "When considering whether a plaintiff has raised an inference of discrimination by showing that he was subjected to disparate treatment, ... the plaintiff must show he was 'similarly situated in all material respects' to the individuals with whom he seeks to compare himself." *Graham,* 230 F.3d at 39 (citing *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 [2d Cir.1997] ). Here, Plaintiff has merely alleged, in conclusory fashion, that he was similarly situated to the individuals with whom he seeks to compare. This is not enough. *See Pergament v. Fed. Express Corp.,* 03–CV–1106, 2007 WL 1016993, at *9 (E.D.N.Y. Mar. 30, 2007) ("Notwithstanding success on the first three prongs, however, the

Court finds that Worthy is unable to make out the fourth element [of a *prima facie* case] because she has not shown that her final warning letter and termination occurred under circumstances giving rise to an inference of discrimination on the basis of her sex or race. Worthy's allegations of racism and sexism by her superiors-and in particular, Malebranche-are, for the most part, highly conclusory and completely unsupported by record evidence. Indeed, Worthy's 'evidence' in this respect consists primarily of her own speculation-as well as that of Mary Anne Leach ..., a former coworker and friend-that Worthy's race and sex, and not the dismal performance of the station she supervised, must have been the 'true' reasons behind Malebranche's decision to terminate Worthy."); *Alfieri v. SYSCO Food Servs., 192 F.Supp.2d 14, 20 (W.D.N.Y.2001)* (observing that it is well-settled that "[f]or a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination ... he or she must offer concrete particulars to substantiate the claim") (internal citations omitted).

Moreover, even assuming, for the sake of argument, that Plaintiff has established a *prima facie* case of discrimination, the Court finds that Defendants have articulated a legitimate, non-discriminatory basis for their actions. More specifically, Defendants have introduced evidence of the following: (1) the timely submission of time sheets is necessary for OCSO to calculate payment for overtime and work-related incidences; (2) beginning in June 2004, the Human Resources Manager, Lieutenant Metz, began sending emails to department chiefs seeking assistance in obtaining missing time sheets from numerous employees; (3) upon receipt of this email, Chief Callisto ordered his supervisory personnel to begin issuing supervisor's memorandums for first time offenders and requests for discipline for those who had offended before; (4) Plaintiff had previously received a supervisor's memorandum regarding his submission of late time sheets in November 2003; (5) the supervisor's memorandum warned Plaintiff of the consequences of failing to timely submit time sheets in the future; (6) Plaintiff commented on the supervisor's memorandum that he would "make every effort possible to turn [the time sheets] in on time"; (7) Plaintiff subsequently failed to timely submit time sheets for the payroll period of May 29, 2004 to June 11, 2004; (8) as a result, on June 30, 2004, Sergeant Banks sent out a memorandum to Captain Albanese for progressive discipline.

Such record evidence establishes the following: (1) that a legitimate basis existed for issuing written reprimands for failure to timely submit time sheets; (2) that Plaintiff failed, on multiple occasions, to timely submit his time sheets prior to receiving a written reprimand; and (3) that, through a supervisor's memorandum, Plaintiff was warned of the consequences of his continued failure to timely submit his time sheets. In addition, Defendants have introduced the following evidence, which rebuts Plaintiff's allegation that he was treated differently than were similarly situated, non-Brazilian employees: (1) Lieutenant Rys, who is a naturalized United States citizen, also received formal discipline for submitting late time sheets; and (2) progressive discipline has been sought for other individuals who have had multiple violations of the time submission policy. [40]

[40]    In fact, Plaintiff admitted, during his deposition, that, since filing his Complaint, he has learned that (1) Sergeant Banks received a written reprimand for submitting late time sheets "many years prior" to the date that Plaintiff received his written reprimand for submitting late time sheets, and (2) at some point in time after Plaintiff received his written reprimand, Sergeant Bucci received a written reprimand for submitting late time sheets. (Dkt. No. 59, Attach. 17, at 7.)

**\*14** Furthermore, Plaintiff has failed to adduce record evidence establishing that (1) Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination, (2) the other individuals who were issued written reprimands were issued these reprimands in the same manner as was Plaintiff, and were also members of the same national origin as Plaintiff (i.e., they were treated the same as Plaintiff because they too are Brazalian), and (3) to the extent the other individuals who were issued written reprimands were non-Brazilian, they were not issued the referenced reprimands before their arbitration hearings (i.e., they received more favorable treatment than did Plaintiff).

For these reasons, Plaintiff's claim of discrimination based on Defendants' issuance of a written reprimand arising out of Plaintiff's failure to timely submit time sheets is dismissed. [41]

[41]    The Court does not liberally construe Plaintiff's Second–Amended Complaint as asserting a claim of discrimination based on Defendant Gonzalez's issuance of a supervisor's memorandum in

response to Plaintiff's email to Melody Holmes. However, the Court notes that, even if it were to liberally construe Plaintiff's Second–Amended Complaint as asserting this claim, it would not survive Defendants' motion for summary judgment. This is because (1) Plaintiff has not established a *prima facie* case of discrimination with regard to this issue (for the same reasons that Plaintiff did not establish *prima facie* case of discrimination with regard to the written reprimand), and (2) Defendants have offered a non-discriminatory reason for issuing the memorandum, i.e., that a number of supervisory officials interpreted the content of the email to be inappropriate, and (3) Plaintiff has failed to adduce record evidence establishing that Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination.

### b. Denial of Promotion

As previously stated, in order to be considered for a promotion, a candidate must have received higher than, or equal to, the third highest score on the civil service examination. Candidates meeting such qualifications are then interviewed by a promotion panel. After the interview, the promotion panel evaluates each candidate and, based on those evaluations, submits its recommendations to Defendant Walsh. In making its recommendations, the promotion panel evaluates candidates according to a number of factors, including, but not limited to, prior discipline, performance evaluations, supervisor's memorandums, and the candidate's performance during the interview.

Plaintiff first became eligible for a promotion on or about February 7, 2005. Despite being eligible for a promotion on this date, as well as on nine other occasions, and despite interviewing for various promotions, Plaintiff was never promoted. Plaintiff argues that he was repeatedly denied promotions because of his national origin.

As an initial matter, it is undisputed that Plaintiff is able to satisfy the first three prongs of his *prima facie* case for discriminatory discharge under the *McDonnell Douglas* analysis. Having said that, the Court finds that Plaintiff has failed to establish a *prima facie* case of discrimination arising from the promotional panel's failure to promote him on ten separate occasions. Instead, Plaintiff has merely alleged, in conclusory fashion, that he was not promoted as a result of his national origin. Again, this is not enough. [42]

[42]   *See, supra,* note 39 of this Decision and Order; *see also Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001) ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates.... Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

Moreover, even assuming, for the sake of argument, that Plaintiff has established a *prima facie* case of discrimination (based on his conclusory allegation that he was treated less favorably than similarly situated, non-Brazilian employees during the interview process), the Court finds that Defendants have articulated a legitimate, non-discriminatory basis for their actions. More specifically, Defendants' have introduced evidence of the following: (1) despite sometimes scoring higher than the individuals who were promoted, Plaintiff was not promoted because, on at least three occasions in which he was interviewed by the promotion panel, he was not ranked high enough to be recommended for a promotion; [43] (2) Plaintiff's rank was based on the shared opinion from members of the promotion panel that he did not possess the qualities necessary to be promoted; [44] (3) in making a promotion determination, Defendants do not rely exclusively on a candidate's score on the civil service examination; and (4) at least some of the members of the promotion panel were not aware that Plaintiff was a naturalized citizen (let alone an individual of Brazilian descent). [45]

[43]   (Dkt. No. 59, Attach. 4, at ¶ 22 [Brisson Affid.]; Dkt. No. 59, Attach. 3, at ¶ 29.)

[44]   (Dkt. No. 59, Attach. 4, at ¶¶ 16, 19, 22–24 [Brisson Affid.]; Dkt. No. 59, Attach. 3, at ¶¶ 26, 29; Dkt. No. 59, Attach. 8, at 38–39 [Wasilweski Dep. Tr.]; Dkt. No. 59, Attach. 10, at 105–106 [Gonzalez Dep. Tr.].)

[45]   (Dkt. No. 59, Attach. 16, at 29–31; Dkt. No. 59, Attach. 3, at ¶ 31; Dkt. No. 59, Attach. 8, at 36; Dkt. No. 59, Attach. 4, at ¶ 18.)

**\*15**  Such record evidence establishes the following: (1) there was a legitimate basis for denying Plaintiff a promotion; and (2) at least some of the promotion panel members could not have even considered denying Plaintiff a promotion based on his national origin because they were unaware that he was even a naturalized citizen. In addition, Defendants have

introduced evidence that, on more than one occasion, Plaintiff was not the only candidate not promoted who scored higher than the individuals who were promoted. [46] This evidence rebuts Plaintiff's allegation that he was treated differently than similarly situated, non-Brazilian employees. [47]

[46]    (Dkt. No. 59, Attach. 55, at 2; Dkt. No. 59, Attach. 57, at 2; Dkt. No. 59, Attach. 59, at 2; Dkt. No. 59, Attach. 81, at 2.)

[47]    The Court notes that there is no evidence in the record that these other eligible candidates, who were not promoted but scored higher than the individuals who were promoted, have the same national origin as Plaintiff.

Furthermore, Plaintiff has failed to adduce record evidence establishing either that (1) Defendants' proffered, non-discriminatory rationale is merely a pretext for discrimination, or (2) the other individuals who were not promoted, who scored higher than the individuals who were promoted, have the same national origin as Plaintiff. Instead, Plaintiff only argues, in conclusory fashion, that it should be presumed that he was not promoted because of his national origin given that (1) Defendants had access to his personnel file (and certain individuals reviewed the file when contemplating disciplinary action or promotion), and they were therefore aware of his nationality, and (2) he was more qualified for the promotion than those promoted. [48] Such a conclusory argument, based entirely on speculation, is not enough to withstand a motion for summary judgment. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("[E]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *see also Goenaga v. March of Dimes Birth Found,* 51 F.3d 14, 18 (2d Cir.1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

[48]    Plaintiff argues that Defendants failure to produce the promotion panel's scoring and ranking of those promoted gives rise to an inference that he was more qualified than those candidates.

For these reasons, Plaintiff's claim of discrimination based on his being denied a promotion because of his national origin is dismissed.

**B. Plaintiff's Claim of Hostile Work Environment Under Title VII Due to Verbal Harassment**

In addition to claiming that he was issued an unjustified written reprimand and wrongfully denied a promotion based on his national origin, Plaintiff claims that he was subjected to a hostile work environment based on his national origin, due to the verbal harassment by Defendants (including Defendant Gonzalez) that he experienced on multiple occasions. In support of their motion, Defendants argue as follows: (1) the claims against Kevin E. Walsh and Esteban Gonzalez, in their official capacity, should be dismissed; (2) Plaintiff failed to exhaust the mandatory administrative remedies before instituting this action in federal court, and therefore his Second–Amended Complaint should be dismissed; (3) Plaintiff's claims pursuant to Title VII are barred by the applicable statute of limitations; and (4) Plaintiff has failed to adduce record evidence establishing his hostile work environment claim.

*16 For the reasons stated in Part IV.A.1. of this Decision and Order, Plaintiff's claims against Defendants Gonzalez and Walsh are dismissed. In addition, because the Court accepts Defendants' fourth argument (i.e., that Plaintiff has failed to adduce record evidence establishing this hostile work environment claim), it need not, and does not, consider Defendants' two other grounds for dismissal.

"To establish a claim of hostile work environment, a plaintiff must show that: (1) he or she was subjected to harassment because of his or her membership in a protected class that was so severe or pervasive as to alter the conditions of his or her employment; and (2) there is a specific basis for imputing the harassment to the defendant." *Little v. Nat'l Broad. Co., Inc.,* 210 F.Supp.2d 330, 388 (S.D.N.Y.2002) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth,* 118 S.Ct. 2257 (1998), and *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998) [other citation omitted] ).

"The test for the first prong is whether the employment environment was 'objectively hostile'—that is, whether the environment was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Little,* 210 F.Supp.2d at 388 [citations and internal quotations omitted]. "The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from

becoming a general civility code." *Little,* 210 F.Supp.2d at 388 [internal quotation marks and citations omitted]. "Courts must distinguish between merely offensive and boorish conduct and conduct that is sufficiently severe or pervasive as to alter the conditions of employment." *Id.* [internal quotation marks and citations omitted].

"In determining whether a workplace is objectively hostile, a court should look at the totality of the circumstances." *Id.* (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 [1993] ). Factors that courts should examine include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Forklift Sys., Inc.,* 510 U.S. at 23. "When evaluating the 'quantity, frequency, and severity' of the incidents, the court must look at the incidents 'cumulatively in order to obtain a realistic view of the work environment.' " *Little,* 210 F.Supp.2d at 389 (citing *Schwapp v. Town of Avon,* 118 F.3d 106, 111 [2d Cir.1997] ). The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. N.Y.,* 366 F.3d 138, 150 (2d Cir.2004). The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, ... [t]he environment need not be 'unendurable' or 'intolerable.' " *Terry v. Ashcroft,* 336 F.3d 128, 147 (2d Cir.2003) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70 [2d Cir.2000] ). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." *Feingold,* 366 F.3d at 150 (quotations and citation marks omitted) (alternation in original).

**\*17** As an initial matter, Plaintiff has failed to allege facts plausibly suggesting that the actions of Defendants —including Defendant Gonzalez—were discriminatory in nature. [49] In any event, even assuming, for the sake of argument, that Plaintiff has alleged facts plausibly suggesting that the actions in question (e.g., the hearsay statements about what an employee told Plaintiff that Gonzalez said, or what Gonzalez told Plaintiff that Melody Holmes said) were discriminatory in nature, Plaintiff has failed to adduce admissible record evidence establishing he was subjected to conduct that was so severe or pervasive as to alter the conditions of his employment. For example, Plaintiff has

not adduced admissible record evidence establishing that the incidents (1) were caused by his national origin, (2) were frequent, (3) were objectively severe, (4) were physically threatening, or (5) otherwise unreasonably interfered with his ability to work.

[49]    For example, with regard to Defendant Gonzalez's actions, Plaintiff's Second–Amended Complaint specifically alleges as follows: (1) on July 26, 2006, Sergeant Banks served him with a Supervisor's Memorandum, on the orders of Defendant Gonzalez, which "reprimand[ed] and chastis[ed] [him] for unprofessional conduct" stemming from Plaintiff's email exchange with Melody Holmes; (2) Sergeant Banks told Plaintiff that Defendant Gonzalez stated that Plaintiff was "condescending" to Holmes; (3) "several months later," during a meeting with Banks and Gonzalez, Plaintiff asked Gonzalez to retract the Supervisor's Memorandum, but he refused, and "further commented that in addition to being[ ] 'condescending,' [Holmes] said [he] was 'abrasive' "; (4) Gonzalez order Plaintiff not to communicate with Holmes; (5) "a week or so later," Banks told Plaintiff that Gonzalez did not want Plaintiff "writing anything down about the meal times" on the Ramadan list; (6) on December 8, 2006, Plaintiff "unexpectedly met [Holmes,]" who told Plaintiff that she "never thought [he was] condescending or abrasive[, and] never said anything in that manner to Gonzalez"; (7) "in January or February of 2007," Gonzalez had a co-worker call Plaintiff at home about "stats" for the annual report for 2006; and (8) on or about June 21, 2007, Plaintiff was interviewed for a promotion, and during the interview, which Gonzalez was present for, then-Lieutenant Brisson asked Plaintiff "about the supervisor's memorandum [he] received for responding by email to [Holmes]." (Dkt. No. 35.)

For these reasons, Plaintiff's hostile work environment claim is dismissed.

## C. Plaintiff's Claim of Retaliation Under Title VII Due to Issuance of Reprimand and Denial of Promotion

As stated above in Part I.A. of this Decision and Order, Plaintiff claims that Defendants violated his rights under Title VII by issuing him an unjustified written reprimand and

by wrongfully denying him a promotion to Deputy–Sheriff Sergeant, in retaliation for his filing grievances and appeals, seeking arbitration, and filing a complaint with the EEOC regarding the written reprimand. Plaintiff also claims that he was issued an unjustified written reprimand and wrongfully denied a promotion in retaliation for his wife's involvement in federal district court proceedings, as well as her participation in disciplinary hearings involving other deputies.

In support of their motion, Defendants argue that Plaintiff's retaliation claim should be dismissed because (1) Plaintiff cannot establish that he was participating in a statutorily protected activity, and (2) Plaintiff cannot establish a causal connection between the protected activity and the adverse employment action. (Dkt. No. 59, Attach. 95, at 14–19.) Based on the current record, the Court accepts a majority of Defendants' first argument, as well as the entirety of Defendants' second argument.

In adjudicating retaliation claims, courts follow the *McDonnell Douglas* burden-shifting approach. *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 552 (2d Cir.2010) (citations omitted). "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Kator,* 609 F.3d at 552–53 (citations omitted). "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 553 (internal quotation marks and citations omitted).

**\*18** "In order to establish a *prima facie* case of retaliation, [a plaintiff] must show (1) that [ ]he participated in an activity protected by Title VII, (2) that h[is] participation was known to h[is] employer, (3) that h[is] employer thereafter subjected h[im] to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor,* 609 F.3d at 552 (2d Cir.2010) (citations omitted). " 'Protected activity' refers to an action taken to protest or oppose statutorily prohibited discrimination." *Berry v. Empire Homes Servs. LLC,* 06–CV–2354, 2010 WL 1037948, at \*10 (E.D.N.Y. Mar. 18, 2010) (citing 42 U.S.C. §§ 2000e–3).

Plaintiff alleges that he engaged in the following protected activity, for which he was retaliated against: (1) on February 15, 2005, he filed a grievance in response to being issued a written reprimand for failing to timely submit time sheets; (2) in or about August 2005, he proceeded to arbitration regarding this incident; (3) on August 4, 2006, he filed a grievance over the supervisor's memorandum issued for the email that he sent to Ms. Holmes; and (4) on or about April 5, 2007, he filed a charge of discrimination with the EEOC.

Plaintiff also alleges that his wife engaged in the following protected activity, for which he was retaliated against: (1) in 1997, roughly seven years before marrying Plaintiff, his wife brought a lawsuit against the County of Onondaga based on alleged gender discrimination by Sergeant O'Dell (whom the County terminated shortly after she filed her Human Rights Complaint), which she ultimately discontinued; (2) in 2003, his wife reported to her supervisor that she smelled alcohol on a deputy's breath, and, based on an arbitrator's finding that the complaint was without merit and that a public apology was necessary, on March 10, 2005, Assistant Chief Wasilewski issued a public apology to the deputy; and (3) in 2006, Plaintiff's wife was subpoenaed to testify in a federal lawsuit filed by Deputy Veronica Casolare against the County of Onondaga and Sergeant O'Dell, but she never testified because the case settled. [50]

[50]    A review of the docket sheet in *Casolare v. Onondaga County,* 00–CV–1500 (N.D.N.Y.) reveals the following: (1) the subpoena was issued sometime in 2006; and (2) the case settled on December 12, 2006.

As an initial matter, only two of the above-described actions were taken to protest or oppose statutorily prohibited discrimination: (1) Plaintiff's filing of his EEOC complaint; [51] and (2) Plaintiff's wife's complaint of gender discrimination in 1997. [52] As a result, to the extent that Plaintiff's retaliation claim arises out of any of the other above-identified issues, the claim is dismissed. [53]

[51]    *See, e.g., Holder v. City of Yonkers,* 04–CV–10314, 2006 WL 1582081, at \*6 (S.D.N.Y. June 7, 2006) (noting that the filing of a charge of employment discrimination with the EEOC constitutes protected activity).

52    *See, e.g., Bampoe v. Coach Stores, Inc.,* 93 F.Supp.2d 360, 372 (S.D.N.Y.2000) (noting that, under Title VII, even informal complaints about discrimination, such as complaints to management, constitute protected activities); *but see Ebanks v. New York City Dept. of Environmental Protection,* 05–CV–3172, 2009 WL 891796, at *7 (E.D.N.Y. Mar. 31, 2009)* ("The filing of a union grievance ... is not a 'protected activity' under Title VII and, therefore, cannot form the basis for a Title VII retaliation claim.").

53    The Court notes that, with regard to Plaintiff's wife's involvement in the *Casolare* lawsuit, without more, the fact that she was (1) mentioned in a Decision and Order denying the defendants' motion for summary judgment, and (2) subpoenaed to testify, does not constitute engagement in "protected activity." In fact, being mentioned in a decision and ordered to provide testimony does not constitute "activity" of any sort.

Moreover, with regard to Plaintiff's wife's complaints of gender discrimination, the Court finds that, under the circumstances, those complaints do not give rise to a Title VII retaliation claim on behalf of Plaintiff. For the sake of much-needed brevity, the Court will assume that "third-party retaliation claims" under Title VII are cognizable, despite the existence of well-reasoned authority to the contrary. [54] Even assuming that a third-party's engagement in protected activity may constitute protected activity by a plaintiff for purposes of a Title VII retaliation claim, the Court finds that no rational juror could find, based on the current record, that the protected activity engaged in by Theresa Spaulding gave rise to the Title VII retaliation claim asserted by Plaintiff in this action. The Court makes this finding for three reasons: (1) Plaintiff was not married to Ms. Spaulding at the time that she complained of gender discrimination; (2) approximately eight years elapsed from Ms. Spaulding's filing of the complaint (in 1997) and Plaintiff's experience of adverse action (in 2005); and (3) legitimate grounds existed warranting the adverse action taken against Plaintiff. Simply stated, these three facts render implausible the alleged causal connection between the two events in question. [55]

54    *See Genao v. New York City Dep't of Parks,* 04–CV–2893, 2005 WL 1220899, at *5–6 (E.D.N.Y. May 23, 2005)* (collecting cases on both sides, noting that "the Second Circuit has not addressed the question of third-party retaliation claims under Title VII").

55    *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001)* ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close[.]' Action taken (as here) 20 months later suggests, by itself, no causality at all.").

*19    Finally, with regard to Plaintiff's filing of his EEOC complaint on or about April 5, 2007, the Court finds that Plaintiff has made out a *prima facie* case of retaliation. This is because, subsequent to April 5, 2007, Plaintiff was denied promotions (specifically in June of 2007, October of 2007, December of 2007, May of 2008, and August of 2008). [56] However, the Court has already found, in Part III.A. of this Decision and Order, that Defendants have satisfied their burden of demonstrating a legitimate, *non-discriminatory* reason for denying Plaintiff promotion opportunities. For this same reason, the Court finds that Defendants have articulated a legitimate, *non-retaliatory* reason for denying him promotion opportunities. [57] As a result, the burden shifts to Plaintiff to demonstrate that Defendants' proffered non-retaliatory reason for denying him a promotion in June of 2007, October of 2007, December of 2007, May of 2008, and August of 2008 was pretextual, and that retaliation was a substantial reason for the adverse employment action.

56    *See Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 57 (2d Cir.2004)* ("A tangible employment action ... constitutes a significant change in employment status, such as ... failing to promote ...." [internal quotations and citations omitted] ).

57    *See Simpson v. New York State Dep't of Civil Serv.,* 02–CV–1216, 2005 WL 545349, at *20 (N.D.N.Y. Mar. 1, 2005)* (McCurn, J.) ("As it did in connection with plaintiff's discrimination claim, and for substantially the same reasons, the court finds that the Department has met its burden of articulating a legitimate, non-retaliatory reason for terminating plaintiff.... The burden thus shifts back to plaintiff Simpson to establish pretext."); *Reznick v. Aramark Corp.,* 97–CV–18977, 1999 WL 287724, at *13 (E .D.N.Y. May 5,

1999) (noting that defendant's non-discriminatory reasons for adverse action also established non-retaliatory reasons for adverse action).

"A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, ... or when there were other objectively valid grounds for a discharge." *Rainola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001) (citations omitted). However, "[a] retaliatory motive must be ... 'at least a 'substantial' or 'motivating' factor behind the adverse action.'" *Rainola,* 243 F.3d at 625 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 [1977] ) (other citation omitted). As the Second Circuit has explained, "[a] plaintiff may prove retaliation was a substantial or motivating fact behind an adverse employment action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similarly conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (internal quotation marks and citation omitted). "Under some circumstances, retaliatory intent may also be shown, in conjunction with the plaintiff's *prima facie* case, by sufficient proof to rebut the employer's proffered reason for the [adverse action]." *Id.* (citation omitted). However, "[t]emporal proximity, standing alone, is insufficient to carry plaintiff's burden at step three[, the pretext element.]" *Pellegrino v. County of Orange,* 313 F.Supp.2d 303, 316 (S.D.N.Y.2004) (internal quotation marks and citation omitted). [58]

[58]    *See also Hines v. Hillside Children's Ctr.,* 73 F.Supp.2d 308, 323–24 (W.D.N.Y.1999) (noting that "[i]t is true that a 'strong temporal correlation' between an employee's protected activity and an adverse job action can constitute some evidence of a retaliatory motive," but holding that temporal proximity is not enough to establish pretext for retaliation); *Vails v. Police Dep't of the City of New York,* 54 F.Supp.2d 367, 378 (S.D.N.Y.1999) (finding a one-day difference between complaint and termination a "coincidence" and therefore insufficient); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 291 (S.D.N.Y.1999) ( "Despite the temporal correlation between plaintiff's filing of the EEOC charge and his termination, he has failed to establish that S & P's proffered reason for dismissing him, his misconduct, was false and that unlawful retaliation was the true reason for his discharge.")

Here, Plaintiff has failed to adduce any evidence establishing that a retaliatory motive was a substantial or motivating factor behind the adverse action. For example, other than temporal proximity, Plaintiff has not adduced other circumstantial evidence, such as disparate treatment of fellow employees who engaged in similar conduct. Nor has he adduced direct evidence of retaliatory animus directed against him by Defendants (or one of his supervisors).

**\*20**  For each of these reasons, Plaintiff's Title VII retaliation claim is dismissed.

### D. Plaintiff's Claim of Denial of Right to Free Speech Under 42 U.S.C. § 1983 and First Amendment

As stated in Part I.A. of this Decision and Order, Plaintiff claims that Defendant Gonzalez unjustifiably suppressed his speech, in violation of 42 U.S.C. § 1983 and the First Amendment. In support of their motion, Defendants argue that Plaintiff's Section 1983 claim should be dismissed because (1) "the speech alleged to have been curtailed was made pursuant to Plaintiff's position as a public employee, and was well within the discretion of the County ... its Sheriff's Office[,] and its employees to restrict[,]" and (2) even assuming that Plaintiff is able to establish that Defendant Gonzalez violated his right to free speech, because this claim is brought against Defendant Gonzalez in his official capacity, the claim is actually a claim of municipal liability against the County, and Plaintiff has failed to establish the existence of a custom or policy. Based on the current record, the Court accepts Defendants' arguments.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006). However, the First Amendment does not protect public employees' speech when made pursuant to their official duties. *See Garcetti,* 547 U.S. at 421 (noting that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen ... [,][i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created").

In determining whether a public employee is entitled to constitutional protections for his or her speech, a court must

embark on two separate inquiries. *Garcetti,* 547 U.S. at 418. "The first requires determining whether the employee spoke as a citizen on a matter of public concern." *Id.* (citations omitted). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* (citation omitted). "If the answer is yes, then the possibility of a First Amendment claim arises." *Id.* "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citation omitted).

Here, Plaintiff alleges that Defendant Gonzalez violated his free speech rights when he told Plaintiff not to have further contact with Melody Holmes, and told a co-worker of Plaintiff's to tell Plaintiff to remove the remarks Plaintiff made regarding mealtimes on the inmate Ramadan meal registration list. Clearly these are not matters of public concern. Rather, they relate to restrictions of Plaintiff's work-related speech.

**\*21** In addition, the Court agrees with Defendants that, because Plaintiff has brought this claim against Defendant Gonzalez in his official capacity, the claim is actually a claim of municipal liability against the County. Furthermore, Plaintiff has failed to allege facts plausibly suggesting a custom or policy of suppressing employee speech, let alone adduce record evidence establishing the existence of a custom or policy of suppressing employee speech.[59]

[59]    Similarly, Plaintiff has failed to allege facts plausibly suggesting a custom or policy of retaliating against employees for engaging in protected activity, let alone adduce record evidence establishing the existence of a custom or policy of retaliation based on engagement in protected activity. As a result, to the extent that Plaintiff's Second–Amended Complaint can be liberally construed to assert a claim of retaliation against Onondaga County under 42 U.S.C. § 1983 (Plaintiff's claims against Defendants Walsh and Gonzalez are brought against them in their official capacity), that claim is also dismissed.

For these reasons, Plaintiff's free-speech claim is dismissed.

**E. Plaintiff's Cross–Motion to File a Third–Amended Complaint**

As an initial matter, the Court rejects Plaintiff's request for leave to file a Third–Amended Complaint, because that

request was already considered and denied by Magistrate Judge Peebles. (*See* Text Minute Entry for 2/17/09.) Plaintiff never filed an appeal from that denial, and the deadline in which to do so has expired.

Moreover, Plaintiff's request was submitted, not as a proper motion, but merely as an argument raised in his response memorandum of law. As a result, Plaintiff's request is unaccompanied by an affidavit, a specific identification of the proposed amendments, and a copy of the proposed amended pleading, as required by the Local Rules of Practice for this Court. *See* N.D.N.Y. L.R. 7.1(a)(4) (noting that "[a] party moving to amend a pleading pursuant to Fed.R.Civ.P. 14, 15, 19–22 must attach an unsigned copy of the proposed amended pleading to its motion papers").[60]

[60]    The Court notes that, on January 2, 2008, Plaintiff filed a motion to amend his Complaint, and attached to his motion a proposed Amended Complaint. (Dkt. No. 26.) Although the Court initially rejected the proposed Amended Complaint (Dkt. No. 34), it is clear that Plaintiff was aware of the requirement that he file a motion to amend his Complaint and attach his proposed Amended Complaint in order for the Court to consider the relief requested.

Furthermore, Plaintiff's request is not contained in a response to a *motion to dismiss for failure to state a claim* (which typically occurs relatively early in an action), but in a response to a *motion for summary judgment.* As a result, Plaintiff's request was filed nearly one year and ten months after the signing of his Complaint, and more than three months after the conclusion of discovery. (*See generally* Docket Sheet.) Simply stated, permitting Plaintiff to drastically change the landscape of his claims at such a late stage of the action would unduly prejudice Defendants, who spent the time and expense of filing two comprehensive and lengthy motions for summary judgment on the claims asserted in Plaintiff's Second–Amended Complaint, and who would not have the benefit of conducting discovery on such new claims before trial.[61]

[61]    *See Matiyn v. Allen,* 06–CV–1503, Decision and Order, at 8–9 & n. 9 (N.D.N.Y. Sept. 28, 2010) (Suddaby, J.) [collecting cases].

In any event, even if the Court were to overlook these flagrant procedural errors, the Court would nonetheless deny

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 69 of 261
Zuk v. Onondaga County, Not Reported in F.Supp.2d (2010)
2010 WL 3909524

Plaintiff's request on grounds of futility. This is because there is no evidence in the record from which a rational factfinder could conclude that Onondaga County, through its policymaking officials, [62] had (or has) a custom or policy of denying individuals (1) their due process rights when such individuals sought (or seek) to challenge the issuance of written reprimands and/or the denial of promotions, or (2) their equal protection right to be treated in the same manner as all other similarly situated individuals (or that such differential treatment was (or is) based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person). To the contrary, the record evidence adduced by the parties establishes that Onondaga County, through the OCSO, has express anti-harassment, anti-discrimination, and anti-retaliation policies. In addition, OCSO maintains internal procedures for aggrieved employees to seek redress for conduct that is discriminatory, harassing, and/or retaliatory.

[62]    In order for a municipality to be liable pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978),

the conduct causing the plaintiff's injury must have occurred pursuant to "policy or custom, ... made by [the municipality's] lawmakers or by those whose edicts or acts may fairly be said to represent official policy ." *Monell,* 436 U.S. at 694.

 **\*22**  For each of these alternative reasons, Plaintiff's cross-motion to file a Third–Amended Complaint is denied.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is ***GRANTED*** in its entirety; and it is further

**ORDERED** that Plaintiffs' Second–Amended Complaint (Dkt. No. 35) is ***DISMISSED*** with prejudice in its entirety. The clerk is directed to enter judgment in favor of the defendants and close this case.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3909524

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

471 Fed.Appx. 70
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Vladimir ZUK, Plaintiff–Appellant,

v.

ONONDAGA COUNTY, Kevin E. Walsh, Sheriff–
Onondaga County Sheriff's Office, as joint public
employer and in his official capacity, Esteban Gonzalez,
in his official capacity, Defendants–Appellees,
Esteban Gonzales, Captain, Onondaga County
Justice Center, Vincent Wasilewski, Assistant Chief,
Onondaga County Justice Center, Kevin Brisson,
Captain, Onondaga County Justice Center, Thomas
Metz, Lieutenant–Personnel Section, Anthony
Callisto, former Chief–Custody Division (Retired
June, 2006), Richard Carbery, Chief–Custody
Division, Onondaga County Justice Center, Kevin
Walsh, Sheriff of Onondaga County, Warren Darby,
Undersheriff of Onondaga County, Defendants.

No. 10–4472–cv.
|
June 18, 2012.

Appeal from the judgment of the United States District Court for the Northern District of New York (Glenn T. Suddaby, Judge).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED.**

**Attorneys and Law Firms**

Vladimir Zuk, Camillus, N.Y., pro se.

Gordon J. Cuffy, County Attorney (Karen A. Bleskoski, of counsel), Syracuse, N.Y., for Defendants–Appellees.

PRESENT: GUIDO CALABRESI, JOSÉ A. CABRANES and RAYMOND J. LOHIER, JR., Circuit Judges.

*SUMMARY ORDER*

**\*1** Plaintiff–Appellant Vladimir Zuk, *pro se,* appeals from an award of summary judgment in favor of his former employer in his employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

We review orders granting summary judgment *de novo* and focus on whether the district court properly concluded that there was no genuine issue as to any material fact and the moving party was entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003). "In determining whether there are genuine issues of material fact, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003) (internal quotation marks omitted). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita* **\*71** *Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

On appeal, Zuk argues that the District Court erred when it granted summary judgment on his Title VII national-origin discrimination claim, which was premised on his allegations that, due to his Brazilian national origin, he was disciplined more severely than other similarly situated employees. We have conducted a *de novo* review of the record in light of the above standards and now affirm for substantially the same reasons set forth by the District Court in its September 30, 2010, decision and order.

Zuk's national-origin discrimination claim is governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this scheme, a plaintiff must first satisfy the minimal burden of making out a *prima facie* case of discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 492 (2d Cir.2010). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes

of making out a *prima facie* case." *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 379 (2d Cir.2003) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000)). In order to raise an inference of discrimination by showing that he was subjected to disparate treatment, however, "the plaintiff must show [ ]he was 'similarly situated in all material respects' to the individuals with whom [ ]he seeks to compare h[im]self." *Graham,* 230 F.3d at 39 (quoting *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997)). In this analysis, there must be an "objectively identifiable basis for comparability" between the plaintiff and the comparator employee, *id.* at 40 (internal quotation marks omitted), which includes an assessment of "whether the conduct for which the employer imposed discipline was of comparable seriousness," *id.* (internal citation omitted).

 **2  In his brief, Zuk argues that he was the only Onondaga County Sheriff's Office ("OSCO") employee "singled out and disciplined for allegedly turning in two time sheets late," and asserts that another employee, Lieutenant Walter Rys, "never received formal discipline for late or missing time sheets." This argument both understates the reason for Zuk's reprimand and overstates the usefulness of Rys as a comparator. First, Zuk was not issued a written reprimand simply for turning in two time sheets late, but also, and more significantly, for disregarding a direct order from his superior to submit his time sheets in a timely fashion. Indeed, Onondaga County Sheriff Kevin Walsh affirmed that it was

Zuk's failure "to abide by an order to turn in his time sheets in a timely fashion" that led him to approve the written reprimand.

Second, Zuk has not shown that he was "similarly situated in all material respects" to Rys. *Graham,* 230 F.3d at 39 (quotation marks omitted). In his affidavit, Rys affirmed that he had received "2 counseling memo[s] for late time sheets." Even assuming that a "counseling memo" is the same as the Supervisor's Memorandum Zuk received, there is no indication in the record that Rys, in those counseling memos, was ever specifically ordered, as Zuk was in his November 2003 Supervisor's Memorandum, to submit his time sheets in a timely fashion. Thus, without evidence that Rys failed to comply with the order of his superior, there is no "objectively identifiable basis for comparability" between Rys and Zuk because it cannot be assessed whether the conduct for which OCSO imposed discipline on Zuk, and not Rys, "was of comparable seriousness." *Id.* at 40 (internal citations and quotation marks omitted).

We have considered all of Zuk's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the District Court.

**All Citations**

471 Fed.Appx. 70, 2012 WL 2213668

---

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4478921
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John H. WHITE, Plaintiff,

v.

Raymond DRAKE, Correctional Officer,
Upstate Correctional Facility, Defendant.

No. 9:10–CV–1034 (GTS/DRH).
|
Sept. 26, 2011.

**Attorneys and Law Firms**

John H. White, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, Albany, NY, for Defendant.

## DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by John H. White ("Plaintiff") against Upstate Correctional Facility Correctional Officer Raymond Drake ("Defendant") pursuant to 42 U.S.C. § 1983, are the following: (1) Defendant's motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 12); (2) United States Magistrate Judge David R. Homer's Report–Recommendation recommending that Defendant's motion be granted and that Plaintiff's Complaint be dismissed without prejudice (Dkt. No. 44); and (3) Plaintiff's cross-motion to amend his Complaint pursuant to Fed.R.Civ.P. 15(a)(2) (Dkt. No. 45). For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendant's motion is granted; Plaintiff's Complaint is dismissed without prejudice; and Plaintiff's cross-motion to amend his Complaint is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Plaintiff commenced this action on August 9, 2010. (Dkt. No. 1.) Generally, liberally construed, Plaintiff's Complaint alleges that, on June 27, 2010, Defendant wrongfully prevented him from seeing a visitor, and assaulted him during a disagreement regarding the visitor. (*Id.*)

More specifically, Plaintiff alleges as follows. After being notified that he had a visitor on June 27, 2010, and waiting more than 30 minutes for an escort, Plaintiff addressed his concerns with Defendant regarding his "visit being delayed." (*Id.*) Defendant shouted at Plaintiff that his visit would not be taking place because his visitor had been apprehended by the Franklin County Police for drug smuggling-a fact that was false. (*Id.*) When Plaintiff complained of "official misconduct," by "speaking in the open area under [his cell] door," Defendant "kicked the door" of Plaintiff's cell "several times," "causing injury to [Plaintiff's] mouth, nose & right jaw," more specifically, causing his "nose ... to bleed on the floor," and him to experience "pain in the right side of [his] jaw." (*Id.*) Aware that the events were being recorded "on VHS/Video," Plaintiff asked Defendant why he had kicked the door; and Defendant offered a response that indicated a retaliatory and/or malicious intent. (*Id.*) Finally, after Plaintiff submitted a grievance to a "Grievance Unit Investigator" regarding Defendant's conduct, Defendant "willfully, knowingly, and intelligently submitted a written statement denying the allegations," which "denied Plaintiff his right to an [sic] fair and impartial investigation ...." (*Id.*)

Construed with the utmost of special liberality, Plaintiff's Complaint attempts to assert the following five claims based on the above-described factual allegations: (1) a claim that Defendant subjected him to verbal harassment followed by a subsequent physical assault, rendering the verbal harassment actionable under the Eighth Amendment; (2) a claim that Defendant intentionally made false statements to Plaintiff regarding his visitor, in violation of the Eighth and/or Fourteenth Amendment; (3) a claim that Defendant wrongfully interfered with Plaintiff's right to visitation from and communication with the "outside world," in violation of the First, Eighth and/or Fourteenth Amendments; (4) a claim that Defendant wrongfully interfered with Plaintiff's right to the grievance process by intentionally making false statements to the Grievance Unit Investigator, in violation of the First and/or Fourteenth Amendments; and (5) a claim that Defendant subjected him to excessive force, in violation of the Eighth Amendment. (*See generally id.; see also* Dkt. No. 17 [Plf.'s Response to Def.'s Motion to Dismiss].) [1]

1     The Court notes that, while Plaintiff used the word "discrimination" at one point in his Complaint, the Court does not liberally construe his Complaint as attempting to assert an equal protection claim under the Fourteenth Amendment, given (1) the lack of factual allegations in his Complaint plausibly suggesting that he is a member of a protected class, and/or how he was discriminated against, and (2) the fact that he does not articulate such a claim in his response to Defendant's motion to dismiss.

 *2  Familiarity with the remaining factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.

**B. Defendant's Motion to Dismiss**

On November 15, 2010, Defendant filed a motion to dismiss the Complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 12.) Generally, in his motion, Defendant asserts the following eight arguments: (1) to the extent that Defendant is sued in his official capacity, he is protected from liability as a matter of law by the Eleventh Amendment; (2) Plaintiff's claim of verbal harassment (under the Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to be free from verbal harassment; (3) Plaintiff's claim that Defendant intentionally made false statements to Plaintiff regarding his visitor (in violation of the Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to be free from false statements; (4) Plaintiff's claim that Defendant wrongfully interfered with Plaintiff's right to visitation (in violation of the First, Eighth and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to visitation; (5) Plaintiff's claim that Defendant wrongfully interfered with Plaintiff's right to the grievance process (in violation of the First and/or Fourteenth Amendments) should be dismissed, because Plaintiff has no constitutional right to the grievance process; (6) Plaintiff's claim that Defendant subjected him to excessive force (in violation of the Eighth Amendment) should be dismissed, because Plaintiff has failed to allege facts plausibly suggesting that the use of force against him was "objectively, sufficiently serious"; (7) in the alternative, all of Plaintiff's claims should be dismissed, because Defendant is protected from liability as a matter of law by the doctrine of qualified immunity; and (8) Defendant is entitled to a protective order, pursuant to Fed.R.Civ.P. 26(c), staying discovery in this action, pending the Court's determination of Defendant's motion. (Dkt. No. 12, Attach.1.)

On November 24, 2010, Plaintiff filed a response to Defendant's motion. (Dkt. No. 17.) Generally, in his response, Plaintiff asserts the following eight arguments: (1) he is not suing Defendant in his official capacity but his individual capacity; (2) he was subjected to both verbal harassment and physical assault, which, when combined, may constitute cruel and unusual punishment under the Eighth Amendment; (3) Defendant's false statements are actionable because they were intended to annoy and harass Plaintiff in violation of 7 NYCRR 701.2(e) (and because they were accompanied by a physical assault); (4) Defendant's challenge to Plaintiff's interference-with-visitation claim is "unnecessary," because Plaintiff asserts no such claim; (5) Plaintiff does have a constitutional right to the grievance process, under the First and/or Fourteenth Amendments, and Defendant violated that right by giving false statements during that process; (6) Plaintiff has alleged facts plausibly suggesting that the use of force against him was "objectively, sufficiently serious," by alleging facts plausibly suggesting that [a] Defendant's use of force was malicious and/or sadistic, with the purpose of causing harm, [b] Defendant's use of force caused Plaintiff wanton pain, and [c] Defendant's use of force violated N.Y. Correction Law § 137(5); (7) Defendant is not entitled to qualified immunity, because Plaintiff has alleged facts plausibly suggesting that Defendant was aware of the regulations and law; and (8) while Defendant is entitled to a protective order barring discovery, the Court should direct Defendant to provide any copies of audio/video tapes relating to the alleged incident(s) giving rise to this action. (*Id.*)

 *3  On December 1, 2010, Defendant filed (with leave of the Court) a supplemental memorandum of law in support of its motion to dismiss. (Dkt. No. 21.) Generally, in that supplemental memorandum of law, Defendant argues that, because Plaintiff has conceded (in Paragraph 4 of his Complaint as well as in Dkt. Nos. 10 and 11) that he failed to exhaust his administrative remedies before filing this action, this action should be dismissed. (*Id.*)

On December 3, 2010, Plaintiff filed (with leave of the Court) a response to Defendant's supplemental memorandum of law. (Dkt. No. 25.) Generally, liberally construed, Plaintiff's response asserts the following three arguments: (1) he should not be required to exhaust his administrative remedies because those remedies (through actions of various

administrative officials) have been rendered unavailable to him; (2) if the Court would allow, he would file an Amended Complaint asserting claims arising from the actions of various administrative officials in rendering his administrative remedies unavailable to him; and (3) even if the Court were inclined to dismiss this action due to his failure to exhaust his administrative remedies, it should do so only without prejudice. (*Id.*)

On January 14, 2011, Defendant filed (with leave of the Court) a reply to Plaintiff's response. (Dkt. No. 29.) Generally, in that reply, Defendant repeats his argument that this action should be dismissed based on Plaintiff's failure to exhaust his administrative remedies. (*Id.*) In addition, Defendant asserts arguments not relevant to the exhaustion issue but relevant to the arguments raised in the parties' prior exchange of briefs. (*Id.*)[2]

[2]    The Court notes that it did not, through its Text Order of November 22, 2010, grant Defendant leave to file a reply further briefing such issues.

On January 24, 2011, without prior leave of the Court, Plaintiff filed a sur-reply to Defendant's reply. (Dkt. No. 30.) Generally, in that unauthorized sur-reply, Plaintiff argues that he "stands by" his prior submissions to the Court. (*Id.*)

On July 25, 2011, the Court issued an Order staying further proceedings in this case until September 1, 2011, "to allow DOCS and CORC to render the final disposition to White's appeal in the present case." (Dkt. No. 39, at 3.)

On August 1, 2011, Defendant filed a letter advising the Court that CORC rendered a final disposition to Plaintiff's appeal on November 24, 2010. (Dkt. No. 40.)

On August 8, 2011, Plaintiff filed a response to Defendant's letter. (Dkt. No. 42.) Generally, liberally construed, that response argues as follows: (1) his original Complaint in this action should be dismissed without prejudice, with leave "to renew or amend within 45 days"; and (2) when that original Complaint is dismissed, an Order should be issued that [a] grants Plaintiff 45 days in which to file an Amended Complaint, which, *inter alia,* will assert claims arising from correctional officials' alleged intentional destruction of the audio/video tape recording of the incident giving rise to his original complaint, and [b] lifts the stay currently imposed on discovery, so that Plaintiff can obtain documents relevant to the investigation of his grievance. (Dkt. No. 42.)

**\*4** On August 10, 2011, Defendant filed a letter advising the Court that, while Defendant does not oppose Plaintiff's request to dismiss the action without prejudice, Defendant "would oppose a motion to amend the complaint as futile, based, *inter alia,* upon plaintiff's failure to exhaust administrative remedies prior to commencing suit." (Dkt. No. 43.)

### C. Magistrate Judge Homer's Report–Recommendation

On August 11, 2011, Magistrate Judge Homer issued a Report–Recommendation recommending that Defendant's motion be granted, and that Plaintiff's Complaint be dismissed without prejudice. (Dkt. No. 44.) Generally, Magistrate Judge Homer based his Report–Recommendation not on the eight arguments asserted by Defendant in his original memorandum of law (Dkt. No. 12), but on the fact that, according to Plaintiff's own factual allegations, he had not exhausted his available administrative remedies before filing this action (on August 9, 2010). (Dkt. No. 44.) Moreover, it is worth noting that Magistrate Judge Homer specifically recommended not that Plaintiff's Complaint be *conditionally* dismissed (i.e., if he does not file of an Amended Complaint curing the deficiencies in his exhaustion allegations), but that the Complaint be dismissed without prejudice, the action be closed, and Plaintiff be required to file a new action. (*Id.*) Familiarity with the particular grounds of Magistrate Judge Homer's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Plaintiff failed to file an Objection to Magistrate Judge Homer's Report–Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) However, on August 15, 2011, Plaintiff filed a motion to amend his Complaint pursuant to Fed.R.Civ.P. 15(a)(2).

### D. Plaintiff's Cross–Motion to Amend

Generally, in support of his cross-motion to amend his Complaint, Plaintiff attaches an affidavit in which he asserts as follows: (1) he wishes to add as Defendants to this action New York State Department of Correctional Services Commissioner Brian Fischer, New York State Department of Correctional Services Grievance Director Karen Bellamy, Upstate Correctional Facility Superintendent David Rock, and Upstate Correctional Facility Correctional Lieutenant Lumbard; (2) his claims against those four new Defendants

are timely because they relate back to the date of his original Complaint pursuant to Fed.R.Civ.P. 15(c); and (3) "the grievance involving this claim ... is not attached but is a part of the record [and] is an essential factor of the Amended Complaint." (Dkt. No. 45.) In addition, he attaches a signed copy of his proposed Amended Complaint. (Dkt. No. 45 & Attach. 1.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b) (1)(C). [3] When only general objections are made to a magistrate judge's report-recommendation, or where the objecting party merely reiterates the same arguments made in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

[3]    On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v.*

*Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

[4]    *See also Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

### B. Legal Standard Governing a Motion to Dismiss for Failure to State a Claim

 *5  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." F ed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show [ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the

above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* —— U.S. ——, —— – ——, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*6** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]- that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [5] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [6] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [7]

[5]     *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6  See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

7  It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint (and are provided by the parties), or (4) any matter of which the court can take judicial notice for the factual background of the case. 8 Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the

extent those papers are consistent with the allegations in the complaint. 9

8  See Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted); *L–7 Designs, Inc. v. Old Navy, LLC,* No. 10–573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed.R.Civ.P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case).

9  See *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ( "In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and

therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v.Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.) (Sharpe, M.J.) ("[I]n cases where *a pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds, 317 F.Supp.2d 160 (N.D.N.Y.2004)* (Hurd, J.).

**C. Legal Standard Governing a Motion to Amend a Complaint**

**\*7** Rule 15(a) (2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to] amend when justice so requires." Fed. R. Civ. Proc. 15(a)(2); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Manson v. Stacescu,* 11 F.3rd 1127, 1133 (2d Cir.1993). Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should ... be 'freely given.'

*Foman,* 371 U.S. at 182, *accord, Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

For example, with regard to the "undue delay" factor, the Second Circuit has held that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir.2000).

In addition, with regard to the "undue prejudice" factor, while as a general rule permission to amend a complaint should be freely given, " 'the trial court [is] required to take into account any prejudice' that might result to the party opposing the amendment." *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (leave to amend denied where new claim concerned different period of time and different theory of recovery from original claim) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31 [1971] ). For example, in *Ansam Associates,* the Second Circuit held that permitting Plaintiff to allege a "new set of operative facts" would have been "especially prejudicial [to the defendant] given the fact that discovery had already been completed and [defendant] had already filed a motion for summary judgment." *Ansam Associates,* 760 F.2d at 446.

Finally, with regard to the "futility" factor, a court measures futility under the same standard as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *Nettis v. Levitt,* 241 F.3d 186, 194 n. 4 (2d Cir2001); *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

**III. ANALYSIS**

**A. Defendant's Motion to Dismiss**

As an initial matter, neither party has filed an Objection to Magistrate Judge Homer's Report–Recommendation. As a result, the Court need review the Report–Recommendation for only clear error. After carefully reviewing all of the papers in this action, including Magistrate Judge Homer's Report–Recommendation, the Court concludes that the Report–Recommendation is correct in all respects. (Dkt. No. 44.) Magistrate Judge Homer employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) As a result, the Court adopts the Report–Recommendation in its entirety for the reasons stated therein.

**\*8** The Court would add only three points. First, Magistrate Judge Homer's thorough and correct Report–Recommendation would survive even *de novo* review.

Second, the Court bases its conclusion that Plaintiff's Complaint should be dismissed on the alternative ground that the claims asserted in that Complaint fail to state a claim upon which relief can be granted *for the reasons stated in the eight arguments asserted by Defendant in his original memorandum of law.* (Dkt. No. 12.)

White v. Drake, Not Reported in F.Supp.2d (2011)

2011 WL 4478921

Third, the Court bases its conclusion that Plaintiff should be required to file a new action rather than be permitted to simply file an Amended Complaint in this action on the following additional grounds: (1) Plaintiff will not be unfairly prejudiced by the Court's current Decision and Order, because the three-year limitations period governing his claims [10] (which appear to have arisen between June 27, 2010, and November 24, 2010) [11] does not yet appear to have expired, and because no reason exists to believe that Plaintiff's *in forma pauperis* status has changed since it was granted on September 8, 2010 (Dkt. No. 4); [12] and (2) if the Court were to simply accept for filing the proposed Amended Complaint that Plaintiff has submitted, the Court would actually be prejudicing Plaintiff because the pleading deficiencies in that Amended Complaint (described below in Part III.B. of this Decision and Order) would cause the Court to dismiss this entire action *with prejudice.*

[10]   "The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years ." *Pinaud v. County of Sufolk,* 52 F.3d 1139, 1156 (2d Cir.1995); *see also Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001) ("[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions ...."). A claim arising under Section 1983 accrues "when the plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) [internal quotation marks omitted], *accord, Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) [internal quotation marks omitted].

[11]   (*Compare* Dkt. No. 1, Attach. 1 [attaching grievance reflecting date of incident as June 27, 2010] *with* Dkt. No. 40 [attaching final decision on grievance, dated November 24, 2010].)

[12]   The Court notes that it appears that Plaintiff has acquired only one "strike" for purposes of 28 U.S.C. § 1915(g), as of the date of this decision. *See White v. Brettschneider,* 10–CV–4957, Order (E.D.N.Y. filed Dec. 23, 2010).

For all of these reasons, Defendant's motion to dismiss is granted, and Plaintiff's Complaint is dismissed without prejudice.

**B. Plaintiff's Cross–Motion to Amend**

As an initial matter, the Court denies Plaintiff's cross-motion to amend on three procedural grounds. First, Plaintiff's cross-motion is untimely in that it had to be filed with his opposition to Defendant's motion. N.D.N.Y. L.R. 7.1(c). [13] Ignoring this rule in this circumstance, and permitting Plaintiff to change the landscape of his claims after Magistrate Judge Homer has reviewed them, would frustrate the purpose of the Magistrate Act . [14]

[13]        The Court notes that, during the time in question, a copy of the District's Local Rules of Practice and *Pro Se* Handbook were on file at Plaintiff's correctional facility. The Court notes also that proceeding *pro se* does not excuse Plaintiff of his obligation to comply with the procedural requirements set forth in the Federal Rules of Civil Procedure and the Local Rules of Practice for this District. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant].")]; *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ( "*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks

and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted]; *Krug v. Cnty. of Rennselaer,* 559 F.Supp.2d 223, 234 (N.D.N.Y.2008) (McAvoy, J.) (noting that *pro se* plaintiffs "must follow the procedural formalities of Local Rules"); *Carmona v. Wright,* 233 F.R.D. 270, 275 (N.D.N.Y.2006) (Sharpe, J.) (*"Pro se* litigants must comply with local rules, and the failure to do so is sanctionable.").

14   *See also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection[ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to *de novo* review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted]; *cf. Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no

justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted].

Second, Plaintiff's motion fails to "set forth specifically the proposed amendments and identify the amendments in the proposed pleading, either through the submission of a redlined version of the original pleading or other equivalent means." N.D.N.Y. L.R. 7.1(a)(3). Neither Defendant nor the Court should be required, at its own peril (i.e., if it happens to be mistaken), to compare Plaintiff's two pleadings on a line-by-line basis, in an attempt to discern Plaintiff's proposed amendments.

Third, in attempting to state a claim in his Amended Complaint, Plaintiff appears to rely heavily on the incorporation by reference of a document attached to only his original Complaint, in violation of Local Rule 7.1(a)(3). (Dkt. No. 45, at ¶ 5 [stating that "the grievance involving this claim ... is not attached but is a part of the record [and] is an essential factor of the Amended Complaint"].) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("A party shall not incorporate any portion of its prior pleading into the proposed amended pleading by reference."). This proscription against piecemeal pleadings is not just a formality, but is supported by several practical justifications.

**\*9** In any event, even setting aside these three procedural violations, the Court would deny Plaintiff's cross-motion on five substantive grounds. First, Plaintiff has failed to even attempt to show cause for his motion, for example, by attempting to persuade the Court that his delay in filing the motion was not "undue," and that the prejudice to Defendants caused by the granting of his motion would not be "undue." (Dkt. No. 45.)

Second, Plaintiff's proposed claims against Defendant Drake in his Amended Complaint are more vague, and less factual, than are his claims against Defendant Drake in his original Complaint. [15] More important, Plaintiff's proposed claims

against Defendant Drake in his Amended Complaint suffer from most, if not all, of the pleading defects that plagued his claims against Defendant Drake in his original Complaint, which defects are accurately described by Defendants in their original memorandum of law. (Dkt. No. 12.) For example, Defendant's alleged false statements are not actionable, even if they were (1) intended to annoy and harass Plaintiff in violation of state law, [16] or (2) provided during the grievance process. [17] In addition, Plaintiff has failed to state a claim for excessive force because he has failed to allege facts plausibly suggesting that (1) the amount of force used against him was more than *de minimis*, [18] and (2) Defendant Drake *intended* to injure him by kicking his cell door. [19] To the contrary, Plaintiff has alleged merely that Defendant Drake kicked his cell door, "injuring [his] nose [and] right jaw." Moreover, Plaintiff's allegation that Defendant Drake's conduct violated N.Y. Correction Law § 137(5), [20] would not, even if plausible, elevate Defendant's conduct to a constitutional level. [21]

[15] (*Compare* Dkt. No. 1, at ¶¶ 6, 7 [focusing exclusively on conduct of Def. Drake] & Ex. 1 *with* Dkt. No. 45, Attach. 1, at ¶¶ 6, 7 [focusing mainly on conduct of five new proposed Defendants].)

[16] *See Robinson v. New York State Dept. of Corr. Serv.,* 08–CV–0911, 2009 WL 3246818, at * 16 (N.D.N.Y. Sept.30, 2009) (McAvoy, J., adopting Report–Recommendation by DiBianco, M.J.) ("Even if defendants had violated New York law or the DOCS Employee Manual prohibiting verbal harassment, the violation of state law, absent a constitutional violation, is not actionable under section 1983.").

[17] *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 349 (N.D.N.Y.2010) (Hurd, J. adopting Report–Recommendation by Lowe, M.J.) (noting that, because inmates do not have a constitutional right to grievance programs, "courts have consistently held that violations of th[e grievance] procedures or the state's failure to enforce them does not give rise to a claim under"); *cf. Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("A prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.").

[18] *See Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.").

[19] *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 341 (S.D.N.Y.2000) (noting that the subjective prong of an excessive force claim requires the plaintiff to allege "that the prison guards acted wantonly, with the sadistic or malicious intent to harm him").

[20] N.Y. Correction Law § 137(5) ("No inmate in the care or custody of the department shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection....").

[21] *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") [citation omitted]; *Murray v. Michael,* 03–CV–1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") [citation omitted]; *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") [citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ].

Third, to the extent Plaintiff has attempted to bring additional claims against these four individuals (as opposed to simply alleging the "special circumstances" that excused his failure to exhaust his claim against Defendant Drake), [22] at the very most, Plaintiff's proposed claims against Brian Fischer,

Karen Bellamy, David Rock, and Lieutenant Lumbard allege facts plausibly suggesting not criminal recklessness but mere negligence, which is not actionable under 42 U.S.C. § 1983.[23]

---

[22]    *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (finding that failure to exhaust administrative remedies may be excused where [1] administrative remedies were not in fact available, [2] prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion, or [3] "special circumstances ... justify the prisoner's failure to comply with administrative procedural requirements").

[23]    *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 827, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.... [D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Daniels v. Williams,* 474 U.S. 327, 331–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ("[I]njuries inflicted by governmental negligence are not addressed by the United States Constitution."); *Pena v. Deprisco,* 432 F.3d 98, 112 (2d Cir.2005) ("In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' ... [T]he Fourteenth Amendment is not a 'font of tort law.' ... It does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable.... '[N]egligently inflicted harm is categorically beneath the threshold of constitutional due process.' ") [citations omitted]; *Riddick v. Modeny,* No. 07–1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.").

Fourth, Plaintiff's proposed Amended Complaint, which is barely legible,[24] fails to allege facts plausibly suggesting the personal involvement of supervisors Brian Fischer, Karen Bellamy, and David Rock: Fisher and Rock are each the subject of merely conclusory allegations by Plaintiff, and Bellamy appears to be the subject of no allegations by Plaintiff. (Dkt. No. 45, Attach.1, ¶¶ 6, 7.) Moreover, Plaintiff's proposed Amended Complaint appears to fail to allege facts plausibly suggesting the personal involvement of Lieutenant Lumbard, whom he vaguely alleges committed "abusive acts ... where allegations are of correctional officers['] official misconduct." (*Id.*)

---

[24]    *See* N.D.N.Y. L.R. 10(a),(b) (requiring, *inter alia,* that pleadings be "double-spaced" and "legibly written").

**\*10** Fifth, and finally, Plaintiff's proposed Amended Complaint appears to allege facts plausibly suggesting that he did not exhaust (or even attempt to exhaust) his administrative remedies with regard to his new claims—i.e., his claims against Brian Fischer, Karen Bellamy, David Rock, and Lieutenant Lumbard arising from their alleged failure to preserve evidence and/or their rendering the administrative grievance process unavailable to him (by failing to render timely and correct administrative decisions on his original grievance). (Dkt. No. 45, Attach.1, ¶¶ 4, 6, 7.) Simply stated, to the extent Plaintiff has attempted to bring additional claims against these four individuals (as opposed to simply alleging the "special circumstances" that excused his failure to exhaust his claim against Defendant Drake), Plaintiff appears to have confused his exhaustion of his administrative remedies on his original grievance with his exhaustion of his administrative remedies with his new claims.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Homer's Report–Recommendation (Dkt. No. 44) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 12) is ***GRANTED*** and Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** without prejudice; and it is further

**ORDERED** that Plaintiff's cross-motion to amend his Complaint (Dkt. No. 45) is ***DENIED.***

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4478921

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 838128
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Grazyna H. CHRISTMAN, Plaintiff,

v.

UTICA NATIONAL INSURANCE
GROUP, INC., Defendant.

No. 6:06–CV–1392 (GTS/GHL).
|
March 27, 2009.

West KeySummary

**1**   **Civil Rights** 🔑 Particular Conditions,
Limitations, and Impairments

A former employee failed to establish that her
cough was a substantial impairment that limited
a major life activity and thus, could not meet her
prima facie burden of demonstrating that she had
a disability within the meaning of the Americans
with Disabilities Act (ADA). The employee
testified that her disability was her "impaired
condition, the urge to cough beyond my control."
However, she admitted in her deposition that her
"impaired condition" did not prevent her from
doing any daily life activities. In addition, she
testified that her medical condition did not limit
her ability to perform her job duties and that
she did not believe her former employer was at
fault for her medical condition, stating that her
condition was "not related to [her] employment."
Americans with Disabilities Act of 1990, § 2, 42
U.S.C.A. § 12101.

**Attorneys and Law Firms**

Grazyna H. Christman, Utica, NY, pro se.

Getnick Livingston Atkinson, Gigliotti & Priore, LLP, Joseph
A. DeTraglia, Esq., of Counsel, Utica, NY, for Defendant.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1**   Currently before the Court in this employment
discrimination action are the following seven motions: (1)
Defendant's motion for summary judgment (Dkt. No. 30);
(2) Plaintiff's motion to reopen discovery in order to obtain
the disclosure of the personnel records of three employees
(Dkt. No. 38); (3) Plaintiff's first motion for sanctions
against defense counsel for, *inter alia,* willfully failing to
produce the records in question (Dkt. No. 46); (4) Defendant's
first motion for a protective order limiting any remaining
disclosure obligations, which it may be deemed to have,
to computerized searches and prohibiting Plaintiff from
disclosing any confidential information she obtains (Dkt. No.
47); (5) Defendant's second motion for a protective order
requiring Plaintiff to return to Defendant all privileged and/
or inadvertently disclosed materials received by Plaintiff in
electronic form, including a DVD inadvertently containing
a small number of privileged emails (Dkt. No. 52); (6)
Plaintiff's motion to compel the disclosure of the above-
referenced personnel records of three employees (Dkt. No.
63); and (7) Plaintiff's second motion for sanctions for, *inter
alia,* making material misrepresentations to the Court in his
motion and response papers (Dkt. No. 64).

For the reasons set forth below, the Court rules as follows:
(1) Defendant's motion for summary judgment (Dkt. No.
30) is GRANTED; (2) Plaintiff's motion to reopen discovery
(Dkt. No. 38) is DENIED; (3) Plaintiff's first motion for
sanctions against defense counsel (Dkt. No. 46) is DENIED;
(4) Defendant's first motion for a protective order (Dkt. No.
47) is DENIED as moot; (5) Defendant's second motion for
a protective order (Dkt. No. 52) is GRANTED to the extent
that it requests that Plaintiff be ordered to return to Defendant
the DVD in question, but is otherwise DENIED; (6) Plaintiff's
motion to compel disclosure of personnel records (Dkt.
No. 63) is DENIED; and (7) Plaintiff's second motion for
sanctions (Dkt. No. 64) is DENIED. As a result, Plaintiff's
Complaint is dismissed in its entirety, and Plaintiff is ordered
to return to Defendant the above-described DVD within seven
(7) days of this Decision and Order.

**I. RELEVANT BACKGROUND**

**A. Procedural History**

2009 WL 838128

On November 16, 2006, Plaintiff filed a Complaint alleging that Defendant violated her following rights by terminating her employment under the pretext of poor performance: (1) her rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.; (2) her rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5 et seq.; and (3) her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. (See Dkt. No. 1.)

On November 5, 2007, discovery in this action closed. (Dkt.Nos.12–14.) On January 24, 2008, Stefan D. Berg, Esq., requested permission to withdraw as counsel for Plaintiff. (Dkt. No. 15.) On February 8, 2008, the Court granted Mr. Berg's request. (Dkt. No. 20.)

**\*2** On April 3, 2008, Defendant moved for summary judgment. (Dkt. No. 30.) Plaintiff requested, and was granted, four (4) extensions of deadline by which to respond to Defendant's motion. On May 28, 2008 (the final day in which she had to respond to the motion), Plaintiff filed her response to Defendant's motion. (Dkt. No. 39.)

On the same day that she filed her response, Plaintiff also filed a motion to reopen discovery—more than four (4) months after the discovery deadline had passed. (Dkt. No. 38.) In her motion papers, Plaintiff argues that, although Mr. Berg had requested the personnel records of three individuals during discovery, these records were never produced. (Id. at 1–2.) Plaintiff also argues that these documents are material to her case, because of the circumstances that surrounded the hiring of two of the individuals, and the decision not to hire the third individual. (Id.)

In response to Plaintiff's motion to reopen discovery, Defendant argues that Plaintiff's motion should be denied for four reasons. First, argues Defendant, Plaintiff failed to articulate any reason for needing the records other than that "they will allegedly show circumstances that surrounded [the] hiring of Mr. Raga and Mrs. Krug, but not hiring Martha Dumont by Michael Evolo." (Dkt. No. 43, at 1.) In support of its argument, Defendant points out that Plaintiff has not alleged in her Complaint a claim for failure to hire, which makes records of whom Plaintiff's former supervisor may or may not have hired irrelevant to Plaintiff's action. (Id. at 1–2.) Second, argues Defendant, because only Mr. Raga worked under Mr. Evolo during the same time period as did Plaintiff, the request of the personnel records of the other two individuals is "not only irrelevant, but also completely inappropriate and would violate their rights to privacy and

confidentiality." (Id. at 2.) Third, argues Defendant, it already provided Mr. Raga's records to Plaintiff "during the extensive investigation of [Plaintiff's] identical discrimination claims before the New York State Division of Human Rights." (Id.) Defendant also indicates that it provided redacted copies of Mr. Evolo's evaluations of the one other employee he supervised besides Plaintiff and Mr. Raga during Plaintiff's employment with Defendant. (Id.) Defendant states that these documents were used by Plaintiff during her deposition of Mr. Evolo. (Id.) Fourth, and finally, argues Defendant, Plaintiff failed to comply with Fed.R.Civ.P. 56(f) when she did not file an affidavit with her motion to compel. (Id.)

On July 31, 2008, Plaintiff filed a motion for sanctions under Fed.R.Civ.P. 11, based on defense counsel's conduct throughout litigation, with particular focus on counsel's actions once Plaintiff became pro se. (Dkt. No. 46.)

On August 8, 2008, Defendant filed a motion for a protective order limiting any remaining disclosure obligations, which it may be deemed to have, to computerized searches and prohibiting Plaintiff from disclosing any confidential information she obtains. (Dkt. No. 47.) In its motion, Defendant argues that it has already disclosed approximately six thousand (6,000) pages of requested materials, and that requiring disclosure of any paper documents would be unduly burdensome. (Dkt. No. 47, at 2.) In addition, Defendant argues that it "intends to turn over any additional emails it finds[,]" noting that it is not trying to hide any materials, but that the search process is burdensome and time consuming. (Id. at 3–4.)

**\*3** On September 12, 2008, Defendant filed a second motion for a protective order. (Dkt. No. 52.) In its motion, Defendant seeks "an Order requiring Plaintiff to return to Defendant a DVD which inadvertently disclosed privileged and other emails falling outside the scope of the Court's Order dated February 8, 2008." (Dkt. No. 53.)

On October 2, 2008, this case was then reassigned to the undersigned. (Dkt. No. 56.)

On November 4, 2008, Plaintiff filed a motion to compel disclosure of the same personnel records sought in the motion to reopen discovery. (Dkt. No. 63.)

On the same day, Plaintiff also filed a second motion for Fed.R.Civ.P. 11 sanctions against defense counsel for, inter

2009 WL 838128

*alia,* making material misrepresentations to the Court in his motion and response papers. (Dkt. No. 64.)

### B. Statement of Undisputed Material Facts

For the sake of brevity, the Court will only provide a brief recitation of the undisputed material facts on Defendant's motion for summary judgment.

Plaintiff was hired by Defendant on June 28, 1990. (*Compare* Dkt. No. 30, Part 2, ¶ 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 1 [Plf.'s Rule 7.1 Response].) On March 3, 1995, Plaintiff was transferred to the corporate accounting department, where Plaintiff held the title of Junior Accountant. (*Compare* Dkt. No. 30, Part 2, ¶¶ 4–5 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶¶ 4–5 [Plf.'s Rule 7.1 Response].) Plaintiff held this position throughout the remainder of her employment with Defendant. (*Compare* Dkt. No. 30, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 6 [Plf.'s Rule 7.1 Response].)

In the Fall of 2002, Defendant restructured some of its departments. (*Compare* Dkt. No. 30, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 7 [Plf.'s Rule 7.1 Response].) As a result, reinsurance accounting was reorganized into a new department known as the reinsurance accounting unit. (*Compare* Dkt. No. 30, Part 2, ¶ 8 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 8 [Plf.'s Rule 7.1 Response].) Michael Evolo was made supervisor of this unit. (*Compare* Dkt. No. 30, Part 2, ¶ 9 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 9 [Plf.'s Rule 7.1 Response].) Three employees, including Plaintiff, reported to Mr. Evolo. (*Compare* Dkt. No. 30, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 10 [Plf.'s Rule 7.1 Response].) In August 2003, Mr. Evolo evaluated Plaintiff after reviewing her performance for about ten (10) months. (*Compare* Dkt. No. 30, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].) This resulted in an overall performance rating of "3" (which means that she "meets expectations of the position."). (*Compare* Dkt. No. 30, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 14 [Plf.'s Rule 7.1 Response].) Plaintiff stated in her deposition that "the 2003 review was not biased [but] ... was consistent with the reviews that [she] was getting for the previous years with [Defendant]." (*Compare* Dkt. No. 30, Part 2, ¶ 15 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 15 [Plf.'s Rule 7.1 Response].)

 **\*4**  During this same time period, Mr. Evolo evaluated an Accountant II co-worker of Plaintiff after reviewing his performance for about ten months. (*Compare* Dkt. No. 30, Part 2, ¶ 16 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 16 [Plf.'s Rule 7.1 Response].) This resulted in an overall performance rating for Accountant II of "2" (which means that she "does not fully meet the expectations of the position."). (*Compare* Dkt. No. 30, Part 2, ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 17 [Plf.'s Rule 7.1 Response].) Subsequent to 2003, Mr. Evolo gave Plaintiff performance evaluations that indicated that her performance was declining. (*Compare* Dkt. No. 30, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 19 [Plf.'s Rule 7.1 Response].) On May 11, 2004, Mr. Evolo and Plaintiff discussed her job performance and Mr. Evolo gave Plaintiff a written memorandum "identifying certain areas of [Plaintiff's] performance that need immediate improvement." (*Compare* Dkt. No. 30, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response].) On June 8, 2004, Mr. Evolo sent Plaintiff an email, again outlining the need for improvement in several areas of her job performance. (*Compare* Dkt. No. 30, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response].) In July 2004, Mr. Evolo provided an annual evaluation of Plaintiff. (*Compare* Dkt. No. 30, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response].) In that review, he rated her overall performance as a "2." (*Compare* Dkt. No. 30, Part 2, ¶ 23 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 23 [Plf.'s Rule 7.1 Response].) In that same month, Mr. Evolo rated the overall performance of Accountant II as a "3." (*Compare* Dkt. No. 30, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response].) On August 10, 2004, Plaintiff again received a written memorandum from Mr. Evolo which indicated the need for Plaintiff to "improve [her] technical performance." (*Compare* Dkt. No. 30, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 25 [Plf.'s Rule 7.1 Response].)

On January 6, 2005, Plaintiff, Mr. Evolo and Mr. Evolo's supervisor met to discuss Plaintiff's job performance, and Plaintiff was put on probation and given a written warning. (*Compare* Dkt. No. 30, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response].) On February 21, 2005, Defendant terminated Plaintiff's employment. (*Compare* Dkt. No. 30, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 40, Part 1, ¶ 29 [Plf.'s Rule 7.1 Response].) Throughout her employment, Plaintiff frequently coughed as a result of a "throat condition." (Dkt. No. 1 at 4.) Plaintiff believes that this "throat condition" constitutes a

2009 WL 838128

disability within the meaning of the ADA. (Dkt. No. 1, at 4–5.)

## II. LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

 **\*5**  Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

As for the *materiality* requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248 [citation omitted].

As for the *genuineness* requirement, a dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Id.* As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a *genuine* issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)* [citation omitted; emphasis added]; *see also* Fed.R.Civ.P. 56(e)(2). [1] Similarly, inadmissible hearsay is insufficient to create a *genuine* issue of fact, "absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir.1985)* [citations omitted]. Moreover, "an affidavit ... that, by omission or addition, contradicts the affiant's previous deposition testimony" is insufficient to create a *genuine* issue of fact. *Hayes v. New York City Dept. of Corr., 84 F.3d 614, 619 (2d Cir.1996)* [citations omitted].

[1]

As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) [citations omitted].

## III. DISCUSSION

### A. Plaintiff's Motion to Reopen Discovery, Her Motion to Compel Disclosure of Personnel Files, Her Two Motions for Sanctions, and Defendant's First Motion for a Protective Order

"To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir.2004)* (citing *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy,* 891 F.2d 414, 422 [2d Cir.1989] ). A district court may deny a discovery request where "the additional discovery would not have precluded summary judgment." *Qualls v. Blue Cross of Cal., Inc.,* 22 F.3d 839, 844 (9th Cir.1994). Stated another way, "[n]o discovery ... is necessary where [the requesting party] cannot establish an essential element of their cause of action or where [that party] fail[s] to create a material issue of fact." *Crossland Federal Sav. Bank v. by F.D.I. C. v. 114 East Realty Co ., 93–CV–2925, 1994 WL 30460, at \*4 (S.D.N.Y. Jan.28, 1994)* (citing *Burke v. Bevona,* 931 F.2d 998, 1002 [2d Cir.1991] ).

 **\*6**  After carefully considering the matter, the Court concludes that Plaintiff's motion to reopen discovery, her motion to compel the disclosure of personnel files, and her two motions for sanctions should be denied (and that Defendant's first motion for a protective order should therefore be denied as moot) for four reasons. First, Plaintiff failed to comply with Fed.R.Civ.P. 56(f) by not filing an affidavit with her motion, which in and of itself is grounds for denying her motion. [2]

[2]

The Court acknowledges that the special leniency normally afforded to *pro se* litigants may somewhat loosen the Court's procedural rules. *See Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). However, that special leniency does not completely relieve

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 88 of 261
Christman v. Utica Nat. Ins. Group, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 838128

a *pro se* litigant of the duty to comply with those procedural rules. Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in the Federal Rules of Civil Procedure (and Local Rules of Practice) are procedural rules that even *pro se* litigants must follow. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). The Court also notes that Plaintiff received a copy of the Pro Se Manuel on February 8, 2008, more than two months before she filed her motion to compel.

Second, the Court finds, based on the record evidence, that the materials that Plaintiff has requested are not reasonably expected to raise a genuine issue of material fact. Indeed, her argument that the materials would do so is entirely speculative in nature. The Court notes that the flaws with Plaintiff's claims are discussed below in Part III.B. of this Decision and Order. The Court notes also that Plaintiff's former attorney, Mr. Berg, represented Plaintiff throughout discovery. When Defendant did not provide the materials in response to Plaintiff's request for them, Mr. Berg decided not to file a motion to compel. At the very least, this raises a significant doubt, in the Court's view, as to the necessity of the materials.

Third, as pointed out by defense counsel, Plaintiff has already been provided the personnel records of one of the three employees (Mr. Raga). As a result, she does not need them to be again produced by Defendant.

Fourth, and finally, Defendant provided approximately six thousand (6,000) pages of requested materials to Plaintiff during discovery, which evidences the fact that Defendant's failure to turn over the requested materials does not amount to bad faith, or anything that resembles sanctionable activity.

For all of these reasons, Plaintiff's motion to reopen discovery (Dkt. No. 38) is denied; her motion to compel the disclosure of personnel records (Dkt. No. 63) is denied; her Plaintiff's first motion for sanctions against defense counsel (Dkt. No. 46) is denied; her second motion for sanctions against defense counsel (Dkt. No. 64) is denied; and Defendant's first motion for a protective order (Dkt. No. 47) is denied as moot.

**B. Defendant's Motion for Summary Judgment**

**1. Plaintiff's ADA Claim**

In its motion for summary judgment, Defendant argues that Plaintiff has failed to establish a prima facie case of discrimination under the ADA because Plaintiff is unable to meet the second or fourth prongs of the test. (Dkt. No. 31, at 6.) In response, Plaintiff argues that she has met her burden of establishing a prima facie case of discrimination, has met her burden of showing pretext, and has produced evidence of disparate treatment. (Dkt. No. 39, at 5–7.) Having reviewed all the evidence, the Court concludes that Plaintiff has not met her prima facie burden under the ADA, and that, in the alternative, she has not demonstrated that her termination because of poor work performance was a pretext for discrimination.

**\*7** In disability discrimination cases, courts apply the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case. *McDonnell Douglas Corp.,* 411 U.S. at 802–04. If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to demonstrate a legitimate non-discriminatory reason for its actions. *Id.* Once the defendant offers a legitimate non-discriminatory reason, in order to prevail, the plaintiff must show that the proffered reason is nothing but a pretext for intentional discrimination. *Id.* Despite the fact that the burden of production may shift, at all times the plaintiff maintains the burden of persuasion and, therefore, in order to withstand summary judgment stage, the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994).

"A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case." *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998) [citation omitted]. "To satisfy this burden, plaintiff must establish that (1) her employer is subject to the ADA; (2) she is disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability." *Cody v. County of Nassau,* 577 F.Supp.2d 623, 637 (E.D.N.Y.2008) [citations omitted]. "Not every impairment is a 'disability' within the meaning of the ADA; rather, there

2009 WL 838128

are two requirements: the impairment must limit a major life activity and the limitation must be substantial." *Capobianco v. City of New York,* 422 F.3d 47, 56 (2d Cir.2005).

In her Complaint, Plaintiff alleges that she frequently coughed as a result of a throat condition for which she had surgery. (Dkt. No. 1 at 4–5.) At her deposition, Plaintiff testified that her disability was her "impaired condition, the urge to cough beyond my control." (Dkt. No. 30, Part 4, at 26 [Plf's Dep. Tr. 24:8–9].) Plaintiff admitted in her deposition that her "impaired condition" did not prevent her from doing any daily life activities. (Dkt. No. 30, Part 4, at 26 [Plf's Dep. Tr. 24:10–12].) In addition, Plaintiff testified that her medical condition did not limit her ability to perform her job duties. (Dkt. No. 30, Part 4, at 27 [Plf's Dep. Tr. 25:6–8].) Plaintiff also testified that she did not believe the Company was at fault for her medical condition, stating that her condition was "not related to [her] employment." (Dkt. No. 30, Part 4, at 27 [Plf's Dep. Tr. 25:9–11].) Because Plaintiff cannot establish that her cough was a substantial impairment that limited a major life activity, Plaintiff cannot meet her prima facie burden of demonstrating that she had a disability within the meaning of the ADA. The fact that Defendant failed to turn over the requested materials is therefore irrelevant.

 **\*8** In the alternative, even if Plaintiff had demonstrated that her cough amounted to a disability within the meaning of the ADA, the Court finds that Plaintiff has failed to offer evidence that she was terminated because of her cough. Finally, and most importantly, even if the Court were to find that Plaintiff had met her prima facie burden under the ADA (which it does not find), Plaintiff's claim would fail because Defendant offered a non-discriminatory reason for her termination—i.e. poor work performance—and she has not demonstrated any record evidence that this allegation of poor work performance is a pretext for discrimination.[3]

[3]     The Court notes that there is copious documentation that reflects the decline in Plaintiff's work, Mr. Evolo's efforts to work with Plaintiff, and Mr. Evolo's explanations of why Plaintiff's work performance was poor. (*See* Dkt. No 30, Part 4, at 39–54.) In addition, NYSDHR's dismissal of Plaintiff's discrimination complaint stated that its investigation "failed to reveal that [Plaintiff] was subjected to disparate treatment with regards to tasks and performance standards ... between August, 2003 and January, 2005, [when Plaintiff] was counseled on at least six occasions for

unsatisfactory performance and given suggestions for improvement ...." The investigation also noted that "[others] were evaluated on the same criteria ... and [Plaintiff] was terminated because she failed to improve on her work performance and not because of her age, gender, or disability." (*See* Dkt. No. 30, Part 4, at 19–21 [DeTraglia Affidavit Exhibit C].).

 **2. Plaintiff's ADEA and Title VII Claims**

"On a motion for summary judgment, claims of discrimination under Title VII, Section 1981, the ADEA, the NYSHRL, and the NYSCRL are analyzed under the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Davis v. Avaya, Inc.,* 295 F. App'x. 380, 381 (2d Cir. Oct 2, 2008). Under this framework, in order for a Plaintiff to survive summary judgment, she must first make out a prima facie case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802–804. In order to make out a prima facie case, Plaintiff must demonstrate the following: "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001). Further, the protected classification "must have actually played a role in" the employer's decision making process and had a determinative influence on the outcome. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) [citation and internal quotation omitted].

The record evidence demonstrates that Plaintiff fails the second prong of the test in that she was not satisfactorily performing her job at the time of her termination. Plaintiff also fails the fourth prong because the evidence establishes that Plaintiff's supervisor filled Plaintiff's position by employing a woman over forty (40) years of age. (Dkt. No. 31, Part 2, at 28 [Evolo Dep. Tr. 54:11–19] .) Furthermore, Plaintiff admitted during her deposition that her supervisor had never made any comments to her concerning her age or gender. (Dkt. No. 30, Part 4, at 28 [Plf's Dep. Tr. 38:9–14].) In sum, even if the requested personnel records demonstrate evidence of discriminatory hiring practices, the records do not help Plaintiff overcome the necessary element of satisfactory job performance, nor do they address the filling of the position that Plaintiff was terminated from. As a result, Plaintiff cannot establish a prima facie case.

2009 WL 838128

In the alternative, even if the Court found that Plaintiff established a prima facie case under the ADEA and Title VII, Defendant has asserted a legitimate, non-discriminatory reason for its action, which Plaintiff cannot show to be pretextual. The law is clear that, to survive summary judgment, once a Plaintiff makes out her prima facie face, the Employer must simply demonstrate a non-discriminatory reason for termination, such as poor work performance. [4] Once an Employer does this, the burden falls squarely on Plaintiff to show that the Employer did not terminate her employment based on the well-documented unsatisfactory job performance. [5]

[4]    If the plaintiff is able to meet her burden of establishing a prima facie case, "the burden of production then shifts to the defendant who must proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir.1998) [citation omitted]. At this stage, "[t]he employer merely needs to 'explain what he has done.' " *Sanzo v. Uniondale Union Free School Dist.,* 381 F.Supp.2d 113, 117–18 (E.D.N.Y.2005) (quoting *Texas Dep't of Cmty. Afairs v. Burdine,* 450 U.S. 248, 256 [1981] ). Poor job performance, which includes poor communication with supervisors, as well as the desire to promote efficiency, constitute "legitimate, clear, specific and non-discriminatory reason[s]" for termination. *Potenza v. City of New York Dept. of Transp.,* 00–CV–0707, 2001 WL 1267172, at *6 (S.D.N.Y. Oct.23, 2001).

[5]    Should the employer satisfy its burden, "the presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some [non-discriminatory] response, simply drops out of the picture." *Greenway,* 143 F.3d at 52 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (first alteration in original). As a result, the "ultimate burden" shifts back to the plaintiff, who must prove that "the employer's proffered reason is merely a pretext for its intentional discrimination." *Greenway,* 143 F.3d at 52 [citations omitted]. "If the plaintiff cannot prove intentional discrimination motivated by [her]

disability, then the defendants are entitled to summary judgment." *Sanzo,* 381 F.Supp.2d at 118.

**\*9** Here, Plaintiff simply cannot meet her burden. The record evidence establishes that Plaintiff's work performance had been declining for a significant period of time. (*See* Dkt. No. 31, Part 2, at 30–48.) Despite numerous attempts at corrective action by Defendant, however, Plaintiff's performance did not improve to an acceptable level, and her employment was terminated. Although Plaintiff may allege that her supervisor was biased, she has not adduced any specific evidence of bias sufficient to withstand summary judgment. In fact, the record evidence is directly to the contrary in that her supervisor consistently applied Defendant's uniform performance standards toward his subordinates.

For all of these reasons, Defendant's motion for summary judgment (Dkt. No. 30) is granted.

**C. Defendant's Second Motion for a Protective Order**
On September 12, 2008, Defendant filed a second motion for a protective order. (Dkt. No. 52.) In its affidavit submitted in support of its motion, Defendant indicated that, while attempting to provide Plaintiff with certain documentation that she requested after the close of discovery, which the Court addressed in its Order dated February 8, 2008, Defendant inadvertently disclosed privileged and other emails falling outside the scope of the Order. (Dkt. No. 53.) Defendant therefore requested in its second motion for a protective order that Plaintiff be ordered to return to it the DVD that contains information that is outside the scope of the Court's Order. Because the information contained on this DVD is Defendant's work product, and because the Court concludes that granting summary judgment in Defendant's favor is appropriate, the Court finds that there is no reason for Plaintiff to continue to possess these materials. As a result, Plaintiff is ordered to return to Defendant the above described DVD within seven (7) days of this Decision and Order. If she fails to do so, the Court will entertain a motion by Defendant for the imposition of sanctions against Plaintiff, including monetary sanctions.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 30) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's motion to reopen discovery (Dkt. No. 38) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's first motion for sanctions (Dkt. No. 46) is *DENIED;* and it is further

**ORDERED** that Defendant's first motion for a protective order (Dkt. No. 47) is *DENIED* as moot; and it is further

**ORDERED** that Plaintiff's motion to compel the disclosure of the personnel records of three employees (Dkt. No. 63) is *DENIED;* and it is further

**ORDERED** that Plaintiff's second motion for sanctions (Dkt. No. 64) is *DENIED;* and it is further

**ORDERED** that Defendant's second motion for a protective order (Dkt. No. 52) is *GRANTED* to the extent that it requests

that Plaintiff be ordered to return to Defendant the DVD in question, but is otherwise *DENIED;* and it is further

 **\*10** **ORDERED** that Plaintiff shall deliver to Defendant the requested DVD within seven (7) days of this Decision and Order. If she fails to do so, the Court will entertain a motion by Defendant for the imposition of sanctions against Plaintiff, including monetary sanctions; and it is further

**ORDERED** that, when Defendant receives the DVD in question, it shall file with the Court a letter stating that fact, whereupon a judgment shall be issued and this action shall be closed.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 838128

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

375 Fed.Appx. 106
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Grazyna H. CHRISTMAN, Plaintiff-Appellant,

v.

UTICA NATIONAL INSURANCE
GROUP, Defendant-Appellee.

No. 09-1385-cv.
|
April 29, 2010.

Appeal from a judgment of the United States District Court
for the Northern District of New York (Suddaby, J.).
**UPON DUE CONSIDERATION IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court be **AFFIRMED.**

### Attorneys and Law Firms

Grazyna H. Christman, pro se, Utica, NY, for Appellant.

Joseph A. DeTraglia, Getnick Livingston Atkinson & Priore,
LLP, Utica, NY, for Appellee.

PRESENT: DENNIS JACOBS, Chief Judge, JOSEPH M.
McLAUGHLIN, ROBERT D. SACK, Circuit Judges.

### SUMMARY ORDER

 **\*\*1** Grazyna H. Christman appeals from a judgment entered
April 6, 2009 in the United States District Court for the
Northern District of New York (Suddaby, *J.*). Christman
claims that she was terminated from her employment in
violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.,* the Age Discrimination in
Employment Act, 29 U.S.C. § 621 *et seq.,* and the Americans
with Disabilities Act, 42 U.S.C. § 12101 *et seq.* In the

orders relevant to this appeal, the district court granted
summary judgment to the defendants on all claims; and
denied Christman's motions for discovery under Federal Rule
of Civil Procedure 56(f), and for sanctions under Federal Rule
of Civil Procedure 11(b). We otherwise assume the parties'
familiarity with the underlying facts, the case's procedural
history, and the issues on appeal.

We review the district court's summary judgment order *de
novo. E.g. Miller v. Wolpoff & Abramson, L.L.P.,* 321
F.3d 292, 300 (2d Cir.2003). Summary judgment **\*107** is
appropriate where, drawing "all factual inferences ... in favor
of the non-moving party[,] ... there are no genuine issues of
material fact and ... the moving party is entitled to judgment
as a matter of law." *Id.* (citation omitted). On review, we find
no error, and affirm for substantially the reasons stated by the
district court in its March 27, 2009 summary judgment order.

Respecting the district court's Rule 56(f) ruling, we review for
abuse of discretion, *Gualandi v. Adams,* 385 F.3d 236, 244-45
(2d Cir.2004); and find none. Christman failed to support
her motion with "an affidavit describing: (1) what facts are
sought and how they are to be obtained; (2) how these facts
are reasonably expected to raise a genuine issue of material
fact; (3) what efforts the affiant has made to obtain them; and
(4) why the affiant's efforts were unsuccessful." *Id.* at 244.

Respecting the district court's Rule 11(b) ruling, we likewise
review for abuse of discretion, *Gurary v. Winehouse,* 235
F.3d 792, 798 (2d Cir.2000); and find none. Christman
has not shown (as she asserts) that the defendant's filings
mischaracterized the evidence in the record or were submitted
for any "improper purpose," Fed. R. Civ. P. 11(b)(1).

We have considered Christman's remaining arguments and
find them to be without merit. The district court's judgment is
accordingly **AFFIRMED.**

### All Citations

375 Fed.Appx. 106, 2010 WL 1718737

---

**End of Document**     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5562694
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael JONES, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

18 Civ. 1937 (VSB) (GWG)

|

Signed 11/29/2021

**Synopsis**
**Background:** Prisoner, proceeding pro se, brought § 1983
action against city, city department of corrections, 10
unnamed correctional officers, and others, asserting various
claims for constitutional violations while he was in city
custody. Prisoner moved for leave to amend his complaint and
to extend discovery.

**Holdings:** The District Court, Gabriel W. Gorenstein, United
States Magistrate Judge, held that:

[1] applicable three-year statute of limitations was tolled,
if at all, only during period in which prisoner remained in
department of corrections custody;

[2] prisoner did not exercise due diligence in seeking to
obtain identities of unknown officers, and thus, proposed
amendment did not relate back to original complaint; and

[3] court would grant prisoner leave to amend complaint to
include new allegations against doctor.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Amend the Complaint;
Motion to Extend Time for Discovery.

West Headnotes (24)

**[1]    Attorneys and Legal
Services**  ⚷  Construction in general
**Federal Civil Procedure**  ⚷  Pro Se or Lay
Pleadings

District courts hold submissions by pro se
litigants to less stringent standards than formal
pleadings drafted by lawyers, construing them
liberally, and interpreting them to raise the
strongest arguments that they suggest.

**[2]    Federal Civil Procedure**  ⚷  Nature and
purpose

Policy behind rule providing that court should
freely give leave to amend when justice so
requires is that liberal amendment promotes
judicial economy by making it possible to
dispose of all contentions between parties in one
lawsuit. Fed. R. Civ. P. 15(a)(2).

**[3]    Federal Civil Procedure**  ⚷  Discretion of
Court

The decision to grant or deny leave to amend
under rule government amendment when justice
so requires is within the trial court's discretion.
Fed. R. Civ. P. 15(a)(2).

**[4]    Federal Civil Procedure**  ⚷  Time for
amendment in general
**Federal Civil Procedure**  ⚷  Injustice or
prejudice
**Federal Civil Procedure**  ⚷  Form and
sufficiency of amendment;  futility

A district court may deny leave to amend
for good reason, which normally involves an
analysis of four factors: (1) undue delay, (2) bad
faith, (3) futility of amendment, or (4) undue
prejudice to the opposing party. Fed. R. Civ. P.
15(a)(2).

**[5]    Federal Civil Procedure**  ⚷  Amendments

The showing necessary under the rule allowing
addition of a party is the same as that
required under the rule governing amended and
supplemental pleadings. Fed. R. Civ. P. 15(a), 21.

**[6]**    **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

A court may deny leave to amend a complaint because amendment would be futile. Fed. R. Civ. P. 15(a).

**[7]**    **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

Claims barred by an applicable statute of limitations are futile, as would warrant denial of leave to amend. Fed. R. Civ. P. 15(a).

1 Cases that cite this headnote

**[8]**    **Federal Civil Procedure** 🔑 Anticipating defenses

A plaintiff is not required to plead that his or her claims are timely, because nonadherence to statutes of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1).

1 Cases that cite this headnote

**[9]**    **Federal Civil Procedure** 🔑 Limitations, laches and prematurity

District courts may dismiss an action sua sponte on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.

1 Cases that cite this headnote

**[10]**    **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

When a plaintiff seeks to amend a complaint to add time-barred claims, the court does not have to wait for a motion to dismiss, and waste judicial time and resources, but may instead deny a motion to amend to add time-barred claims as futile. Fed. R. Civ. P. 15(a).

2 Cases that cite this headnote

**[11]**    **Limitation of Actions** 🔑 Causes of action in general

An otherwise time-barred claim may proceed if there is a basis for tolling the statute of limitations.

**[12]**    **Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

The doctrine of equitable tolling applies with regard to limitations period only in rare and exceptional circumstances, where extraordinary circumstances prevented a party from timely performing a required act, and the party acted with reasonable diligence throughout the period he sought to toll.

**[13]**    **Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

Generally, a litigant seeking equitable tolling of the limitations period bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way.

**[14]**    **Limitation of Actions** 🔑 Pendency of Action or Other Proceeding

A prisoner is entitled to equitable tolling on a § 1983 claim for the period during which he is exhausting applicable administrative remedies under the Prison Litigation Reform Act (PLRA). Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a); 42 U.S.C.A. § 1983.

**[15]**    **Limitation of Actions** 🔑 Amendment of defects

Generally, "John Doe" pleadings cannot be used to circumvent statutes of limitations because replacing a "John Doe" with a named party in effect constitutes a change in the party sued; "John Doe" substitutions may only be accomplished if it relates back to the original pleading. Fed. R. Civ. P. 15(c).

**[16]**   **Limitation of Actions**   🔑   Amendment of defects

The lack of knowledge of a "John Doe" defendant's name does not constitute a mistake of identity under rule governing relation back of amendments. Fed. R. Civ. P. 15(c)(1)(C).

**[17]**   **Civil Rights**   🔑   Time to Sue

**Federal Courts**   🔑   Civil rights and discrimination cases

In § 1983 actions, courts apply the statute of limitations for personal injury actions under state law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[18]**   **Civil Rights**   🔑   Time to Sue

For § 1983 actions filed in New York, the applicable statute of limitations allows three years to file suit. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

**[19]**   **Limitation of Actions**   🔑   Pendency of Action or Other Proceeding

Applicable three-year statute of limitations, under New York law, for prisoner's § 1983 claims against city's department of corrections and its officers was tolled, if at all, only during period in which he remained in department of corrections custody, where he purportedly had access to and pursued department of corrections grievance process, which he was required to exhaust under Prison Litigation Reform Act (PLRA); once prisoner was transferred out of department of corrections custody and into state custody, prisoner no longer had access to department of corrections grievance process. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a); 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

**[20]**   **Prisons**   🔑   Exhaustion of Other Remedies

Administrative procedure is "unavailable," such that a prisoner is excused under the Prison Litigation Reform Act (PLRA) from pursuing an administrative remedy, when (1) it operates as simple dead end, with officers unable or consistently unwilling to provide any relief to aggrieved inmates, (2) the scheme is so opaque that it becomes, practically speaking, incapable of use, meaning that some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it, or (3) when prison administrators thwart inmates from taking advantage of grievance process through machination, misrepresentation, or intimidation. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

**[21]**   **Limitation of Actions**   🔑   Amendment of defects

To take advantage of New York statute authorizing the substitution of a true name for an unknown party and providing that when such substitution occurs, all prior proceedings shall be deemed amended accordingly, a party must meet two requirements: first, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name, and second, the party must describe the "John Doe" party in such form as will fairly apprise the party that he is the intended defendant. N.Y. CPLR § 1024.

**[22]**   **Limitation of Actions**   🔑   Amendment of defects

Prisoner did not exercise due diligence in seeking to obtain identities of correctional officers involved in strip-searches of prisoner while he was in custody of city's department of corrections, and thus, prisoner could not take advantage of New York statute providing that amendment replacing "John Doe" or "Jane Doe" with officers' true names would relate back to timely filed original § 1983 complaint; prisoner filed original complaint near end of limitations period, and although prisoner previously filed complaint with city comptroller soon after strip

searches, prisoner provided no evidence that he sought information regarding officers' identities, or that he requested their identities from city or department of corrections, and district court order requiring disclosure of officers' identities was not issued at prisoner's request. 42 U.S.C.A. § 1983; N.Y. CPLR § 1024.

[23]  **Federal Civil Procedure** 🔑 Complaint

District court would grant prisoner leave to amend § 1983 complaint against city, city's department of corrections, and others, including doctor who treated him while in city custody, to add new allegation that he saw doctor on specific date, and that she refused to provide prisoner with special mattress to relieve pressure on his lumbar spine; doctor's only objection to proposed amendment was that new allegations were factually incorrect, in that she did not see prisoner on newly alleged date. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 15(a).

[24]  **Federal Civil Procedure** 🔑 Complaint

A party may not oppose a motion to amend on the ground that the proposed new allegations are factually incorrect. Fed. R. Civ. P. 15(a).

**Attorneys and Law Firms**

Michael Jones, Ossining, NY, Pro Se.

Sharon Vicky Sprayregen, New York City Law Department, New York, NY, for Defendants The City of New York, Joseph A. Ponte, Rostislav Davydov, Corizon Health Inc.

Bruce Morgan Brady, Koster, Brady & Nagler, LLP, New York, NY, for Defendant Olga Segal.

OPINION AND ORDER

GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE

**\*1**  Plaintiff Michael Jones, currently incarcerated at Sing Sing Correctional Facility, brought this action pro se under 42 U.S.C. § 1983 alleging that defendants violated his rights in various ways while he was detained at Rikers Island. See Complaint at 7, filed March 2, 2018 (Docket # 2) ("Comp."). Fact discovery concluded on February 21, 2020. See Order of January 27, 2020 (Docket # 91). On May 4, 2020, Jones moved for leave to amend his complaint and to extend discovery.[1] For the following reasons, Jones's motion for leave to amend is granted in part, and Jones's motion to extend discovery is denied.

[1]  Letter from Michael Jones, at 1, filed May 4, 2020 (Docket # 94) ("May 4 Letter"); Letter from Bruce Brady, filed June 29, 2020 (Docket # 96) ("June 29 Letter"); Letter from Michael Jones, filed July 17, 2020 (Docket # 98) ("July 17 Letter"); Letter from Bruce Brady, filed July 20, 2020 (Docket # 99) ("July 20 Letter"); Letter from Sharon Sprayregen, at 2-6, filed Aug. 11, 2020 (Docket # 103) ("Aug. 11 Letter"); Letter from Michael Jones, filed Sept. 1, 2020 (Docket # 105) ("Sept. 1 Letter").

I. BACKGROUND

A. Original Complaint

Jones's original complaint, dated February 24, 2018, and docketed March 2, 2018, asserted claims against the City of New York ("the City"), the New York City Department of Correction ("DOC") Commissioner Joseph A. Ponte, Corizon Health Inc. ("Corizon"), 10 unnamed correctional officers, 17 Rikers Island/Corizon medical staff (collectively, the "medical staff defendants"), and an unnamed "Food Service Administrator." See Comp. at 2-5, \*16.[2] Jones's claims were based on three alleged constitutional violations involving (1) denial of medical treatment; (2) improper strip searches; and (3) food poisoning, all of which allegedly took place between 2014 and 2015 while Jones was incarcerated at Rikers Island. Id. ¶¶ 8-56.

[2]  "\*___" refers to page numbers assigned by the ECF system.

1. Medical Treatment

Corizon contracts with DOC to provide medical services to inmates in DOC facilities, including Rikers Island. See id. ¶ 13. In 2006, Jones underwent back surgery, which now

requires him to use a special mattress to relieve pressure on his lumbar spine. See id. ¶¶ 16-17. On May 15, 2014, Jones arrived at Rikers Island. See id. ¶ 18. Upon his arrival, Jones informed the intake examiner of his prior surgery, provided copies of his relevant medical records, and requested a special mattress. See id. The examiner told Jones that Rikers Island and Corizon policy prohibited the issuance of such a mattress. See id. Jones was instead given "a worn down used mattress approximately one inch in thickness with rips in it causing the insulation to come out." Id. ¶ 19. Subsequently, Jones experienced "extreme lower and upper back pain, stiffness in his lower back, muscle spasms, shoulder pain, loss of sleep, numbness in his hipbones, and difficulty standing." Id. ¶ 20. While at Rikers Island, Jones visited the medical clinic over two dozen times. See id. ¶¶ 21-39. On each occasion, Jones informed the medical staff about the pain his mattress caused, but when Jones requested a special mattress, he was told that Rikers Island and Corizon policy prohibited it. See id. The complaint asserts Eighth Amendment claims against the medical staff defendants, as well as against Corizon and the City. See id. at 2-5, 7-12.

### 2. Strip Searches

**\*2** On April 14, 2015, Jones was transported from Rikers Island to a court proceeding. See id. ¶ 43. Before boarding the bus, Jones "went through the normal body cavity strip-search procedure." Id. Jones was then driven to a "search [f]acility." Id. ¶ 44. There, a DOC Captain and three DOC Officers boarded the bus in gas masks, "armed with cannisters of MK9," a type of pepper spray. Id. The DOC Captain and Officers "wore all black uniforms with no identification tags." Id. ¶ 45. The DOC Captain yelled, "listen up, I want all you mother fuckers off the bus now. If you give my officers or me any shit, we will spray your ass until you fall out. Stand up and walk straight off the bus and do not look back or say a word. This is the new policy handed down from the Commissioner." Id. Jones exited the bus and joined the other inmates in a line outside the search facility. See id. ¶ 46. A female DOC Officer then led a drug-sniffing dog "up and down the line," while another female DOC Officer took video footage. Id. ¶ 47. The dog did not alert. See id. A male DOC officer then ordered Jones to enter "a large open cage." Id. ¶ 48. Jones did so and the male DOC officer told Jones to strip naked. See id. Jones protested that he was Jewish and therefore could not "disrobe in the presence of other inmates." Id. The male DOC officer "stated that this was the new policy," he "didn't want to hear what [Jones] had to say," and again ordered Jones to comply.

Id. ¶ 49. Jones complied. See id. During the search, Jones's "cloth[e]s were thrown on the dirty floor" and a second male DOC Officer threatened to pepper spray Jones's face if he "fail[ed] to comply or sa[id] anything." Id. ¶ 50.

On April 22, 2015, Jones was transported from court back to Rikers Island. See id. ¶ 51. During that trip, the bus was again taken to a search facility where a second DOC Captain boarded the bus and yelled, "you guys know the drill, stand up and don't say a word. Get the fuck off the bus in a straight line. This is the new policy, if there is any shit, you will be sprayed." Id. Jones exited the bus. See id. ¶ 52. A third female DOC officer led a drug-sniffing dog "up and down the line o[f] inmates" while a fourth female DOC officer filmed. Id. A third male DOC officer ordered Jones into a "large open cage" and directed him to strip naked. Id. ¶ 53. Jones protested that his religious beliefs prevented him from "disrob[ing] in the presence of other inmates." Id. The third male DOC officer "stated that this was the new policy," he "didn't want to hear what [Jones] had to say," and again ordered Jones to comply. Id. ¶ 54. Jones complied. See id. During the search, Jones's "cloth[e]s were thrown on the dirty floor" and a fourth male DOC Officer threatened to pepper spray Jones's face if he "fail[ed] to comply or sa[id] anything." Id. ¶ 55. Jones then re-boarded the bus, which took him back to Rikers Island. See id. ¶ 56. At Rikers Island, Jones "was subjected to another full body cavity strip-frisk-search." Id. The complaint asserts First and Fourth Amendment claims against the City of New York ("the City"), Commissioner Ponte, the two John Doe DOC Captains, the four Jane Doe DOC Officers, and the four John Doe DOC Officers. See id. at 4-5, 7, 12-14.

### 3. Food Poisoning

Jones's original complaint also asserted a "Cruel and Unusual Punishment" claim based on a single incident of food poisoning that Jones allegedly suffered on February 25, 2015. See id. ¶¶ 40-42.

### B. May 2018 Order

On May 15, 2018, Judge Broderick issued an "Order of Service" dismissing some claims and ordering service as to certain defendants. See Order of Service, filed May 15, 2018 (Docket # 7) ("Order of Service"). The Order of Service noted that only claims that arose after February 24, 2015, three years prior to the date Plaintiff gave his Complaint to prison officials, would be timely. Id. at 2-3. Accordingly, the Order

of Service dismissed the claims against all the individual medical staff defendants except Drs. Rostislav Davydov and Olga Segal as barred by the applicable statute of limitations. See id. at 2-4. The Order of Service also dismissed the claim involving food poisoning, which had been brought against the unnamed "Food Service Administrator." See id. at 4-5.

With respect to the unnamed correctional officer defendants, listed as "John Doe" or "Jane Doe," Judge Broderick issued an order requiring the New York City Law Department to identify and locate these defendants so that they could be served. See id. at 5; see generally Valentin v. Dinkins, 121 F.3d 72 (2d. Cir. 1997). Jones was directed to file an amended complaint within 30 days of learning the John and Jane Doe defendants' identities. See Order of Service at 5-6. Before learning of those identities, on July 19, 2019, plaintiff filed an amended complaint, see Amended Complaint, filed July 19, 2019 (Docket # 68), but because he alleged no new relevant facts, Judge Broderick struck the amended complaint from the record. See Order of July 26, 2019 (Docket # 69) (July 26 Order), at *3-4.

**\*3** The City received several extensions to comply with its obligation to identify the officers, see Order of July 12, 2018 (Docket # 16); Order of September 10, 2018 (Docket # 20), but then informed Judge Broderick that they could not identify the officers based on the information provided, see Letter from Sharon Sprayregen, filed Oct. 1, 2018 (Docket # 27); Order of October 3, 2021 (Docket # 28); Letter from Sharon Sprayregen, filed Jan. 4, 2019 (Docket # 33). On February 14, 2020, however, the City provided Jones with the names. See Sept. 1 Letter at 4.

### C. April 2020 Opinion & Order

In the meantime, the City, Corizon, Dr. Segal, Dr. Davydov, and Commissioner Ponte all moved for judgment on the pleadings. See Motion for Judgment on the Pleadings, filed Jan. 11, 2019 (Docket # 36); Motion for Judgment on the Pleadings, filed April 5, 2019 (Docket # 53). On April 4, 2020, Judge Broderick denied Dr. Segal's motion and granted in part the remaining defendants' motion. Jones v. City of New York, 2020 WL 1644009 (S.D.N.Y. Apr. 2, 2020). In brief, he allowed the following claims to survive: plaintiff's Eighth Amendment claims (relating to medical treatment) against Dr. Segal, Dr. Davydov, and the City; and plaintiff's Fourth and First Amendment claims (relating to the strip searches) against the John and Jane Doe correctional officers, Commissioner Ponte, and the City. Id. at *18.

Additionally, Judge Broderick stated that the Order of Service might have improperly dismissed plaintiff's claims (relating to medical treatment) against defendants Jessy Liburd, Yves Gauvin, and Jorge Villalobos. Id. at *10. Nonetheless, plaintiff revised his allegations in his (later stricken) amended complaint to reflect that his encounters with Liburd and Gauvin occurred outside the limitations period. See July 26 Order at 3-4. Judge Broderick directed plaintiff to inform the court whether he was going to proceed against these defendants and to set forth allegations regarding their conduct. Id. at *11, *18.

### D. Proposed Amended Complaint

On May 4, 2020, Jones responded to Judge Broderick's Opinion & Order, indicating that he intended to proceed with respect to the claim arising from his March 23, 2015 appointment with Dr. Villalobos. See May 4 Letter at *1. Jones's May 4 letter also included his proposed amended complaint, id. at *14-28 ("Proposed Am. Comp."), and requested an extension of fact discovery, which had concluded on February 21, 2020, id. at *1.

As an initial matter, we note that the proposed amended complaint no longer contains the original complaint's since-dismissed food poisoning allegations. See Comp. ¶¶ 40-42; Proposed Am. Comp. ¶¶ 1-55.

Regarding Jones's medical treatment allegations, the proposed amended complaint makes various changes involving dates of visits with Dr. Segal, see Comp. ¶ 39; Proposed Am. Comp. ¶ 39, realleges the original complaint's allegations regarding Dr. Villalobos, see Comp. ¶ 29; Proposed Am. Comp. ¶ 29, and also describes inadequate medical treatment by previously-dismissed medical staff defendants, although it does not list these individuals as defendants, see Proposed Am. Comp. ¶¶ 18-37.

Regarding Jones's strip-search claims, the proposed amended complaint realleges all of Jones's non-dismissed claims against Commissioner Ponte and the City, see Comp. ¶¶ 5, 12, 43-56; Proposed Am. Comp. ¶¶ 5, 12, 40-53, and replaces the unnamed correctional officer defendants with over 30 named individuals, see Comp. ¶ 5; Proposed Am. Comp. ¶ 5. Its section describing the strip-search incidents is altered by the insertion of the actual names of the proposed new defendants, see Proposed Am. Comp. ¶¶ 41-52.

### E. Defendants' Response to the Proposed Amended Complaint and Motion to Extend Discovery

**\*4** On June 29, 2020, Dr. Segal responded to Jones's May 4 letter, objecting to the inclusion of Jones's new allegation against her. See June 29 Letter. Jones replied on July 17, 2020. See July 17 Letter. Dr. Segal responded on July 20, 2020. See July 20 Letter. The remaining defendants responded to Jones's May 4 letter on August 11, 2020, consenting to the reinstatement of Dr. Villalobos, objecting to the addition of the named correctional officer defendants, and objecting to an extension of discovery. See Aug. 11 Letter. On September 1, 2020, Jones responded to both Dr. Segal's July 20 letter and the remaining defendants' August 11 letter. See Sept. 1 Letter.

### F. Submissions Regarding Jones's Use of the Rikers Island Grievance Process

The original complaint and the proposed amended complaint include identical allegations regarding Jones's efforts to grieve his claims while at Rikers Island. See Comp. ¶ 6; Proposed Am. Comp. ¶ 6. Jones's submissions provide more detail on these efforts. See July 17 Letter at 2-3, \*10, \*16; Sept. 1 Letter at 2-4, \*34-38. These submissions reflect that Jones filed a grievance about the strip searches on April 24, 2015, and a hearing was conducted four days later. See Sept. 1 Letter at 2, \*34-36. Jones was told by the hearing officer that the grievance could not be addressed because the incident occurred outside the Rikers Island facility, and that the hearing officer's decision was unappealable. See id. at 2. Jones responded that the denial was appealable, and upon Jones's request, the grievance was forwarded to the Warden's office. See id. Jones wrote a letter to the Warden concerning his grievance on June 1, 2015. See id. at \*38.

### G. Order of Reference & Reinstatement of Defendant Villalobos

On August 30, 2021, Judge Broderick referred this case to the undersigned for general pretrial purposes. See Amended Order of Reference, filed August 30, 2021 (Docket # 106). This Court then issued an Order of Service as to Dr. Villalobos. See Order of Service, filed Sept. 1, 2021 (Docket # 107) ("Villalobos Order of Service"). Dr. Villalobos was served by mail on October 5, 2021, and proof of service was filed on November 10, 2021. See Marshal's Process Receipt and Return Form, filed Nov. 10, 2021 (Docket # 109).

### H. Claims Currently in the Case

The currently operative complaint, that is, Jones's original complaint, alleges the following, non-dismissed claims: (1) an Eighth Amendment claim against Dr. Villalobos; (2) an Eighth Amendment claim against Dr. Davydov; (3) three Eighth Amendment claims (that is, based on three different dates of treatment) against Dr. Segal; (4) an Eighth Amendment Monell claim against the City and Corizon, respectively; (5) First and Fourth Amendment Monell claims, respectively, against the City; (6) First and Fourth Amendment claims, respectively, against Commissioner Ponte; and (7) First and Fourth Amendment claims, respectively, against each anonymous correctional officer defendant. See Jones, 2020 WL 1644009, at \*18; Villalobos Order of Service.

## II. CONSTRUCTION OF PRO SE FILINGS

**[1]** Because Jones is a pro se litigant, we hold his submissions "to less stringent standards than formal pleadings drafted by lawyers," Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (per curiam) (quoting Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)), construing them "liberally," e.g., Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)), and interpreting them "to raise the strongest arguments that they suggest," Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). As a result, we construe Jones's May 4 Letter as constituting a motion for leave to amend his complaint and a motion to extend discovery. We discuss each next.

## III. MOTION TO AMEND

### A. Applicable Law

#### 1. Motions to Amend Generally

**\*5** **[2]** **[3]** **[4]** Rule 15(a) provides that a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The policy behind this rule is that "[l]iberal amendment promotes judicial economy by making it possible to dispose of all contentions between parties in one lawsuit." Bilt-Rite Steel Buck Corp. v. Duncan's Welding & Corr. Equip., Inc., 1990 WL 129970, at \*1 (E.D.N.Y. Aug. 24, 1990) (citing Jenn-Air Prods. v. Penn Ventilator, Inc., 283 F. Supp. 591, 594 (E.D. Pa. 1968)). The decision to grant or deny leave to amend under Rule 15(a)(2) is within the trial court's

discretion. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) (citation omitted). The court may deny leave to amend for "good reason," which normally involves an analysis of the four factors articulated in Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962): undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (citing Foman, 371 U.S. at 182, 83 S.Ct. 227).

[5] "If the amendment seeks to add a party, Rule 21 of the Federal Rules of Civil Procedure, which allows addition of a party ... also comes into play. However, that creates no additional obstacle, as the 'showing necessary under Rule 21 is the same as that required under Rule 15(a).' " Soroof Trading Dev. Co. v. GE Microgen, Inc., 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (internal citation omitted) (quoting Johnson v. Bryson, 851 F. Supp. 2d 688, 703 (S.D.N.Y. 2012)).

## 2. Statutes of Limitations and Futility of Amendment

[6] [7] As noted above, a court may deny leave to amend because amendment would be futile. McCarthy, 482 F.3d at 200 (citing Foman, 371 U.S. at 182, 83 S.Ct. 227). Claims barred by an applicable statute of limitations are futile. Grace v. Rosenstock, 228 F.3d 40, 53 (2d Cir. 2000) ("Amendment would likely be futile if, for example, the claims the plaintiff sought to add would be barred by the applicable statute of limitations."); Davis v. Smith, 2007 WL 3104754, at *1 (N.D.N.Y. Oct. 22, 2007) ("A proposed amended pleading seeking to assert a claim which is barred by the statute of limitations is futile.").

[8] [9] [10] Nonetheless, a plaintiff is not required to plead that his or her claims are timely because nonadherence to statutes of limitations is an affirmative defense. See Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007) (citation omitted); Fed. R. Civ. P. 8(c)(1). However, "district courts may dismiss an action sua sponte on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted." Walters v. Indus. and Com. Bank of China, Ltd., 651 F.3d 280, 293 (2d Cir. 2011) (internal quotation omitted). In such cases, "[a] court does not have to wait for a motion to dismiss, and waste judicial time and resources, but may instead deny a motion to amend to add time-barred claims as futile." Gilmore v. Gilmore, 2010 WL 4910211, at *2

(S.D.N.Y. Nov. 15, 2010) (internal quotation omitted); see also Grace, 228 F.3d at 55.

## 3. Equitable Tolling and the Prison Litigation Reform Act

[11] [12] [13] An otherwise time-barred claim may proceed if there is a basis for tolling the statute of limitations. The doctrine of equitable tolling, however, applies "only in 'rare and exceptional circumstances,' where ... 'extraordinary circumstances' prevented a party from timely performing a required act, and ... the party 'acted with reasonable diligence throughout the period he [sought] to toll.' " Walker v. Jastremski, 430 F.3d 560, 564 (2d Cir. 2005) (third alteration in original) (quoting Doe v. Menefee, 391 F.3d 147, 159 (2d Cir. 2004)); see also Moses v. Westchester Cnty. Dep't of Corr., 951 F. Supp. 2d 448, 454 (S.D.N.Y. 2013) ("[C]ourts in this Circuit deciding section 1983 claims have applied the federal equitable tolling standard, which allows tolling where extraordinary circumstances prevented a party from timely performing a required act." (internal quotation omitted)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); accord A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 144 (2d Cir. 2011).

*6 [14] The doctrine of equitable tolling may in some instances be invoked in relation to the prison grievance process given that the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Second Circuit has held that a prisoner is entitled to equitable tolling on a § 1983 claim for the period during which he is exhausting applicable administrative remedies under the PLRA. See Gonzalez v. Hasty, 651 F.3d 318, 323-24 (2d Cir. 2011). Gonzalez applied the equitable tolling doctrine to prisoners pursing mandatory administrative remedies to resolve a "catch-22"; namely, that "the prisoner who files suit ... prior to exhausting administrative remedies risks dismissal based upon [the PLRA]; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness." Id. at 323 (first alteration in original) (internal

quotation marks omitted) (quoting Johnson v. Rivera, 272 F.3d 519, 522 (7th Cir. 2001)).

### B. Analysis

#### 1. Addition of Correctional Officer Defendants

Defendants argue that the proposed amended complaint's addition of the named correctional officer defendants is futile because it is barred by the applicable statute of limitations. See Aug. 11 Letter at 2-4.

**[15]** **[16]** Here, Jones's original complaint named the officers involved in the strip searches as John or Jane Does. See Comp. ¶ 5. "Generally, 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013) (internal quotation marks omitted) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1075 (2d Cir. 1993)). "['][J]ohn Doe['] substitutions ... 'may only be accomplished' " by satisfying an applicable provision in Fed. R. Civ. P. 15(c). Id. (quoting Aslanidis, 7 F.3d at 1075). Under Rule 15(c), when a party seeks to add new claim with respect to which the applicable statute of limitations has run, the new claim may proceed if it "relates back" to the original pleading. Fed. R. Civ. P. 15(c)(1). Here, Jones relies on Rule 15(c)(1)(A), which saves otherwise time-barred claims if "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A).[3]

---

[3]     Relation back is also allowed in "mistaken identity" cases—where the plaintiff sues the wrong defendant, the correct defendant knows of the mistake and is not prejudiced, and the plaintiff's proposed amended complaint seeks to remedy the error. See Fed. R. Civ. P. 15(c)(1)(C). Jones does not and cannot claim that such a mistake occurred here. Case law reflects that "the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity' " under Rule 15(c)(1)(C). See Hogan, 738 F.3d at 518 (quoting Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 470 (2d Cir. 1995)).

#### a. Application of Statute of Limitations and Equitable Tolling

**[17]** **[18]** We begin by analyzing the date when the statute of limitations expired. Although "[f]ederal law determines when a § 1983 cause of action accrues, and the Second Circuit has ruled that 'accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action,' " Lefebvre v. Morgan, 234 F. Supp. 3d 445, 459 (S.D.N.Y. 2017) (quoting Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002)), § 1983 itself does not provide a statute of limitations. See 42 U.S.C. §§ 1983, 1988; Hogan, 738 F.3d at 517; accord Owens v. Okure, 488 U.S. 235, 239, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Therefore, in § 1983 actions, "courts apply the statute of limitations for personal injury actions under state law." Hogan, 738 F.3d at 517 (citing Owens, 488 U.S. at 249-51, 109 S.Ct. 573; Pearl, 296 F.3d at 79). For § 1983 actions filed in New York, the applicable statute of limitations is section 214 of New York's Civil Practice Law and Rules ("CPLR"), which allows three years to file suit. See id. (citing Pearl, 296 F.3d at 79; N.Y. C.P.L.R. § 214); accord Lefebvre, 234 F. Supp. 3d at 458.

***7** **[19]** Jones alleges that the strip-search violations took place on April 14, 2015 and April 22, 2015, see Comp. ¶¶ 43, 51; Proposed Am. Comp ¶¶ 40, 48, and thus the three-year limitations period as to these claims expired on April 14, 2018, and April 22, 2018. However, Jones has made reference to the ongoing grievance process in relation to the statute of limitations issue, see Sept. 1 Letter at 2-4, which we liberally construe as an assertion that he is entitled to equitable tolling under Gonzalez, 651 F.3d at 323-24.

Any grievance Jones was required to file was governed by the New York City Department of Correction's Inmate Grievance and Request Program (available at https://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Program.pdf) ("IGRP"). See, e.g., Girodes v. City of New York, 2018 WL 3597519, at *3 (S.D.N.Y. July 26, 2018) ("The New York City Department of Correction's Inmate Grievance Resolution Program ('IGRP') sets out the grievance procedures for inmates at Rikers Island."). The IGRP requires an inmate to: (1) file a complaint within ten business days from the date the alleged condition or issue occurred; (2) in the event that informal resolution is not reached within five days, request a formal hearing which must be held within five business days; (3) appeal any unfavorable decision to the Commanding

Officer within five business days, who must render his or her decision within five businesses days; and (4) appeal any unfavorable decision by the Commanding Officer to the Central Office Review Committee within five business days, which must render its decision within 15 business days of receiving the inmate's appeal. See IGRP at 12-27. In the event that the inmate does not receive a timely disposition at any stage of the IGRP process, the inmate may submit a request for an appeal within 10 days of when the response was due. Id. at 15. However, an inmate transferred out of DOC custody cannot pursue an appeal of his grievance because he "no longer ha[s] access to the IGRP process." Id. at 19, 22, 25.

The strip-search incidents were grievable under the IGRP. See IGRP, Appendix A. And Jones has submitted evidence that he filed a grievance on the matter. See Sept. 1 Letter at 2-4, *34-36. But these efforts are ultimately of no consequence because the longest possible period of tolling to which Jones could be entitled is from April 24, 2015, when Jones filed a grievance, see id., to some date in "July 2015," when Jones alleges that he was transferred from Rikers Island to a New York State prison before receiving a final resolution—despite having appealed the initial DOC adjudication. See Jones Dep. Tr. 13:24-25, 14:1-25, 15:1-25. Upon Jones's transfer, the IGRP no longer applied to him. See IGRP at 19, 22, 25. Using July 31 as the transfer date, 98 days passed from the time Jones established that he filed a grievance until the transfer. Thus, equitable tolling could at most extend the statutes of limitations deadlines through July 21, 2018 and July 29, 2018. The proposed amended complaint, however, is dated April 22, 2020, see Proposed Am. Comp. at *27, long past even a tolled limitations deadline.

 [20]   Jones maintains that because DOC failed to respond to his grievances, the grievance process was "unavailable" to him under the PLRA, and thus the "statu[t]e of limitations never started to run." Sept. 1 Letter at 3 (citing Ross v. Blake, 578 U.S. 632, 644, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016); Williams v. Correction Officer Priatno, 829 F.3d 118, 120-21 (2d Cir. 2016)). Jones is correct that exhaustion is excused under the PLRA if an administrative remedy is not "available." See Ross, 578 U.S. at 642, 136 S.Ct. 1850.[4] But that issue is not relevant to Jones's motion. Unavailability does not toll the statute of limitations; it merely excuses Jones from pursuing an administrative remedy—which as noted above, is an obligation that ceased to apply to Jones after July 2015. See Ross, 578 U.S. at 642-44, 136 S.Ct. 1850; Gonzalez, 651 F.3d at 323-24; Jones Dep. Tr. 13:24-25, 14:1-25, 15:1-25; IGRP at 19, 22, 25. If the IGRP was

"unavailable" to Jones prior to his transfer, he would not be entitled to any equitable tolling while he exhausted his administrative remedies at Rikers Island. In this situation, Jones would have had no obligation to exhaust, and in the absence of such an obligation, the "catch-22" concerns that animated the Gonzalez court have no force. See 651 F.3d at 323. In any event, because the IGRP did not apply to Jones once transferred, see Jones Dep. Tr. 13:24-25, 14:1-25, 15:1-25; IGRP at 19, 22, 25, by August 2015, nothing prevented Jones from filing suit. Consequently, Jones could not possibly be entitled to tolling beyond that date, irrespective of whether the IGRP procedure was previously unavailable. Thus, we conclude that Jones's claims are untimely.

[4]        "An administrative procedure is 'unavailable' when (1) 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates;' (2) the scheme is 'so opaque that it becomes, practically speaking, incapable of use,' meaning that 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;' or (3) 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " Hayes v. Dahlke, 976 F.3d 259, 268 (2d Cir. 2020) (quoting Ross, 578 U.S. at 643-44, 136 S.Ct. 1850).

b. Relation Back Under N.Y. C.P.L.R. § 1024

 *8   [21]   As noted, Fed. R. Civ. P. 15(c)(1)(A) saves otherwise time-barred claims if "the law that provides the applicable statute of limitations allows relation back." New York's CPLR § 1024 authorizes the substitution of a "true name" for an "unknown party" and provides that when such substitution occurs, "all prior proceedings shall be deemed amended accordingly." The Second Circuit has held that a § 1983 plaintiff in federal court may substitute John and Jane Doe defendants nunc pro tunc under § 1024. See Hogan, 738 F.3d at 518-20. "To take advantage of § 1024, a party must meet two requirements. First, the party must 'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name.' Second, the party must describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.' " Id. at 519 (quoting Bumpus v. N.Y.C. Transit Auth., 66 A.D.3d 26,

883 N.Y.S.2d 99, 104 (2009)) (alteration in original) (internal citations omitted).

To satisfy the first prong, "a plaintiff must 'show that he or she made timely efforts to identify the correct party before the statute of limitations expired.' " Abreu v. City of New York, 2018 WL 3315572, at *5 (S.D.N.Y. July 5, 2018) (quoting Ceara v. Deacon, 68 F. Supp. 3d 402, 409 (S.D.N.Y. 2014)). This requires "concrete and timely steps to ascertain an officer['s] ... identity." Barrett v. City of Newburgh, 720 F. App'x 29, 33 (2d Cir. 2017) (summary order).

In contrast to its due diligence standard, § 1024's second prong "is not particularly arduous." Abreu, 2018 WL 3315572, at *6. This requirement is satisfied when a plaintiff's original complaint "provides enough detail to give notice to the John Does that they are the intended defendants." Hogan, 738 F.3d at 519 (adequate description when complaint alleged date, time, and location of excessive force incident, and included "substantial detail concerning the appearance of [the] alleged assailants"); Gudanowski v. Burrell, 2021 WL 3887612, at *5 (S.D.N.Y. Aug. 31, 2021) (adequate description where complaint alleged date and time of incident, as well as "specific details unique to the incident that an officer involved would likely remember, such as the presence of a news helicopter and the involvement of a flatbed tow truck from Brookside Towing in Hackensack, New Jersey").

 [22] Here, Jones cannot satisfy the first prong. To demonstrate his due diligence, Jones points to a 2015 personal injury claim he submitted to the New York City Comptroller and Judge Broderick's Valentin order. See Sept. 1 Letter at 3. Jones stats that on July 15, 2015, he filed a personal injury claim with the New York City Comptroller's officer regarding the strip searches. See id. at 3, *42-47. When Jones inquired into the status of his claim in 2016, he was informed that the claim was under investigation. See id. at 3, *49. But Jones provides no evidence that his 2015 claim sought information regarding the identities of then-unknown correctional officers. See id. Nor does he provide any evidence that he requested their identities from the City or from DOC. See id. Jones does not point to any action he took after the filing of the claim except for a request he made in 2016 for an update from the Comptroller, who told Jones that his claim was still "under investigation." Id. at 3, *49. This claim to the Comptroller cannot be viewed not as an attempt to obtain information about the John and Jane Doe defendants' identities but only as a step analogous to filing a lawsuit, which courts have repeatedly recognized is

insufficient, standing alone, to satisfy the first prong. See, e.g., JCG v. Ercole, 2014 WL 1630815, at *14 (S.D.N.Y. Apr. 24, 2014); Temple v. N.Y. Cmty. Hosp. of Brooklyn, 89 A.D.3d 926, 933 N.Y.S.2d 321, 323 (2d Dep't 2011). As for the May 15, 2018, Valentin order, its existence does not reflect due diligence on Jones's part as it was not issued at Jones's request and --- because Jones filed suit so late in the limitations period --- was issued after the un-tolled limitations deadline and just weeks before the expiration of the tolled deadline. See generally Gutek v. Borchardt, 2020 WL 2336187, at *5-6 (N.D.N.Y. May 11, 2020) (no due diligence when plaintiff, who "could not identify any action ... taken to identify" John Doe defendants prior to expiration of limitations period, sued with three months remaining in limitations period and a sua sponte Valentin order was not issued until limitations period had expired). [5]

[5]

> Jones mentions his "expeditious use of the pretrial discovery process," see Sept. 1 Letter at *9-21 (plaintiff's interrogatory requests dated January 7, 2019). This effort is of no consequence because it did not take place "prior to the running of the statute of limitations." Hogan, 738 F.3d at 518 (quotation omitted).

 *9  In sum, Jones filed suit only weeks (or a few months if equitable tolling is applied) before the expiration of the statute of limitations and has not identified any actions he took to uncover the John and Jane Doe defendants' identities prior to the expiration of the limitations period. This is insufficient under § 1024. See, e.g., Vasconcellos v. City of New York, 2014 WL 4961441, at *9 (S.D.N.Y. Oct. 2, 2014) (declining to apply § 1024 because "Vasconcellos did nothing to exercise due diligence prior to the running of the statute-or, for that matter, after it ran"); JCG, 2014 WL 1630815, at *14-15 (no due diligence when incarcerated pro se plaintiff made only last minute efforts to obtain information but did not serve discovery demands, file FOIL requests, or write letters to the Attorney General); Williams v. United States, 2010 WL 963474, at *13 (S.D.N.Y. Feb. 25, 2010) (incarcerated pro se plaintiff's representation that he "made his best efforts to carry out the case accordingly" was insufficient to show diligence when there was no evidence plaintiff filed FOIL requests or wrote letters to identify defendants). Courts commonly reject attempts to invoke § 1024 where, as here, a plaintiff waits until the very end of the limitations period to file suit. See, e.g., Berman v. Perez, 2018 WL 565269, at *3 (S.D.N.Y. Jan. 24, 2018); Galberth v. Washington, 2016 WL 1255738, at *10-11

(S.D.N.Y. Mar. 29, 2016), aff'd, 743 F. App'x 479 (2d Cir. 2018) (summary order).

Accordingly, Jones is denied leave to amend to the extent he seeks to substitute the named correctional officers for the John and Jane Doe defendants.

### 2. New Allegation Against Dr. Segal

 **[23]**  Jones seeks to add a new allegation against Dr. Segal; namely, that he saw her on June 1, 2015, and that she refused to provide Jones with a double or special mattress on that date. See Proposed Am. Comp. ¶ 39. Jones's original complaint alleged that he saw Dr. Segal on various dates in 2015, though not the June 1 date. See Comp. ¶ 39. Dr. Segal makes no argument that the amendment fails to relate back to the original filing, that there would be any prejudice from the proposed amendment, that there is undue delay, or that that the proposed amendment could not survive a motion to dismiss addressed to the pleadings. See June 29 Letter at *1-3; July 20 Letter at *1-2; see generally Foman, 371 U.S. at 182, 83 S.Ct. 227. Indeed, Dr. Segal cites no case law whatsoever in opposition to the motion to amend. See June 29 Letter at *1-3; July 20 Letter at *1-2. Instead, Dr. Segal alleges that she did not in fact see plaintiff on June 1, 2015, and that there is documentary evidence to prove it. See June 29 Letter at *1-3; July 20 Letter at *1-2.

 **[24]**  The Court rejects this argument. Dr. Segal will of course have the opportunity to prove that she never saw plaintiff on June 1, 2015, either in a summary judgment motion or at trial. But a party may not oppose a motion to amend on the ground that the proposed new allegations are factually incorrect inasmuch as factual inaccuracy is not one of the Foman factors. See generally Safety Mgt. Sys., Inc. v. Safety Software Ltd., 2011 WL 498313, at *2 (S.D.N.Y. Feb. 10, 2011) (rejecting argument that leave to amend could be denied on the ground that allegations in the proposed pleading were "factually untrue"). We thus grant Jones's application for leave to amend with respect to this allegation.

\* \* \*

To recapitulate: Jones's motion for leave to file the proposed amended complaint is granted in part and denied in part as set forth above. Rather than require that Jones, who is pro se and incarcerated, redraft the complaint, the Court will docket the proposed amended complaint as the

"Amended Complaint" and strike the names of the newly-named defendants, including the allegations identifying those individuals as defendants. The substantive allegations regarding the individual defendants, Proposed Am. Comp. ¶¶ 41-52, will remain as they may be relevant to plaintiff's surviving claim pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### IV. MOTION TO EXTEND DISCOVERY

 **\*10**  Jones also moves to extend discovery so he can obtain additional information regarding the roles each of the newly-named correctional officers played in the 2015 strip-search incidents. Jones received the names of these correctional officers before the close of discovery. See May 4 Letter at *1. He does not explain, however, what specific information he seeks and why it could not have been obtained earlier. Jones therefore has not shown "good cause" under Fed. R. Civ. P. 6(b) to extend the deadlines in the existing scheduling order, see Scheduling Order ¶¶ 4-5. Also, reopening discovery into the named correctional officers is unwarranted in light of our determination that Jones should be denied leave to add those officers as defendants.

Finally, the Court notes that Jorge Villalobos has been served, see Marshal's Process Receipt and Return Form, filed Nov. 10, 2021 (Docket # 109), and will presumably be appearing as a defendant. While it is theoretically possible that this new appearance might require new discovery, it seems unlikely. In any event, the parties shall discuss this matter within 10 days of Villalobos responding to the complaint and the City shall report on the outcome of the discussions within 21 days thereafter. Assuming no discovery is required, the parties shall at that time propose a schedule for summary judgment motions, which shall be returnable before Judge Broderick.

### V. CONCLUSION

For the foregoing reasons, Jones's motion to amend (Docket # 94) is granted in part, and Jones's motion to extend discovery (Docket # 94) is denied. The Court will docket Jones's proposed amended complaint with the addition of the proposed new defendants omitted. The City shall report to the Court in accordance with this Opinion and Order on the status of this matter within 31 days of Villalobos responding to the complaint.

SO ORDERED.

Jones v. City of New York, --- F.Supp.3d ---- (2021)
Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 105 of 261

2021 WL 5562694

**All Citations**

--- F.Supp.3d ----, 2021 WL 5562694

Gutek v. Borchardt, Not Reported in Fed. Supp. (2020)

2020 WL 2336187

2020 WL 2336187
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony Dennis GUTEK, Plaintiff,

v.

James BORCHARDT, Grievance Officer - 2014
B.C.J., formerly known as John Doe #1, David
Parsons, Rover Officer, 7-8-2014, B.C.J., formerly
known as John Doe #2, Ronald Riquier, Rover
Officer, 7-8-2014, B.C.J., formerly known as John
Doe #3, Franklin Birt, Rover Officer, 7-8-2014,
B.C.J., formerly known as John Doe #4, Defendants.

9:17-CV-00471 (BKS/TWD)
|
Signed 05/11/2020

**Attorneys and Law Firms**

For Plaintiff: Woodruff Lee Carroll, Carroll & Carroll
Lawyers, P.C., 334 Nottingham Road, Syracuse, New York
13210.

For Defendants: Robert G. Behnke, Broome County Attorney,
Jennifer L. Suwak, Assistant County Attorney II, Broome
County Attorney's Office, Edwin L. Crawford County Office
Building, P.O. Box 1766, 60 Hawley Street, Binghamton,
New York 13902.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 *1 Plaintiff Anthony Dennis Gutek brings this action under
42 U.S.C. § 1983 alleging that Defendants James Borchardt,
David Parsons, Ronald Riquier, and Franklin Birt subjected
him to excessive force on July 8, 2014, while he was a
pretrial detainee in Broome County Jail, in violation of the
Fourteenth Amendment.[1] (Dkt. No. 13). Presently before
the Court are Defendants' motion for summary judgment
under Federal Rule of Civil Procedure 56, (Dkt. No. 52),
Plaintiff's motions for an extension of time "for service of
complaint" and to consolidate cases, (Dkt. Nos. 63, 65), and
the parties' responses, (Dkt. Nos. 62, 66, 69). The Court heard
oral argument on the motions on May 8, 2020, after issuing a
text order directing the parties to "be prepared to discuss why

this action is not barred by the statute of limitations." (Dkt.
No. 70).[2] For the reasons that follow, the Court concludes
that this action is barred by the statute of limitations,
grants Defendants' motion for summary judgment, and denies
Plaintiff's motions as moot.

[1]   There appears to be no dispute that Plaintiff was a
pretrial detainee at the time of the alleged incident.
(Dkt. No. 52-17, at 12). The parties, however, do
not cite record evidence in support of this fact.

[2]   Plaintiff filed a memorandum of law on May 6,
2020, without seeking the Court's permission for
any such filing, which was not permitted under the
Rules. (Dkt. No. 71). Plaintiff is cautioned to not
to submit any such filings in the future, without
leave of Court. In this case the Court has considered
Plaintiff's submission.

**II. BACKGROUND**

According to Plaintiff, on July 8, 2014, he was "signed up for
church" but Officer James Jones "refused to open the cell door
[to] let [Plaintiff] attend church." (Dkt. No. 62-1, ¶ 42). After
Plaintiff called Officer Jones "a bitch for not allowing [him]
to attend church," Officer Jones called Defendants Borchardt,
Parson, Riquier, and Birt. (*Id.* ¶ 46). When they arrived,
they handcuffed him, and escorted him to solitary." (*Id.*
¶¶ 48–49, 63). "When passing the desk of [O]fficer Jones
[Plaintiff] called Jones a bitch again." (*Id.* ¶ 50). Defendants
"then picked [Plaintiff] up by [his] arms and legs and slammed
[him] into a steel beam." (*Id.* ¶ 51). Plaintiff "started bleeding
and was knocked unconscious." (*Id.* ¶ 52). Defendants then
"picked [Plaintiff] up" again "and carried [him] head first
smashing [his] head into various doors until they reached
the solitary confinement." (*Id.* ¶ 53). Plaintiff was knocked
unconscious again, sustained a concussion, and "received a
large gash." (*Id.* ¶¶ 54, 55, 57). Defendants assert that Plaintiff
hit his head as they were attempting to subdue him after he
had "violently resisted the defendants and also lunged toward
Officer Jones" when the officers were escorting him to the D-
Pod unit (also known as "the box" or "the SHU"). (Dkt. No.
52-16, at 2–4).

**A. Gutek I**
On April 11, 2017, Plaintiff, acting pro se, filed this action
in the Southern District of New York. (Dkt. No. 1 ("*Gutek
I*")). Plaintiff named the People of the State of New York

2020 WL 2336187

as the sole Defendant. (*Id.*). On April 25, 2017, finding venue improper because, inter alia, Plaintiff's claims arose in Broome County, New York, Chief United States District Judge Colleen McMahon transferred this matter to the Northern District of New York. (Dkt. No. 2). On May 2, 2017, this Court entered an Order directing administrative closure of the case because Plaintiff had neither paid the filing fee for this action nor filed an In Forma Pauperis Application Form ("IFP Application"). (Dkt. No. 4). On May 15, 2017, the Court reopened the case and restored it to the active docket after receiving Plaintiff's IFP Application. (Dkt. No. 7).

**\*2** In an Order entered on June 30, 2017, the Court, screening the Complaint under 28 U.S.C. §§ 1915(e) and 1915A, concluded that Plaintiff's claims against the People of the State of New York were barred by sovereign immunity and dismissed them with prejudice. (Dkt. No. 8, at 6–7). The Court nevertheless considered the viability of his excessive force claim and found that while the Complaint "alleges facts that plausibly suggest his Eighth Amendment rights were violated, his failure to name a proper defendant requires dismissal of this claim." (*Id.* at 9). The Court noted that the Complaint alleged that an Officer Jones and "five unidentified officers used excessive force," but that Plaintiff had not identified "these individuals as defendants in the caption of his complaint, or for that matter, anywhere in the complaint." (*Id.* at 9 n.5). Though it dismissed the claims against the People of the State of New York with prejudice, in light of his pro se status, the Court allowed Plaintiff thirty days to file an amended complaint. (*Id.* at 10–11).

On July 21, 2017, Plaintiff filed an Amended Complaint naming John Doe #1, John Doe #2, John Doe #3, and John Doe #4. (Dkt. No. 9). On August 11, 2017, the Court issued an Order finding that the Amended Complaint's Eighth Amendment excessive force claims against the John Doe defendants survived initial review and required a response. (Dkt. No. 10, at 4). Further, the Court directed the Clerk of the Court to contact the Office of the County Attorney for Broome County and request its assistance in identifying the John Doe defendants. (*Id.*).

In a letter filed on September 11, 2017, the Broome County Attorney's Office identified Defendants Borchardt, Parsons, Riquier, and Birt. (Dkt. No. 11). In a Text Order entered on September 26, 2017, the Court directed the Clerk's Office to forward the letter from the Broome County Attorney's Office to Plaintiff and directed Plaintiff to file a proposed second amended complaint identifying the Doe defendants. (Dkt. No. 12).

On October 13, 2017, Plaintiff filed the Second Amended Complaint naming Borchardt, Parsons, Riquier, and Birt as Defendants. (Dkt. No. 13). In an Order entered on December 1, 2017, the Court deemed the Second Amended Complaint the operative pleading in this action and directed the Clerk to issue summonses and forward them to the United States Marshal for service on Defendants. (Dkt. No. 14). Defendants were personally served on January 10 and 11, 2018. (Dkt. Nos. 19–22). On January 26, 2018, Defendants filed an Answer. (Dkt. No. 24).

### B. *Gutek II*
The same day he filed *Gutek I*, Plaintiff filed a second complaint in the Southern District concerning the same events but naming, in addition to the People of the State of New York and Broome County Jail, John Doe Officer #1 and John Doe Officer #2. *See Gutek v. People of the State of New York et al.* ("*Gutek II*"), 9:17-cv-00433 (DNH/CFH) (filed Apr. 11, 2017). On April 11, 2017, upon determining Plaintiff's claims arose in Broome County, Chief Judge McMahon transferred the action to the Northern District, where it was assigned to United States District Judge David N. Hurd. (*Gutek II*, Dkt. No. 3). On July 10, 2017, following administrative closure and reopening, (*Gutek II*, Dkt. Nos. 5, 8), Judge Hurd issued an Order dismissing *Gutek II* as duplicative of *Gutek I*. (*Gutek II*, Dkt. No. 9). Judge Hurd observed that although it was filed the on the same day *Gutek I*, Plaintiff signed the complaint in *Gutek II* "on April 5, 2017—three days after he signed the complaint in *Gutek I*." (*Gutek II*, Dkt. No. 9, at 8). Judge Hurd further observed that the complaints contained "nearly identical allegations" concerning "the alleged use of excessive force by unidentified corrections officers at Broome County Jail on July 8, 2014." (*Id.*). In dismissing the complaint as duplicative, [3] Judge Hurd noted that *Gutek I* was still pending and that Plaintiff had "been provided with an opportunity to submit an amended complaint in *Gutek I* to identify 'to the best of his ability' the name of each individual responsible for the alleged use of excessive force" and if Plaintiff "wish[ed] to proceed with the claims [in *Gutek II*] against any party alleged to have been involved in the July 8, 2014 wrongdoing at Broome County Jail, he should pursue those claims" in *Gutek I*. (*Gutek II*, Dkt. No. 9, at 8, 9 n.9). *Gutek II* was dismissed without prejudice and judgment was entered on July 10, 2017. Plaintiff did not file an appeal or an amended complaint.

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 108 of 261
Gutek v. Borchardt, Not Reported in Fed. Supp. (2020)
2020 WL 2336187

3    Judge Hurd determined that "judicial economy would be best served by dismissing" *Gutek II* as duplicative, because although both complaints were filed the same day, the complaint in *Gutek I* was signed first. (*Gutek II*, Dkt. No. 9, at 9 n.8 (citing *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) ("[W]here there are two competing lawsuits, the first suit should have priority."))).

## III. LEGAL STANDARD

**\*3** Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## IV. DISCUSSION

Defendants argue that Plaintiff's excessive force claims against them are barred by the three-year statute of limitations applicable to claims brought under § 1983 because the alleged

incident occurred on July 8, 2014, and they were not named as Defendants until July 21, 2017, at the earliest. (Dkt. No. 52-17, at 7–8; *see* Dkt. No. 9 (Amended Complaint, filed July 21, 2017, naming John Doe Defendants #1–4); Dkt. No. 13 (Second Amended Complaint, filed October 13, 2017, identifying John Doe Defendants by name)). Plaintiff asserts that the statute of limitations does not bar his claims claiming, inter alia, that the complaint identifying the four defendants relates back to the originally-filed complaint under Fed. R. Civ. P. 15 and N.Y. C.P.L.R. 1024. (Dkt. No. 71). Also threaded through Plaintiff's submissions is his contention that he, or the Court, mistakenly filed *Gutek I* and *Gutek II* as separate actions, and that the original pleadings, including his claims against two John Doe defendants as asserted in *Gutek II*, should have been viewed as part of a single, timely, action. (*See* Dkt. No. 62-19, at 14–18; Dkt. No. 63; Dkt. No. 65-1, ¶¶ 11–14 (stating that "the district court erroneously treated" *Gutek I*, which was "a notice of claim," "as a complaint" and "ignored the document denominated a complaint," i.e., the complaint in *Gutek II*, dismissing it "as redundant")). Plaintiff's assertions, many of which lack legal and factual support, are unavailing.

"Section 1983 does not provide a specific statute of limitations. Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Owens v. Okure*, 488 U.S. 235, 249–51, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)). In New York, the statute of limitations for personal injury actions is three years. *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citing N.Y. C.P.L.R. § 214(5)). In this case, the statute of limitations on Plaintiff's excessive force claim began to run on July 8, 2014, the date of the incident, and expired three years later on July 8, 2017. Although Plaintiff filed the original Complaint on April 11, 2017—within the three-year limitations period—he only named the People of the State of New York as a defendant without naming any individual defendants—John Doe or otherwise. (Dkt. No. 1). Plaintiff first named John Doe defendants in his Amended Complaint, filed on July 21, 2017, after the statute of limitations had expired, and did not identify them until October 13, 2017, when he filed the Second Amended Complaint. (Dkt. Nos. 9, 13). Moreover, even if the original —timely—Complaint could be construed as a "John Doe pleading," there is no evidence Plaintiff attempted to ascertain Defendants' identities prior to the July 8, 2017 expiration of the statute of limitations. Thus, Plaintiff's naming the individual Defendants in the Second Amended Complaint would not relate back to the filing of the original Complaint.

Gutek v. Borchardt, Not Reported in Fed. Supp. (2020)

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 109 of 261

2020 WL 2336187

**\*4** "Generally, 'John Doe pleadings cannot be used to circumvent statutes of limitations because replacing a John Doe with a named party in effect constitutes a change in the party sued.' " *Hogan*, 738 F.3d at 517 (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993)). Thus, "John Doe substitutions ... 'may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met.' " *Id.* (quoting *Aslanidis*, 7 F.3d at 1075). To determine whether the Second Amended Complaint naming the individual Defendants relates back to the date of the original complaint, the Court considers Rules 15(c)(1)(C) and Rule 15(c)(1)(A).[4]

[4]   Rule 15(c)(1) provides:
> An amendment to a pleading relates back to the date of the original pleading when:
> (A) the law that provides the applicable statute of limitations allows relation back;
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out-- in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.
> Fed. R. Civ. P. 15(c)(1).

## A. Rule 15(c)(1)(C)

Under Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure, the following requirements must be met for a later amendment to a pleading to relate back to the date of the original pleading:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity*, the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Ceara v. Deacon*, 916 F.3d 208, 211 (2d Cir. 2019) (quoting *Hogan*, 738 F.3d at 517). The Second Circuit has interpreted this rule to preclude "relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Hogan*, 738 F.3d at 517. Even assuming, as Plaintiff asserts, that the Court (or Plaintiff) mistakenly filed *Gutek I* and *Gutek II* as separate actions, and that the original pleadings, including his claims against two John Doe defendants as asserted in *Gutek II*, should have been viewed as part of a single action, Rule 15(c)(1)(C) would not save his claims because he cannot meet the third requirement. The original complaint in *Gutek II* named two John Doe defendants and Circuit precedent "makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.' " *Id.* at 518; *see also Ceara*, 916 F.3d at 211–12 ("[A]mendments to 'John Doe complaints' to add real names do not relate back under Rule 15(c)(1)(C) because such amendments were made 'not to correct a mistake but to correct a lack of knowledge.' ") (quoting *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995)). Thus Rule 15(c)(1)(C) does not allow relation back.[5] The outcome is the same even if the Court construes the original Complaint in *Gutek I* as asserting an excessive force claim against unidentified officers.[6] Accordingly, the Court must consider whether Rule 15(c)(1)(A) permits relation back.

[5]   In his submissions, Plaintiff repeatedly references "120 days," (Dkt. No. 62-19, at 15; Dkt. No. 62-18, ¶¶ 25–27, 30; Dkt. No. 63, ¶ 28–30, 33), and asserts this action is timely because "Defendants knew of this action before the 120 days after the original complaint." (Dkt. No. 62-16, ¶ 30). There is no evidence that any Defendant was aware of this action before August 14, 2017, which is 125 days

*Gutek v. Borchardt*, Not Reported in Fed. Supp. (2020)

2020 WL 2336187

after the filing of the original Complaint. Even if Plaintiff satisfied the 120-day notice requirement for relation back, *Ceara*, 916 F.3d at 211, because there was no "mistake of identity," Plaintiff's assertions are unavailing.

6      The Court advised Plaintiff when dismissing the original Complaint on June 30, 2017—within the limitations period—that he had not named any individuals as defendants and that he would need to do so in order to proceed on his claims against them. (Dkt. No. 8, at 10).

**B. Rule 15(c)(1)(A)**

 **\*5** "Rule 15(c)(1)(A) permits an amended pleading to relate back when 'the law that provides the applicable statute of limitations allows relation back.' " *Hogan*, 738 F.3d at 518 (quoting Fed. R. Civ. P. 15(c)(1)(A)). As relevant here, § 1024 of "the New York Civil Practice Law and Rules ... creates a special procedure for claims alleged against John Doe defendants," which "New York courts have interpreted ... to permit John Doe substitutions *nunc pro tunc*." *Id.* at 518–19 (citing *Bumpus v. N.Y.C. Transit Auth.*, 66 A.D.3d 26, 29–30, 883 N.Y.S.2d 99 (2d Dep't 2009)); *see also* N.Y. C.P.L.R. § 1024. Under § 1024, "[a] plaintiff 'who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party' may proceed against that party by designating a fictitious name (a 'John Doe') until they become aware of that party's identity." *Barrett v. City of Newburgh*, 720 F. App'x 29, 33 (2d Cir. 2017) (quoting N.Y. C.P.L.R. § 1024).

To satisfy § 1024, a party must: (1) "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name"; and (2) "describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.' " *Hogan*, 738 F.3d at 519 (quoting *Bumpus*, 66 A.D.3d at 29–30, 883 N.Y.S.2d 99).

Even viewing Plaintiff's efforts—given his pro se status throughout much of this case—in the most generous light, there is no basis for finding that Plaintiff exercised due diligence to identify the John Doe defendants prior to the expiration of the limitations period. To establish due diligence, a "plaintiff must 'show that he or she made timely efforts to identify the correct party before the statute of limitations expired,' and that he or she took 'concrete and timely steps' to ascertain the defendant's identity." *Wheeler v. Buckley*, No. 16-cv-7441, 2019 WL 2024005, at *6, 2019 U.S. Dist. LEXIS

77526, at \*15 (S.D.N.Y. May 7, 2019) (first quoting *Strada v. City of New York*, No. 11-cv-5735, 2014 WL 3490306, at \*5, 2014 U.S. Dist. LEXIS 94687, at \*16 (E.D.N.Y. July 11, 2014) then quoting *Smith v. New York*, No. 17-cv-6344, 2019 WL 1208384, at \*4, 2019 U.S. Dist. LEXIS 41512, at \*9 (W.D.N.Y. Mar. 14, 2019)). *See also Barrett*, 720 F. App'x at 33 ("A plaintiff exercising due diligence will take concrete and timely steps to ascertain an officer defendant's identity, for example by submitting multiple discovery demands, requests under state or federal Freedom of Information laws, or requests to the Attorney General's office.").

Plaintiff filed the action on April 11, 2017, approximately two years and nine months into the three-year limitations period. (Dkt. No. 1). He has not described taking any action before the July 8, 2017 expiration of limitations period to identify the officers who subjected him to the alleged excessive force. *See Wheeler*, 2019 WL 2024005, at \*6, 2019 U.S. Dist. LEXIS 77526, at \*16 ("[C]ourts have consistently required that plaintiffs, *including pro se plaintiffs*, themselves take action to identify John Doe defendants.") (citing cases) (emphasis added). *See also Bumpus*, 66 A.D.3d at 30, 883 N.Y.S.2d 99 ("[a]ny failure to exercise due diligence to ascertain the 'Jane Doe's' name subjects the complaint to dismissal as to that party."); *Mosquea v. City of New York*, No. 15-cv-9410, 2016 WL 5818592, at \*2, 2016 U.S. Dist. LEXIS 138473, at \*5 (S.D.N.Y. Oct. 5, 2016) (finding the plaintiff failed to show due diligence where he failed to "describe[ ] any efforts, prior to the expiration of the limitations period, to ascertain the identities of the John and Jane Doe defendants").

Further, even assuming the allegations concerning the four officers who allegedly subjected Plaintiff to excessive force were sufficient to deem them John Doe defendants at the outset, [7] by filing the Complaint three months before the expiration of the limitations period, Plaintiff did not allow sufficient time to obtain a "*Valentin* order (which is routinely issued in this district) in order to identify the [person] he wanted to sue." [8] *Sherrard v. City of New York*, No. 15-cv-7318, 2016 WL 1574129, at \*4, 2016 U.S. Dist. LEXIS 51044, at \*10 (S.D.N.Y. Apr. 15, 2016). Indeed, by the time the Court issued the *Valentin* order on August 11, 2017, the statute of limitations had expired. (Dkt. No. 10). *See Liverpool v. Davis*, No. 17-cv-3875, 2020 WL 917294, at \*9, 2020 U.S. Dist. LEXIS 33237, at \*23 (S.D.N.Y. Feb. 26, 2020) (finding the plaintiff failed to exercise due diligence where he filed the complaint "more than two years and ten months after the incident occurred," which did not allow sufficient time to obtain a *Valentin* order, and "neither alleged

Gutek v. Borchardt, Not Reported in Fed. Supp. (2020)

2020 WL 2336187

nor argued that he took any steps during that time to identify the individual who had allegedly used excessive force against him").

7    Plaintiff argues this could be accomplished by consolidating *Gutek I* and *II*, the latter of which named two John Doe defendants. (Dkt. No. 62-19, at 17–18).

8    *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997).

**\*6** Plaintiff knew as early as July 8, 2014, the date of the alleged incident, that four officers were involved. (Dkt. No. 1; Dkt. No. 52-12, at 33–34). There is no evidence that Plaintiff took any steps by making formal or informal requests to Broome County Jail or the County to identify these officers prior to the expiration of the statute of limitations on July 8, 2017. When questioned at oral argument, Plaintiff's counsel could not identify any action that Plaintiff had taken to identify the officers before July 8, 2107. In addition, Plaintiff filed this action less than three months before the limitations period expired and made no requests for assistance during that initial time period in identifying the officers. *See Berman v. Perez*, No. 17-cv-2757, 2018 WL 565269, at *3, 2018 U.S. Dist. LEXIS 9837, at *7–8 (S.D.N.Y. Jan. 11, 2018) (finding § 1024 did not permit relation back where there was "no indication that [the plaintiff] took any action beyond filing his original complaint much less exercised due diligence—in the nearly three years between the alleged incident on June 9, 2014, and June 9, 2017, when the statute of limitations expired, to ascertain the identities of the John Doe defendants" and "waited over two and a half years after the incident in question ... to bring his original complaint"). Thus, because Plaintiff has failed to show due diligence in attempting to identify Defendants, his claims against them in the Second Amended Complaint do not relate back to the original Complaint and are barred by the statute of limitations.

## C. Equitable Tolling

It is not clear what Plaintiff means by his assertion that the procedural history of this case somehow reflects that the Court "extended the statute of limitations." (Dkt. No. 62-19, at 15). To the extent this could be construed as an assertion that equitable tolling applies in this case, he fails to identify any facts in the record that would justify application of that doctrine. "Equitable tolling is an extraordinary measure that applies only when plaintiff is *prevented from filing* despite exercising that level of diligence which could reasonably be expected in the circumstances." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) (quoting *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004)) (emphasis in original). For the reasons described above, Plaintiff has not demonstrated the requisite level of diligence.

Furthermore, in *Gonzalez*, the Second Circuit instructed "that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process [under the Prison Litigation Reform Act]." 651 F.3d at 323–24 (quoting *Brown v. Valoff*, 422 F.3d 926, 943 (9th Cir. 2005)). The equitable tolling period begins when a plaintiff first raises his administrative claim and ends when the plaintiff's administrative remedies are deemed exhausted. *Id.* at 324 ("[T]he applicable three-year statute of limitations is tolled only during that exhaustion period and not during the period in between the accrual of those claims and when [the plaintiff] began the administrative remedy process."). The applicable statute of limitations is tolled during the time that an inmate is " 'actively exhausting' his administrative remedies." *Melendez v. Greiner*, 477 F. App'x 801, 803 (2d Cir. 2012) (quoting *Gonzalez*, 651 F.3d at 322 n.2). The plaintiff bears the burden of showing that he is entitled to equitable tolling. *See Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). Plaintiff did not raise this point in arguing that his Second Amended Complaint was timely and, even if the Court were, in an abundance of caution, to consider this issue, Plaintiff failed to adduce evidence of a time period in which he was "actively exhausting" his administrative remedies that would change the result here.[9]

9    In his deposition Plaintiff testified that "tried" to file a grievance, without specifying how or when, and that the grievance officer – one of the alleged assailants -- who provided grievance forms would not come to Plaintiff's cell. (Dkt. No. 62-5, at 79–80). Plaintiff stated that he was told he could file a grievance after his July 29, 2017 disciplinary hearing, but that after the hearing he was told by "[e]very officer that [he] talked to" that no officer would allow him to file a grievance on another officer, and that he "eventually" – without specifying when – "stopped asking." (*Id.*). Even assuming that Plaintiff "was actively exhausting" his administrative remedies during the 21-day period between July 8, 2014, the date of the alleged assault, and July 29, 2014, the date of the disciplinary hearing, adding these 21 days to extend he statute of limitations, and extending it to July 29, 2017, would not aid Plaintiff because, as discussed

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 112 of 261

Gutek v. Borchardt, Not Reported in Fed. Supp. (2020)
2020 WL 2336187

above, there is no evidence that Plaintiff took any action to identify Defendants prior to July 29, 2017. Indeed, the first step toward identifying the John Doe defendants occurred on August 11, 2017, when the Court requested the Broome County Attorney's assistance. (Dkt. No. 10). Plaintiff only identified the individual Defendants in the Second Amended Complaint (filed September 26, 2017) after the Broome County Attorney's response. (Dkt. Nos. 11, 13).

## V. CONCLUSION

**\*7**  For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 52) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motions for extension of time for service and consolidation (Dkt. Nos. 63, 65) are **DENIED as moot**; and it is further

**ORDERED** that the Second Amended Complaint (Dkt. No. 13) is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2336187

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4437584
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brandon GRIFFITH, Plaintiff,

v.

Mitchel TROY, Lieutenant, Auburn Correctional
Facility, Harte, Sergeant, Auburn Correctional Facility,
Mohammad M. Iqbal, Chris Mayer, Unit Chief
Clinician, Auburn Correctional Facility, Maggie Pitaro,
Clinician, Auburn Correctional Facility, B. Smith,
Correctional Officer, Auburn Correctional Facility,
Girvin, Correctional Officer, Auburn Correctional
Facility, Barber, Dennis, Correctional Officer,
Auburn Correctional Facility, Thomas, Correctional
Officer, Auburn Correctional Facility, Cooper,
Correctional Officer, Auburn Correctional Facility,
Pyke, Sergeant, Auburn Correctional Facility, Fisher,
Correctional Officer, Auburn Correctional Facility,
Larry Nolan, Correctional Officer, Attica Correctional
Facility, Pattison, Correctional Officer, Attica
Correctional Facility, and David Tarby, Correctional
Officer, Auburn Correctional Facility, Defendants.

9:19-CV-00354 (MAD/ML)
|
Signed 09/28/2021

**Attorneys and Law Firms**

BRANDON GRIFFITH, 0000263241, Westchester County
Jail, P.O. Box 10, Valhalla, New York 10595, Plaintiff, pro se.

OF COUNSEL: CHRISTOPHER LIBERATI-CONANT,
AAG, OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, New York State Attorney General, The Capitol,
Albany, New York 12224, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

**\*1** On March 21, 2019, Plaintiff, Brandon Griffith, filed
this 42 U.S.C. § 1983 action *pro se* against Defendants

alleging various civil rights violations. Dkt. No. 1. Plaintiff
also filed an incomplete application to proceed *in forma
pauperis*. Dkt. No. 2. After Plaintiff submitted a completed
application, the Court granted Plaintiff's application to
proceed *in forma pauperis* and held that only three of
Plaintiff's claims survived initial review: (1) Plaintiff's Eighth
Amendment deliberate medical indifference claims asserted
against Defendants Iqbal, Mayers, Mitchel, and Pitaro
(Grosso); (2) Plaintiff's Eighth Amendment excessive force
and failure to intervene claims asserted against Defendants
Yorkie, Girvin, Mitchel, Pyke, Fisher, Tarby, Smith, Thomas,
Barber, Harte, Cooper, Dennis, Nolan, and Pattison; and (3)
Plaintiff's First Amendment retaliation claims asserted against
Defendants Nolan and Pattison. Dkt. No. 12.

On December 3, 2020, Defendants moved for summary
judgment on Plaintiff's remaining three claims. On July
30, 2021, Magistrate Judge Lovric issued a Report-
Recommendation recommending that Defendants' motion be
granted-in-part and denied-in-part. Dkt. No. 99. Both parties
filed objections to the Report-Recommendation. Dkt. Nos.
104, 108. As set forth below, the Report-Recommendation is
adopted-in-part and rejected-in-part.

**II. BACKGROUND**

On or about September 22, 2015, [1] while incarcerated
in Auburn Correctional Facility ("Auburn C.F."), Plaintiff
was placed in the Residential Treatment Crisis Prevention
("RTCP") observation unit. Dkt. No. 1 at 16. On October
15, 2015, Defendant Dr. Iqbal spoke with Plaintiff in the
RTCP cell. *Id.* at 17. Plaintiff informed Defendant Iqbal that
he was suicidal and that, if he was returned to the Special
Housing Unit ("SHU"), he would "do all in [his] power to
take [his] life." *Id.* Defendant Iqbal responded by releasing
Plaintiff to SHU. *Id.* Defendant Unit Chief Clinician Chris
Mayers escorted Plaintiff to SHU and administered a suicide
screening test. *Id.* Although Plaintiff "failed SHU suicide
prevention," Defendant Mayers left Plaintiff alone in his SHU
cell. *Id.* Within forty-five minutes, Plaintiff attempted suicide
by hanging himself with the bed sheets. *Id.* Plaintiff was
"tak[en] to medical ... but not sent to the hospital as directive
commands" and "[l]eft without medical treatment." *Id.*

[1] Plaintiff did not submit an opposition to
Defendants' statement of material facts. *See*
Dkt. No. 94. However, Defendants' statement of

material facts does not address any of the factual allegations alleged in the complaint. *See* Dkt. No. 80-2. Thus, the factual background is largely taken from the Court's initial review of Plaintiff's complaint on June 26, 2019. Dkt. No. 12.

On October 21, 2015, Defendant Iqbal again released Plaintiff from the RTCP to the SHU notwithstanding Plaintiff's warning that he would attempt suicide. *Id.* at 18. Defendant Mayers again placed Plaintiff in the SHU cell after Plaintiff told him that he would use the bed sheets to kill himself. *Id.* Defendant Mayers responded by directing a SHU sergeant to "give [Plaintiff] all his sheets." *Id.* Approximately one hour after Plaintiff arrived at his SHU cell, he hanged himself. *Id.* Defendant Deputy Superintendent of Auburn C.F. Fennessey found Plaintiff and directed a correctional officer to "cut [him] down." *Id.* Plaintiff was brought to "medical" but "not sent to [an] outside hospital" and "denied proper medical attention." *Id.*

**\*2** Plaintiff again attempted suicide in the RTCP on or about November 8, 2015. *Id.* He hanged himself in the shower and "was revived by smelling salt[s]" but provided "no other medical treatment." *Id.* On or about November 21, 2015, Plaintiff swallowed a paper clip. *Id.* Because the paper clip became lodged in Plaintiff's throat, he was transported to Upstate University Hospital in Syracuse, New York, for surgery. *Id.*

On December 1, 2015, approximately one hour before lunch, Plaintiff was assaulted by Defendant Sergeant Yorkie. *Id.* Plaintiff's hands were "mangled and scarred" as a result of the assault. *Id.* While serving Plaintiff lunch at his cell, Defendant Correctional Officer Girvin "horse[-]kicked" the slot in the cell door while Plaintiff's hands were inside, "causing deep puncturing wounds." *Id.* at 19. Plaintiff was denied medical treatment for his injuries. *Id.*

During her treatment of Plaintiff, Defendant RTCP Crisis Counselor Maggie Pitaro ignored Plaintiff's mental health history, refused to recognize Plaintiff's mental illness, and did not acknowledge his suicidal triggers. *Id.* at 19. Although it is not clear from the Complaint when Defendant Pitaro began treating Plaintiff or for how long she remained his counselor, she was at least Plaintiff's counselor in and around October 2015 through December 2015. *Id.*

On December 3, 2015, Plaintiff "was once again sent out of RTCP by the treatment team" and failed the suicide screening test. *Id.* at 19. Nevertheless, Plaintiff was housed in SHU, where he attempted suicide three days later by swallowing a razor blade. *Id.* Plaintiff also attempted to hang himself before a correctional officer thwarted his efforts. *Id.* Plaintiff was then escorted to the "transport depot" where Defendants Lieutenant Troy Mitchel, Sergeant Harte, and Correctional Officers Cooper and Dennis met him. *Id.* Defendant Mitchel directed Plaintiff "to go thru [sic] with the strip process." *Id.* at 20. Defendant Mitchel then conducted a strip search, during which he squeezed Plaintiff's genitals "harder and harder" and directed racial slurs and threats at him. *Id.* Defendants Harte, Cooper, and Dennis witnessed the incident without intervening, and Plaintiff was not provided any medical treatment following the assault. *Id.* Although Plaintiff reported the incident directly to Auburn C.F. Superintendent Graham "the following week," Graham did not take any corrective action. *Id.* Plaintiff also told Auburn Captain Diego about the sexual assault by Defendant Mitchel. *Id.* at 24. Captain Diego allegedly only "talked to" Defendant Mitchel about the incident, which Plaintiff alleges was "not sufficient." *Id.*

On December 21, 2015, Defendants Mitchel, Pyke, Fisher, and Tarby poured gallons of water over Plaintiff's head. *Id.* at 20. Plaintiff experienced asthma symptoms during the incident, but Defendant Mitchel refused to provide him with his inhaler. *Id.* Defendant Mitchel then directed Defendant Fisher to fabricate a misbehavior report accusing Plaintiff of possessing an altered razor blade. *Id.* at 21. Plaintiff began a hunger strike on that date that lasted until January 26, 2016. *Id.* On January 26, 2016, Dr. Geer "removed [Plaintiff] off hunger strike." *Id.* at 23. Between December 6, 2015 and January 26, 2016, Plaintiff "was denied showers, dental minimum care (such as finger brushing, any mouthwash, floss), running water, soap, washing water, no exercise, heat or warmth or any basic minimal elements of hygiene." *Id.*

**\*3** Defendant Mitchel assaulted Plaintiff on January 4, 2016, while directing racial slurs towards him and insulting his religion. *Id.* Defendants Harte, Smith, Thomas, and Barber witnessed the assault and did not intervene on Plaintiff's behalf. *Id.*

Between January 27, 2016 and March 7, 2016, religious publications (described by Plaintiff as "Nation of Gods and Earths lessons" and "God Centered Culture necessitated material") were withheld from Plaintiff. *Id.* at 22. Plaintiff was placed on pen deprivation on February 12, 2016, and denied a haircut on February 13, 2016, both in retaliation for Plaintiff's filing of grievances. *Id.* On an unidentified date while Plaintiff

was incarcerated in Auburn C.F., Defendant Quinn ordered Plaintiff to be transferred to the RTCP, where he was stripped in front of four or five other officers and then placed into a cell that had urine on the mattress. *Id.* at 24.

On or about March 7, 2016, Plaintiff was transferred from Auburn C.F. to Attica Correctional Facility ("Attica C.F."). *Id.* Upon arriving, Defendants Correctional Officers Nolan and Pattison threatened and intimidated Plaintiff by telling him that they were aware of the grievances Plaintiff had filed against their "friends in Auburn [C.F.]," and that Plaintiff's stay at Attica C.F. would be "a dangerous one." *Id.* On or about March 21, 2016, Defendants Nolan and Pattison "attacked [Plaintiff] with strike[s] to the body and skull." *Id.* During the assault, Defendants used racial slurs and told Plaintiff that he should "stop writing" grievances or else he would "find [himself] hung." *Id.* Plaintiff notified Attica C.F. Superintendent Noeth about the assault by Defendants Nolan and Pattison while Superintendent Noeth made rounds in the SHU. *Id.* Plaintiff claims that Superintendent Noeth disregarded the information and did not investigate the incident. *Id.*

Attica C.F. grievance records indicate that Plaintiff filed two grievances on March 16, 2016 and one on March 24, 2016. Dkt. No. 80-2 at ¶ 18. CORC records show that Plaintiff appealed one of the grievances filed at Attica C.F. on March 16, 2016. *Id.* at ¶ 19. Plaintiff did not appeal his remaining grievances. *Id.* at ¶ 20.

## III. DISCUSSION

**A. Standard of Review**
A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

 **\*4**  " 'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' " *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* at 554 (quoting *Anderson*, 477 U.S. at 252) (emphasis in original). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp.2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which

merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Statute of Limitations**

*1. Governing Law*

"[T]he limitations period for § 1983 claims is borrowed from state law, which, in the case of New York, confers only a three-year period." *Duplan v. City of New York*, 888 F.3d 612, 619 (2d Cir. 2018) (citing *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009)). "Section 1983 claims brought in New York ordinarily accrue when the 'plaintiff knows or has reason to know of the injury' on which his claim is based." *Sides v. Paolano*, 782 Fed. Appx. 49, 50 (2d Cir. 2019) (citing *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015)).

"Under the prison mailbox rule, a *pro se* prisoner's complaint is deemed filed upon its delivery to prison authorities for transmittal to the district court." *Id.* (citing *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993)). "That date of delivery is presumed to be the date that the inmate signs his or her complaint." *Brown v. Smithem*, No. 15-CV-1458, 2017 WL 1155825, *4 (N.D.N.Y. Feb. 28, 2017) (citing *Johnson v. Connolly*, No. 9:07-CV-0158, 2008 W L 724167, *7 (N.D.N.Y. Mar. 17, 2008)). If the complaint is not signed, "the date of the postmark is the date the petition is presumed filed." *Nolley v. Superintendent of Bare Hill*, No. 11-CV-6384, 2012 WL 2131891, *5 (W.D.N.Y. June 12, 2012).

*2. Application*

In the present matter, applying the prison mailbox rule, Magistrate Judge Lovric determined that the date of commencement was not the date that the complaint was received by the Clerk of the Court (March 21, 2016), but the date on the signature line of the complaint (December 1, 2018), which is the date it was presumably put in the hands of prison officials. Dkt. No. 99 at 22. As such, Magistrate Judge Lovric determined that "Plaintiff's claims related to incidents that occurred on or after December 1, 2015, are timely, and those related to incidents that occurred before December 1, 2015, are untimely." *Id.* In both their underlying motion for summary judgment and in their objections to the Report-

Recommendation, Defendants argue that Plaintiff was not entitled to the presumption that he put his complaint into the hands of prison officials for mailing on the date it was signed because (1) the operative portion of the complaint is unsigned and undated, (2) the envelope in which the complaint and affidavit were sent is postmarked March 19, 2019, and (3) Plaintiff's notarized affidavit, submitted with the complaint, is dated December 28, 2018. *See* Dkt. No. 104 at 6. The Court agrees with Defendants that Plaintiff was not entitled to the presumption that his complaint was given to prison officials on the date it was signed.

**\*5** As Defendants note, while the first half of Plaintiff's complaint is dated December 1, 2018, the second half of the complaint, which contains the numbered paragraphs and the claims that survived initial review, is undated. *See* Dkt. No. 1 at 15, 25. The affidavit that Plaintiff filed with his complaint is dated December 27, 2018. *See* Dkt. No. 1-4 at 7. Moreover, exhibits attached to Plaintiff's complaint are dated well after the December 1, 2018 signature date. For example, Plaintiff attached as an exhibit a letter from Deputy Commissioner Stephen Maher that is dated January 30, 2019. *See* Dkt. No. 1-1 at 1; *see also* Dkt. No. 1-2 at 108. It necessarily follows that Plaintiff could not have given his complaint to prison officials for mailing on December 1, 2018, when exhibits attached to the complaint are dated January 30, 2019. As such, the Court finds that the filing date of Plaintiff's complaint was March 19, 2019, which is the date of the postmark on the mailing envelope in which the complaint was mailed. *See* Dkt. No. 1-9; *see Nolley v. Superintendent of Bare Hill*, No. 11-cv-6384, 2012 WL 2131891, *5 (W.D.N.Y. June 12, 2012) ("Ordinarily, in the absence of evidence to the contrary, the Court presumes that the date the petition was signed is the date it was given to the appropriate prison authorities for mailing") (citations omitted). As such, all claims accruing before March 19, 2016, are subject to dismissal unless an exception applies. [2]

---

[2]      The Court notes that all claims raised in the complaint, except those against Defendants Nolan and Pattison, arose before March 8, 2016. Magistrate Judge Lovric, however, recommended that the claims against Defendants Nolan and Pattison be dismissed because Plaintiff failed to exhaust his administrative remedies as to those claims.

### a. Continuing violation doctrine

"The continuing violation doctrine, however, creates an 'exception to the normal knew-or-should-have-known accrual date.' " *Sides v. Paolano*, 782 Fed. Appx. 49, 50 (2d Cir. 2019) (quoting *Shomo*, 579 F.3d at 181).

> That doctrine "can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs," but it may be invoked only on a showing "both [of] the existence of an ongoing policy of deliberate indifference to his or her serious medical needs and some non-time-barred acts taken in the furtherance of that policy."

*Id.* (quoting *Shomo*, 579 F.3d at 182).

"To assert a continuing violation for statute of limitations purposes, the plaintiff must allege both the existence of an ongoing policy of [deliberate indifference to serious medical needs] and some non-time-barred acts taken in the furtherance of that policy." *Orlando v. Johnson*, No. 9:19CV1183, 2020 WL 7684949, *4 (N.D.N.Y. Oct. 5, 2020) (quoting *Shomo*, 579 F.3d at 181) (alterations in original) (internal quotation marks omitted). "Under this doctrine, the limitations period does not begin to run until the last act taken in furtherance of that policy." *Id.* (citing *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). "[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred ... act." *Id.* (quoting *Warren v. Sawyer*, No. 9:15-CV-0591, 2016 WL 1558460, *5 (N.D.N.Y. Apr. 15, 2016)).

Plaintiff objects to Magistrate Judge Lovric's failure to apply the continuing violation doctrine. *See* Dkt. No. 108 at 1. Plaintiff claims that the statute of limitations did not begin to run until March 26, 2016. Plaintiff argues that from September 22, 2015 to January 26, 2016 while incarcerated at Auburn C.F., he made repeated attempts to take his own life and without any medical attention in response. *See* Dkt. No. 1 at 16-20. Magistrate Judge Lovric recommended that summary judgment be granted as to Plaintiff's claims against Defendants Iqbal and Mayer, which involved incidents that occurred before December 1, 2015, and denied as to the claims against Defendants Mitchel and Pitaro, which accrued on December 21, 2015. Dkt. No. 99 at 20-21.

Magistrate Judge Lovric correctly noted that Plaintiff has not alleged the existence of an ongoing policy of deliberate indifference to his serious medical needs and, without such, the continuing violation doctrine does not apply. Dkt. No. 99 at 20 n.14; *see also Orlando*, 2020 WL 7684949, at *4; *Warren*, 2016 WL 1558460, at *5 ("Plaintiff's conclusory assertions that all of the actions of the defendants were taken pursuant to a policy does not suffice"). Rather, the alleged deliberate indifference were all discrete events. Therefore, all claims of deliberate indifference that took place prior to March 19, 2016, are untimely. Plaintiff's complaint does not allege any claims of deliberate indifference to his serious medical needs after March 19, 2016. *See* Dkt. No. 1.

**\*6** As such, the Court finds that since all of Plaintiff's deliberate indifference claims accrued before March 19, 2016, and the continuing violation doctrine is inapplicable, Defendants are entitled to summary judgment on all such claims.

### 3. Eighth Amendment Excessive Force and Failure to Intervene Claims

Plaintiff alleges Eighth Amendment violations against Defendants Yorkie, Girvin, Mitchel, Pyke, Fisher, Tarby, Smith, Thomas, Barber, Harte, Cooper, Dennis, Nolan, and Pattison based on the allegedly unnecessary force against him and failure to intervene and protect him from harm on December 1, 2015, December 3, 2015, December 21, 2015, and January 4, 2016, while he was confined at Auburn C.F. Dkt. No. 1 at 18-21. Magistrate Judge Lovric determined that these claims were timely based on the determination that the complaint was filed on December 1, 2018. *See* Dkt. No. 99 at 21. In their objections, Defendants contend that Magistrate Judge Lovric erred in determining that these claims are not barred by the statute of limitations. *See* Dkt. No. 104 at 7-8.

Again, the Court agrees with Defendants. Plaintiff is not entitled to the presumption that his complaint was filed on December 1, 2015, because of the substantial evidence submitted with his complaint that is clearly dated much later. Since these claims accrued no later than January 4, 2016, the complaint was not filed until March 19, 2019, and Plaintiff has not set forth any basis to apply the continuing violation doctrine or equitable tolling, they are untimely. As such, the Court rejects the Report-Recommendation insofar as it recommends denying Defendants' motion for summary judgment as to these claims.

### C. Exhaustion of Administrative Remedies

Magistrate Judge Lovric concluded that Plaintiff failed to exhaust his administrative remedies "for the reasons stated in Defendants' memorandum of law." Dkt. No. 99 at 21-22. Defendants moved for summary judgment on Plaintiff's First and Eighth Amendment claims against Defendants Pattison and Nolan asserting that Plaintiff failed to grieve the March 21, 2016 incident. Dkt. No. 80-7 at 9-11.

The Prison Litigation Reform Act states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90–103.

 **\*7** New York State has a three-step administrative review process, commonly referred to as the Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), which reviews and investigates the formal complaint before issuing a written determination. *See 7 N.Y.C.R.R. § 701.5(b)*. Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). If all three levels of review are exhausted, then the

prisoner may seek relief in a federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by the CORC, must be completed before an action asserting that claim may be filed in federal court. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC after commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S. 516) (emphasis in original); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

Plaintiff's complaint alleges that on or about March 21, 2016, Defendants Nolan and Pattison "attacked [Plaintiff] with strike[s] to the body and skull." *Id.* During the assault, Defendants used racial slurs and told Plaintiff that he should "stop writing" grievances or else he would "find [himself] hung." *Id.*

Attica C.F. grievance records indicate that Plaintiff filed two grievances dated March 16, 2016 and one on March 24, 2016. Dkt. No. 80-3 at 6. CORC records show that Plaintiff only appealed one grievance filed at Attica C.F., the March 16, 2016 grievance. *Id.* Plaintiff did not appeal any other grievances. *Id.* Plaintiff objects to Magistrate Judge Lovric's recommendation, asserting that he fully exhausted his administrative remedies. Dkt. No. 108 at 2.

The Court has reviewed the extensive filings submitted in support of Defendants' motion for summary judgment, as well as the grievances filed in 2015 and 2016, which were attached to Plaintiff's complaint. Dkt. No. 1-2 at 20-107. However, Plaintiff does not include a grievance for the alleged March 21, 2016 incident and Defendants have submitted competent evidence demonstrating that no appeal was taken from regarding any grievance involving the March 21, 2016 incident. Plaintiff's conclusory allegations

to the contrary are insufficient to create an issue of fact. Therefore, Magistrate Judge Lovric correctly recommended that summary judgment on Plaintiff's First and Eighth Amendment claims against Defendants Pattison and Nolan must be granted. The Court therefore adopts Magistrate Judge Lovric's Report-Recommendation as to this issue.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**\*8 ORDERS** that Magistrate Judge Lovric's Report-Recommendation is **ADOPTED-in-part and REJECTED-in-part** for the reasons set forth herein; and the Court further

**ORDERS** Defendants' motion for summary judgment (Dkt. No. 80) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4437584

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

162 Fed.Appx. 61
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Vensel HARDY, Petitioner-Appellant,

v.

James T. CONWAY, Superintendent, Attica
Correctional Facility, Respondent-Appellee.

No. 04-0934-PR.
|
Jan. 12, 2006.

**Synopsis**

**Background:** Following affirmance of his convictions for
first and second-degree robbery, 743 N.Y.S.2d 287, state
inmate filed petition for writ of habeas corpus. The United
States District Court for the Eastern District of New York,
Arthur D. Spatt, J., 299 F.Supp.2d 159, dismissed petition,
and petitioner appealed.

**Holding:** The Court of Appeals held that petitioner was not
required to provide affidavit of service to verify when he gave
petition to prison officials.

Vacated and remanded.

West Headnotes (1)

**[1]    Habeas Corpus** 🔑 Date of filing;  mailbox
rule

State prisoner was not required to provide
affidavit of service to verify when he gave his pro
se federal habeas petition to prison officials in
order to establish date of filing pursuant to prison
mailbox rule; rather, in absence of contrary
evidence, district court should have assumed that
prisoner's papers were given to prison officials
on date of their signing.

57 Cases that cite this headnote

**\*61**   Appeal from the United States District Court for the
Eastern District of New York (Arthur D. Spatt, Judge).

**Attorneys and Law Firms**

Vensel Hardy, Attica, New York, for Appellant, pro se.

Glenn Green, Assistant District Attorney of Counsel,
for Thomas J. Spota, District Attorney, Suffolk County,
Riverhead, New York, for Appellee.

PRESENT: Honorable AMALYA L. KEARSE, Honorable
REENA RAGGI, Circuit Judges. and Honorable JANE A.
RESTANI, [1] Chief Judge, U.S. Court of Int'l Trade.

[1]        The Honorable Jane A. Restani, Chief Judge of the
United States Court of International Trade, sitting
by designation.

**\*62   SUMMARY ORDER**

**\*\*1**   UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED that the
judgment of the district court, entered on February 5, 2004, is
VACATED and REMANDED to the district court for further
proceedings consistent with this order.

Petitioner-appellant Vensel Hardy filed a habeas corpus
petition under 28 U.S.C. § 2254 challenging his state court
convictions for first and second-degree robbery and third-
degree criminal weapons possession. The one-year statute
of limitations prescribed by the Antiterrorism and Effective
Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d)
(1), was due to expire in Hardy's case on November 18, 2003.
Although Hardy dated (and presumably signed) his habeas
petition on November 15, 2003, it was not filed in the district
court until December 9, 2003.

The district court dismissed the petition as untimely, not
finding present in Hardy's case the " 'rare or extraordinary
circumstances' " necessary to justify equitable tolling of
the AEDPA statute of limitations. Hardy v. Conway, 299
F.Supp.2d 159, 161 (E.D.N.Y.2004) (quoting Valverde v.
Stinson, 224 F.3d 129, 133 (2d Cir.2000)). In April 2005,
this court granted Hardy a certificate of appealability and
instructed the parties to address whether the "prison mailbox
rule," set forth in Houston v. Lack, 487 U.S. 266, 276, 108

S.Ct. 2379, 101 L.Ed.2d 245 (1988), excused the late filing of Hardy's petition. Both parties have failed to address the requested issue in their briefs.

The prison mailbox rule provides that a *pro se* prisoner's habeas petition is deemed filed at the moment he gives it to prison officials. *See Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001); *see also Walker v. Jastremski,* 430 F.3d 560 (2d Cir.2005). The district court here declined to apply the mailbox rule to Hardy's petition because Hardy "fail[ed] to provide an affidavit of service to show that he in fact submitted his petition to the Department of Correctional Services ... for filing and copying by November 18, 2003." *Hardy v. Conway,* 299 F.Supp.2d at 161. However, we have never required prisoners to provide affidavits of service to verify when they give their documents to prison officials. Indeed, in the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing. *See, e.g., Porter v. Greiner,* No. 00-6047, 2005 WL 3344820, *7, 2005 U.S. Dist. LEXIS 31828, at *20 (E.D.N.Y. Nov. 18, 2005) ("Where it is unclear when a *pro se* state prisoner mailed his or her habeas petition, the court assumes that the petition is filed on the day it is signed and dated."); *Cardona v. Andrews,* No. 04 Civ. 6534, 2005 U.S. Dist. LEXIS 12994, at *8 n. 3 (S.D.N.Y. June 15, 2005); *Corrigan v. Barbery,* 371 F.Supp.2d 325, 328 n. 4 (W.D.N.Y.2005); *Bourguignon v. Spielvogel,* No. 00-Cv-2465, 2004 WL 717161, 2004 U.S. Dist. LEXIS 5476, at *3 (D.Conn. Mar. 29, 2004); *Salerno v. People of New York State,* No. 98-Cv-1187, 2002 U.S. Dist. LEXIS 23214, at *4 n. 2 (N.D.N.Y. Dec. 5, 2002); *Rosa v. Walker,* No. 00-Cv-2059, 2002 WL 1467737, *1 n. 2, 2002 U.S. Dist. LEXIS 13487, at *4 n. 2 (E.D.N.Y. May 10, 2002); *Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) ("Although it is not clear when the plaintiff gave his complaint to prison officials, absent evidence to the contrary, the Court

assumes that the prisoner gave his petition to prison officials for mailing on the date he signed it.") (alterations and internal quotation marks omitted); *Torres* **\*63** *v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (collecting cases); *see also Marsh v. Soares,* 223 F.3d 1217, 1218 n. 1 (10th Cir.2000) ("Liberal application of the mailbox rule ... causes us to treat the petition as placed in the hands of prison authorities on the same day it was signed.").

**\*\*2**  We are unable to discern from the record when Hardy provided his petition to prison officials. We recognize that in prior submissions to the district court, Hardy provided certain excuses to the district court for his late filing, *see Hardy v. Conway,* 299 F.Supp.2d at 161, indicating his awareness that his petition had been filed after the expiration of the AEDPA statute of limitations. However, it is unclear whether Hardy provided these excuses with the knowledge that his petition was timely as long as he provided it to prison officials before November 18, 2003, or whether he was ignorant of the prison mailbox rule and believed that his petition's late filing prevented its consideration. Given the lenient standards we apply to the filings of *pro se* litigants, *see, e.g., Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996), we are unwilling to conclude on an ambiguous record that Hardy's submission was untimely.

Accordingly, we remand the case to the district court for it to determine when Hardy gave his petition to prison officials and to treat Hardy's petition on its merits if the prison mailbox rule applies. The district court's judgment is hereby VACATED and the case REMANDED for further proceedings consistent with this order.

### All Citations

162 Fed.Appx. 61, 2006 WL 93083

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 762108
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Craig J. ALEXANDER, Petitioner,
v.
SUPERINTENDENT, et al., Respondents.

No. 9:07–cv–00680–JKS.
|
March 19, 2009.

**Attorneys and Law Firms**

Craig J. Alexander, Auburn, NY, pro se.

Alyson J. Gill, Office of Attorney General, New York, NY, for Respondents.

MEMORANDUM DECISION

JAMES K. SINGLETON, JR., District Judge.

 **\*1** Petitioner Craig J. Alexander, a state prisoner appearing *pro se,* has filed a petition for habeas corpus relief under 28 U.S.C. § 2254. Alexander is currently in the custody of the New York Department of Correctional Services incarcerated at the Great Meadow Correctional Facility. Respondent Superintendent has answered; Alexander has not filed a traverse.

I. BACKGROUND/PRIOR PROCEEDINGS

In April 2004 Alexander was convicted in the Broome County Court upon a guilty plea of Manslaughter in the First Degree (N.Y. Pen. Law § 125.20(1)). Alexander was sentenced to a determinate term of 11 years plus 5 years supervised release. Alexander timely appealed his conviction to the Appellate Division, Third Department, which confirmed his conviction and sentence in a reasoned decision, and the New York Court of Appeals denied leave to appeal on November 29, 2005.[1]

[1]   *People v. Alexander,* 21 A.D.3d 1223, 801 N.Y.S.2d 431 (N.Y.App.Div.), *lv. denied,* 5 N.Y.3d 881, 808 N.Y.S.2d 584, 842 N.E.2d 482 (N.Y.2005).

On April 20, 2006, Alexander filed a motion in the Broome County Court under New York Criminal Procedure Law 440.20 to set aside his sentence, which the Broome County Court denied in a reasoned decision, and the Appellate Division, Third Department, denied leave to appeal on August 8, 2006.

Alexander filed his undated petition for relief in this Court on June 28, 2007 (postmarked June 26, 2007).

II. GROUNDS RAISED/DEFENSES

In his petition Alexander raises a single ground: the failure of the trial court to advise him of the fact that a five-year period of supervised release would be imposed rendered his plea involuntary and not freely given.

Respondent asserts that the petition is barred by the one-year limitation period of 28 U.S.C. § 2244(d)(1). Respondent does not assert any other affirmative defense.[2]

[2]      *See* Rules—Section 2254 Cases, Rule 5(b).

III. STANDARD OF REVIEW

Because Alexander filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d). Consequently, this Court cannot grant relief unless the decision of the Appellate Division was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3] The Supreme Court has explained that "clearly established Federal law" in § 2254(d) (1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[4] Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.' "[5] When a claim falls under the "unreasonable application" prong, a state court's application of the Supreme Court precedent must be "objectively unreasonable," "not just incorrect or

erroneous."[6] The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing the state court determination was incorrect.[7] In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the jury's verdict.[8]

[3]     28 U.S.C. § 2254(d); *Williams v. Taylor,* 529 U.S. 362, 405–406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70–73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (explaining this standard).

[4]     *Williams,* 529 U.S. at 412.

[5]     *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (alterations by the Court); *see Wright v. Van Patten,* —— U.S. ——, —— – ——, 128 S.Ct. 743, 746–47, 169 L.Ed.2d 583 (2008) (per curiam).

[6]     *Wiggins v. Smith,* 539 U.S. 510, 520–21, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

[7]     *Schriro v. Landrigan,* 550 U.S. 465, ——, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007).

[8]     *Fry v. Pliler,* 551 U.S. 112, ——, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007) (adopting the standard set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

**\*2** In applying this standard, this Court reviews the last reasoned decision by the state court.[9] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[10]

[9]     *Ylst v. Nunnemaker,* 501 U.S. 797, 504, 111 S.Ct. 2590, ——, 115 L.Ed.2d 706, —— (1991).

[10]    28 U.S.C. § 2254(e)(1); *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

## IV. DISCUSSION

Respondent has pled as a defense the AEDPA one-year limitation period. A petition for relief under § 2254 must be filed within one year of the date the conviction became final.[11] The New York Court of Appeals denied leave to appeal on Alexander's direct appeal on November 29, 2005. Alexander's conviction became final 90 days later, February 27, 2006, when his time to petition the United States Supreme Court for *certiorari* expired.[12] Thus, except to the extent that the time was tolled, Alexander had one year, until February 27, 2007, to file his petition for relief under § 2254.

[11]    28 U.S.C. § 2244(d)(1)(A).

[12]    *See Fernandez v. Artuz,* 402 F.3d 111, 112 (2d Cir.2005).

The one-year limitation period is tolled during the time that a properly filed application for State post-conviction or other collateral review with respect to the judgment is pending.[13] In this case, Alexander filed a motion for relief under New York Criminal Procedure Law § 440.20 on April 20, 2006, which was pending until leave to appeal was denied by the Appellate Division on August 8, 2006.[14] On the date that he filed his § 440.20 motion, 51 days of the one-year period had lapsed; thus, on the date that the Appellate Division denied leave to appeal denial of his § 440.20 motion, Alexander had 314 days, until June 18, 2007, to file his petition for habeas relief in this Court. Alexander filed his undated petition in this Court on June 28, 2007, postmarked June 26, 2007.

[13]    28 U.S.C. § 2244(d)(2).

[14]    The date of the order, not the date when notice of it is received, determines when a state proceeding is no longer pending under § 2244(d)(2). *Geraci v. Senkowski,* 211 F.3d 6, 9 (2d Cir.2000).

Under the "mailbox rule" a petition filed by a *pro se* state prisoner is deemed filed on the date that it is given to the prison authorities for mailing.[15] Ordinarily, it is presumed in the absence of evidence to the contrary that the date the petition was signed is the date it was given to the appropriate prison authorities for mailing.[16] In this case, the petition and accompanying application to proceed *in forma pauperis* are undated. Thus, the date of the postmark, June 26, 2007, is the

date the petition is presumed filed—eight days late unless the time is tolled further.

15 *Noble v. Kelly,* 246 F.3d 93, 97–98 (2d Cir.2001); *see Houston v. Lack,* 486 U.S. 266, 270 (1988) (applying mailbox rule to notices of appeal under Fed. R.App. P. 3(a) and 4(a)(1)).

16 *See, e.g., Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998); *see also Marsh v. Soares,* 223 F.3d 1217, 1218 n. 1 (10th Cir.2000) ( "Liberal application of the mailbox rule ... causes us to treat the petition as placed in the hands of prison authorities on the same day it was signed.").

The one-year limitation period is also subject to equitable tolling. To warrant equitable tolling, a petitioner "bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." [17] Equitable tolling is applied only under rare and exceptional circumstances, [18] and the party seeking equitable tolling must have acted with reasonable diligence throughout the entire period sought to be tolled. [19] In his petition Alexander, in an apparent attempt to justify his untimely filing, after noting the date he filed his application for leave to appeal denial of his § 440.20 motion, states in response to paragraph 18 "Timeliness of Petition," that "entry of judgment of the Appellate division [*sic* ] has not been served on petitioner." Alexander presents no other facts concerning denial of leave to appeal. Even if the Court were to treat this statement as an attempt to invoke equitable tolling, it would fail.

17 *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *Diaz v. Kelly,* 515 F.3d 149, 153 (2d Cir.2008).

18 *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000) (per curiam).

19 *Id.*

**\*3** The Court initially notes that Alexander's statement is contradicted by the fact that appended to the petition is a copy of the August 8, 2006, Order denying his application for leave to appeal. This is indicative that Alexander in fact received the Order. Second, Alexander has failed to bear the burden of establishing either of the two prongs required to justify application of equitable tolling—that he has been pursuing his rights diligently and that some extraordinary circumstance stood in his way.

V. CONCLUSION AND ORDER

The petition was not filed timely. Accordingly,

**IT IS THEREFORE ORDERED THAT** the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DISMISSED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. [20] Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* Fed. R.App. P. 22(b); Second Circuit R. 22.

20 28 U.S.C. § 2253(c); *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

The Clerk of the Court to enter final judgment accordingly.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 762108

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Vangundy v. Haque, Not Reported in Fed. Supp. (2017)

2017 WL 1274318

2017 WL 1274318
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Lee E. VANGUNDY, Plaintiff,

v.

S. HAQUE, Pharmacy; Susan Kickbush,
Superintendent Gowanda CF; B. Lewis, Adm
Nurse; and John Doe, (Doctor) MD, Defendants.

17-CV-0024(LJV)
|
Signed 01/20/2017

**Attorneys and Law Firms**

Lee E. Vangundy, Gowanda, NY, pro se.

ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT
JUDGE

INTRODUCTION

**\*1** The plaintiff, Lee E. Vangundy, is a prisoner confined
at Gowanda Correctional Facility. He has submitted to this
Court a pro se complaint asserting a claim of deliberate
indifference pursuant to 42 U.S.C. § 1983. Docket Item
1. The plaintiff did not pay the required filing fee, but
he did submit an application to proceed *in forma pauperis*
(that is, as someone who should have the prepayment of
the ordinary filing fee waived because he or she cannot
afford it). Docket Item 2. The application, however, did not
include a certified account statement or a completed Prison
Certification Section, one of which is required by 28 U.S.C.
§ 1915(a)(2).

As provided below, the Clerk of Court is ordered to
administratively terminate this action. If the plaintiff wishes
to re-open this case, he must notify this Court in writing
**within 30 days of the date of this order** and include either
(1) the $350.00 filing fee and the $50.00 administrative
fee ($400.00 total) or (2) an *in forma pauperis* application,
properly supported by affidavit or affirmation along with the
completed and signed certification of the plaintiff's inmate
trust fund account. [1]

[1]
The United States District Court for the Western
District of New York has made available a
form motion to proceed *in forma pauperis* with
supporting affirmation that is designed to help pro
se litigants (such as the plaintiff here) comply with
the requirements of 28 U.S.C. § 1915. This Court
has ordered that a form motion to proceed *in forma
pauperis* with supporting affirmation and "Prison
Certification Section" be mailed to the plaintiff.
These and other forms are available at <http://
www.nywd.uscourts.gov/pro-se-forms>.

DISCUSSION

A party commencing a civil action in this Court ordinarily
must pay a $350.00 filing fee as well as a $50.00
administrative fee. [2] *See* 28 U.S.C. § 1914; Judicial
Conference Schedule of Fees, District Court Miscellaneous
Fee Schedule; [3] Western District of New York, District Court
Schedule of Fees. [4] If a "prisoner" (as defined in 28 U.S.C. §
1915(h)) wishes to commence a civil action, the prisoner must
either (1) pay those fees or (2) obtain permission to proceed
*in forma pauperis,* pursuant to 28 U.S.C. § 1915.

[2]
Effective May 1, 2013, the Judicial Conference
of the United States added an administrative
fee of $50.00 to the cost of filing a civil
lawsuit in district court. *See* September 2012
Report of the Proceedings of the Judicial
Conference of the United States, available
at <http://www.uscourts.gov/about-federal-courts/
reports-proceedings-judicial-conference-us>. But
this additional administrative fee does not apply to
prisoners who are granted permission to proceed *in
forma pauperis. See generally id.*

[3]
Available at <http://www.uscourts.gov/services-
forms/fees/district-court-miscellaneous-fee-
schedule>.

[4]
Available at <http://www.nywd.uscourts.gov/fee-
schedule>.

**I. Requirements for *In Forma Pauperis* Application**
The Prison Litigation Reform Act of 1995, Pub. L. No.
104-134, 110 Stat. 1321 (1996), which amended 28 U.S.C.
§ 1915, established certain requirements that a prisoner

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 126 of 261
Vangundy v. Haque, Not Reported in Fed. Supp. (2017)
2017 WL 1274318

must meet in order to proceed *in forma pauperis.* Those requirements are summarized below.

### A. Supporting Affidavit or Affirmation

**\*2** Under 28 U.S.C. § 1915(a)(1), a prisoner seeking to bring a civil action *in forma pauperis* must submit an affidavit or affirmation detailing the prisoner's assets and liabilities and swearing under oath that the prisoner is unable to pay the $350.00 filing fee. A motion to proceed *in forma pauperis* should be supported by such an affidavit or affirmation filed at the same time as the complaint. *Id.*

The plaintiff's motion to proceed *in forma pauperis* included a completed affirmation filed at the same time as the complaint, and so it complied with this requirement. *See* Docket Item 2 at 1-2.

### B. Certification of Inmate Trust Fund Account

Under 28 U.S.C. § 1915(a)(2), a prisoner seeking to proceed *in forma pauperis* also must submit a certified copy of the prisoner's inmate trust fund account statement (or an institutional equivalent) for the six months immediately before the prisoner's complaint was filed. A prisoner must obtain this certified account statement from the appropriate official at each correctional facility where the prisoner was confined during that six-month period. *Id.* Alternatively, the prisoner may have prison officials complete and sign the "Prison Certification Section" of the Court's form motion to proceed *in forma pauperis.* The "Prison Certification Section" is the institutional equivalent of a prisoner's trust fund account statement whereby prison officials provide the information required by 28 U.S.C. § 1915(a)(2).

In this case, the plaintiff's application to proceed *in forma pauperis* did not include a certified account statement or a completed "Prison Certification Section." *See* Docket Item 2 at 2.

### C. Authorization Form

A prisoner seeking to proceed *in forma pauperis* also is required to submit a completed and signed prisoner authorization form permitting the prisoner's institution of confinement to pay—over time, if necessary—the $350.00 filing fee from the prisoner's trust fund account. *See* 28 U.S.C. § 1915(b)(1)-(4). In other words, even if the prisoner is granted *in forma pauperis* status, the prisoner must pay the full $350.00 filing fee in installments. *See id.* § 1915(b)(1)-

(2). The initial payment will be 20 percent of the average monthly deposits to the prisoner's account or 20 percent of the average monthly balance in the prisoner's account for the six-month period immediately preceding the filing of the complaint, whichever is greater. See *id.* § 1915(b)(1). For each month after that, as long as the amount in the prisoner's account exceeds $10.00, the agency having custody of the prisoner will deduct from the prisoner's account and forward to the Clerk of Court an installment payment equal to 20 percent of the preceding month's income that was credited to the prisoner's account. *See id.* § 1915(b)(2). Those payments continue until the $350.00 fee is paid in full. *Id.*

The plaintiff here did submit a signed prisoner authorization form along with his motion to proceed *in forma pauperis,* and so his application complied with this requirement. *See* Docket Item 2 at 3.

## II. ADMINISTRATIVE TERMINATION OF THIS ACTION

In sum, the plaintiff did not pay the $350.00 filing fee or the $50.00 administrative fee that ordinarily is required to commence a civil action, nor did he complete and sign the certification of his inmate trust fund account, *see id.* § 1915(a)(1)-(2). Therefore, the Clerk of Court shall administratively terminate this action,[5] without filing the complaint or assessing a filing fee, as ordered below. As also ordered below, the plaintiff is granted leave to re-open this action no later than 30 days from the date of this order.

5    Administrative termination is not a dismissal for purposes of the statute of limitations. Rather, if the case is re-opened pursuant to the terms of this order, it is not subject to the statute of limitations time bar as long as it originally was timely filed. *See McDowell v. Del. State Police,* 88 F.3d 188, 191 (3d Cir. 1996) ("... [W]e deem a complaint to be constructively filed as of the date that the clerk received the complaint—as long as the plaintiff ultimately pays the filing fee or the district court grants the plaintiff's request to proceed *in forma pauperis.");* see also *Houston v. Lack,* 487 U.S. 266 (1988) (articulating the prisoner mailbox rule for purposes of timely filing).

## III. MOTION FOR APPOINTMENT OF COUNSEL

**\*3** The plaintiff also has filed a motion for appointment of counsel. *See* Docket Item 4. He appears to make this request in

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 127 of 261

Vanguilly v. Haque, Not Reported in Fed. Supp. (2017)

2017 WL 1274318

order to have counsel evaluate whether his claims have merit and assist in other administrative matters. *See id.* at 4.

Under 28 U.S.C. § 1915(e)(1), the court may, but is not required to, appoint counsel to assist indigent litigants in civil cases. *Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.,* 865 F.2d 22, 23 (2d Cir. 1988); *In re Martin-Trigona,* 737 F.2d 1254, 1260 (2d Cir. 1984). The court first should consider whether the complaint makes "a threshold showing of some likelihood of merit." *Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir. 1997) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61-62 (2d Cir. 1986)). If so, the court should consider other relevant factors, including "the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues[,] and any special reason" warranting the appointment of counsel. *Hendricks,* 114 F.3d at 392 (quoting *Hodge,* 802 F.2d at 61-62). Each case should be determined on its own facts, and no single factor is controlling. *Hodge,* 802 F.2d at 61; *see also Hendricks,* 114 F.3d at 394 (stating that the relevant factors "really amount to evaluating [the plaintiff's] ability to manage his case effectively on his own").

As noted above, the plaintiff's complaint will not be filed because he did not pay the $350.00 filing fee or the $50.00 administrative fee. Therefore, the Court cannot determine whether his claims show a likelihood of merit or whether the other factors noted above favor appointing counsel. The plaintiff's motion for the appointment of counsel therefore is denied without prejudice to renewal.

## IV. DEFERMENT OF SCREENING PURSUANT TO 28 U.S.C. §§ 1915(e)(2), 1915A

This Court is required to screen civil actions filed by prisoners and dismiss them if they: (1) are frivolous or malicious; (2) fail to state a claim upon which relief may be granted; or (3) seek monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915(e)(2), 1915A; *see also* 42 U.S.C. § 1997e(c) (dismissal of prisoner actions brought with respect to prison conditions). Relatedly, if a prisoner has, on three or more prior occasions while incarcerated, brought in federal court an action or appeal that was dismissed because it was frivolous or malicious, or because it failed to state a claim upon which relief may be granted, he will not be permitted to bring another action *in forma pauperis* unless he is "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

Because the plaintiff did not properly commence this action, this Court will defer the mandatory screening process until and if this case is re-opened. If this action is reopened and then dismissed, installment payments of the filing fee pursuant to 28 U.S.C. § 1915 will not be suspended, and the prisoner will not be permitted to obtain a refund of the filing fee or any part of it that he already has paid.

## ORDER

Based on the above, it is hereby

ORDERED that the Clerk of Court shall administratively terminate this action, without filing the complaint or assessing a filing fee; and it is further

 **\*4** ORDERED that the Clerk of Court is directed to send to the plaintiff a form motion to proceed *in forma pauperis* with supporting affirmation and "Prison Certification Section"; and it is further

ORDERED that if the plaintiff wishes to re-open this action, he shall so notify the Court, in writing, no later than **30 days from the date of this order.** This writing must include either (1) the $350.00 filing fee and the $50.00 administrative fee ($400.00 total) or (2) an *in forma pauperis* application, properly supported by affidavit or affirmation along with the completed and signed certification of the plaintiff's inmate trust fund account; and it is further

ORDERED that upon the plaintiff's submission of either (1) the $350.00 filing fee and the $50.00 administrative fee ($400.00 total) or (2) an *in forma pauperis* application, properly supported by affidavit or affirmation along with the completed and signed certification of the plaintiff's inmate trust fund account, the Clerk of Court shall re-open this case; and it is further

ORDERED that the plaintiff's motion for the appointment of counsel is denied without prejudice to renewal.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1274318

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 128 of 261

Vangundy v. Haque, Not Reported in Fed. Supp. (2017)
2017 WL 1274318

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01503-DNH-TWD  Document 34  Filed 06/21/22  Page 129 of 261
Leitner v. I.R.S., Not Reported in F.Supp.2d (2013)
2013 WL 2385169

2013 WL 2385169
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Mark–Daniel LEITNER, Plaintiff,

v.

INTERNAL REVENUE SERVICE, Defendant.

No. 13–MC–6010CJS.
|
May 24, 2013.

**Attorneys and Law Firms**

Mark–Daniel Leitner, Lisbon, OH, pro se.

ORDER

JOHN T. CURTIN, District Judge.

**\*1** Plaintiff Mark–Daniel Leitner, a prisoner proceeding *pro se,* filed this case on April 29, 2013, as a miscellaneous action and submitted a payment of $46.00 for a filing fee. The complaint in the instant case is nearly identical to the civil action plaintiff previously attempted to file in 13–CV–6015CJS. Civil action 13–CV–6015CJS was administratively closed by Order dated March 28, 2013, because plaintiff's application to proceed *in forma pauperis* did not include a completed prison certification and authorization form as required by Order dated March 28, 2013.[1] Plaintiff did not provide the information required in 13–CV–6015CJS and that matter remains closed.

---

[1]    Plaintiff had previously filed a similar action in 12–CV–6471CJS which was dismissed for failure to either pay the required civil action fee of $350.00 or provide a completed prison certification and authorization form as ordered by the Court. Plaintiff did not appeal that Order.

The instant case is also a civil action, and should not have been filed as a miscellaneous action. The action is converted to a civil action and shall be administratively closed.

**In Forma Pauperis Application or Payment of Fee**

In order for a prisoner to file a civil action, either a filing fee of $350.00 or a proper *in forma pauperis application* must be filed with the Court.[2] As plaintiff was previously advised in both 13–CV–6015CJS and 12–CV6471CJS, if he wishes to proceed *in forma pauperis* while imprisoned he must submit a motion to proceed *in forma pauperis* that includes a completed and signed Prison Certification and a signed Prison Authorization authorizing the institution in which he is confined to pay the full amount of the $350.00 filing fee pursuant to 28 U.S.C. § 1915(b)(1)-(4).

---

[2]    As of May 1, 2013, a $50.00 administrative fee is required in addition to the $350.00 filing fee for civil filings, however, plaintiff's complaint was filed on April 29, 2013 and no administrative fee is required.

For the reasons set forth above, plaintiff's miscellaneous filing is hereby converted to a civil action. The Clerk of the Court is ordered to administratively terminate the civil action without filing the complaint or assessing a filing fee. The civil action will be reopened upon either the payment of the full $350.00 filing fee or the filing of a motion to proceed *in forma pauperis* that includes a completed and signed Prison Certification and a signed Prison Authorization authorizing the institution in which he is confined to pay the full amount of the $350.00 filing fee within 30 days.[3] Further, the Clerk of the Court is directed to refund the $46.00 miscellaneous filing fee.

---

[3]    Such an administrative termination is not a "dismissal" for purposes of the statute of limitations, and if the case is reopened pursuant to the terms of this Order, it is not subject to the statute of limitations time bar if it was originally filed timely. *See Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (prisoner mailbox rule); *McDowell v. Delaware State Police,* 88 F.3d 188, 191 (3d Cir.1996); *see also Williams–Guice v. Board of Education,* 45 F.3d 161, 163 (7th Cir.1995).

IT IS HEREBY ORDERED, that the Clerk of the Court shall convert this action from a miscellaneous action to a civil action and assign a civil action case number;

FURTHER, that the Clerk of the Court shall file all documents from 13–MC–6010CJS in the new civil action;

2013 WL 2385169

FURTHER, that the Clerk of the Court shall close 13–MC–6010CJS; and

FURTHER, that the Clerk of the Court shall refund the $46.00 submitted upon filing of the miscellaneous action;

FURTHER, that the Clerk of the Court shall administratively terminate the new civil action, without filing the complaint or assessing a filing fee;

FURTHER, that the Clerk of the Court is directed to send to plaintiff a form motion to proceed *in forma pauperis* **and** Prison Authorization Form;

FURTHER, that if plaintiff wishes to reopen this civil action, he shall so notify the Court, in writing, no later than **30 days after the date this order is signed;** plaintiff's writing

shall include either (1) a signed Prison Authorization **and** new motion to proceed *in forma pauperis* that includes a completed and signed Prison Certification, or (2) the $350.00 filing fee;

**\*2** FURTHER, that upon plaintiff's submission of either (1) a signed Prison Authorization **and** new motion to proceed *in forma pauperis* that includes a completed and signed Prison Certification, or (2) the $350.00 filing fee, the Clerk of the Court shall re-open this civil action.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2385169

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 131 of 261

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

2016 WL 5376371
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lorcen BURROUGHS, Plaintiff,
v.
Derrick PETRONE, C.O., Coxsackie
Correctional Facility, et al, Defendants.

9:15-CV-0818 (DNH/ATB)
|
Signed 07/15/2016

**Attorneys and Law Firms**

LORCEN BURROUGHS, Plaintiff pro se.

MARK G. MITCHELL, Asst. Attorney General for Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that the some of the remaining defendants retaliated against him for filing grievances and other remaining defendants either used excessive force, or failed to protect plaintiff during incidents that occurred on April 1 and April 12, 2013. (Amended Complaint ("AC") at ¶¶ 98-123 (retaliation), 164, 171(excessive force), 172 (failure to protect)) (Dkt. No. 12). Plaintiff has also sued Brian Fischer, the former Commissioner of the Department of Corrections and Community Supervision ("DOCCS"). Plaintiff seeks substantial monetary relief. (AC ¶ 212).

Presently before the court is the defendants' motion for partial dismissal. (Dkt. No. 27). Plaintiff has responded in opposition to the motion, defendants have replied, plaintiff has filed a sur-reply, and pursuant to the court's direction, defendants have filed a "letter-brief" in further support of their motion. (Dkt. Nos. 47, 49, 62). For the following reasons, this court will recommend granting defendants' motion in part and denying the motion in part.

**DISCUSSION**

**I. Procedural History**

The court will review the procedural history in this action in order to clarify the recommendations below. Plaintiff filed his original complaint in this action on July 6, 2015. (Dk. No. 1). Plaintiff signed the complaint on June 29, 2015. [1] (Dkt. No. 1 at p.36). The complaint was postmarked July 2, 2015. (Dkt. No. 1-3) (Envelope). At the same time, plaintiff filed a motion to proceed in forma pauperis ("IFP") and an "Inmate Authorization Form. (Dkt. Nos. 2, 3). On July 7, 2015, Judge Hurd issued an Order, directing "Administrative Closure with Opportunity to Comply with Filing Fee Requirement," denying the IFP motion as "incomplete" because the IFP application was not certified according to the IFP statute and the Local Rules of the Northern District of New York. (Dkt. No. 4).

[1]     Plaintiff's signature was notarized.

On the last page of Judge Hurd's order, there is a footnote which reads:

> Plaintiff is advised that if this case is reopened as set forth herein, the timeliness of his complaint will be determined with reference to the filing date thereof. See McDowell v. Delaware State Police, 88 F.3d 188, 191 (3d Cir. 1996) (deeming complaint to have been constructively filed upon receipt even though the filing fee requirements had not yet been complied with); c.f. Jordan v. United States, 694 F.2d 833, 837 (D.C. Cir. 1982) (noting that when a Rule 60(b) motion is granted, "the complaint should be reinstated as of the date it was originally filed."); Akobardiya v. Princess Cruise Lines, Ltd., No. 11-CV-2921, 2012 WL 3746218, at \*2 (E.D.N.Y. Aug. 27, 2012) (Rule 60(b) motion granted and case reopened where statute of limitations had since expired and claims would be untimely if action were refiled); see also Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993) (under the prison-mailbox rule, the court deems a pro se prisoner's complaint filed on the date that the prisoner delivered the complaint to prison officials for transmittal to the court).

**\*2** (Dkt. No. 4 at 2 n.2). On August 5, 2015, plaintiff filed a new IFP motion, together with the completed certification. (Dkt. No. 7). Plaintiff also submitted a new complaint which he requested be used as the "complaint of record,"

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 132 of 261

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

and the "current complaint returned." (Dkt. Nos. 7, 8, 8-1 ("Replacement Complaint")).

On the same day, the court issued a Text Order, reopening the action and restoring it to the Court's active docket. (Dkt. No. 9). On October 15, 2015, Judge Hurd issued an order in which he granted plaintiff's motion for IFP, dismissed certain claims with prejudice, dismissed other claims without prejudice, dismissed most of the defendants, and ordered the "Replacement Complaint" be filed as the complaint in this action. (Dkt. No. 11). The court also ordered that the exhibits from plaintiff's original complaint be attached to the "Replacement Complaint" because the replacement complaint incorporated the original exhibits by reference, but plaintiff neglected to resubmit them. (Dkt. No. 11 at 4 n.2). The Clerk of the Court was directed to make a separate docket entry for the replacement complaint (Dkt. No. 8-1 and the exhibits to the original complaint. (*Id.*) The replacement complaint and the original exhibits are filed as Dkt. No. 12. Thus, Dkt. No. 12 is the operative complaint in this action. The court does note that although plaintiff's "replacement complaint" is almost identical to the original, [2] he has corrected typographical errors and has included some other corrections. Thus, this document is essentially an "Amended Complaint," and the court will refer to it as such.

2    There are no new defendants and no new claims in the replacement document.

As a result of Judge Hurd's October 15, 2015 order, the following defendants and claims remain:

(1) Claims against defendants Corrections Officer ("CO") Peter Stetz, CO Scott Mellett, [3] CO James McKeown, and potentially CO Petrone, alleging that the defendants filed misbehavior reports against plaintiff in retaliation for grievances that he filed;

(2) Claims that defendants CO Stetz, CO Mellett, Lieutenant Kenneth Baldwin, and Sergeant Paul Morris confiscated plaintiff's property in retaliation for grievances that he filed;

(3) Supervisory claims against defendant former DOCCS Commissioner Brian Fischer related to alleged retaliatory conduct by defendant CO Petrone;

(4) Claims of excessive force against defendant CO McKeown for alleged incidents which occurred on April 1, 2013 and April 12, 2013; and

(5) Claims of failure to protect against defendant CO Abel Melendez and defendant John Doe #1 relating to the April 1, 2013 incident.

(Dkt. No. 11 at 57-58). Defendants filed their partial motion to dismiss on February 4, 2016. (Dkt. No. 27). Defendants are requesting dismissal of the amended complaint in its entirety as against defendants Petrone, Fischer, Baldwin, and Morris. (Dkt. No. 27-1 at 12). Defendants are requesting the dismissal of plaintiff's First Amendment retaliation claim against defendant Stetz based upon his alleged confiscation and denial of property.

3    Although this defendant's name has consistently been spelled "Mellet," the court notes that his name is actually spelled "Mellett," and the court will refer to this defendant with the proper spelling of his name.

## II. Facts

**\*3** Judge Hurd provided a "summary of the complaint" in his October 15, 2015 order. (Dkt. No. 11 at 6-18). This court assumes familiarity with that summary and will discuss the specific facts as necessary to address the defendants' motion to dismiss.

## III. Statute of Limitations

### A. Legal Standards

Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure*, 488 U.S. 235, 250–51 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action. Federal law governs the question of when a section 1983 claim accrues. *Covington v. City of New York*, 171 F.3d 117, 121 (2d. Cir. 1999) (citing *Morse v. University of Vermont*, 973 F.2d 122, 125 (2d. Cir. 1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) (internal quotation marks omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997).

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

The Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court. *Houston v. Lack*, 487 U.S. 266 (1988). This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), modified on other grounds, 25 F.3d 81 (2d Cir. 1994).

In "rare and exceptional" cases, the doctrine of equitable tolling may apply to defeat an argument that the action was not timely filed. *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). *See also Veltri v. Bldg. Serv. 32B J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). Equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 159 (2d Cir. 2004)).

**B. Application**

In Judge Hurd's order, citing the prison mailbox rule, he found that the date of filing of plaintiff's amended complaint was July 23, 2015, the date that he signed the amended complaint. (Dkt. No. 11 at 54). As a result, any section 1983 claim that plaintiff sought to bring would have to have accrued after July 23, 2012 to be within the three year statute of limitations. Thus, Judge Hurd dismissed plaintiff's claims accruing prior to July 23, 2012, which included "the receipt of a misbehavior report in early July 2012." (*Id.*) The order did not specify who issued the misbehavior report in question, but earlier in the decision, Judge Hurd stated that "[o]n July 7, 2012, Petrone filed a misbehavior report ..." after plaintiff filed a grievance against Petrone on July 4, 2012. (Dkt. No. 11 at 8). Even though Judge Hurd found that these facts stated a retaliation claim against defendant Petrone, sufficient to require a response by defendants, (Dkt. No. 11 at 23), if he later found that this claim was barred by the statute of

limitations, it would justify dismissal as against defendant Petrone. [4]

[4] The court realizes that there may have been an error in the "ordered" paragraphs of Judge Hurd's decision because in one paragraph, he orders dismissal as against defendant Petrone, and in the next, he orders service against defendant Petrone. (Dkt. No. 11 at 58 ¶¶ 9-10). The same is true for defendant Melendez. (*Id.*) It is clear that the case was meant to proceed as against defendant Melendez and "John Doe #1." (Dkt. No. 11 at 38-39) (specifically stating that plaintiff's allegations against these two defendants were "sufficient to survive this initial review"). However, the court does note that "John Doe #1" has never been identified, and the case would be subject to dismissal as against an unknown defendant. (Dkt. No. 11 at 58 n.27).

**\*4** Defendants argue that this dismissal is the "law of the case," and this court cannot change Judge Hurd's finding. While that may be true, the court notes that Judge Hurd also stated that "[a]lthough it does not appear from the face of plaintiff's complaint that he has meritorious tolling arguments, plaintiff will be afforded 'notice and an opportunity to be heard' on the issue of timeliness prior to dismissal." (Dkt. No. 11 at 55) (quoting *Abbas*, 480 F.3d at 640-41 (stating that a District Court should not dismiss a complaint as time-barred without providing a pro se plaintiff with notice and an opportunity to be heard as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered timely))." Thus, notwithstanding Judge Hurd's finding, he would not have ordered dismissal until plaintiff had an opportunity to be heard.

This court finds that even assuming that the claim is time-barred pursuant to Judge Hurd's order, [5] this court finds that the claim against defendant Petrone should be considered timely. When the court ordered administrative closure of the case based on plaintiff's inadequate IFP application, Judge Hurd's order contained a footnote which specifically stated that if the case were to be reopened, the timeliness of the complaint would be based upon the original filing date, even though the filing fee requirements had not been met. (Dkt. No. 4 at 2 n.2) (citing inter alia *McDowell v. Delaware State Police*, 88 F.3d 188, 191 (3d Cir. 1996). The court in *McDowell* specifically stated that "when the filing fee

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 134 of 261

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

requirement is satisfied (either through remittance of the filing fee or the district court's grant of the plaintiff's IFP application), the filing date will relate back to the date on which the clerk received plaintiff's papers." (*Id.*)

5    For the same reasons upon which this court bases its equitable tolling analysis, is arguable that the statute of limitations has not expired for claims accruing between June 29, 2012 three years prior to the date plaintiff signed the original complaint and July 23, 2012 three years prior to the date that plaintiff signed his amended complaint.

Although plaintiff in this case submitted an "amended complaint" which he asked to "replace" the original, this should not prejudice him. The amended complaint and the proper IFP application were filed within the time allowed by the court in its Administrative Closure Order. *Cf. Favors v. State of New Jersey,* No. 16-1940, 2016 WL 2647665, at *3 (D.N.J. May 9, 2016) (court denied relation back when plaintiff waited "five years" before taking action, rather than submitting the proper IFP application within the 30 days ordered by the court).

In addition, a review of the amended complaint in this case shows that it is almost identical to the original complaint, except for the correction of a few typographical errors and some very minor alterations. All the claims are the same, and all the defendants are the same. In fact, the court ordered that the exhibits from plaintiff's original complaint be attached to the amended complaint because he referred to the exhibits in the amended document, but forgot to attach them. (Dkt. No. 11 at 4 n.2, 56 ¶ 5). Thus, this court finds that, although plaintiff asked that the amended complaint "replace" the original, the filing date should relate back to the signing of the original complaint as contemplated by the footnote in Judge Hurd's July 7, 2015 Order. (Dkt. No 4 at 2 n.2).

To the extent that plaintiff's request to "replace" the original complaint could somehow have been interpreted differently, plaintiff should be afforded equitable tolling from the time that he signed the original complaint until July 23, 2015, the date that he signed the amended complaint. Plaintiff should not be penalized for the inaccuracy of his language. Thus, for purposes of the statute of limitations, this action should be deemed filed on June 29, 2015, the date that plaintiff signed the original complaint. Based on such a filing date, plaintiff's claim as against defendant Petrone [6] is timely and should not

be dismissed. Thus, defendant Petrone's motion to dismiss should be denied.

6    Plaintiff alleges that on July 7, 2012, defendant Petrone filed a misbehavior report against plaintiff in retaliation for a previous grievance that plaintiff filed against Petrone the only claim that accrued during that time period. The other claim that Judge Hurd held time-barred accrued in March and April of 2012, which would still be time-barred notwithstanding the change in the filing date.

## IV. Retaliation

### A. Legal Standards
**\*5** In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137.

### B. Application
Defendants Baldwin, Morris, and Stetz move to dismiss plaintiff's claim that they deprived plaintiff of his property in retaliation for grievances that he filed. Judge Hurd found that claims against Stetz, Mellett, [7] Baldwin, and Morris for retaliation would survive initial review, but Judge Hurd did not preclude dispositive motions relating to the same claim.

7    Defendant Mellett was not included in the motion to dismiss.

### 1. Facts Relating to the Incident

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

Plaintiff alleges that on December 21, 2012, CO Peter Stetz told plaintiff to pack his belongings because he was going to be moved to another housing unit. (AC ¶ 98). CO Stetz initially gave plaintiff four "draft" bags, but gave him two more after plaintiff asked for an extra bag. (*Id.*) Plaintiff claims that after he packed the six bags, he was then told that he had too many bags, and that two of them had to be taken to the property room so that they could be sent home. (AC ¶ 99). Defendant Mellett was in the package room, and allegedly told plaintiff that "this was being done because plaintiff likes to file grievances." (*Id.*) Plaintiff asked if he could give the property to a visitor, but defendant Mellett told plaintiff that he had to take "Option A" – which was to ship the property home at his own expense. (AC ¶ 100). Plaintiff states "this was done in retaliation." Then plaintiff filed Grievance No. CX-17522-12. (*Id.* & Pl.'s Ex. 14, Dkt. No. 12-2 at 19-20).

Plaintiff states that he was escorted back to A-Block, where he discussed the issue with CO Julio Saez. (AC ¶ 101). Plaintiff asked CO Saez to speak with defendant Mellett. Plaintiff and CO Saez both went back to the property room, and after speaking with defendant Mellett, [8] plaintiff's two bags were returned to him. However, when he and CO Saez returned to the housing unit, Sgt. Todd Looman spoke with CO Saez and then told plaintiff that he was being keeplocked pending a misbehavior report, and the two bags of property were again taken away from plaintiff. (*Id.*)

[8] Plaintiff also alleges a variety of regulatory violations regarding the handling of his property, none of which survived initial review.

Plaintiff claims that on December 23, 2012, plaintiff was given a "false misbehavior report" by CO Stetz, charging plaintiff with various offenses and stating that plaintiff had ten property bags. (AC ¶ 102). Plaintiff claims that this misbehavior report was "in retaliation." Although plaintiff does not explain his sentence, he cites Grievance No. 17522-12. (*Id.*) Plaintiff alleges that he was moved on the same day, and his personal property was inspected upon arrival by Sgt. Todd Looman and CO Stephen Woods. (AC ¶ 103). Plaintiff states that he received a visitor on the same day, and on his way to the visit, he stopped at the package room, where defendant Mellett failed to properly complete a "form 2068 disposal form." (AC ¶ 104). Plaintiff asked whether the property that was deemed excessive could be given to his visitor, but defendant Mellett denied plaintiff's request because the property in question had been searched, packed, and was ready to ship. (*Id.*)

*6 On his way back from the visit, plaintiff stopped by the package room again to retrieve a package that was left by his visitor, but was told by CO Robert Davies and defendant Mellett that plaintiff was getting another "false misbehavior report" for "owning and operating a business," and that plaintiff had "documents" showing this. (AC ¶ 105). Although plaintiff states that another officer later told him that he could not get a misbehavior report for the documents in question, CO Davies stated that he would still issue the misbehavior report because plaintiff filed a grievance against defendant Petrone.

Defendant Baldwin was assigned as hearing officer for the misbehavior report issued by CO Saez, but the hearing was adjourned. (AC ¶¶ 107-111). Defendant Baldwin ultimately re-convened the hearing on December 28, 2012. (AC ¶ 113). Plaintiff states that defendant Baldwin dismissed the charges, and told plaintiff that he would get his property back. However, he later told plaintiff, off the record, that he would not get any of his property back and that his " 'stay here will be hell' " because "he would not stop filing grievances against staff." (AC ¶ 114).

Plaintiff claims that he was called out for another visit on December 28, 2012, and on his way to the visit, he stopped at the package room to ask defendant Mellett if his property could be returned because the misbehavior report had been dismissed. (AC ¶ 115). Defendant Mellett told plaintiff he was not getting his property, and he would be issued another "false misbehavior report." (*Id.*) Plaintiff was also told by CO Morris that he was not getting his personal property back, and plaintiff filed Grievance No. CX-17532-12. (AC ¶ 116 & Pl.'s Ex. 15).

Plaintiff claims that on January 7, 2013, Lt. James Woods told plaintiff that he spoke to plaintiff's family, and he would have plaintiff's property given to his family at their next visit. (AC ¶ 119). Plaintiff states that on January 8, 2013, Sgt. Morris and Lt. Baldwin came to his cell and interviewed plaintiff regarding a letter that he wrote to Commissioner Fischer about "property and what was taking place." (AC ¶ 120). Plaintiff states that he asked that his property be returned due to the dismissal of the misbehavior report on December 28, 2012. (*Id.*) Plaintiff states that defendants Morris and Baldwin refused to return plaintiff's property, and the property was not held for his family. Instead, the property was shipped out, and "plaintiff was charged." (*Id.*) Finally, plaintiff claims that on January 9, 2013, defendant Baldwin came to plaintiff's cell

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

and told defendant McKeown that plaintiff was a "snitch," and he liked to file grievances against staff. (AC ¶ 121). Defendant McKeown allegedly stated that "he would take care of plaintiff." (*Id.*)

### 2. Baldwin

Defendants argue that if plaintiff's property was confiscated between December 21 and 23, 2012, and defendant Baldwin did not become involved in this incident until December 26, 2012, presiding over a hearing based on the misbehavior report written by Julio Saez, he could not have been responsible for the unconstitutional confiscation of plaintiff's property. (Def.s' Br. at 7). In addition, defendant Baldwin ultimately dismissed the misbehavior report, even though he was later involved in failing to return plaintiff's property.

The problem with defendants' argument is that plaintiff alleges that defendant Baldwin continued to deny plaintiff his property after he dismissed the disciplinary charges. Plaintiff alleges that defendant Baldwin told plaintiff after he "cut the tape off," that he was not going to get his property back, and his "stay" would be hell because he would not stop filing grievances against staff. Earlier in the complaint, plaintiff stated that he had a discussion with defendant Baldwin about defendant Petrone. (AC ¶ 94). On November 18, 2012, defendant Baldwin allegedly told plaintiff that defendant Petrone was "upset with [Baldwin]" because Baldwin would not fire plaintiff and file a false misbehavior report. Plaintiff cites to at least three grievances that he filed against defendant Petrone. (AC ¶¶ 82 (7/4/12), 86 (7/29/12), and 91 (10/9/12)).

**\*7** Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie,* 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases). Defendants cite *Coleman v. Racette,* No. 9:15-CV-40, 2015 U.S. Dist. LEXIS 164393 at *19-22 (N.D.N.Y. Dec. 7, 2015), *adopted,* 2016 U.S. Dist LEXIS 312 (N.D.N.Y. Jan. 4, 2016)[9] and *Jones v. Harris,* 665 F. Supp. 2d 384, 399 (S.D.N.Y. 2009). These cases hold that dismissal of a retaliation claim is proper where plaintiff provided conclusory allegations that the officer was motivated by grievances that did not involve him. (*Id.*)

[9]    *Coleman v. Racette,* No. 9:15-CV-40, 2015 WL 9595400, at *6 (N.D.N.Y. Dec. 7, 2015), *adopted,* 2016 WL 51255 (N.D.N.Y. Jan. 4, 2016).

This case is distinguishable from both of the cases cited by defendants. In *Coleman,* plaintiff was speculating that the defendant was retaliating for a grievance filed against another defendant. In fact, Coleman alleged that the defendant "could have been around" when other officers were talking about plaintiff's grievances. Thus I recommended granting the motion to dismiss. In *Jones v. Harris,* the court apparently considered plaintiff's deposition testimony in addition to the facts stated on the face of the complaint. 665 F. Supp. 2d at 399-400. However, in this case, plaintiff specifically alleges that the defendants told him that they were taking action against him because he filed grievances. The court is hesitant to recommend granting a motion to dismiss based on the pleadings in such a situation. *See Mateo v. Bristow,* No. 12 Civ. 5052, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013) (denying motion to dismiss and finding that a causal connection was sufficiently alleged when defendant officers specifically state that they are taking action because of "all those grievances against officers"). However, this would not preclude defendants from making a properly supported motion for summary judgment on this issue.

### 3. Morris/Stetz

Defendants argue that the only grievances that plaintiff filed against these two defendants were after the incident in question and thus, their actions could not have been in retaliation for those grievances. (Def.'s Br. at 8-9). However, plaintiff alleges that defendant Stetz told plaintiff that he was taking plaintiff's bags because "this is what happens when you file grievances." (AC ¶ 99). Plaintiff alleges that defendant Morris forced plaintiff to sign a form and told plaintiff he was not getting his property back. (AC ¶ 116). After that encounter, plaintiff states that he filed a grievance against defendant Morris and defendant Mellett.[10] (*Id.* & Dkt. No. 12-2 at 22-23). Plaintiff claims that on January 8, 2013, defendants Morris and Baldwin came to plaintiff's cell to interview him about the letter that he wrote to defendant Fischer, and plaintiff asked for his property to be returned. (AC ¶ 120). Instead, plaintiff alleges that his property was mailed out of the facility, and plaintiff was charged for the shipping. It is plausible from plaintiff's statements that these defendants could have been taking action based upon plaintiff's grievances, including the grievance filed on December 28, 2012.

Case 9:20-cv-01503-DNH-TWD Document 34 Filed 06/21/22 Page 137 of 261

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

10    As stated above, defendant Mellett did not join in the partial motion to dismiss.

Thus, this court recommends that the motion to dismiss plaintiff's retaliation claim be denied. As stated above, although the court is not recommending dismissal for failure to state a claim, the defendants are not precluded from filing a motion for summary judgment with respect to these claims.

## V. Personal Involvement/Respondeat Superior

### A. Legal Standards

**\*8**  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136,

at \*8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of defendant Brian Fischer in any of his claims.

### 2. Application

Judge Hurd allowed one claim to proceed past the pleading stage regarding defendant Fischer. (Dkt. No. 11 at 51). After discussing the claim that defendant Petrone retaliated against plaintiff by filing a false misbehavior report against him on July 7, 2012, and then citing more alleged retaliatory behavior by defendant Petrone in subsequent paragraphs, the amended complaint states:

> 87. Plaintiff wrote numerous letters to Superintendent Daniel Martusciello, Deputy Miller, Attorney general [sic] and inspector general's office, explaining what was taking place. **(See Exhibit 9).**

(AC ¶¶ 83-87) [11] (emphasis added). Exhibit 9, a document that were attached to the original complaint, is a letter, dated November 24, 2012, that plaintiff wrote to defendant Fischer – not to the other defendants mentioned in ¶ 87. The letter states that defendant Petrone issued a false misbehavior report against plaintiff in retaliation for plaintiff's grievances against Petrone. (Dkt. No. 12-2 at 12). Plaintiff also states that he wrote a previous letter to defendant Fischer in "July 2012" which defendant Fischer sent to Theresa Knapp-David for response. Plaintiff's November 24th letter also references alleged harassment by defendant Petrone. (*Id.*) The only specific reference in the actual amended complaint to plaintiff writing a letter to defendant Fischer, is a statement in a subsequent paragraph of the amended complaint which states that plaintiff wrote "another letter" to defendant Fischer about a different defendant.[12] (AC ¶ 129).

11    The amended complaint contains other allegations against this defendant, but the only remaining allegation which states a claim and is within the statute of limitations is the retaliatory misbehavior report. (*See* AC ¶¶ 83-86).

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

12    Judge Hurd did not find sufficient allegations of personal involvement in this instance to justify proceeding beyond initial review of the complaint. (Dkt. No. 11 at 51).

**\*9** Plaintiff's exhibits also include a letter dated March 6, 2013 from Joseph Bellnier, Deputy Commissioner ("DC"). (Pl.'s Ex. 35) (Dkt. No. 12-2 at 47). The letter states that "Commissioner Fischer has asked me to respond to your letter to him concerning your allegations of unprofessional staff conduct and your Superintendent's Hearing of February 8, 2013." (*Id.*) There are no specific defendants mentioned in DC Bellnier's letter. In any event, the letter states that, to the extent that plaintiff's letter could be interpreted as an appeal of a disciplinary hearing, DC Bellnier forwarded the letter to the Office of Special Housing "to be accepted as an appeal of that hearing." (*Id.*) With respect to "unprofessional staff conduct," DC Bellnier stated that such claims "should be directed to facility officials through the established grievance mechanism or by writing to the superintendent." (*Id.*) DC Bellnier stated that he was forwarding plaintiff's letter to Superintendent Martuscello, who would "thoroughly" investigate plaintiff's concerns and take "appropriate action" "if warranted." (*Id.*)

There is no further discussion of defendant Fischer being aware of or involved in the allegations against defendant Petrone. In fact, it is clear from DC Bellnier's letter, to the extent that the court can assume that the "unprofessional" staff conduct included conduct by defendant Petrone on July 7, 2012, defendant Fischer merely sent the letter to a subordinate for review. Plaintiff's own letter acknowledges that his prior letter was also reviewed by one of defendant Fischer's subordinates.

The personal involvement of a supervisory official cannot be established if his only involvement is to refer an inmate's complaint to the appropriate staff for investigation. [13] *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official). Thus, plaintiff cannot establish personal involvement based upon Fischer's referral of plaintiff's letter to DC Bellnier for review. Because this is the only reference to defendant Fischer's involvement in claims against defendant Petrone, the complaint should be dismissed as against defendant Fischer.

13    In fact, it is clear there is no constitutional right to an investigation by government officials at all. *Nieves v. Gonzalez*, 05-CV-00017, 2006 WL 758615 at \*4 (W.D.N.Y. March 2, 2006) (collecting cases). *See also Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.")

## VI. Opportunity to Amend

### A. Legal Standard

Generally, when the court dismisses a pro se complaint for failure to state a claim, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *See Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 238-39 (E.D.N.Y. 2015) (considering whether to grant plaintiff leave to amend after finding that plaintiff failed to state a plausible claim under section 1983) (citing *Cuoco v. Moritsugo*, 222 F.3d 99, 112 (2d Cir. 2000)) (leave to amend should be denied where "better pleading will not cure" the defects in a plaintiff's complaint.")

### B. Application

In this case, the court seriously doubts whether plaintiff could amend his complaint to show any personal involvement by defendant Fischer in the alleged conduct of defendant Petrone. However, if the District Court dismisses the action as against defendant Fischer, the court will recommend dismissal without prejudice to plaintiff amending his complaint within thirty (30) days of Judge Hurd's order approving the Report-Recommendation.

**\*10 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 27) be **DENIED AS TO DEFENDANT PETRONE, BALDWIN, MORRIS, and STETZ**, and it is

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 139 of 261

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5376371

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 27) be **GRANTED AS TO DEFENDANT FISCHER,** and the complaint **DISMISSED WITHOUT PREJUDICE** to plaintiff submitting a proposed amended complaint, amending or supplementing **only allegations as to the personal involvement of defendant Fischer with respect to the alleged retaliatory misbehavior report issued by defendant Petrone on July 7, 2012.** Any proposed amended complaint must completely supercede the original and **should include only the claims that remain in this action after Judge Hurd's October 15, 2015 order,** [14] **in addition to any amended allegations relating to the personal involvement of defendant Fischer.** Plaintiff should not repeat any of the dismissed claims in the amended complaint.

[14]    The claims surviving Judge Hurd's decision are:

(1) Claims against defendants Corrections Officer ("CO") Peter Stetz, CO Scott Mellett, CO James McKeown, and CO Petrone, alleging that the defendants filed misbehavior reports against plaintiff in retaliation for grievances that he filed;

(2) Claims that defendants CO Stetz, CO Mellett, Lieutenant Kenneth Baldwin, and Sergeant Paul Morris confiscated plaintiff's property in retaliation for grievances that he filed;

(3) Claims of excessive force against defendant CO McKeown for alleged incidents which occurred on April 1, 2013 and April 12, 2013; and

(4) Claims of failure to protect against defendant CO Abel Melendez and defendant John Doe #1 relating to the April 1, 2013 incident.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 15, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5376371

---

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Burroughs v. Petrone, Not Reported in Fed. Supp. (2016)

2016 WL 5374126

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 140 of 261

2016 WL 5374126
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Lorcen BURROUGHS, Plaintiff,

v.

Derrick PETRONE, John Doe #1, Kenneth Baldwin,
Abel Melendez, Paul R. Morris, Scott E. Mellet, James G.
McKeown, Peter A. Stetz, and Brian Fischer, Defendants.

9:15-CV-0818 (DNH/ATB)
|
Signed 09/26/2016

**Attorneys and Law Firms**

LORCEN BURROUGHS, 08-B-3022, Attica Correctional
Facility, Box 149, Attica, NY 14011, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the
State of New York, The Capitol, OF COUNSEL: MARK
G. MITCHELL, ESQ., Ass't Attorney General, Albany, NY
12224, Attorneys for Defendants.


**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** *Pro se* plaintiff Lorcen Burroughs brought this civil rights
action pursuant to 42 U.S.C. § 1983. On July 15, 2016, the
Honorable Andrew T. Baxter, United States Magistrate Judge,
advised by Report-Recommendation that defendants' motion
for partial dismissal concerning defendants Petrone, Baldwin,
Morris, Stetz and Fischer be granted in part and denied in part.
See ECF No. 67. Neither party has filed timely objections.

Based upon a de novo review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

1. Defendants' motion to dismiss (ECF No. 27) is **DENIED**
as to defendants Petrone, Baldwin, Morris and Stetz;

2. Defendants' motion to dismiss (ECF No. 27) is **GRANTED**
as to defendant Fischer, and the complaint **DISMISSED
WITHOUT PREJUDICE** to plaintiff submitting a proposed
amended complaint on or before **October 26, 2016**, amending
or supplementing only allegations as to the personal
involvement of defendant Fischer with respect to the alleged
retaliatory misbehavior report issued by defendant Petrone
on July 7, 2012. Any proposed amended complaint must
completely supercede the original complaint and should
include only the claims that remain in this action after this
Court's October 15, 2015 order, in addition to any amended
allegations relating to the personal involvement of defendant
Fischer. Plaintiff should not repeat any of the dismissed
claims in the amended complaint; and

3. The Clerk serve a copy of this Decision and Order upon
plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.


Dated: September 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5374126

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1500633
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Donnell BRIDGES, Plaintiff,

v.

The State of New York CORRECTIONAL SERVICES;
Dr. Janis; Thomas Griffin; Arcl. Koenigsmann; Dr. F.
Bernstein; Dr. Y. Korobkova; R. Bentivegna, M.D.;
E. Pagan; N.A. Dawn Osselmann; Montefiore Mount
Vernon Hospital; and Dr. Pennsylvania, Defendants.

No. 17-CV-2220 (NSR)
|
Signed 05/12/2022

**Attorneys and Law Firms**

Donnell Bridges, Dannemora, NY, Pro Se.

Steven Neil Schulman, Office of The Attorney General, New
York, NY, for Defendants The State of New York Correctional
Services, Dr. Janis, Thomas Griffin, Arcl. Koenigsmann, Dr.
F. Bernstein, Dr. Y. Korobkova, R. Bentivegna, M.D., E.
Pagan, N.A. Dawn Osselmann.

Andrew L. Zwerling, Gillian Barkins, Garfunkel Wild, P.C.,
Great Neck, NY, Roy W. Breitenbach, Harris Beach PLLC,
Uniondale, NY, for Defendant Montefiore Mount Vernon
Hospital.

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

*1 Plaintiff Donnell Bridges ("Plaintiff"), proceeding *pro se*,
commenced the instant action against Defendants New York
State Department of Corrections and Community Supervision
("DOCCS"), Dr. Marc Janis ("Dr. Janis"), Superintendent
Thomas Griffin ("Supt. Griffin"); Dr. Carl J. Koenigsmann
(s/h/a Dr. Arcl Koenigmann) ("Dr. Koenigsmann");
Dr. Frederick Bernstein ("Dr. Bernstein"), Dr. Yelena
Korobkova (s/h/a Dr. Korobkova) ("Dr. Korobkova"),
Dr. Robert Bentivegna (s/h/a Dr. Pennsylvania [1] ) ("Dr.
Bentivegna"), Physician Assistant Enrique Pagan ("Pagan"),
Nurse Administrator Dawn Osselmann ("Osselmann"), and
Montefiore Mount Vernon Hospital ("MMVH") seeking
relief for alleged constitutional violations pursuant to 42

U.S.C. § 1983 ("Section 1983") and violations of the
Americans with Disabilities Act ("ADA"). (ECF No. 2.)

[1]   Although Plaintiff commenced the action listing
Dr. Robert Bentivegna and Dr. Pennsylvania as two
separate defendants, Plaintiff has clarified in the
Second Amended Complaint that these names refer
to the same person. (SAC ¶¶ 9, 17, 51, 60.)

Presently before the Court are defendants' two motions to
dismiss Plaintiff's Second Amended Complaint. (ECF Nos.
61.) For the following reasons, the motions to dismiss are
granted.

**BACKGROUND**

The following facts are derived from a liberal interpretation
of Plaintiff's allegations in his Second Amended Complaint
("SAC," ECF No. 99) and are assumed as true for purposes of
this motion. *See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009);
Nicosia v. Amazon.com, Inc., 834 F. 3d 220, 230 (2d Cir.
2016).*

Plaintiff is an inmate at Green Haven Correctional Facility
("Green Haven"). Plaintiff alleges the medical staff at Green
Haven and his treating physicians failed to provide adequate
medical care and displayed callous deliberate indifference to
his medical needs. Plaintiff alleges the individual defendants
were acting under color of state law at the time of the alleged
events.

**I. Biopsy By Dr. Janis**

On March 19, 2014 or April 16, 2014, [2] Plaintiff was
experiencing pain in his groin area and met with Defendant
Enrique Pagan, a physician's assistant at Green Haven. (SAC
¶ 3.) Pagan arranged for Plaintiff to be seen by Defendant Dr.
Marc Janis at Montefiore Mount Vernon Hospital for a biopsy
examination to determine if Plaintiff had prostate cancer and
whether such cancer had spread to other organs. (*Id.* ¶¶ 3–
4.) Upon arrival to the hospital, Plaintiff was taken into the
operating room for the biopsy. (*Id.* ¶ 5.) Soon after anesthesia
was administered and the procedure had begun, Plaintiff woke
up to severe and excruciating pain. (*Id.*) Plaintiff overheard
Dr. Janis say that he had cut into Plaintiff's urinary bladder.
(*Id.*) The pain caused Plaintiff to "sit-up-right-straight on the
operation table." (*Id.* ¶ 6.) Plaintiff overheard Dr. Janis state,
"Whoop I Made A Mistake," and tell his medical assistant

to hurry up and put Plaintiff back under "because he did cut the wrong thing." (*Id.*) Plaintiff alleges that Dr. Janis acted with deliberate indifference and negligence in conducting the biopsy. (*Id.* ¶ 50.) Plaintiff also asserts Pagan refused to send him to see outside medical specialists, which contributed to Plaintiff's injury from the biopsy. (*Id.* ¶¶ 26–27.)

2    The Second Amended Complaint refers to the same biopsy procedure that took place with two different dates – March 19, 2014 (SAC ¶¶ 3, 4) and April 16, 2014 (*id.* ¶¶ 24, 25, 27).

**\*2** Plaintiff alleges Defendant Montefiore Mount Vernon Hospital employed Dr. Janis as one of its medical employees. (*Id.* ¶ 37.) Plaintiff asserts MMVH should be indemnified for Dr. Janis' damages because the hospital had a medical contract with Dr. Janis. (*Id.* ¶ 38.) Plaintiff asserts Dr. Janis is a private physician who also had a contract with the state of New York to provide medical services to inmates at Green Haven on a part-time basis. (*Id.* ¶ 44.) Plaintiff asserts that Dr. Janis abused his medical position while acting in his official capacity under his contract with the state of New York. (*Id.* ¶ 45.)

### II. Delay In Examination By Dr. Bernstein

On July 10, 2014, Plaintiff went to the bathroom, noticed blood in his urine and stool, and requested to see a doctor. (*Id.* ¶ 9.) Plaintiff was seen by Defendant Dr. Robert Bentivegna, a doctor at Green Haven, who informed him that he needed to be examined by Defendant Dr. Frederick Bernstein. (*Id.* ¶¶ 9–10.) Despite the referral, thirty-nine days passed before Plaintiff was examined by Dr. Bernstein. (*Id.* ¶ 10.) Plaintiff suffered pains and mental anguish as a result of the delay in medical treatment, not knowing the cause of his symptoms, and not knowing whether there was a rupture in the sutures from the biopsy procedure. (*See id.* ¶¶ 11–12.) Plaintiff seeks to hold both Dr. Bernstein and Dr. Bentivegna are liable for the delay in treatment. (*Id.* ¶ 17.)

### III. Treatment by Dr. Korobkova

On an unspecified date, Plaintiff was treated at Memorial Sloan Kettering Cancer Center by Dr. Levitt, who issued a medical order for Defendant Dr. Yelena Korobkova to provide antibiotics to treat a yeast infection. (*Id.* ¶ 18.) When Plaintiff returned to Green Haven, Dr. Korobkova did not prescribe any antibiotics and only told Plaintiff that he needed to drink plenty of water to treat the yeast infection. (*Id.* ¶ 20.) Furthermore, Plaintiff asked Dr. Korobkova for a walking

cane and for "a new pair of medical-boots." (*Id.* ¶ 21.) Dr. Korobkova rejected such requests and told Plaintiff "[t]his is prison's [sic] Mr: Bridges, not Burger King, you cannot have it your way." (*Id.*) Plaintiff alleges Dr. Korobkova contributed to the injury he sustained from April 16, 2014. (*Id.* ¶ 24.)

### IV. Allegations Against Dr. Koenigsmann

On July 30, 2016, Plaintiff "again wrote" to the Chief Medical Director of Green Haven, Dr. Carl J. Koenigsmann, concerning his overall treatment. (*Id.* ¶ 30.) Plaintiff complained in his letter regarding the Green Haven medical staff's medical treatment and standard of care. (*Id.*) Defendant Dr. Koenigsmann referred the matter to a subordinate, who took no corrective actions. (*Id.*) Plaintiff alleges Dr. Koenigsmann contributed to Plaintiff's injury suffered from Dr. Janis's procedure on April 16, 2015. (*Id.* ¶ 32.)

### V. Allegations Against Osselmann and Supt. Griffin

Plaintiff alleges Defendant Nurse Administrator Dawn Osselmann denied him participation in the UPD [3] housing program at Green Haven. (*Id.* ¶ 33.) Plaintiff asserts that Defendant Superintendent Thomas Griffin stated that Plaintiff did not qualify as somebody who has a medical disability under the ADA, even though Plaintiff suffers from prostate cancer. (*Id.*) Plaintiff also claims Osselmann refused to follow Pagan's order and that she participated and contributed to Plaintiff's injury incurred on April 16, 2014. (*Id.* ¶ 36.)

3    UPD stands for Unit for the Physically Disabled at Green Haven, devoted to inmates who require 24-hour nursing care. (ECF No. 118 at 8, 17.)

### VI. Relief Requested

Plaintiff alleges he suffers ejaculation issues and has erective disfunction for the rest of his lifetime as a result of the biopsy. (*Id.* ¶ 52.) Plaintiff seeks $150 million [4] in damages for pain and suffering caused by the alleged defective and negligent biopsy procedure by Dr. Janis. (*Id.* ¶ 55.) Specifically, Plaintiff seeks $20 million from Dr. Janis, $20 million from Dr. Koenigsmann in his individual capacity, $10 million from Dr. Griffin in his individual capacity, $10 million from Dr. Bernstein in his individual capacity, $10 million from Dr. Bentivegna in his individual capacity, $10 million from Pagan in his individual capacity, $10 million from Osselmann in her individual capacity, $30 million from MMVH "in their medical role and individual capacity," and $20 million from Dr. Korobkova "in her medical role." (*Id.* ¶¶ 56–64.)

4          Although Plaintiff totals his damages sought to
           be $150 million, his Second Amended Complaint
           appears to only account for $140 million. (*See* SAC
           ¶¶ 55–66.)

## PROCEDURAL HISTORY

**\*3** Plaintiff commenced this action on March 27, 2017.
(ECF No. 2.) Plaintiff was granted *in forma pauperis* status on
June 29, 2017. (ECF No. 11.) On April 29, 2019, defendants
moved to dismiss Plaintiff's Complaint pursuant to Federal
Rule of Civil Procedure 12(b)(6). (ECF Nos. 73 & 79.)
On May 12, 2020, this Court granted defendants' motions.
("May 12, 2020 Order," ECF No. 82.) Specifically, this Court
dismissed with prejudice: (1) Plaintiff's claim for deliberate
indifference against DOCCS and individual defendants in
their official capacity; (2) Plaintiff's medical malpractice
claim against Dr. Janis and MMVH; and (3) Plaintiff's ADA
claim against Supt. Griffin and Osselmann. (*Id.*) The Court
dismissed without prejudice for renewal: (1) Plaintiff's claim
for deliberate indifference against individual defendants in
their individual capacity; (2) Plaintiff's medical malpractice
claim against Dr. Korobkova; and (3) Plaintiff's Fourteenth
Amendment claim. (*Id.*)

On July 24, 2020, Plaintiff filed a First Amended Complaint.
(ECF No. 87.) Because the First Amended Complaint
failed to identify certain previously named defendants, the
Court granted Plaintiff leave to file a Second Amended
Complaint. (ECF No. 97.) On December 13, 2020, Plaintiff
filed a Second Amended Complaint ("SAC"). (ECF No.
99.) On March 24, 2021, defendants filed motions to
dismiss the SAC. Defendants DOCCS, Dr. Janis, Supt.
Griffin, Dr. Koenigsmann, Dr. Bernstein, Dr. Korobkova,
Dr. Bentivegna, Pagan, and Osselmann (together, "State
Defendants"; together with MMVH, "Defendants") move to
dismiss the SAC pursuant to Rule 12(b)(6). (ECF No. 117.)
Defendant MMVH moved to dismiss the SAC pursuant to
Rule 12(b)(6), statute of limitations, and failure to exhaust
administrative remedies. (ECF No. 109.) Plaintiff submitted
a filing, dated February 22, 2021, that appears to be
an opposition only to MMVH's motion. (ECF No. 120.) By letter
dated March 24, 2021, State Defendants represent that they do
not interpret Plaintiff's filing as a response to their motion to
dismiss nor does the filing contain any arguments warranting
a reply brief from them. (ECF No. 121.) MMVH filed a reply
in support of its motion on March 24, 2021. (ECF No. 115.)

## LEGAL STANDARD

### I. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal
is proper unless the complaint "contain[s] sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Bell
Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there
are well-pled factual allegations in the complaint, "a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement to relief." *Id.* at 679.

While the Court must take all material factual allegations
as true and draw reasonable inferences in the non-moving
party's favor, the Court is "not bound to accept as true a
legal conclusion couched as a factual allegation," or to credit
"mere conclusory statements" or "[t]hreadbare recitals of the
elements of a cause of action." *Id.* at 662, 678 (quoting
*Twombly*, 550 U.S. at 555). The critical inquiry is whether the
plaintiff has pled sufficient facts to nudge the claims "across
the line from conceivable to plausible." *Twombly*, 550 U.S.
at 570.

### II. Section 1983

Section 1983 provides that "[e]very person who, under the
color of any statute, ordinance, regulation, custom, or usage,
of any State ... subjects, or causes to be subjected, any
citizen of the United States ... to the deprivation of any
rights, privileges, or immunities secured by the Constitution
and laws, shall be liable to the party injured." 42 U.S.C. §
1983. Section 1983 "is not itself the source of substantive
rights, but a method for vindicating federal rights elsewhere
conferred by those parts of the United States Constitution and
federal statutes it describes." *Baker v. McCollan*, 443 U.S.
137, 144 n.3 (1979); *see Paterson v. County of Oneida*, 375
F.3d 206, 225 (2d Cir. 2004). To state a claim under Section
1983, a plaintiff must allege (1) the challenged conduct was
attributable to a person who was acting under color of state
law and (2) "the conduct deprived the plaintiff of a right
guaranteed by the U.S. Constitution." *Castilla v. City of New
York*, No. 09 Civ. 5446, 2013 WL 1803896, at \*2 (S.D.N.Y.
Apr. 25, 2013); *see Cornejo v. Bell*, 529 F.3d 121, 127 (2d Cir.
2010). Therefore, there are two elements to a Section 1983
claim: (1) the defendant acted under color of state law, and
(2) as a result of the defendant's actions, the plaintiff suffered
a denial of his federal statutory rights, or his constitutional

rights or privileges. *See Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347,354 (E.D.N.Y. 1999) (Section 1983 "furnished a cause of action for violation of federal rights created by the Constitution") (citation omitted).

**\*4** "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). Instead, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (emphasis added) (internal quotation marks omitted), *cert. denied sub nom., Brooks v. Pataki*, 137 S. Ct. 380 (2016). As the Second Circuit has explained, the personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

## DISCUSSION

Construing the SAC liberally, Plaintiff brings the following claims against Defendants: (1) Eighth Amendment deliberate indifference claims against Dr. Janis, Dr. Bernstein, Dr. Bentivegna, Dr. Korobkova, Pagan, Dr. Koenigsmann,

Supt. Griffin, and Osselmann; (2) medical malpractice claims against Dr. Janis, Dr. Bernstein, Dr. Bentivegna, Dr. Korobkova, Pagan, Dr. Koenigsmann, Supt. Griffin, and Osselmann; (3) Fourteenth Amendment procedural due process claims against Dr. Bernstein, Dr. Bentivegna, and Pagan; and (4) ADA claims against Supt. Griffin and Osselmann. Plaintiff also seeks to hold MMVH liable for Dr. Janis' alleged wrongful conduct.

### I. Eighth Amendment

Plaintiff alleges Defendants violated his Eighth Amendment rights. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Consequently, the government is obligated to provide adequate medical care to incarcerated people, such that the failure to do so is a violation of the Eighth Amendment and gives rise to a deliberate indifference claim under Section 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). To state a claim of medical indifference, an inmate must show that (1) he had an objectively serious medical need, and (2) a defendant acted with subjective deliberate indifference, which measures whether the prison official acted with a sufficiently culpable state of mind. *Harrison v. Barkley*, 219 F.3d 132, 136–38 (2d Cir. 2000). The defendant must have actual notice of the prisoner's serious medical need. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1986). In other words, the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he defendant's belief that his conduct poses no serious harm ... need not be sound as long as it is sincere." *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006).

There are various limits to a deliberate indifference claim. "[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Instead, to be a constitutional violation, the act or omission must result in a "condition of urgency" that may result in "degeneration" or "extreme pain." *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); *Koehl*, 85 F.3d at 88 (holding the court incorrectly dismissed the plaintiff's claim on a 12(b)(6) motion when plaintiff alleged he was deprived of his medically needed eye glasses resulting in a significant loss of vision); *Lowrance v. Coughlin*, 862 F. Supp 1090, 1116 (S.D.N.Y. 1994) (finding plaintiff was deprived of medical care when his knee surgery was delayed due to various retaliatory prison transfers, causing pain and suffering). Thus, for example, if a prison official deliberately ignores a gash on a prisoner's face that is becoming infected, an omission of treatment could violate the

Bridges v. Correctional Services, Slip Copy (2022)
Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 145 of 261

2022 WL 1500633

Eighth Amendment; however, the failure to provide cosmetic surgery when a prisoner nicks himself shaving would not. *Chance,* 143 F.3d at 702.

**\*5** An inadvertent failure to provide adequate medical care also fails to rise to the level of deliberate indifference. *See Estelle,* 429 U.S. at 105–06. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (internal citations omitted).

Plaintiff brings deliberate indifference claims against Defendants Dr. Janis, Dr. Bernstein, Dr. Bentivegna, Dr. Korobkova, Pagan, Dr. Koenigsmann, Supt. Griffin, and Osselmann in their individual capacities.[5] As with his initial Complaint, Plaintiff again fails to sufficiently assert in the SAC that State Defendants acted with the requisite culpable state of mind necessary to establish subjective deliberate indifference. A mere recitation of the standard does not suffice. Here, Plaintiff alleges that the State Defendants "knew of a substantial risk from the very fact that the risk was obvious." (SAC ¶ 31.) Such conclusory statement lacks any factual allegations and are insufficient to state a claim.

[5]    To the extent Plaintiff intends to bring deliberate indifference claims against State Defendants in their official capacities, these claims have been dismissed with prejudice in the May 12, 2020 Order. (ECF No. 82.)

Plaintiff does not make any allegations in the SAC to demonstrate that Defendants had the requisite state of mind. Notably, Plaintiff alleges Dr. Janis cut into his urinary bladder during a biopsy procedure and said, "whoop I made a mistake." (*Id.* ¶ 6.) This allegation in itself demonstrates that Dr. Janis did not act with subjective deliberate indifference to Plaintiff's medical needs.

Next, Plaintiff brings claims against Dr. Bernstein and Dr. Bentivegna for the thirty-nine-day delay in his examination by Dr. Bernstein. (*Id.* ¶ 17.) Plaintiff conclusively declares that this was a "significant delayed [sic] in treatment" and that the defendants were "fully liable," without alleging whether defendants had a role in scheduling medical appointments or that they deliberately delayed Plaintiff's appointment.

Plaintiff claims Dr. Korobkova failed to prescribe antibiotics for his yeast infection, despite Dr. Levitt's medical order. (*Id.* ¶ 18.) Dr. Korobkova instead directed Plaintiff to drink plenty of water to cure the infection. (*See id.* ¶ 20.) "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Plaintiff does not allege he had continued or prolonged yeast infection or otherwise that he was not properly treated. Plaintiff also does not allege that Dr. Korobkova subjectively intended to not treat his yeast infection or to be different to his medical needs. Furthermore, Plaintiff alleged Dr. Korobkova denied his request for a walking cane and for a new pair of medical boots and he offensively stated that "This is prison's [sic] Mr. Bridges, not Burger King, you cannot have it your way." (*Id.* ¶ 21.) This claim also fails because Plaintiff has not alleged that he had a serious medical need for a walking cane and for medical boots.

Plaintiff alleges Pagan refused to send Plaintiff out to see medical specialists. (*Id.* ¶ 26.) However, not only does Plaintiff not allege any particular instance of this occurring, but the SAC itself contradicts this allegation. Plaintiff alleges he saw Pagan in March 2014 due to groin pain and Pagan scheduled a medical appointment for a biopsy at MMVH. (*See id.* ¶ 3.) Accordingly, Plaintiff has not sufficiently stated a deliberate indifference claim against Pagan.

**\*6** Further, Plaintiff brings claim against Dr. Koenigsmann for referring his letter of complaint to a subordinate who then took no corrective action. (*Id.* ¶ 31.) Plaintiff does not make any allegations regarding Dr. Koenigsmann's state of mind. Rather, Plaintiff conclusively recites the standard that defendants must have actual notice of a plaintiff's serious medical need. (*See id.* ¶ 30.)

Plaintiff brings claims against Supt. Griffin and Osselmann for denying him admission into the Unit for Physically Disabled[6] ("UPD") (*id.* ¶¶ 33–36). Plaintiff has not alleged he had a serious medical need or otherwise required 24-hour nursing care such that he qualified for admission into the UPD. Plaintiff also makes no representations regarding Supt. Griffin and Osselmann's state of mind in denying him admission.

[6]    The SAC refers to the "UPD" without explanation. State Defendants represent that these allegations concern Plaintiff's denial of admission to the Unit for Physically Disabled, which is a housing unit

2022 WL 1500633

devoted to inmates who require 24-hour nursing care. (State Defs. Mot. at 4, 17.)

Lastly, Plaintiff generally claims State Defendants' actions or inactions contributed to the injury caused by Dr. Janis without any elaboration. (*Id.* ¶¶ 36, 52.) These conclusory statements do not survive dismissal. Because Plaintiff has failed to amend his complaint to allege sufficient culpable state of mind, his Eighth Amendment deliberate indifference claims against State Defendants are dismissed with prejudice.

### II. Fourteenth Amendment

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Reading the SAC liberally, Plaintiff brings Fourteenth Amendment claims against Dr. Bernstein, Dr. Bentivegna, and Pagan. Because Plaintiff is a convicted inmate, rather than a pretrial detainee, his deliberate indifference claims must be analyzed under the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Cf. Cook v. Dewitt*, No. 19 CIV. 2780 (NSR), 2022 WL 580774, at *3 (S.D.N.Y. Feb. 24, 2022) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). As discussed *supra*, Plaintiff's Eighth Amendment deliberate indifference claims against Dr. Bernstein, Dr. Bentivegna, and Pagan are dismissed.

### III. ADA

Plaintiff reasserts claims under the ADA against Supt. Griffin and Osselmann. (SAC ¶ 33.) This Court dismissed these claims with prejudice in the May 12, 2020 Order for many reasons, including that Plaintiff's claims were not of discrimination but instead concern the quality and quantity of medical care, Plaintiff failed to assert he was entitled to receive the benefits he sought, and Plaintiff asserted claims against two individual defendants rather than a public entity. (*See* ECF No. 82 at 14–15.) In the SAC, Plaintiff brings an ADA claim against Supt. Griffin and Osselmann alleging they denied him admission into UPD, even though Plaintiff has prostate cancer that "falls under ADA." (SAC ¶ 33.) The conclusory statements in the SAC do not cure the defects identified by the Court. Therefore, the Court reiterates that the ADA claims against Supt. Griffin and Osselmann have been dismissed with prejudice.

### IV. Medical Malpractice

Plaintiff appears to bring state law medical malpractice claims against Defendants Dr. Janis, Dr. Bernstein, Dr. Bentivegna,

Dr. Korobkova, Pagan, Dr. Koenigsmann, Supt. Griffin, and Osselmann. (SAC ¶¶ 46, 52.) In New York, a negligent act or omission "that constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician constitutes malpractice." *B.F. v. Reprod. Med. Assocs. of New York, LLP*, 136 A.D.3d 73, 80 (1st Dep't 2015); *Scott v. Uljanov*, 74 N.Y.2d 673, 674 (1989) ("[M]edical malpractice is simply a form of negligence, [and] no rigid analytical line separates the two").

**\*7** In New York, the statute of limitations for medical malpractice is two and a half years and runs from the date of the alleged negligent act or omission that caused the patient's injury. N.Y. C.P.L.R. § 214-a. The limitations period may be extended beyond the two-and-a-half-year period under the continuous treatment doctrine, in which case the period begins to run as of the date of the last treatment. *Id.*; *Borgia v. City of New York*, 12 N.Y.2d 151, 156 (1962). To invoke the doctrine, a plaintiff must establish a continuous course of treatment with a particular health care provider with respect to the condition that gives rise to malpractice action. *Rudolph v. Jerry Lynn, D.D.S., P.C.*, 16 A.D.3d 261, 262 (2005).

As an initial matter, Plaintiff reasserts his medical malpractice claim against Dr. Janis, which was previously dismissed with prejudice by the Court in its May 12, 2020 Order as time-barred. (ECF No. 82 at 12.) The allegations in the SAC do not alter the Court's previous conclusion. Plaintiff refers to two dates on which the biopsy procedure was conducted by Dr. Janis – March 19, 2014 and April 16, 2014. (SAC ¶¶ 4, 36.) Even assuming the biopsy procedure occurred on the later date of April 16, 2014, the claims are still time-barred because Plaintiff commenced this action on March 27, 2017, more than two-and-a-half years after the biopsy. Accordingly, the Court upholds its previous ruling and reiterates that Plaintiff's medical malpractice claim against Dr. Janis has been dismissed with prejudice.

As for Plaintiff's medical malpractice claims against the other defendants, State defendants claim to have immunity under New York Correction Law Section 24. (State Defs. Mot. at 18–21.) Section 24 provides, in pertinent part: "Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state." N.Y. Correct. Law § 24(2). Since the Court dismisses Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over

2022 WL 1500633

Plaintiff's state law claims. Accordingly, the Court finds it unnecessary to consider Defendants' immunity under the New York State Correction Law.

### V. Claims Against MMVH

Plaintiff seeks to hold the owner of MMVH, who he alleges to be the employer of Dr. Janis, liable for its employee's damages. (SAC ¶ 38.) Because the Court dismisses all of Plaintiff's claims against Dr. Janis, the Court finds it unnecessary to consider Plaintiff's arguments surrounding MMVH's liability. The SAC does not otherwise contain allegations regarding MMVH's direct involvement in any of the alleged medical procedures or treatment. Accordingly, Plaintiff's claims against MMVH are dismissed.

### VI. Leave To Amend

"The Second Circuit has instructed courts not to dismiss a complaint 'without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Howard v. Brown*, No. 15-CV-09930 (ER), 2018 WL 3611986, at *6 (S.D.N.Y. July 26, 2018) (quoting *Shabazz v. Bezio*, 511 F. App'x 28, 31 (2d Cir. 2013)). However, where "the Court has put Plaintiff on notice of the deficiencies in his original complaint and given him an opportunity to correct these deficiencies in an Amended Complaint, but Plaintiff has failed to do so, dismissal with prejudice is appropriate." *Coon v. Benson*, No. 09-CV-00230 (SCR) (LMS), 2010 WL 769226, at *4 (S.D.N.Y. Mar. 8, 2010). Here, the Court previously detailed the deficiencies in Plaintiff's original Complaint and provided *pro se* Plaintiff leave to amend. However, Plaintiff's Second Amended Complaint fails to address the same deficiencies. Therefore, *pro se* Plaintiff's claims must be dismissed with prejudice without leave to replead.

### CONCLUSION

**\*8** For the foregoing reasons, the Court GRANTS Defendants' motions to dismiss (ECF Nos. 109 & 117) and DISMISSES *pro se* Plaintiff's Second Amended Complaint in its entirety without leave to replead. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 109 and 117, to enter judgment accordingly, and to close the case.

SO ORDERED.

### All Citations

Slip Copy, 2022 WL 1500633

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

178 Fed.Appx. 39
This case was not selected for
publication in the Federal Reporter.
United States Court of Appeals,
Second Circuit.

Francisco VELOZ, Plaintiff–Appellant,

v.

The State of NEW YORK, et al., Defendants–Appellees,
John Doe, C.O., Defendant.

No. 05–0272–pr.
|
April 24, 2006.

**Synopsis**
**Background:** Prisoner brought pro se § 1983 action against
State of New York and prison officials, alleging denial
of his right to be free of cruel and unusual punishment,
equal protection violations, and violations of Americans with
Disabilities Act (ADA) in connection with medical treatment
he received for spinal condition. The United States District
Court for the Southern District of New York, 339 F.Supp.2d
505, Stein, J., granted summary judgment to defendants.
Prisoner appealed.


**Holdings:** The Court of Appeals held that:

[1] prisoner failed to submit any evidence that he attempted
fully to exhaust his available administrative remedies with
respect to claims that prison officials subjected him to cruel
and unusual punishment;

[2] neither prisoner's disagreement with his medical
providers' decisions concerning his treatment plan for a spinal
condition nor his bare allegations of negligence created an
Eighth Amendment claim arising out of inadequate medical
care; and

[3] denying prisoner placement in the unit for the physically
disabled (UPD) did not violate Americans with Disabilities
Act (ADA).


Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.


West Headnotes (3)

**[1]    Civil Rights** 🗝️ Criminal law enforcement;
prisons

Prisoner failed to submit any evidence that
he attempted fully to exhaust his available
administrative remedies with respect to claims
that prison officials subjected him to cruel and
unusual punishment in violation of the Eighth
Amendment and discriminated on the basis of
race in violation of the Fourteenth Amendment
by exhibiting deliberate indifference to his left
shoulder injury and to treatment of his right wrist,
housing him in a cell with a black water leak and
in a prison gym, and denying him a transfer to
honor block housing, as was required by Prison
Litigation Reform Act to maintain § 1983 action.
U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. §
1983; Prison Litigation Reform Act of 1995, §
101(a), 42 U.S.C.A. § 1997e(a).

18 Cases that cite this headnote


**[2]    Prisons** 🗝️ Particular Conditions and
Treatments

**Sentencing and Punishment** 🗝️ Medical care
and treatment

Neither prisoner's disagreement with his medical
providers' decisions concerning his treatment
plan for a spinal condition nor his bare
allegations of negligence created an Eighth
Amendment claim arising out of inadequate
medical care. U.S.C.A. Const.Amend. 8.

14 Cases that cite this headnote


**[3]    Civil Rights** 🗝️ Medical care and treatment

Prison's denying prisoner placement in the
unit for the physically disabled (UPD) did
not violate Americans with Disabilities Act
(ADA); prisoner's primary physicians did not
recommend him for UPD placement because, in
their estimation, his condition did not qualify
him for the 24-hour nursing care provided in the

UPD. Americans with Disabilities Act of 1990, § 201(2), 42 U.S.C.A. § 12131(2).

1 Cases that cite this headnote

**\*40** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court is AFFIRMED.

**Attorneys and Law Firms**

Francisco Veloz, Attica, New York, for Plaintiff–Appellant, pro se.

Mariya S. Treisman, Assistant Solicitor General, and Michael S. Belohlavek, Senior Counsel, for Eliot Spitzer, Attorney General of the State of New York, Albany, New York, for Defendants–Appellees.

PRESENT: Hon. AMALYA L. KEARSE, Hon. ROGER J. MINER, and Hon. PETER W. HALL, Circuit Judges.

**SUMMARY ORDER**

**\*\*1** Francisco Veloz, proceeding *pro se,* appeals a September 30, 2004 decision of the United States District Court for the Southern District of New York (Stein, *J.*) that granted summary judgment to defendants on Veloz's 42 U.S.C. § 1983 complaint. We assume the parties' familiarity with the underlying facts and procedural history of this case.

This Court reviews a district court's grant of summary judgment de novo, "construing **\*41** the record in the light most favorable to the non-moving party." *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). We will affirm a district court's grant of summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 117–18 (2d Cir.2005).

[1] Veloz alleged, *inter alia,* that defendants subjected him to cruel and unusual punishment in violation of the Eighth Amendment and discriminated on the basis of race in violation of the Fourteenth Amendment by exhibiting deliberate indifference to his left shoulder injury and to treatment of his right wrist, housing him in a cell with a black water leak and in a prison gym, and denying him a transfer to Honor Block housing. The district court dismissed

these claims on the ground that Veloz failed to exhaust his administrative remedies. The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because Veloz failed to submit any evidence that he attempted fully to exhaust his available administrative remedies, the district court properly dismissed these claims.

[2] Veloz also asserted that defendants violated his Eighth Amendment rights by denying him proper medical treatment for a spinal condition, a claim that he did exhaust. " 'In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks omitted) (quoting *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). The district court held that Veloz had not alleged the requisite direct and personal involvement by most of the defendants to render them culpable, and that the remaining defendants had provided Veloz with proper treatment. Veloz's disagreement with his medical providers' decisions concerning his treatment plan did not "create a constitutional claim," *Chance,* 143 F.3d at 703, and neither did his bare allegations of negligence, *id.* Furthermore, Veloz presented no evidence that the defendants acted with a "sufficiently culpable state of mind," *id.* at 702 (internal quotation marks omitted), by disregarding an excessive risk to his health and safety. *See Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Accordingly, we affirm the district court's dismissal of Veloz's exhausted Eighth Amendment claim.

**\*\*2** [3] In reading Veloz's complaint liberally, the district court found that Veloz pled a claim under the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"), when he alleged that he was denied placement in the Unit for the Physically Disabled ("UPD") on account of his disability. In order to succeed on an ADA claim, the prisoner must show, *inter alia,* that he is a 'qualified individual with a disability,' " *i.e.,* that he is "an individual with a disability who ... meets the essential eligibility requirements for ... participation in programs ... provided by a public entity." 42 U.S.C. § 12131(2). The record indicates that Veloz's primary physicians did not recommend him for UPD placement because, in their estimation, his condition did not qualify him for the twenty-four hour nursing care provided in the UPD. Finding that Veloz was not qualified for the program from

which he was excluded, the district court properly dismissed this claim as well.

 **\*42**  We have considered all of Veloz's remaining arguments and find them to be without merit. Accordingly, the judgment of the district court is hereby AFFIRMED.

**All Citations**

178 Fed.Appx. 39, 2006 WL 1082836

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 991402
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,
v.
Donald VENETTOZZI, Director Special Housing and
Inmate Discipline; Michael Dixon, Sergeant; Jeffery
Rock, Lieutenant; Earl Bell, Deputy Superintendent
of Security; Jerry Kowalowski, Recreation Program Leader;
and Richard Houck, Transfer Coordinator, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

HALLIE E. MITNICK, ESQ., MEGAN WELCH, ESQ.,
PRISONERS' LEGAL SERVICES OF NY, Counsel for
Plaintiffs, 114 Prospect Street, Ithaca, NY 14850.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, ERIK B. PINSONNAULT, ESQ., Assistant
Attorney General, Counsel for Defendants, The Capitol,
Albany, NY 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), [1] Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Special Housing and Inmate
Discipline Director Donald Venettozzi, Sergeant Michael
Dixon, Deputy Superintendent of Security Earl Bell, Sergeant
Jeffery Rock, Recreation Program Leader Jerry Kowalowski,
and Transfer Coordinator Richard Houck ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 69.)
For the reasons set forth below, Defendants' motion is granted
in part and denied in part.

[1] The Court notes that, for the ease of reading, it will
still refer to Francisco DeJesus as a plaintiff in this
action.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Amended Complaint

Generally, Plaintiffs' Amended Complaint alleges that
Defendants violated their due process rights and took various
adverse actions against them at Clinton Correctional Facility
("Clinton") in 2015 and 2016 as a result of Plaintiffs' election
(by fellow prisoners) to Clinton's Inmate Liaison Committee
("ILC") following the well-publicized escape of two inmates
(Richard Matt and David Sweat) from Clinton's Honor
Block. (Dkt. No. 17 [Pls.' Am. Compl.].) Five claims in the
Amended Complaint survived the Court's Decision and Order
of September 23, 2019: (1) a First Amendment retaliation
claim by Plaintiff DeJesus against Defendants Dixon and
Rock; (2) a First Amendment retaliation claim by Plaintiff
Emerenciano against Defendants Kowalowski and Bell; (3) a
First Amendment retaliation claim by Plaintiff Scott against
Defendant Houck; (4) a Fourteenth Amendment due process
claim by Plaintiff Emerenciano against Defendants Bell and
Venettozzi; and (6) a supervisory liability claim by Plaintiffs
against Defendant Venettozzi. (Dkt. No. 40, at 50.)

### B. Undisputed Material Facts on Defendants' Motion
### for Summary Judgment

Before reciting the undisputed material facts on Defendants'
motion, the Court observes that, in addition to their Rule 7.1
Response, Plaintiffs have submitted what they characterize as
a "Statement of Additional Facts" that "are either undisputed
or at least supported by sufficient record evidence that the
jury could accept them...." (Dkt. No. 73, Attach. 1, at 9-22.)
Of course, no Statement of *Undisputed* Additional Facts is
permitted under the District's Local Rules of Practice. *See*
N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's
Response may set forth any assertions that the opposing party
contends are in dispute in a short and concise Statement of
Additional Material Facts *in dispute* ....") (emphasis added).
Furthermore, many of Plaintiffs' additional factual assertions
are immaterial to the resolution of the issues presented
by Defendants' motion. *Id.* (permitting a "Statement of
Additional *Material* Facts in Dispute....") (emphasis added).
However, to the extent Plaintiffs actually assert additional
material facts not in dispute, the Court will take them
into consideration in its below recitation of the undisputed
material facts.

**\*2**  The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

Defendant Dixon's Misbehavior
Report Against Plaintiff DeJesus

1. At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus. [2]

[2]    The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

2. During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3. During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

4. Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5. On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing. Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6. Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7. On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016. [3]

[3]    The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

8. Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior
Report Against Plaintiff Emerenciano

9. Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10. Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

11. During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard. [4]

[4]    The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact. *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established ... Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000)

("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts ... [A] vague cite to all of the exhibits is simply unacceptable.").

**\*3** 12. During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison.[5]

[5]    The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983. However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

13. After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats.[6] Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

[6]    The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' ").

14. On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15. At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16. Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17. On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended. On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

<u>Defendant Houck's Transfer of Plaintiff Scott</u>

18. Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19. Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20. In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers. Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods. First, some of the inmate "transfer referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference." Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons." However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility —ordinarily must approve the transfer referral. Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

**\*4** 21. On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

22. Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23. On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

## I. RELEVANT LEGAL STANDARDS

### A. Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [7] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[7]  As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Standard Governing Claims Under 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights. It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement. *Cooper v. Pate*, 378 U.S. 546, 546 (1964). In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1. Standard Governing Retaliation Claims Under the First Amendment

**\*5**  To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... objectively[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising ... [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

**2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment**

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

**\*6** With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

**3. Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments**

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d

880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation). Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted). More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994). As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner). *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001). This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> \*7  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case). [8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test. [9]

[8]  In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

[9]  In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement. *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing

supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above). *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). " 'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676). Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly. *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*. *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate, through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

**\*8** "[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

## II. ANALYSIS

### A. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

#### 1. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitutes constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].) [10] According to Defendant Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff. (*Id.* at 7-8.)

[10]    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

**\*9** More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules. (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].) As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC. (*Id.*) At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat ... to the safety and operation of the facility." (*Id.*) Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct." (*Id.*) Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus. (*Id.* at 2-3.) [11] Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report. (*Id.*)

[11]    The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation. (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that it is undisputed that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at \*1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at \*7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

officer found '[i]ndicating you intend to sue is not a violation of 102.10' ....") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous. The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause." (Dkt. No. 69, Attach. 14, at 81.) To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc." (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

 **\*10** Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2. Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech. (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing. (*Id.*) Defendants also argue that the admissible record evidence indicates that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer. (*Id.*) Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made

against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock. (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct. (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]." (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing. According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff. (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].) At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon. (*Id.*) More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs." (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

 **\*11** Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus. (Dkt. No. 69, Attach. 10, at 78.) According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[ ] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report. (*Id.* at 78.) Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision) [12] but by conspiring with Defendant Dixon to charge him without adequate grounds. (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

[12]    The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer." *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a ... Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski. [13]    (*Id.*)

[13]    The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant

Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

**\*12** During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an altercation occurs. [14]    (Dkt. No. 73, Attach. 13, at 1-2.) In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time. (*Id.*) For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard. (*Id.*) After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes. (*Id.*) At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day. (*Id.* at 1-2.) In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather. (*Id.* at 2.) Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid. (*Id.*)

14      Defendant Kowalowski attended this ILC meeting
        as the "civilian staff advisor." (Dkt. No. 73, Attach.
        13, at 1.)

Approximately 45 minutes after the ILC meeting had ended,
when Plaintiff Emerenciano had already returned to his cell,
four DOCCS officers placed him in keeplock restraints and
escorted him to SHU. (*Id.*) After spending almost three hours
in SHU, Plaintiff Emerenciano was informed that he was
being transferred to Upstate later that same day. (*Id.*) On
October 2, 2015, Plaintiff Emerenciano was transferred from
Clinton to the SHU at Upstate. (Dkt. No. 73, Attach. 15.)
On October 5, 2015, Plaintiff Emerenciano was served a
misbehavior report issued by Defendant Kowalowski. (*Id.*)
According to this misbehavior report, at the ILC meeting,
"[Plaintiff Emerenciano] stated that if [the policy requiring
inmates to remain on the ground of the prison yard] continues
we will have another 83 ...." (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a
genuine dispute of material fact as to the second element of
a claim for retaliation. While a "prison inmate has no general
constitutional right to be free from being falsely accused
in a misbehavior report," "false accusations contained in a
misbehavior report can rise to the level of a constitutional
violation ... where the false accusation is based on something
more, such as 'retaliation against the prisoner for exercising
a constitutional right.' " *Tafari v. McCarthy*, 714 F. Supp.2d
317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105
F.3d 857, 862 [2d Cir. 1997]). In other words, in the context
of a retaliation claim, there is no question that a falsified
misbehavior report constitutes an adverse action. *See Gill*,
389 F.3d at 381 (holding that a plaintiff's allegations that
defendants issued false misbehavior reports against him was
sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the
causation element of a retaliation claim has been established.
According to Defendant Kowalowski's deposition testimony,
the basis for his issuing of a misbehavior report against
Plaintiff Emerenciano was Emerenciano's reference to a
prison riot that had occurred at Clinton in 1983. (Dkt.
No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].)
Specifically, Defendant Kowalowski testified that, during the
ILC committee meeting, Plaintiff Emerenciano stated that
the newly implemented prison yard policy could lead to
frustration among the inmates, which may ultimately lead to
a riot (similar to the riot at Clinton Correctional Facility in
1983). (*Id.*)

Plaintiff Emerenciano argues that he made no such reference
to the 1983 Clinton prison riot, and therefore Defendant
Kowalowski's falsified misbehavior report constituted an
adverse action. (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem.
of Law].) In fact, Plaintiff Emerenciano testified that
he was "unaware of any incident [at Clinton] in 1983"
until Defendant Kowalowski issued him the misbehavior
report. (Dkt. No. 69, Attach. 17, at 52 [Emerenciano
Tr.].) Additionally, other members—Inmate Leon, Inmate
Rashawn Scott, Inmate David Maxwell, Inmate Selah, Inmate
Newman, Inmate Matos—of the ILC committee testified to
the fact that they did not recall hearing Plaintiff Emerenciano
remark to an "83." (Dkt. No. 69, Attach. 26, at 11, 14-15, 18,
20-21, 24-25, 29-30.) Instead, Plaintiff Emerenciano argues
that, given his role on the ILC committee, he was merely
informing DOCCS staff of the inmates' growing frustration
regarding the prison yard policy, and proposing possible
solutions for the future. (Dkt. No. 73, at 26-27 [Pls.' Opp'n
Mem. of Law].) Finally, of at least some materiality is the fact
that Plaintiff Emerenciano had previously filed a grievance
against Defendant Kowalowski.

**\*13** For all of these reasons, the Court denies Defendants'
motion for summary judgment on Plaintiff Emerenciano's
First Amendment retaliation claim against Defendant
Kowalowski.

### 4. Plaintiff Emerenciano's First Amendment
### Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide
evidence showing "one particular thing" that would motivate
Defendant Bell to retaliate against him. (Dkt. No. 69, Attach.
2, at 14 [Defs.' Mem. of Law.])

Plaintiff Emerenciano responds (persuasively) that has
adduced admissible record evidence from which a reasonable
juror could find that (1) Emerenciano had engaged in
constitutionally protected conduct by voicing generalized
inmate concern over the newly implemented prison yard
policy to Defendant Kowalowski, and (2) he suffered an
adverse action by being charged with a disciplinary violation
by Defendant Kowalowski, and was found guilty at his Tier
III disciplinary hearing and then punished by Defendant Bell.
(Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].) Less clear,
however, is whether Plaintiff Emerenciano has shown a causal
connection between his protected conduct and the adverse
action by Defendant Bell.

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]). Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made. (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].) However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute). In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him. (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].) At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion ... could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987). "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342, 2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337, 2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016]). Here, the Court need not scrutinize Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make determinations regarding a witness's credibility. *See Hill*, 472 U.S. at 455 (explaining that application of the "some evidence" standard does not require that the Court conduct an independent assessment of the credibility of the witnesses).

*14 For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5. Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his constitutional rights. (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].) According to Defendants, it was Plaintiff Scott himself who had requested the facility transfer. (*Id.* at 16.) Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's communication with media outlets and elected officials who were seeking information on the 2015 prison escape of inmates David Sweat and Richard Matt. (*Id.*)

Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly facilitating his transfer from Clinton to the Green Haven hub. (Dkt. No. 73, at 29-32 [Pls.' Opp'n Mem. of Law].) According to Plaintiffs, Defendant Houck retaliated against Plaintiff Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton. (*Id.* at 29.) More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton. (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right. *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at *8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape. Plaintiff Scott has also

adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established. To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff." *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted). When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

**\*15**  To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month). [15] (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton." (*Id.*)

[15]  In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities. (*Id.* at 3.)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level. [16] (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].) Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes. (Dkt. No. 69, Attach. 30, at 4.) According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015. [17] (Dkt. No. 69, Attach. 11, at 60 [Houck Tr.].) On October 26, 2015, Plaintiff

Scott was transferred from Clinton to the Green Haven hub. (Dkt. No. 69, Attach. 31.)

[16]  The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer. (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].) This review includes an interview of the inmate. (*Id.*)

[17]  Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs. (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request. Simply put, Plaintiff Scott overlooks the fact that he had no right to be confined to an institution of his choosing. *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York. [18] (*Id.* at 5.) As a result, these hubs have the longest waiting list for inmates seeking a transfer to them. [19] (*Id.*) Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns. (*Id.*) Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations). (*Id.*) Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to. (*Id.*)

[18]  The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub. (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

[19]  According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year. (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].) However, the

Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation. (*Id.* at 56-57.)

**\*16** Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].) The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred. Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at \*14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at \*11 [N.D.N.Y. June 7, 2018].) Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed. (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].) Such speculation, of course, is insufficient to create a genuine dispute of material fact. *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at \*12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC.[20] (*Id.* at 30-31.) The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

[20]    The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

**B. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them**

**1. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell**

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell. (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].) For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

**2. Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi**

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights. (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination. (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].) Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference. (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019. When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion is

"not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

**\*17**  In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss. (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].) In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss. For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations. (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].) Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination. (*Id.* at 24.) Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director. (*Id.* at 25.) Defendant Venettozzi could not recall the approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year. (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings. (*Id.* at 39-40.) Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21] (*Id.* at 41.) Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on

officer reprisals against inmates for filing grievances. (*Id.* at 47.)

21      The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC. (*Id.* at 42.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination. (*Id.* at 60.) Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations. (*Id.*) Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal. (*Id.*) There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.) Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it. (*Id.* at 66-67.) For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal. (*Id.* at 67.) Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter. (*Id.* 67-68.) In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work." (*Id.* at 68.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate. (*Id.* at 111.) In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations. (*Id.* at 109-10.)

**\*18**  On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination. (Dkt. No. 73, Attach. 13.) As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges. (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges. (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU. (Dkt. No. 69, Attach. 29.) The memorandum stated that, "per conversation with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]." (*Id.*)

In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel. (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence. (*Id.*) AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting. (*Id.*)

A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (Dkt. No. 69, Attach. 29, at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*) Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing." (*Id.* at 3.) This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to ... [his] appeal, ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.*) This

letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline. (*Id.*) According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence." (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal. (*Id.* at 157, 166.)

**\*19** As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983. *Grullon*, 720 F.3d at 138. Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation. *Samuels v. Fischer*, 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt*, 10-CV-1440, 2014 WL 4676569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that defendant's personal involvement in the alleged constitutional violations. *Chavez*, 2021 WL 4248917, at \*14 (citing *Washington v. Fitzpatrick*, 20-CV-0911, 2021 WL 966085, at \*10 [S.D.N.Y. Mar. 15, 2021]).

" 'In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional violation....' " *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at \*9 (N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140 [W.D.N.Y. 2011]). However, a supervisory official will be found to have been personally involved if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Whitley v. Miller*, 57 F. Supp.3d 152, 161 (N.D.N.Y. 2014).

In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano. (Dkt. No. 69, Attach. 29, at 3.) This letter notified Plaintiff Emerenciano that "[o]n behalf of the Commissioner and in response to ... [his] letter of appeal ... [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015. (*Id.* at 3.) The letter contained an itemized breakdown of the modified penalties imposed upon Plaintiff Emerenciano. (*Id.*) Corey Bedard's signature is affixed towards the bottom portion of this letter. (*Id.*)

On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had reversed the determination of the Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Kowalowski. (*Id.* at 1.) The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges." (*Id.*) A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner ..., [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016." (*Id.* at 2.) Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter. (*Id.*)

**\*20** To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive. There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten

form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Whitley*, 57 F. Supp.3d at 162. As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

### C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi

#### 1. Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon. (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them. (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].) More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner. (*Id.*) Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions ... directly enabled, condoned, and ratified the unlawful retaliation being carried out against ... Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi ... engaged in unlawful

retaliation. (*Id.*) Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/ or tolerated a custom or policy through which retaliation against ILC members ..., but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech." (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.). To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

**\*21** On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office. (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016. (*Id.*) On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges against Plaintiff DeJesus. (*Id.* at 107-08, 121-23.) As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped. (Dkt. No. 69, Attach. 23, at 1.) Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate. (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon. Instead, Plaintiff DeJesus' argument

assumes that, because of his title as the Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff DeJesus. Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant Venettozzi "intentionally built and maintained a system ... [that] tolerates a wrongful custom and policy" of deliberate indifference towards unconstitutional retaliatory conduct. (*Id.*)

With regard to Plaintiffs' apparent argument that the length of time it took for Defendant Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the fact that, before the reversal of the disciplinary hearing officer's determination, counsel for Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to the pending appeal, and yet, the appeal was decided more than sixty days after it was received by Defendant Venettozzi's office. (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].) Of course, "[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient to establish personal involvement." *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9 (N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.); *Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]"); *accord, Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017) (Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.). Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the extent of any communication that they might have had. To the extent that Plaintiff DeJesus argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day deadline to decide an appeal, a failure to adhere to an internal policy or state law does not constitute a violation of § 1983. *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions. *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in ... § 254.8 .... However, this

eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd,* 453 F. App'x 80 (2d Cir. 2011).

**\*22** Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one. This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination. In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry,* 2011 WL 5975027, at \*4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

**\*23** For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

> (a) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Bell;

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 170 of 261

(b) Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d) Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e) Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f) Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **<u>SURVIVE</u>** this motion for summary judgment:

(a) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b) Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c) Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

**All Citations**

Slip Copy, 2022 WL 991402

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 171 of 261

McCluskey v. Roberts, Not Reported in Fed. Rptr. (2022)

2022 WL 2046079

2022 WL 2046079
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Peter MCCLUSKEY, Plaintiff-Appellant,

v.

Samuel D. ROBERTS, New York State Commissioner
of the Office of Temporary and Disability
Assistance, acting in his Individual Capacity, Darla
P. Oto, Principal Hearing Officer of the Office of
Temporary and Disability Assistance, acting in
her Individual Capacity, Defendants-Appellees.

20-4018
|
June 7, 2022

Appeal from the United States District Court for the Eastern
District of New York (Mauskopf, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the May
18, 2020 judgment and November 3, 2020 order of the district
court are **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Peter McCluskey, pro se,
Lynbrook, NY.

FOR DEFENDANTS-APPELLEES: David Lawrence, III,
Assistant Solicitor General, Judith N. Vale, Senior Assistant
Solicitor General, Barbara D. Underwood, Solicitor General,
for Letitia James, Attorney General of New York, New York,
NY.

PRESENT: JOHN M. WALKER, JR., ROBERT D. SACK,
SUSAN L. CARNEY, Circuit Judges.

**SUMMARY ORDER**

*\*1 Pro se plaintiff Peter McCluskey sued Samuel Roberts,
the New York State Commissioner of the Office of Temporary
and Disability Assistance ("OTDA"), and Darla Oto, the
Principal Hearing Officer of the OTDA, in their individual
capacities, asserting claims under 42 U.S.C. § 1983. He
alleged primarily that defendants denied him Supplemental
Nutrition Assistance Program ("SNAP") benefits in violation

of 7 U.S.C. § 2014(e)(5)(B)(ii)(II) and (III), 7 U.S.C.
§ 2020(e)(3), 7 C.F.R. § 273.10(d)(4), and New York
Social Services Law ("NYSSL") § 22(2). The district court
granted defendants' motion to dismiss the complaint and
denied McCluskey's Rule 59(e) motion to alter or amend
the judgment. We assume the parties' familiarity with the
underlying facts, the procedural history of the case, and the
issues on appeal, and refer to them only as necessary to
explain our decision.

**I. Jurisdiction**

Neither party has raised any issue concerning our jurisdiction
over an appeal from the judgment or order denying Rule 59(e)
relief. Nonetheless, we have an "independent obligation to
consider the presence or absence of subject matter jurisdiction
*sua sponte.*" *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006).

In general, the time to appeal a judgment is tolled by the
timely filing of a Rule 59(e) motion. *See* Fed. R. App. P. 4(a)
(4)(A). To be timely, a Rule 59(e) motion must be filed within
28 days of the entry of judgment. Fed. R. Civ. P. 59(e). When
a Rule 59(e) motion is untimely filed, affecting the time for
filing a notice of appeal, this Court will generally treat it as a
motion for reconsideration under Rule 60(b). *See Branum v.
Clark*, 927 F.2d 698, 704 (2d Cir. 1991); *see also* Fed. R. Civ.
P. 60(c) (requiring that a Rule 60(b) motion "be made within
a reasonable time" after entry of judgment or order, subject
to certain limitations). Federal Rule of Appellate Procedure
(FRAP) 4(a)(4)(A)(vi) provides that, even if filed "within a
reasonable time," a Rule 60(b) motion does not toll the time
to appeal the underlying judgment unless it is filed within
28 days after the entry of judgment or order appealed from.
Even so, we have recognized that FRAP 4(a)(4)(A)(vi) is not
jurisdictional; rather, it is a "claim-processing rule" and is
therefore subject to waiver and equitable exceptions. *Weitzner
v. Cynosure, Inc.*, 802 F.3d 307, 312 (2d Cir. 2015).

Here, the district court granted defendants' motion to dismiss
and entered judgment dismissing the complaint on May 18,
2020. McCluskey's Rule 59(e) motion to alter or amend that
judgment was mailed from Lynbrook, New York, and is
postmarked June 10—five days *before* the 28-day time limit
expired on June 15. The Clerk's Office in the U.S. District
Court for the Eastern District of New York, in Brooklyn,
New York, stamped the motion "filed" and docketed the
motion on June 22—twelve days after the postmark date and
seven days after expiration of the 28-day period for filing a
Rule 59(e) motion. On November 3, the district court denied

McCluskey's motion on its merits, making no mention of the motion's untimeliness.

**\*2** McCluskey's notice of appeal was docketed on November 30. The time limit for appealing the May 18 dismissal judgment was not automatically tolled under FRAP 4(a)(4)(A) because his Rule 59(e) motion was filed outside the 28-day limit. As a result, we would ordinarily exercise jurisdiction over his appeal only insofar as he challenged the November 3 order denying reconsideration under Rule 59(e), and not the May 18 dismissal judgment, absent reasons for making an equitable exception to the untimeliness.

Because no party contends that the Clerk's Office received the motion on an earlier date than the docket reflects, we presume that the motion was in fact delivered to the district court and filed on June 22. *See generally Wight v. BankAmerica Corp.,* 219 F.3d 79, 85 (2d Cir. 2000) (a paper filed by mail "is considered 'filed' when delivered to the Clerk's Office"); 1 Moore's Federal Practice § 5.30 (3d ed. 2021) ("If papers sought to be filed are mailed well before a deadline and arrive one day after the deadline, the filing is untimely."). We observe, however, that the month of June 2020 was one in which ordinary expectations of timely mail delivery were disrupted by the tumultuous onset of the COVID-19 pandemic. Moreover, defendants raised no timeliness issue before the district court or on appeal.

Under these circumstances, we conclude that the equities favor granting an equitable exception in favor of McCluskey so as to permit consideration of the entirety of his appeal. *See Weitzner,* 802 F.3d at 312. We therefore construe his Rule 59(e) motion as a motion filed under Rule 60(b) within a reasonable time after entry of the dismissal judgment, and, in acknowledgment of the severe constraints placed on filing and processing documents with the courts during the early days of the pandemic, we make an equitable exception relieving him of the otherwise applicable 28-day limit imposed by FRAP 4(a)(4)(A)(vi).

We thus proceed now to review not only the district court's November 3 denial of reconsideration but also the merits of its May 18 order and judgment dismissing the case.

### II. Waiver

Although we "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest," *McLeod v. Jewish Guild for the Blind,* 864 F.3d 154, 156 (2d Cir. 2017) (per

curiam) (internal quotation marks omitted), pro se appellants must still comply with Federal Rule of Appellate Procedure 28(a), which "requires appellants in their briefs to provide the court with a clear statement of the issues on appeal," *Moates v. Barkley,* 147 F.3d 207, 209 (2d Cir. 1998) (per curiam). Thus, despite affording pro se litigants "some latitude in meeting the rules governing litigation," this Court "normally will not[ ] decide issues that a party fails to raise in his or her appellate brief." *Id.*

McCluskey raises some arguments—including that he alleged a due process claim and that judicial immunity does not protect Oto from suit for her participation in an alleged conspiracy to cover up OTDA's wrongdoing in unlawfully denying his SNAP benefits—for the first time on appeal, and therefore are waived. *See Greene v. United States,* 13 F.3d 577, 586 (2d Cir. 1994) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.").

### III. The district court's judgment and denial of reconsideration are affirmed

On de novo review, we identify no error in the district court's judgment dismissing the complaint, and McCluskey has not established any abuse of discretion in its denial of what we treat as his Rule 60(b) motion for reconsideration. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002); *Motorola Credit Corp. v. Uzan,* 561 F.3d 123, 126 (2d Cir. 2009); *see also Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir. 2008) ("Rule 60(b)[ is] a mechanism for extraordinary judicial relief" appropriately granted only where the moving party shows "exceptional circumstances." (internal quotation marks omitted)).

**\*3** The district court dismissed McCluskey's complaint principally on the ground of res judicata. It found that (1) McCluskey's 2017 action against Roberts and Oto (as well as two other individuals) was dismissed for failure to state a claim and thus adjudicated on the merits, *see Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n.3 (1981); (2) McCluskey was the plaintiff in both actions; and (3) the claims raised in this action could have been asserted in the 2017 action because they involved the "same transaction or connected series of transactions," *TechnoMarine SA v. Giftports, Inc.,* 758 F.3d 493, 499 (2d Cir. 2014) (internal quotation marks omitted).

In the alternative, the district court determined that the complaint was subject to dismissal because (1) McCluskey

Case 9:20-cv-01503-DNH-TWD Document 34 Filed 06/21/22 Page 173 of 261

McCluskey v. Roberts, Not Reported in Fed. Rptr. (2022)

2022 WL 2046079

did not allege sufficient "personal involvement" by Roberts to state a section 1983 claim against him, *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); (2) his allegations against Oto involved actions taken only in her judicial capacity as an OTDA hearing officer, and were therefore barred by judicial immunity; and (3) he failed to allege "the violation of a federal *right*, not merely a violation of federal *law*," *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). As explained in more detail below, we identify no error in these conclusions.

McCluskey argued in his motion for reconsideration that (1) res judicata did not bar his lawsuit because his complaint included claims arising from events that occurred after the first suit was decided; (2) other circuit courts have found, for res judicata purposes, that officials sued in their individual capacities are not in privity with themselves when sued in their official capacities; (3) he established a section 1983 claim, based on due process and federal statutory rights, for violating the time limits set forth in 7 U.S.C. § 2020(e);[1] (4) he established a section 1983 claim against Roberts because Oto was Roberts's "agent" under NYSSL § 22(2); and (5) the district court overlooked allegations made in his proposed amended complaint that Oto and her attorneys engaged in a conspiracy to cover up OTDA's illegal action. We discuss these arguments below.

[1] Section 2020(e)(3) provides in part that the state agency administering the SNAP program will "complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application."

**A. Failure to state a claim against Roberts**

To state a claim for liability under section 1983 against a government official sued in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (internal quotation marks omitted). Such pleadings may not depend on a theory of supervisory liability, because "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Id.* at 616 (internal quotation marks and alteration omitted). McCluskey therefore must establish that Roberts violated his constitutional rights through Roberts's own conduct, not through his supervision of others who may have committed the violation.

The complaint makes only two factual allegations involving Roberts. First, McCluskey alleges that, in September 2017, he sent Roberts a letter advising that the OTDA affirmed the decision denying McCluskey's application to increase his SNAP benefits and noting what he perceived as a conflict between 18 NYCRR § 387.12(c), the state regulation concerning medical expense deductions for purposes of calculating SNAP benefits, and 7 U.S.C. § 2014(e)(5)(B), the federal statute concerning the same. Second, McCluskey alleges that, by designating Oto to decide administrative appeals at the OTDA, Roberts acted contrary to his duty under NYSSL § 22(2), which provides for a fair hearing in appeals from denials of aid applications and allows an agency commissioner to designate staff to decide such appeals. In seeking reconsideration of the district court's dismissal of his section 1983 claims against Roberts, McCluskey argued that the court overlooked the implications of *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), which he cites for the proposition that the OTDA commissioner can be required to enforce SNAP time limits. He further suggests that, under NYSSL § 22, Oto was Roberts's agent and "agency law" renders Roberts liable.

**\*4** McCluskey does not allege that Roberts had any personal involvement in the decision denying him benefits. In alleging that Oto was Roberts's "agent" in denying benefits, McCluskey improperly seeks to hold Roberts liable for the actions of his subordinate. *See Littlejohn v. City of New York*, 795 F.3d 297, 314–15 (2d Cir. 2015) (dismissing section 1983 claim attempting to impose respondeat superior liability). Further, the text of NYSSL § 22 imposes no duty on Roberts to respond to McCluskey's letters to subordinates, and the allegation that Roberts failed to respond to McCluskey's letter is not sufficient to plead Roberts's personal involvement under section 1983. *See Delee v. Hannigan*, 729 F. App'x 25, 32 (2d Cir. 2018) (summary order) (defendant's "decision not to act on a letter received ... [was] insufficient to establish personal involvement by a supervisor" under section 1983).

Moreover, *Briggs*, which did not effect an intervening change of controlling law, has no applicability here, notwithstanding McCluskey's arguments to the contrary. In *Briggs*, the plaintiff sued the Connecticut Commissioner of the Department of Social Services in his official capacity, complaining of untimely processing of the plaintiff's SNAP application under 7 U.S.C. § 2020(e). 792 F.3d at 241. We held that those time limits were privately enforceable through section 1983. *Id.* at 245–46. But the Commissioner's personal

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 174 of 261
McCluskey v. Roberts, Not Reported in Fed. Rptr. (2022)

2022 WL 2046079

involvement was not an issue in *Briggs*, and McCluskey did not allege a claim for violation of the section 2020(e) time limits in his complaint here.

Accordingly, we affirm the district court's ruling that McCluskey failed to state a claim for relief against Roberts.

### B. Failure to state a claim against Oto

McCluskey alleged that Oto, an OTDA Principal Hearing Officer, responded to his request for review in a September 2017 letter that acknowledged McCluskey's contentions that his rights were violated but did not specifically address them, and concluded that the decision denying the SNAP increases was correct. In December 2017, Oto wrote to McCluskey again, reiterating that that denial decision was correct but offering a further hearing to reexamine his dental expense documents, including anticipated expenses. McCluskey's complaint also alluded to a telephone call that McCluskey had with OTDA's counsel, which apparently prompted McCluskey to contact the U.S. Attorney's Office alleging violations of 18 U.S.C. § 371 and obstruction of justice. [2]

> [2]    Section 371 criminalizes a conspiracy to commit an offense against or defraud the United States or any of its agencies. 18 U.S.C. § 371.

It is "well established that officials acting in a judicial capacity are entitled to absolute immunity against section 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999). Such immunity also "extends to administrative officials performing functions closely associated with the judicial process," such as hearing examiners, because their roles are "functionally comparable to that of a judge." *Id.* (internal quotation marks omitted). McCluskey sued Oto in her individual capacity for money damages. Oto served as an OTDA Principal Hearing Officer, adjudicating SNAP benefit application appeals. The conduct to which McCluskey objected occurred while Oto served in that adjudicatory capacity, and the court properly ruled that claims against her were barred by judicial immunity. *See Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009).

In his motion for reconsideration, McCluskey argued that the district court overlooked his allegations that Oto engaged in a corrupt conspiracy to cover up OTDA's wrongdoing

and that such behavior stated a claim under section 1983. This argument is unavailing. McCluskey's civil complaint contained only a vague reference to his filing a criminal complaint with the U.S. Attorney's Office in which he alleged a violation of 18 U.S.C. § 371; the civil complaint at issue provided no details, such as the names of those involved in the alleged conspiracy. [3] *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (complaints containing only conclusory, vague, or general allegations that defendants engaged in a conspiracy to deprive plaintiff of constitutional rights are properly dismissed).

> [3]    McCluskey provided further allegations of a conspiracy in his proposed amended complaint, but that is not the operative pleading in this appeal.

**\*5**  Judicial immunity is overcome in only two circumstances: (1) "a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity"; and (2) "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (per curiam). In the first circumstance, "the Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d at 210. The judicial immunity doctrine "protects judges from civil actions even when they perform judicial acts in excess of their authority, even when such acts are allegedly done maliciously or corruptly." *Maestri v. Jutkofsky*, 860 F.2d 50, 52 (2d Cir. 1988). The alleged conspiracy, and any allegedly corrupt acts regarding that purported conspiracy, were pursued by Oto in her capacity as a hearing officer in McCluskey's individual case and were therefore "judicial in nature." *Bliven*, 579 F.3d at 210. Judicial immunity applies to these judicial acts even if they were allegedly done maliciously or corruptly. *See Maestri*, 860 F.2d at 52. Accordingly, we affirm the district court's ruling that McCluskey failed to state a claim for relief against Oto.

We have considered McCluskey's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the May 18, 2020 judgment and November 3, 2020 order of the district court.

### All Citations

Not Reported in Fed. Rptr., 2022 WL 2046079

**McCluskey v. Roberts, Not Reported in Fed. Rptr. (2022)**

2022 WL 2046079

---

**End of Document**                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

688 Fed.Appx. 44 (Mem)
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Melvin CINTRON, Plaintiff-Appellant,

v.

Nunzio E. DOLDO, Warden/Superintendent; Cape
Vincent Correctional Facility, G. Decker, Director
of Recreation; Cape Vincent Correctional Facility,
Mattraw, Recreation Staff; Cape Vincent Correctional
Facility, City of Cape Vincent, Defendants-Appellees.

16-2550
|
April 19, 2017

Appeal from a judgment of the United States District Court
for the Northern District of New York (Hurd, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR APPELLANT: Melvin Cintron, pro se, Cape Vincent,
New York.

FOR APPELLEE: No appearance.

**\*45** PRESENT: ROBERT A. KATZMANN, Chief Judge,
DENNIS JACOBS, PIERRE N. LEVAL, Circuit Judges.

## SUMMARY ORDER

Melvin Cintron, pro se, appeals from the district court's sua
sponte dismissal of his 42 U.S.C. § 1983 complaint against
a prison recreation staff employee, Mattraw, at the facility
where Cintron was incarcerated. Cintron alleged that the
prison employee violated his Eighth Amendment rights by
failing to remove a chair from a baseball field. Cintron later
ran into the chair during a game and broke his arm. The district
court sua sponte dismissed Cintron's complaint pursuant to 28
U.S.C. §§ 1915(e)(2)(B) and 1915A. We assume the parties'
familiarity with the underlying facts, the procedural history
of the case, and the issues on appeal.

We review de novo a district court's sua sponte dismissal
of claims under §§ 1915(e)(2) and 1915A. See *Giano v. Goord*,
250 F.3d 146, 149–150 (2d Cir. 2001); *see also Larkin v.
Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam). To
avoid dismissal, a complaint must plead "enough facts to
state a claim to relief that is plausible on its face." *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167
L.Ed.2d 929 (2007). "A claim has facial plausibility when
the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,
678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We afford pro
se litigants "special solicitude" by interpreting a complaint
filed pro se "to raise the strongest claims that it suggests."
*Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal
alterations and quotation marks omitted).

To state a cognizable Eighth Amendment challenge to
conditions of confinement, a plaintiff must plead both an
objective element and a subjective element. *Walker v. Schult*,
717 F.3d 119, 125 (2d Cir. 2013). The objective element is
met if the plaintiff alleges conditions that objectively posed an
unreasonable risk of serious damage to his health so as to deny
him "the minimal civilized measure of life's necessities." *Id.*
(internal quotation marks omitted). When considering these
conditions, a court should "assess whether society considers
the risk that the prisoner complains of to be so grave that it
violates contemporary standards of decency to expose *anyone*
unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25,
35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective
element requires a plaintiff to allege that the defendant acted
with deliberate indifference with regard to the risks posed by
the condition. *Walker*, 717 F.3d at 125. The defendant must
have known of the condition that posed an excessive risk to
inmate health and chosen to disregard it. *Id.*

Cintron failed to satisfy either the objective or subjective elements. As to the objective element, the placement of the chair on the baseball field did not constitute a "deprivation ... sufficiently serious that [Cintron] was denied the minimal civilized measure of life's necessities," nor did treatment by prison staff member Mattraw "deprive [Cintron] of his basic human needs." *Id.* (internal quotation marks omitted); *cf. Walker*, 717 F.3d at 126 (prisoner established objective element by showing he was kept in an unsanitary and poorly ventilated cell with five other men). As to the subjective element, Cintron did not adequately allege that the prison staff member acted with deliberate indifference. The facts pled in the complaint do not suggest that Mattraw was aware of the risk that the chair posed or that he disregarded such a risk. Conduct that constitutes **\*46** deliberate indifference must be more than mere negligence. *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

Additionally, as Cintron had already amended his complaint, and failed to make a showing to the district court of how further amendment would cure the complaint's deficiencies, we find no error or abuse of discretion in the court's denial of leave to amend as futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

We have considered all of Cintron's arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

688 Fed.Appx. 44 (Mem)

---

**End of Document**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1204862
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathon A. OLES, Plaintiff,

v.

Lisa SAUER, FNP, Individual and Official; Wendy
Moore, RN, Individual and Official; Wayne Altman,
RN, Individual and Official; et al., Defendants.

No. 19-CV-8865 (NSR)
|
Signed 04/22/2022

**Attorneys and Law Firms**

Jonathan A. Oles, Kerhonkson, NY, Pro Se.

Adam Rodd, Drake Loeb PLLC, New Windsor, NY, for
Defendants FNP Lisa Sauer, Wendy Moore, RN, Wayne
Altman, RN, John Linen, RN, Martin Davis, RN, Maureen
Johnson, RN.

David Clifford Holland, David C. Holland, ESQ., New York,
NY, Gail B. Rubenfeld, Lonstein Law Office, P.C., Ellenville,
NY, for Defendant Christopher Bini.

Michael Davidoff, Drew, Davidoff & Edwards Law Offices,
LLP, Monticello, NY, for Defendants KM Dale Frasier, Cook
Oscar Rodriguez, Cook Richard Burke, Saul Carranza, Louis
Torres.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

 **\*1** Plaintiff Jonathon A. Oles ("Plaintiff") brings this
*pro se* action pursuant to 42 U.S.C. § 1983 ("Section
1983") alleging violation of the Fourteenth Amendment
against Family Nurse Practitioner Lisa Sauer, Nurse Wendy
Moore, Nurse Wayne Altman, Nurse John Linen, Nurse
Martin Davis, Nurse Maureen Johnson (together, the "Nurse
Defendants"), Kitchen Manager Dale Fraser, Cook Oscar
Rodriguez, Cook Richard Burke, Food Service Helper Saul
Carranza, Food Service Helper Louis Torres, (together, the
"Kitchen Defendants"), and Lieutenant Christopher Bini
(all together, the "Defendants"). Before the Court are the
Nurse Defendants' motion to dismiss, the Kitchen Defendants'
motion to dismiss, and Lieutenant Bini's motion to dismiss.

(ECF Nos. 45, 48 & 60.) For the following reasons, the
motions are GRANTED.

**BACKGROUND**

The following facts are taken from the Complaint, as well
as Plaintiff's February 14, 2020 letter in opposition to
Defendants' request for leave to file a motion to dismiss (the
"Letter", ECF No. 40) [1], and are construed in the light most
favorable to Plaintiff, the non-movant, and accepted as true
for purposes of this motion.

[1]     The Court construes Plaintiff's letter and exhibits
        as supplementing the Complaint. "While a court
        generally 'may not look outside the pleadings when
        reviewing a Rule 12(b)(6) motion to dismiss ...
        the mandate to read the papers of *pro se* litigants
        generously makes it appropriate to consider
        plaintiff's additional materials ....' " *Brown* v. *New
        York City Hous. Auth.*, No. 05-CV-10332(VM),
        2006 WL 1378599, at \*1 n.2 (S.D.N.Y. May
        17, 2006) (quoting *Burgess* v. *Goord*, No. 98-
        CV-2077(SAS), 1999 WL 33458, at \*1 (S.D.N.Y.
        Jan. 26, 1999)).

Plaintiff is a pretrial detainee at Sullivan County Jail ("SCJ").
(Compl. at 3; 11.) Plaintiff suffers from "acute gastritis" and
a "hintle hernia", and he is prescribed medication that he
takes a half hour before meals. (*Id.* at 5.) On April 15, 2018,
Plaintiff was brought to SCJ and advised Nurse Moore about
his condition and medications during the intake process. (*Id.*
at 16.) For the month he was incarcerated, his medication
was "improperly administered." (*Id.*) Plaintiff states that his
medication is always provided to him late and is sometimes
forgotten. (*Id.* at 5.) Without his medication, Plaintiff suffers
severe abdominal pain. (*Id.*)

Plaintiff returned to SCJ on February 21, 2019 and Nurse
Moore again did Plaintiff's intake. (*Id.* at 17.) Nurse
provided the same conditions and medications, but his
medications and diet were "altered to suit the facility." (*Id.*)
Plaintiff claims he complained of chest and abdominal pain
for months and wrote several letters, but was ignored. (*Id.*)

Plaintiff was supposed to be provided a specific diet to
help with his medical issues, but he claims the kitchen staff
was not qualified to create and maintain his medical diet,
and also intentionally messed up the special diet trays. (*Id.*)

Specifically, Plaintiff claims Rodriguez, Burke, Carranza, and Torres follow Fraser's instructions in preparing his dietary trays, and Fraser has resisted meeting Plaintiff's dietary needs. (*Id.* at 14.) When he complained about incorrect food items, the staff would fail to rectify the situation. (*Id.* at 18.)

**\*2** The medical staff does not keep track of his medication and fails to inform the kitchen of his diet needs, and the kitchen department does not follow his physicians' recommendations and serves "inadequate and harmful" food. (*Id.* at 5.) Specifically, Plaintiff alleges (i) Moore recorded incorrect information in his intake records and refused to treat his severe stomach pain three days before he had to visit the emergency room; (ii) Altman refused to treat his stomach pain per Moore's instructions and is late in administering his afternoon medication; (iii) Davis refused to deliver his medications after being asked; (iv) Linen, Sauer, and Johnson bring his medication late and always have an excuse; and (v) Linen forgets Plaintiff's medication and gives out insufficient dosages of his dietary support. (*Id.* at 13-14.)

He states administration, including Lieutenant Bini, was made aware of his complaints and has "avoided the subject" or "made excuses for their staff." (*Id.* at 5; 13.) Plaintiff claims he has suffered from multiple symptoms due to his untreated gastritis, including vomiting, fainting, and excessive sweating. (Letter at 2-4.) Plaintiff was taken to the emergency room for stomach and chest pains due to an insufficient dosage of his medication and the substandard food. (Compl. at 5.) As a result, his medication was increased, and he has pain and anxiety daily. (*Id.*)

Plaintiff filed suit on September 24, 2019. (ECF No. 2.) The Nurse Defendants, Kitchen Defendants, and Lieutenant Bini were granted leave to file motions to dismiss on March 29, 2021. (ECF No. 44.) The Nurse Defendants and the Kitchen Defendants filed their motions on July 15, 2021 (ECF Nos. 45 & 48), and Lieutenant Bini filed his motion on April 22, 2022 [2] (ECF No. 60.) Plaintiff did not file any oppositions.

[2]   While Lieutenant Bini did not file his motion on the docket until April 22, 2022, he previously sent the Court courtesy copies of his motion papers.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Where a motion to dismiss is unopposed, a court should nevertheless "assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000). While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 662, 678 (quoting *Twombly*, 550 U.S. at 555). The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**\*3** Where a *pro se* plaintiff is concerned, courts must construe the pleadings in a particularly liberal fashion. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Further, courts must interpret a *pro se* plaintiff's pleadings "to raise the strongest arguments that they suggest." *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (internal citation omitted). Nevertheless, a *pro se* plaintiff's pleadings must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it," *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

## DISCUSSION

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Section 1983 ... is not itself a source of substantive rights ... [i]t merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotation marks omitted). To state a claim under Section 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013).

Reading the Complaint liberally, Plaintiff alleges violations of the Constitution pursuant to Section 1983 for conditions of confinement related to food and medical care. (Compl. at 5.) The Court analyzes Plaintiff's claims under the Due Process Clause of the Fourteenth Amendment because, as noted above, Plaintiff was a pretrial detainee, and a "pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

The Fourteenth Amendment requires that prison officials "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Grant-Cobham v. Martinez*, No. 20-cv-1947 (BMC) (LB), 2020 WL 2097807, at *2 (E.D.N.Y. May 1, 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994)). To set forth a Section 1983 claim for conditions of confinement, a plaintiff must show that an individual "acted with deliberate indifference to the challenged conditions." *Sanders v. City of New York*, No. 16 Civ. 7426 (PGG), 2018 WL 3117508, at *6 (S.D.N.Y. June 25, 2018) (citing *Darnell*, 849 F.3d at 29). This deliberate indifference test is a two-pronged test, that contains an objective prong and a subjective prong. *Darnell*, 849 F.3d at 29.

For the first prong—the "objective prong"—a plaintiff "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health ...." *Darnell*, 849 F.3d at 30. "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)).

**\*4** Under the second prong—the "*mens rea* prong"—which is defined objectively, a plaintiff must plausibly allege that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. Without more, mere "knowledge and acquiescence" to unconstitutional conduct, or "mere failure to act on a complaint," fails to state a claim under this standard. *Smith v. Westchester Cty.*, No 19-CV-03605 (NSR), 2021 WL 2856515, at *7 (S.D.N.Y. July 7, 2021) (internal quotation marks omitted).

### I. Personal Involvement

As an initial matter, the Kitchen Defendants and Lieutenant Bini argue that Plaintiff has failed to show the personal involvement of each defendant. (Defendants' Memorandum of Law in Support of Motion ("Kitchen Mem.") ECF No. 51 at 5-7; Memorandum of Law in Support of Defendant Bini's Motion to Dismiss the Complaint Pursuant to Rule12(b)(6) ("Bini Mem.") ECF No. 60 at 4-5.) "It is well settled that ... to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Accordingly, here, to hold the Kitchen Defendants and Lieutenant Bini liable under Section 1983, Plaintiff must allege that each individual defendant meets all of the elements required for each claim.

Here, the Kitchen Defendants aver that Plaintiff's allegations involving the "Kitchen staff" or "the Kitchen" are general conclusory allegations regarding the meals he has received.

2022 WL 1204862

(Kitchen Mem. at 6.) The Court agrees. The only section of the Complaint that discusses the individual Kitchen Defendants states that Rodriguez, Burke, Carranza, and Torres follow Fraser's instructions in preparing his dietary trays, and that Fraser has "relayed his resistance to [his] dietary needs to officers on kitchen duty as well as to medical RNs." (Compl. at 14.) However, Plaintiff has failed to include factual allegations showing that any individual Kitchen Defendant affected the conditions of his confinement. Merely alleging that the Kitchen Defendants work in the kitchen and that he receives inadequate meals is insufficient for a constitutional claim. *See Rivera v. Viger*, No. 3:21-cv-00470 (VAB), 2021 WL 3269095, at *3 (D Conn. July 30, 2021) ("To the extent that Rivera asserts his allegations against the entire staff of the DOC, his claim is insufficient as conclusory with allegations failing to raise an inference that all DOC staff members acted with deliberate indifference to his health and safety."); *Cavico v. Steuben County Jail*, No. 6:18-CV-06329 EAW, 2018 WL 11317396, at *4 (W.D.N.Y. Aug. 27, 2018) ("Should Plaintiff ... wish to name as defendants the individuals who were responsible for the alleged constitutional violations, he must set forth allegations of a factual nature which establish both personal involvement of an individual staff member and that person's deliberate indifference ...."). Further, the allegation that Fraser has resisted Plaintiff's dietary needs does not support Plaintiff's allegations that Fraser actually did anything to affect the food trays provided to him. Therefore, Plaintiff has failed to allege the personal involvement of the Kitchen Defendants, which is fatal to his claims against them.

**\*5** Similarly, Plaintiff has failed to allege any facts involving Lieutenant Bini. As there is no supervisory liability under Section 1983, the fact that Lieutenant Bini may have received complaints from Plaintiff about the food or his medical treatment is insufficient to show his personal involvement. *See Smart v. Annucci*, No. 19-CV-7908 (CS), 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("That [the defendants] failed to act on Plaintiff's complaints ... cannot support the inference that these Defendants, through '[their] own individual actions, [have] violated the Constitution.' ") (quoting *Tangreti v. Bachmann*, 983 F.3d 609, 615 (2d Cir. 2020)); *Rivera v. Bloomberg*, No. 11-CV-629, 2012 WL 3655830, at *6 (S.D.N.Y. Aug. 27, 2012) ("Even if the [c]omplaints could be read to suggest that [the] [c]ommissioner ... failed to act, a prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official exhibited deliberate

indifference by failing to act on information indicating that the violation was occurring.").

Accordingly, the claims against the Kitchen Defendants and Lieutenant Bini are dismissed.

**II. Deliberate Indifference to Medical Needs**
Plaintiff alleges that the Nurse Defendants were deliberately indifferent to his medical needs. To successfully allege a Section 1983 claim, a plaintiff must allege facts showing he or she had a "sufficiently serious" medical need. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The serious medical needs standard contemplates a "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (citing *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)).

> In determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, [courts] consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain.

*Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019) (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). Where a plaintiff has alleged deliberate indifference to medical needs that is premised on "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone" in analyzing the nature of the deprivation. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702 (emphasis in original)).

As discussed above, "deliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind." *Charles*, 925 F.3d at 86 (citing *Darnell*, 849 F.3d at 33–34). It is well-settled that

"negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Sanders v. Laplante*, No. 3:19-CV-01151 (CSH), 2019 WL 5538118, at *3 (D. Conn. Oct. 25, 2019) (citing *Clay v. Kellmurray*, 465 F. App'x 46, 47 (2d Cir. 2012)); *see also Darnell*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a *mens rea* greater than mere negligence.").

Here, Plaintiff's claim fails under the *mens rea* prong. First, the majority of Plaintiff's allegations involve his medication being forgotten or late. Specifically, he alleges (i) Altman is "consistently late with administering [his] afternoon medication prior to dinner"; (ii) Davis told him medications were not distributed before lunch and dinner; (iii) Linen is "always late with medication" and has also forgotten to deliver it; and (iv) Sauer stated Plaintiff's medications are late because he does not remind the medical staff that he needs them before lunch. (Compl. at 13-14.) However, all of these allegations show no more than mere negligence, which is insufficient to show deliberate indifference. *See Evans v. Bonner*, 196 F. Supp. 2d 252, 256 (E.D.N.Y. Mar. 27, 2002) (holding one defendant's "failure to deliver the medications on time ... could at most be found to be negligence."); *Burns v. Head Jailor of La Salle County Jail*, 576 F. Supp. 618, 620 (N.D. Ill. 1984) ("Burns assails defendants' failure to provide him medicine when needed. He alleges at times defendants either ran out of medicine or were late in delivering his medicine to him ... Burns alleges only an occasional oversight, which he himself attributes to defendants' negligence."). Plaintiff has failed to allege facts showing that any of the Nurse Defendants knew or should have known that the failure to provide his medications on schedule posed an excessive risk to his health or safety. Therefore, the claims against Defendants Linen, Sauer, and Johnson are dismissed.

\*6  Second, Plaintiff's allegations involving Moore and Altman are too conclusory to survive a motion to dismiss. The only specific allegations against Moore are that he recorded "[i]ncorrect information" during intake and "refused relief for stomach pain (severe)" and the only allegation involving Altman is that he "refused stomach pain relief as per [Moore's] instruction." (Compl. at 13.) Plaintiff fails to allege facts showing what he told Moore or Altman about his condition at the time he was allegedly in pain, and what relief he was seeking. Without this information, the Court cannot hold that Moore or Altman intentionally or recklessly failed to act with reasonable care.

Accordingly, Plaintiff's claim against the Nurse Defendants is dismissed.

## CONCLUSION

For the foregoing reasons, the Nurse Defendants' motion to dismiss, the Kitchen Defendants' motion to dismiss, and Lieutenant Bini's motion to dismiss are GRANTED. Plaintiff is granted leave to file an Amended Complaint consistent with this Opinion and Order on or before, May 30, 2022. An Amended Civil Rights Complaint form is attached to this Order. Failure to file an Amended Complaint within the time allowed, and without good cause to excuse such failure, will result in dismissal of Plaintiff's Complaint with prejudice.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 45, 48 and 60. The Clerk of Court is further respectfully directed to mail a copy of this Opinion & Order to the *pro se* Plaintiff at the address listed on ECF, and to show proof of service on the docket.

Exhibit

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

AMENDED COMPLAINT
(Prisoner)

Do you want a jury trial?
☐ Yes   ☐ No

_____
Write the full name of each defendant. If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I. LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☐ Violation of my federal constitutional rights

☐                                          Other:

_____

## II. PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

| First Name | Middle Initial | Last Name |
| --- | --- | --- |

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Current Place of Detention

Institutional Address

| County, City | State | Zip Code |
| --- | --- | --- |

## III. PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐ Pretrial detainee

☐ Civilly committed detainee

☐ Immigration detainee

☐ Convicted and sentenced prisoner

☐                                          Other:

_____

## IV. DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

| First Name | Last Name | Shield # |
| --- | --- | --- |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
| --- | --- | --- |

Defendant 2:

| First Name | Last Name | Shield # |
| --- | --- | --- |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
| --- | --- | --- |

Defendant 3:

| First Name | Last Name | Shield # |
| --- | --- | --- |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
| --- | --- | --- |

Defendant 4:

| First Name | Last Name | Shield # |
| --- | --- | --- |

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
| --- | --- | --- |

## V. STATEMENT OF CLAIM

Place(s)              of              occurrence:

Date(s)              of              occurrence:

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

_____

_____

_____

_____

_____

## VI. RELIEF

State briefly what money damages or other relief you want the court to order.

## VII. PLAINTIFF'S CERTIFICATION AND WARNINGS

~~By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of~~ Federal Rule of Civil Procedure 11.

**INJURIES:**

 **\*8**  If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature | |
|---|---|---|---|
| First Name | Middle Initial | Last Name | |
| Prison Address | | | |
| County, City | | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing: _____

**All Citations**

Slip Copy, 2022 WL 1204862

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 84280
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jessica Ashley WILLIAMS, Plaintiff,

v.

County Executive Edward P. MANGANO,
Police Commissioner Jane Doe, Detectives:
William Bourguignon, Leonard Mathewson,
Hector Bourren, Jason Wrieske, Jason Collins,
Damian Suarez, Stephen Firestone, Siliva
Marquez, and James Marinucci, Defendants.

17-CV-2667 (RRM) (AKT)
|
Signed 01/11/2021

**Attorneys and Law Firms**

Jessica Ashley Williams, Queens Village, NY, pro se.

Liora M. Ben-Sorek, Nassau County Attorney's Office,
Mineola, NY, for Defendants.

### MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, Chief United States District
Judge.

**\*1** Plaintiff Jessica Ashley Williams, proceeding *pro se*,
brings this action pursuant to 42 U.S.C. § 1983 alleging
that Defendants violated her constitutional rights when they
arrested her on May 1, 2014, and charged her with various
drug-related offenses. Defendants now move for summary
judgment under Fed. R. Civ. P. 56. For the reasons stated
below, Defendants' motion is granted in part and denied in
part.

### BACKGROUND

On May 1, 2014, Williams was riding in a car on the Long
Island Expressway, in the company of her boyfriend, Gerald
Mobley, and his twin brother Gerod Mobley. (Defs.' Rule 56.1
Statement ("Defs.' SOF") (Doc. No. 54) ¶¶ 5–11.) The car
was stopped by a team of Nassau County police officers, who
alleged they saw drugs in plain view in the car. (*Id.* ¶¶ 11–12.)
The officers arrested Williams and the Mobleys and brought

them back to their stationhouse. (*Id.* ¶¶ 15–16.) Williams was
incarcerated for a month thereafter before the grand jury voted
no true bill, which resulted in her release. (*Id.* ¶¶ 20–24.)

#### The Complaint

Williams commenced this action on April 26, 2017, by filing a
form § 1983 complaint. (Compl. (Doc. No. 1).) She appended
to this form a "statement of facts" which alleges that she was
"misidentified by N.C.P.D. as a target in a[n] ongoing criminal
investigation which resulted in the plaintiff being falsely
accused of possessing a criminal control substance narcotics
[sic]" and states that she "has been subjected to being
falsely arrested, held unlawfully imprisoned, and pursued
maliciously in a feign prosecution." (*Id.* at 6–7.) [1] Williams
also asserts that her "detention is predicated on the basis of
an unconstitutional illegal search & seizure arrest." (*Id.* at 7.)
Williams further alleges that Officer William Bourguignon
called her obscenities, made sexual advances toward her, and
physically assaulted her when he "caress[ed]," "grop[ed],"
and "inspect[ed]" her body during a search "without the
pretense of a female officer there." (*Id.* at 6.)

[1]    All page numbers refer to ECF pagination.

Although Williams did not specifically allege any causes of
action, the Court construes these allegations as advancing
four claims. First, the Court construes the claims that she
has been "misidentified as a target" and "falsely arrested" as
stating a § 1983 claim for false arrest against all Defendants.
Second, the Court construes Williams's allegations that she
has been "held unlawfully imprisoned" as stating a § 1983
claim for false imprisonment against all Defendants. Third,
the Court construes her statement that she has been "pursued
maliciously in a feign prosecution" as alleging a § 1983
malicious prosecution claim against all Defendants. Fourth,
the Court construes Williams's allegations that Bourguignon
made sexual advances towards her and that she was assaulted,
caressed, and groped during a search he conducted as alleging
a claim of unlawful search under § 1983 against Bourguignon.

On October 11, 2017, Judge Bianco *sua sponte* terminated
defendants James Marinucci, Silvia Marquez, Police
Commissioner Jane Doe, Stephen Firestone and County
Executive Edward P. Mangano *sua sponte* for failure to
plausibly allege personal involvement. (*See* Order granting
leave to proceed in forma pauperis (Doc. No. 5).) In that
order, Judge Bianco granted Williams leave to amend her
complaint to add allegations of personal involvement against
those defendants, but she did not do so.

2021 WL 84280

The Instant Action

**\*2**  The remaining Defendants now move for summary judgment. This motion is unopposed. To support their motion, Defendants submit a statement of facts and accompanying evidence, as described below:

In the mid-afternoon of May 1, 2014, members of CIRRT, a Nassau County Police Department anti-crime Task Force unit, were in the vicinity of Hempstead Turnpike and Hendrickson Avenue in Elmont, New York. (Defs.' SOF ¶ 1.) This area is known for high drug activity. (*Id.* ¶ 2.) A CIRRT officer observed what appeared to be a drug transaction between two individuals. (*Id.* ¶ 3.) When the officer attempted to make an arrest, the purported purchaser ran away and was not apprehended. (*Id.* ¶ 4.) The purported seller, who was later identified as Gerod Mobley, was seen entering the back seat, on the passenger side, of a 1995 Jeep Grand Cherokee. (*Id.* ¶¶ 5–6.) Williams was seated in the front passenger seat of the SUV. (*Id.* ¶ 7.) The driver of the SUV was Gerald Mobley, Gerod's twin brother and Williams's boyfriend. (*Id.* ¶¶ 9–10.)

Officers followed the SUV, keeping it in constant view, and eventually pulled over the car on the Long Island Expressway. (*Id.* ¶ 11.) According to the arrest report, upon approaching the car Officers Jason Wrieske and Leonard Mathewson observed small bags of a tan powdered substance believed to be heroin on the floor of the vehicle, and Bourguignon observed "a black pouch open and in plain view in the center console of the vehicle. The pouch contained twenty-two (22) individual wrapped pieces of [a] rock-like substance believed to be crack cocaine." (Exhibit C to Def.'s Motion for Summ. J., Arrest Report ("Exhibit C") (Doc. No. 55-3) at 3.) A large quantity of drugs was recovered from the vehicle. (Defs.' SOF ¶ 13.) The largest quantity of drugs was located in the open bag in the center console of the SUV. (*Id* ¶ 14.) Because no one claimed ownership of the drugs, all three of the occupants of the vehicle were arrested. (*Id.* ¶ 15.)

Bourguignon was the officer who spoke with Williams at the scene of the vehicle stop. (*Id.* ¶ 21.) In her deposition testimony, Williams said that Bourguignon and Mathewson called her names and yelled at her during the vehicle stop. (Exhibit H, Excerpt from Williams Deposition ("Exhibit H") (Doc. No. 55-8) at 1–3.) She further testified that she did not remember any of the other officers named in her complaint or what they had done aside from "watching everything that's happening" and "they could have observed ... [n]obody did anything to help or stop or interject or anything like

that." (*Id.* at 5, 7.) She affirmed that she listed Officers Hector Bourren, Jason Wrieske, Jason Collins, and Damian Suarez in her complaint because she "got their name[s] off the arrest paperwork" and that she believed "some of them" had witnessed her arrest – "whoever was there." (*Id.* at 6.)

At the station house, at least one of the Mobley brothers asked Williams to state that the drugs belonged to her. (Defs.' SOF ¶ 16.) Two weeks after the arrests, Gerod Mobley signed a statement addressed to the Court and to the Nassau County District Attorney's Office in which he admitted that the drugs belonged to him and that Williams did not possess any of the drugs. (*Id.* ¶¶ 17–18.) By the time the statement was made, the case had been turned over to the District Attorney's Office. (*Id.* ¶ 19.) In August 2014, Williams's case was presented to a Grand Jury, which declined to issue an indictment against her. (*Id.* ¶ 24.)

**\*3**  In their Memorandum of Law, Defendants argue that Bourren, Wrieske, Collins, and Suarez are entitled to summary judgment because Williams has failed to allege personal involvement. (Mem. (Doc. No. 55) at 13–14.) Defendants assert that Mathewson is also entitled to summary judgment because Williams's allegations against him do not form the basis of a cognizable claim under § 1983. (*Id.* at 14.) Further, Defendants state that Williams's arrest was supported by probable cause, and so Defendants are entitled to summary judgment for her claims of false arrest, malicious prosecution, and unlawful search. (*Id.* at 9–13.)

Though there is nothing in the record addressing whether a search of Williams's person occurred, an unfinished footnote in Defendants' Memorandum reads, "Defendants do no[t] concede that there was a search of Plaintiff at the scene of arrest. However, because the standards for a summary judgment require the facts to be viewed in the light most favorable to the non-movant,". (*Id.* at n. 1.) This footnote appears to disclaim the argument that the search did not occur for the purposes of the instant motion. Rather, Defendants argue that, even if probable cause for the arrest and the search did not exist, Bourguignon is entitled to qualified immunity. (*Id.* at 15–16.)

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the

2021 WL 84280

movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it may impact the "outcome of the suit under the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions ... in the light most favorable to the party opposing the motion." (citations omitted)).

"Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). "[T]he failure to respond to the motion does not alone discharge the burdens imposed on a moving party." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Wilson v. Air Serv Corp.*, 705 F. App'x 43, 44 (2d Cir. 2017) (summary order) (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 244). In addition, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Id.* (quoting *Vermont Teddy Bear Co.*, 373 F.3d at 242).

The same standards for summary judgment apply where, as here, the non-movant is proceeding *pro se*. *Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015). However, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

## DISCUSSION

### I. Personal Involvement

**\*4**  In order to maintain a § 1983 action, a plaintiff must allege two essential elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted). Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* In addition, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). "[P]ersonal involvement for these purposes ... mean[s] direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty*, No. 01-CV-2123 (KMW) (DF), 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted).

Here, the undisputed record contains no evidence from which a reasonable factfinder could conclude that Bourren, Wrieske, Collins, or Suarez were personally involved in a constitutional deprivation. At her deposition, Williams testified that she did not remember what any of the officers looked like other than Mathewson and Bourguignon, she did not recall anything they had done, and she was not sure which of the officers she named in her complaint were present for or observing her arrest or allegedly unlawful search. Accordingly, there is no evidence establishing personal involvement on the part of Bourren, Wrieske, Collins, or Suarez, and they are entitled to summary judgment.

Defendants also argue that Williams fails to allege that Mathewson was personally involved in a constitutional violation. In her deposition testimony, Williams stated that she remembers Mathewson being present at the scene of her arrest and describes him as "yelling at me and calling me names too with Bourguignon." (Exhibit H at 2.) "[A]lthough indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation under § 1983." *Rebenstorf v. City of New York*, No. 15-CIV-5784 (BMC), 2015 WL 6438765 at \*4 (E.D.N.Y. Oct. 21, 2015) (quoting

*Jermosen v. Coughlin*, 878 F.Supp. 444, 449 (N.D.N.Y. 1995) (internal quotations omitted)). Thus, Williams has not alleged that Mathewson was personally involved in a constitutional violation and so Mathewson is entitled to summary judgment.

## II. False Arrest

A false arrest claim brought under § 1983 is substantially the same as a claim for false arrest brought under New York law. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1998). Under New York law, an action for false arrest requires that the plaintiff show that (1) the defendant intentionally confined the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged. *Id.* at 118. In other words, a plaintiff must show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause is a complete defense to a false arrest claim under § 1983. *See Singer*, 63 F.3d at 118; *see also Weyant*, 101 F.3d at 852 ("[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest") (internal quotation and citation omitted).

Probable cause arises whenever an officer "has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *See Singer*, 63 F.3d at 118 (quotation omitted). Probable cause may exist "even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citation omitted). An officer who has probable cause to arrest need not "explore and eliminate every theoretically plausible claim of innocence" prior to making an arrest. *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)).

**\*5** The undisputed record demonstrates that officers witnessed Gerod Mobley engage in what they believed was a drug deal and then get into the car with Williams and Gerald Mobley. The officers never lost sight of the vehicle and, when they pulled it over, several of them, including Bourguignon, were able to see what they believed to be heroin and crack cocaine in plain view. Under New York Penal Law § 220.25(1), "[t]he presence of a controlled substance in an automobile ... is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time

such controlled substance was found...." *See also People v. Levya*, 38 N.Y.2d 160 (1975) (upholding the presumption); *Lopez ex rel Garcia v. Curry*, 583 F.2d 1188 (2d Cir. 1978) (same). The undisputed record demonstrates that the arresting officers had probable cause to arrest Williams. Therefore, Bourguignon is entitled to summary judgment on the false arrest claim.

## III. Malicious Prosecution

Like false arrest claims, malicious prosecution claims brought under § 1983 are analyzed under state law. *See Janetka v. Dabe*, 892 F.2d 187, 189 (2d Cir. 1989). The elements of malicious prosecution under New York law are as follows: "(1) that the defendant commenced or continued a criminal proceeding against [the plaintiff]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). "Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause...." *Kinzer*, 316 F.3d at 144 (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Thus, "[a] malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of [exculpating information]" where a defendant had a duty to alert the prosecuting authorities of that exculpating evidence and maliciously failed to do so. *Id.* at 143–44.

As already discussed, Bourguignon had probable cause to arrest Williams during the vehicle stop. Yet, two weeks after Williams's arrest, Gerod Mobley mailed a letter to the Court and to the Nassau County District Attorney's Office stating that the drugs were his and that Williams had never possessed the drugs. Even if this letter provided exculpatory evidence that vitiated the probable cause upon which Williams's arrest was based, it is not sufficient to sustain a malicious prosecution claim where Bourguignon was never in possession of the letter and did not withhold it from the prosecution. Accordingly, Bourguignon is entitled to summary judgment on the claim of malicious prosecution.

## IV. Unlawful Search

Defendants erroneously cite to case law regarding a prisoner's expectation of privacy to explain why Williams's claim of unlawful search must fail. Though Defendants are correct that "where an officer lacks probable cause to make an arrest, 'any search incident to that arrest is illegal,' " *see* Mem. at

9 (quoting *Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740, 753 (S.D.N.Y. 2005)), it does not follow that any search conducted incident to a lawful arrest is by definition lawful. "Excessive and deliberate contact with sexualized parts of a subject's body during a frisk–in other words, groping–violates the Fourth Amendment." *Bobbit v. Marzan*, 16-CV-2042 (AT), 2020 WL 5633000, at *8 (S.D.N.Y. Sept. 21, 2020) (collecting cases).

Williams alleges that Bourguignon "groped" and "caressed" her during a search of her person, and also made sexual advances towards her. Defendants do not address this claim in their briefing aside from, in a footnote, apparently disclaiming the argument that the search did not occur for the purposes of the instant motion. Viewing the evidence in the light most favorable to Williams and drawing all inferences in her favor, the allegation that Bourguignon groped and caressed her in a sexual manner during a search could suggest that Bourguignon's search of Williams's person was violative of the Fourth Amendment. Because Defendants have disclaimed the argument that the search did not occur for the purpose of this action, and because the record is devoid of evidence to suggest that the search was conducted lawfully, Defendants are not entitled to summary judgment on this claim.

**\*6** Defendants argue that Bourguignon is entitled to qualified immunity with respect to this claim, but this argument is clearly established that "a search must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Casado*, 303 F.3d 440, 447 (2d

Cir. 2002) (internal quotations and citations omitted). "No reasonable officer could believe that fondling an arrestee's breasts was a reasonable part of a search incident to arrest." *Bobbit*, 2020 WL 5633000, at *9. Similarly, no reasonable officer could believe that caressing, groping, and making sexual advances toward an arrestee during a search, as is alleged here, was a reasonable part of a search incident to arrest. Accordingly, Bourguignon is not entitled to qualified immunity for this claim.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted with respect to all claims against Bourren, Wrieske, Collins, Suarez, and Mathewson; and granted with respect to the false arrest and malicious prosecution claims against Bourguignon. Defendants' motion for summary judgment is denied with respect to the unlawful search claim against Bourguignon. This action is recommitted to Magistrate Judge Tomlinson for all remaining pre-trial matters, including settlement discussions if appropriate. The Clerk of Court is respectfully directed to mail a copy of this Memorandum and Order to the *pro se* plaintiff and to note the mailing on the docket.

SO ORDERED.

### All Citations

Slip Copy, 2021 WL 84280

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5095284
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas BRYANT, Plaintiff,

v.

Christopher MILLER, et al., Defendants.

No. 9:18-CV-494 (GTS/CFH)
|
Signed 07/22/2021

**Attorneys and Law Firms**

Thomas Bryant, Plaintiff pro se.

JORGE A. RODRIGUEZ, ESQ., WILLIAM A. SCOTT, ESQ., Assistant Attorneys General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]      This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

 **\*1** Plaintiff pro se Thomas Bryant ("plaintiff"), a former inmate [2] who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Great Meadow Correctional Facility ("Great Meadow C.F."), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, [3] Great Meadow C.F. Superintendent, Christopher Miller ("Supt. Miller"); former Great Meadow C.F. Administrative Sergeant, Marvin Hawk ("Sgt. Hawk"); Great Meadow C.F. Correction Sergeant, Douglas Coonradt ("Sgt. Coonradt"); Senior Offender Rehabilitation Coordinator at Great Meadow C.F., John Scroggy ("Scroggy"); and Great Meadow C.F. Correction Officers ("C.O.") Christopher Bogardus ("C.O. Bogardus"), Noah Kaiser ("C.O. Kaiser"), and Michael Savage ("C.O. Savage") (collectively, where appropriate, "DOCCS defendants")—who, at all relevant times, were employed by DOCCS; and New York State Office of

Mental Health ("OMH") Commissioner, Ann Marie Sullivan ("Sullivan"); former Executor Director of the Central New York Psychiatric Center ("CNYPC"), Deborah McCulloch ("McCulloch"); CNYPC psychiatric nurse practitioner, Cheryl Meyers ("N.P. Meyers"); former OMH clinical psychologist, Dr. John McCloskey ("Dr. McCloskey"); Director of Corrections-Based Operations Risk Management at OMH Meaghan Bernstein ("Bernstein"); and OMH Mental Health Program Specialist III in Customer Relations, James Steed ("Steed") (collectively, where appropriate, "OMH defendants")—who, at all relevant times, were employed by OMH—violated his constitutional rights under the First and Eighth Amendments. See Dkt. No. 12 ("Amen. Compl."). [4]

[2]      The DOCCS's inmate locator website (http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ2/WINQ120, Department ID Number 02A5545), indicates that plaintiff was conditionally released to parole supervision on April 15, 2021, and plaintiff submitted a change of address showing a private address effective as of April 22, 2021. See Dkt. No. 121.

[3]      The undersigned notes that plaintiff's claims asserted against Sing Sing Correctional Facility employees Capra and Hickson were transferred, by Order of the Court, to the Southern District of New York. See Dkt. No. 13 at 6. In February 2021, the Southern District dismissed all claims asserted against those defendants with prejudice. See Bryant v. Capra, No. 18-CV-10198 (KMK), 2021 WL 323263, at *5 (S.D.N.Y. Feb. 1, 2021).

[4]      On June 18, 2019, the undersigned issued a Report-Recommendation and Order concerning defendants' partial motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). See Dkt. No. 49. The undersigned recommended granting defendants' motion insofar as it sought dismissal of plaintiff's: (1) claims against former defendants Jackson and Bellamy for lack of personal involvement; (2) First Amendment Free Exercise Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy; (3) First Amendment Establishment Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy insofar as his claim was based on the religious exemption provided under DOCCS Directive No. 4914, which allows

only Rastafarian inmates to wear their hair under a religious head covering; (4) First Amendment retaliation against C.O.s Savage, Kaiser, and Bogardus concerning the opening of plaintiff's cell door and denial of mental health callouts; (5) Eighth Amendment conditions of confinement against C.O.s Savage, Kaiser, and Bogardus as to the alleged denial of access to programs and recreation, mental health callouts, and opening plaintiff's cell door; and (6) Fourteenth Amendment Equal Protection Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy; and recommended that Jackson and Bellamy be dismissed as defendants. See Dkt. No. 49 at 46-47. The undersigned recommended denying defendants' motion to dismiss insofar as it sought dismissal of: (1) the action against Sullivan for lack of personal involvement; (2) plaintiff's First Amendment Establishment Clause claims against Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy based on plaintiff's allegations that these defendants instructed plaintiff to register as a Rastafarian; (3) plaintiff's Establishment Clause claims based on qualified immunity; (4) First Amendment retaliation claims against C.O.s Savage, Kaiser, and Bogardus concerning plaintiff's allegations that defendants denied him nutritionally adequate meals in retaliation for plaintiff's July 14, 2015 grievance; (5) Eighth Amendment conditions of confinement claim against C.O.s Savage, Kaiser, and Bogardus as to plaintiff's allegations that he was confined in his cell and denied nutritionally adequate meals. See id. at 47-49.

On September 10, 2019, Chief United States District Court Judge Glenn T. Suddaby accepted and adopted the undersigned's Report-Recommendation and Order in its entirety. See Dkt. No. 51 at 9. Thus, the following of plaintiff's claims remain pending: (1) First Amendment Establishment Clause claim against Supt. Miller, C.O. Savage, Sgt. Hawk, Scroggy, and Sgt. Coonradt based on defendants' alleged instruction that plaintiff register as a Rastafarian; (2) First Amendment retaliation claim against C.O.s Savage, Kaiser, and Bogardus based on the alleged deprivation of nutritionally adequate meals in retaliation for plaintiff filing his July 14, 2015 grievance; (3) Eighth Amendment conditions of

confinement claim against C.O.s Savage, Kaiser, and Bogardus based on plaintiff's alleged cell confinement and the deprivation of nutritionally adequate meals; and (4) Eighth Amendment medical indifference claims against (a) C.O.s Savage, Kaiser, and Bogardus for allegedly depriving plaintiff of mental health callouts; and (b) McCloskey, Meyers, Bernstein, McCulloch, Steed, and Sullivan for allegedly failing to provide plaintiff with adequate mental health care.

**\*2** Presently pending before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 109. Plaintiff filed an opposition to defendants' motion insofar as it seeks dismissal of plaintiff's claims asserted against the OMH defendants. See Dkt. No. 114. Plaintiff filed a separate response in opposition to defendants' motion insofar as it seeks dismissal of plaintiff's claims against the DOCCS defendants. See Dkt. No. 115 .. Defendants filed a memorandum of law in reply to plaintiff's response, see Dkt. No. 118, and plaintiff filed a reply memorandum of law in further opposition. Dkt. No. 119. Also pending is plaintiff's requests that the Court reopen discovery pursuant to Fed. R. Civ. P. 56(d). [5] See Dkt. No. 114. For the reasons that follow, it is recommended that defendants' motion be granted in its entirety and plaintiff's Amended Complaint be dismissed in its entirety with prejudice. Further, for the reasons discussed below, plaintiff's request to reopen discovery pursuant to Fed. R. Civ. P. 56(d) is denied.

---

[5]    Although labeled as a "cross motion" for summary judgment on the docket, the undersigned concludes that plaintiff's submission at Dkt. No. 114 is more accurately characterized as (1) an opposition to defendants' motion insofar as defendants seek summary judgment as to plaintiff's claims against the OMH defendants, and (2) a request to reopen discovery pursuant to Fed. R. Civ. P. 56(d). Indeed, at no point in this submission does plaintiff request that the Court grant summary judgment in his favor; rather. plaintiff asks that the Court "dismiss" and "set aside defendant's [sic] summary judgment motion." Dkt. No. 114 at 1, 2 (capitalization omitted).

**I. Background**

2021 WL 5095284

## A. Facts

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection III., infra. At all relevant times, plaintiff was an inmate incarcerated at Great Meadow C.F.

### 1. Plaintiff's Amended Complaint

#### a. First Amendment Establishment Clause Claim

Plaintiff states that he is 5'11" tall and wears his dreadlocks, which he has "been growing for approx. 24 years," at a length such that they "reach[ ] the floor either standing up or sitting down." Amen. Compl. at 6 ¶ 29. In June 2015, plaintiff states that he entered the mess hall at Great Meadow C.F. "with his hair in a ponytail." Id. at ¶ 30. After receiving his meal, plaintiff "placed his hair around his waist and sat it in his lap to avoid it from coming into contact with the ... floor" when he sat down. Id. While plaintiff was eating his meal, he "was approached by an officer, who told him 'he couldn't have his hair like this,' knowing or should have been known [sic] to do otherwise would have plaintiff's hair on the floor." Id. at ¶ 31. "Because of this confrontation, plaintiff did not enter into the mess[ ]hall again with his hair in a ponytail." Id. at ¶ 32.

On July 14, 2015, C.O. Savage approached plaintiff on his way to the mess hall and inquired about "his hair being wrapped up without a religious hair covering on it." Amen. Compl. at 8 ¶ 33. C.O. Savage gave plaintiff a direct order " 'not to come out [of] his cell with his dredlocks [sic] wrapped on the top of his head without a religious hair covering on it' even after plaintiff informed him that he [was] not religious/ Rastafarian." Id. at ¶ 34. Because plaintiff was unwilling to change his religion to Rastarian in order to wear the religious hair covering, he "remained in his cell as he was ordered by [C.O.] Savage." Id. at ¶ 35. Plaintiff states that he "had received numerous misbehavior reports in the past" for failing to adhere to DOCCS guidelines regarding his hair. See id. at ¶ 36. Faced with what plaintiff describes as "Hobson's Choice," he decided to remain confined in his cell and not change his hairstyle. Id. at ¶ 38. Later that day, plaintiff filed a grievance as to C.O. Savage's alleged conduct. See id. ¶ 39; Dkt. No. 12-1 at 7-8 (Grievance No. GM-59784-15).

*3 On July 16, 2015, plaintiff wrote a letter to Supt. Miller, "requesting that he revoke [C.O.] Savage's order until the matter was resolved by the inmate grievance program." Amen. Compl. at 8 ¶ 40; see Dkt. No. 12-1 at 9. Plaintiff alleges that Supt. Miller did not respond, which caused plaintiff to remain "wrongly confined to his cell." Id. at ¶ 41. Plaintiff contends that, while he was confined in his cell as a result of C.O. Savage's order, he did not receive any mess[ ]hall meals[.]" Id. at ¶ 42.

Plaintiff states that he informed his family and friends about "what was going on with him" and that "[t]hey ... contacted the facility informing them that plaintiff's needs [were not] being met." Amen. Compl. at 8 ¶ 43. In response to inquiries from plaintiff's family and friends, C.O. Savage and Scroggy visited plaintiff at his cell, at which time "plaintiff explained the situation ... about his hair and [C.O.] Savage's direct order that wrongfully confined him." Id. at 9 ¶ 45. "While plaintiff and ... Scroggy were speaking, [C.O.] Savage interjected" and stated, "we can't just allow inmates to do what they want!" Id. at ¶ 46. Plaintiff alleges that, "[a]fter hearing plaintiff and [C.O.] Savage out, ... Scroggy informed plaintiff that 'he had to cut his hair, or change his religion to Rastafarian, in order to wear a crown as instructed by [C.O.] Savage and this will go away.' " Id. at ¶ 47. Plaintiff avers that, "even when faced with outside agencies inquiring into the well being of plaintiff's health and mind state, [Scroggy] reiterated [sic] that all [p]laintiff had to do was cut his hair or change his religion to the Rastafarian faith in order to wear a crown and this problem would go away." Id. ¶ 49.

Sgt. Coonradt, the supervising sergeant of plaintiff's housing unit, conducted an investigation into plaintiff's allegations, and listened to plaintiff's complaints of being wrongfully confined for his hair and being deprived of meals. See Amen. Compl. at 10 ¶ 50. "Sgt. Coonradt gave plaintiff a highlighted copy of [DOCCS Directive] 4914 and told him that "[C.O.] Savage was right and if [plaintiff] wanted out of this compliance was key.' " Id.; see Dkt. No. 12-1 at 33. Sgt. Coonradt submitted a memorandum dated August 7, 2015, to IGPS S. Pelo concerning plaintiff's Grievance (No. GM-59, 784-15), in which he stated that "what [plaintiff] [wa]s requesting in his grievance is a clear violation of directive 4914 Inmate grooming standards. The Fact that [C.O.] Savage enforced department policy is in no way harassment." Dkt. No. 12-1 at 32. As Sgt. Coonradt's memorandum and plaintiff's letter to Supt. Miller make clear, plaintiff was requesting to be allowed to wear his dreadlocks wrapped on top of his head without a religious covering. See id. at 9, 32.

On August 17, 2015, the Inmate Grievance Review Committee ("IGRC") denied plaintiff's grievance request to wear his hair on top of his head, noting in its decision that DOCCS Directive 4914 "specifically addresses dreadlock hair, and instructs that hair must be tied back, or worn in a crown. There are no provisions allowing grievant to wrap his hair on top of his head, unless it is under a religious crown." Dkt. No. 12-1 at 14. Plaintiff appealed the IGRC's determination to Supt. Miller, who denied the grievance on September 1, 2015. See id. at 15. Plaintiff appealed defendant Miller's decision to the Central Office Review Committee ("C.O.R.C."). See id.

On March 16, 2016, plaintiff submitted another grievance to the IGRC at the direction of a C.O.R.C. Grievance Supervisor. See Dkt. No. 12-1 at 16. [6] Plaintiff's Grievance (No. GM-60782-16) requested that he "be allowed to wrap [his] hair up or be allowed to wear a non-religious hat or scarf on [his] hair so [that he is] able to go to the mess[ ]hall, yard, and programs and not be subjected to unsanitized [sic] and other harmful environments." Id. at 17. Plaintiff's grievance also requested, as relevant here, that he "be afforded 3 meals a day and an opportunity for out of cell participation in programs and recreation." Id.

[6]    Plaintiff's March 16, 2016 letter indicates that personnel at C.O.R.C. informed him in March 2016 that his appeal for Grievance No. GM-59, 784-15 "was not received or misplaced," and that because six months had passed, he could not re-submit his appeal to C.O.R.C. Dkt. No. 12-1 at 16. Therefore, plaintiff states, C.O.R.C. personnel "advised that [plaintiff] write another grievance about the same incident involving [his] hair." Id.

**4  On March 21, 2016, the IGRC acknowledged receipt of plaintiff's Grievance (No. GM-60782-16). Dkt. No. 12-1 at 18. On May 16, 2016, the IGRC denied plaintiff's March 21, 2016 grievance. See id. at 19. On May 18, 2016, plaintiff appealed the IGRC's determination to Supt. Miler. See id. On May 23, 2016, Supt. Miller denied the grievance. See id. at 20. On May 27, 2016, plaintiff appealed defendant Miller's denial to C.O.R.C. See id. On December 14, 2016, C.O.R.C. issued a decision upholding Supt. Miller's determination. See id. at 22. In April 2017, Sgt. Hawk conducted a further investigation into plaintiff's complaints, and advised plaintiff by letter that, "[a]fter consultation of [DOCCS] directives and facility ministerial staff[,] the only way for you to legally possess and

wear a Tsalot Kob [7] due to your having dreadlocks is for you to be a registered member of the Rastafarian religion." Dkt. No. 12-1 at 28; see Amen. Compl. at 12 ¶ 57.

[7]    Defendants point out that "[a] tsalot-kob, otherwise known as a Rastafarian crown, is an approved religious head covering that members of the Rastafarian faith are permitted to wear over their dreadlocks." Dkt. No. 109-26 at 10 n. 1.

Plaintiff alleges that C.O. Savage, Supt. Miller, Sgt. Hawk, Sgt. Coonradt, and Scroggy "issued orders and/or ruled on plaintiff's grievances in a way that would force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dredlocks [sic] up even after becoming aware that plaintiff [was] non-religious and didn't want to practice the tenets of any religion." Amen. Compl. ¶ 114. Liberally construed, plaintiff alleges that C.O. Savage, Supt. Miller, Sgt. Hawk, Sgt. Coonradt, and Scroggy violated his constitutional rights under the First Amendment Establishment Clause.

### b. First Amendment Retaliation and Eighth Amendment Conditions of Confinement —Denial of Nutritionally Adequate Meals

Plaintiff alleges that, while confined to his cell based on C.O. Savage's order concerning his dreadlocks, he was not provided "mess[ ]hall meals for breakfast, lunch[,] and dinner." Amen. Compl. at 13 ¶ 62. Plaintiff posits that "[C.O.s] Savage, Bogardus, and Kaiser ... were aware that plaintiff wasn't coming out of his cell for chow ... after being instructed not to; because these ... defendant[s] ... took the 'Go around' acknowledging him not coming out of his cell." Id. at 14 ¶ 64. Plaintiff explains that the "Go around Slip" is an account of "which inmates are left in their cells and those who left their cells for chow...." Id. at 13 ¶ 60.

From July 15, 2015, through April 5, 2016, plaintiff alleges that he "missed approx. 634 meals." Amen. Compl. at 19 ¶ 74. Plaintiff contends that he only received three complete nutritious meals on three consecutive days during that time period when non-party Dr. Karandy issued him a feed in cell pass. See id. From April 6, 2016 through October 11, 2016, plaintiff alleges that he "missed approx. 567 meals." Id. at ¶ 75. Plaintiff states that he only "ate 1 complete nutritious meal" when the facility locked down on August 30, 2016. Id. From October 22, 2016, through July 20,

2017, when he transferred from Great Meadows, plaintiff alleges that he missed approximately 849 meals. Id. at 20 ¶ 76. Plaintiff posits that he only received one breakfast meal during that time period. See id. Plaintiff alleges that he developed stomach pains and headaches, and lost energy, motivation and a "substantial amount of [weight]" from the lack of food. Id. at ¶ 77. Plaintiff suggests that he sold his personal property to other inmates in order to obtain food. See id. ¶¶ 77-78. Plaintiff states that he was "periodically" allowed to go to the commissary. Id. at ¶ 79.

Plaintiff contends that C.O. Savage, C.O. Bogardus, and C.O. Kaiser did "not provid[e] him nutritiously prepared meals from the mess[ ]hall ... because ... plaintiff wr[ote] grievances and complain[ts] to their [r]anking officers about them[,]" in violation of "plaintiff's rights to be free from [r]etaliation under the [First] Amendment[.]" Amen. Compl. at 30 ¶ 117. Plaintiff further avers that C.O. Savage, C.O. Bogardus, and C.O. Kaiser "deprived [him] of ... approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression[.]" Am. Compl. at 30 ¶ 118. Liberally construed, the foregoing allegations contained in the Amended Complaint allege that C.O. Savage, C.O. Bogardus, and C.O. Kaiser violated plaintiff's First and Eighth Amendment rights because retaliated against plaintiff for filing grievances and complaints against them by depriving him of nutritionally adequate meals.

### c. Eighth Amendment Medical Indifference

**\*5** Plaintiff states that, "[t]hroughout his incarceration[, he was] actively ... on the OMH case load and ha[d] been receiving treatment for severe mental illness and/or severe personality disorder.... At all times mentioned[, p]laintiff was designated an OMH Level 2-8." Amen. Compl. at 22 ¶ 87. Plaintiff states that he "is diagnosed with Anti-Social Personality disorder and intermittent explosive disorder." Id. at ¶ 88 (internal quotation marks omitted). Plaintiff states that he "has been known to hurt himself when feeling depressed, stressed, agitated or when things isn't [sic] going his way." Id. at 23 ¶ 88. Plaintiff states that, "[p]rior to his arrival to [Great Meadow C.F.] in March 2015, [he] was housed in a 'Residential Mental Health Unit' ('R.M.H.U.')[,]" which he explains "is an OMH, CNYPC and DOCCS jointly operated therapeutic facility that provide [sic] patients/inmates who's

[sic] designated level 1-5 and 2-8, suffering from a severe mental illness and/or personality disorder with out of cell treatment and programming while serving SHU time." Id. at 23 ¶ 89.

### i. C.O.s Savage, Bogardus, and Kaiser —Denial of Mental Health Callouts

Plaintiff alleges that he cut himself in front of Bogardus and Kaiser, both of whom "left without getting plaintiff any medical and mental health treatment." Amen. Compl. at 21 ¶¶ 81, 82. Plaintiff also contends that C.O.s Savage, Bogardus, and Kaiser denied him mental health callouts between July 14, 2015, and May 2016. See id. at ¶ 84. In particular, plaintiff lists fourteen separate dates between February 5, 2016, and May 24, 2017, when he alleges that C.O.s Savage, Bogardus, and Kaiser denied him mental health callouts. See id. at 21-22 ¶ 85. Plaintiff alleges that these defendants "were denying [him] his MHU callouts so he couldn't report what was going on with him even after witnessing it or made [sic] aware that plaintiff mutilated himself and/or wasn't coming out of his cell for ... chow...." Id. at 21 ¶ 84. Liberally construed, plaintiff's Amended Complaint alleges a claim of deliberate medical indifference in violation his Eighth Amendment rights against C.O.s Savage, Bogardus, and Kaiser.

### ii. OMH Defendants—Failure to Provide Adequate Mental Health Treatment

Plaintiff states that Dr. McCloskey was his therapist, and that he "notified ... [Dr.] McCloskey and N.P. Meyers about the officer's wrongdoing and violative actions ... which caused [him] to remain cell confined (for approx. 22 months) because of his unwillingness to comply with Dir. 4914 and the direct conflict it produced regarding his long length hair." Amen. Compl. at 23 ¶ 91. Plaintiff states that he also informed Dr. McCloskey and N.P. Meyers about his unwillingness to "change his religion" or "wear[ ] any religious hair coverings" and about Great Meadow C.F. personnel "not allowing him to come meet with them for scheduled appointments, nor providing him with 3 meals a day[.]" Id. at ¶¶ 90, 92. Plaintiff denies singing any refusal forms for mental health callouts. See id. at 24 ¶ 93.

Plaintiff contends that Bernstein, McCulloch, Steed, and Sullivan "were made aware of [his] circumstances via his numerous filed complaints" in which he "addressed

specifically ... not receiving adequate mental treatment." Amen. Compl. at 24 ¶ 94. Plaintiff alleges that he had, "at one time or another, either in person or by way of letter[,]" made requests to Dr. McCloskey, N.P. Meyers, Bernstein, McCulloch, Steed and Sullivan to "be placed in a Tri-Immediate care program (Tri-ICP) or Immediate care Program (ICP), so he c[ould] be in a therap[e]utic environment where all inmates is [sic] designated as level 1-s or 2-s, receives mental health treatment, program and get medication together, and was denied." Id. at 24 ¶ 95. Plaintiff contends that "[a]t no time did" any of those defendants "put [him] in to see the medical department; nor any referrals to be seen by [mental health] nurses to take his vital signs or have him weighed as he complained of a substantial amount of w[ ]eight loss." Id. at 24-25 ¶ 96. Liberally construing the pro se Amended Complaint, plaintiff alleges claims of deliberate medical indifference in violation of his Eighth Amendment rights against McCloskey, Meyers, Bernstein, McCulloch, Steed, Sullivan for their purported failure to provide plaintiff with adequate mental health care.

## II. Present Motions

### A. Defendants' Motion for Summary Judgment

#### 1. Exhaustion of Administrative Remedies —C.O. Bogardus and C.O. Kaiser

**\*6** Defendants contend that the Amended Complaint must be dismissed as to C.O. Bogardus and C.O. Kaiser for failure to exhaust administrative remedies. See Dkt. No. 109-26 at 38. [8] In particular, defendants aver that the summary judgment record establishes that plaintiff did not file any grievance or administrative appeal concerning his pending claims against those defendants. See id. In support of this contention, defendants first proffer the declaration of non-party Alexandria Mead ("Mead"), the IGP Supervisor at Great Meadow C.F. See Dkt. No. 109-23 at 1 ¶ 2. Mead declares that "Great Meadow C.F. has a fully functional IGP by which inmates can file grievances," that is set forth in "NYCRR Title 7 and [DOCCS Directive #4040." Id. at 2 ¶ 5. Mead states that that both "NYCRR Title 7 and [DOCCS Directive #4040 are available in the facility's law library." Id. Further, Mead explains that, "[o]nce an inmate grievance is determined to be timely, it is logged, coded, and titled." Id. at ¶ 7. Moreover, Mead states that "[a]ll documents, or copies thereof, related to a particular grievance, including the grievance as well as

investigations and appeals, are stored in the Great Meadow C.F. grievance office in the regular course of that office's activities as they are created or received." Id. at ¶ 9.

[8]      These defendants asserted failure to exhaust administrative remedies as an affirmative defense in their Answer to plaintiff's Amended Complaint. See Dkt. No. 53 at 4 ¶ 17.

Mead explains that all documents relating to inmate grievances are kept on file at Great Meadow C.F. for four years such that, as of the date of her declaration, November 30, 2020, "[a]ny grievances filed by [p]laintiff prior to January 1, 2016 ha[d] been destroyed." Dkt. No. 109-23 at 3 ¶ 9. She states that the claims asserted in plaintiff's Amended Complaint "are a proper subject for a grievance under the IGP," id. at ¶ 12, and that "[i]f plaintiff filed a grievance related to these claims after January 1, 2016, while incarcerated at Great Meadow C.F., there would be a record of such grievance in the grievance files maintained at the facility." Id. at ¶ 11. However, Mead states, that "[u]pon review of the records maintained in the grievance office at Great Meadow C.F., [p]laintiff[ ] did not file any grievances related to the incidents alleged" in his Amended Complaint. Id. at ¶ 13. Attached as an exhibit to Mead's declaration is a computer printout of the IGP database, which reflects her search of plaintiff's grievance files, and indicates that, after January 1, 2016, plaintiff filed only one grievance for lack of receipt of a package, but not the claims asserted in his present action. See id. at 6-7.

Further, defendants proffer the declaration of Rachael Seguin ("Seguin"), DOCCS Assistant Director of the IGP. See Dkt. No. 109-24 at 1 ¶ 1. Seguin explains that her duties as Assistant Director of the IGP include "maintaining records of appeals of grievances filed by incarcerated individuals. Specifically, [she] oversee[s] the records that DOCCS maintains of appeals received by the [CORC]. Which is the final level of administrative review in the IGP." Id. at ¶ 2. Seguin declares that the claims asserted in plaintiff's Amended Complaint "are the proper subject for a grievance under DOCCS grievance procedure as outlined at 7 NYCRR § 701 et seq." Id. at 3 ¶ 11. Further, Seguin explains that, pursuant to the grievance procedure set forth in 7 NYCRR § 701 et seq., "CORC is the final appellate level" of review. Id. at ¶ 8; see id. at 2 ¶ 7. Moreover, Seguin indicates that, "CORC maintains files of grievance appeals received by CORC" "for the current year and the previous four calendar years." Id. at 4 ¶ 12.

Seguin declares that she conducted "a diligent search of CORC records for all appeals received from facility-level grievance determinations pertaining to [p]laintiff." Dkt. No. 109-24 at 4 ¶ 15. Attached to Seguin's declaration as an exhibit is a "copy of the computer printout from the CORC database reflecting the results of [her] search, as of November 24, 2020, which was created and maintained in the usual course of business at CORC[,]" id. at 4 ¶ 15. Seguin states that her search results evidence that

> **\*7** CORC did not receive, nor has it ever received, any appeals from [p]laintiff regarding his allegations that [d]efendants (1) prevented [p]laintiff from receiving nutritiously adequate meals; (2) prevented [p]laintiff from accessing the Great Meadow mess[ ]hall; (3) prevented [p]laintiff from attending mental health callouts; and (4) confined [p]laintiff to his cell, while [he] was housed at Great Meadow from June 2015 through August 2017.

Id. at 5 ¶ 16.

In addition, defendants cite to exhibit F attached to Sgt. Coonradt's declaration, which contains a correspondence from IGP Supervisor S. Pelo to the Office of the Superintendent, dated August 24, 2015, and states that "[t]he attached grievance appeals require a response from the Superintendent[,]" including "59, 784-15" with the notation "N" next to that grievance number. Dkt. No. 109-14 at 6. Exhibit F to Sgt. Coonradt's declaration also contains copies of plaintiff's Grievance No. GM-59784-15 and Grievance No. GM-60782-16, and related IGRC, IGP Superintendent, and administrative appeal documents. See id. at 7-28. Moreover, defendants submit the declarations of C.O. Bogardus and C.O. Kaiser, which both indicate that those defendants were not aware that plaintiff had filed a grievance with respect to their conduct. Dkt. No. 109-15 at 2 ¶ 15 (C.O. Bogardus' declaration); Dkt. No. 109-16 at 2 ¶ 25 (C.O. Kaiser's declaration).

### 2. Personal Involvement—Sullivan, Supt. Miller, and Sgt. Coonradt

#### a. Sullivan

Defendants contend that the Amended Complaint must be dismissed insofar as asserted against Sullivan for lack of personal involvement. See Dkt. No. 109-26 at 34-35. In particular, defendants aver that plaintiff has failed submit proof to establish Sullivan's involvement beyond merely receiving plaintiff's complaints concerning his mental health treatment, which defendants posit is insufficient to establish personal involvement pursuant to Section 1983. See id. at 35. Further, defendants submit Sullivan's declaration in which she states that, "[a]s the Commissioner of OMH [she] had no personal involvement in [plaintiff's Eighth Amendment medical indifference] allegations." Dkt. No. 109-22 at 2 ¶ 4. Sullivan explains that "[a]ll letters of complaint that are addressed to [her] are forwarded to OMH Risk Management for investigation and reply" and that "[i]f a patient disagrees with Risk Managements [sic] findings and is incarcerated and receiving OMH services through a DOCCS facility, the inmate patient may appeal Risk Management's determination to the Executive Director of [CNYPC]." Id. at ¶ 5. In the event that an inmate patient wants to appeal the Executive Director of CNYPC's determination, "he may appeal to the office of OMH Customer Relations to exhaust his claims." Id. Based on the foregoing, Sullivan declares that she "has no personal role in addressing or answering complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's OMH complaint, investigate the allegations made therein, or review the findings or conclusions made by other OMH personnel regarding the said allegations." Id. at ¶¶ 6, 7. Similarly, Sullivan explains, she "had no authority to direct any DOCCS employees to undertake or abstain from any actions." Id. at ¶ 8. Thus, defendants aver, Sullivan was not personally involved in the alleged Eighth Amendment medical indifference claims.

#### b. Supt. Miller

Defendants aver that plaintiff cannot establish Supt. Miller's personal involvement in any of the alleged constitutional violations asserted against him because the record evidence establishes only that Supt. Miller affirmed determinations of the IGRC with respect to plaintiff's grievances. See Dkt.

No. 109-26 at 35-36. Specifically, defendants point out "that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Id. at 35 (internal quotation marks and citations omitted). Defendants point to Supt. Miller's declaration in which he explains that his role with respect to plaintiff's grievances was limited to reviewing plaintiff's grievances and affirming the IGRC's determinations. See Dkt. No. 109-19 at ¶¶ 6-8, 12. Thus, defendants posit, plaintiff's Amended Complaint must be dismissed insofar as asserted against Supt. Miller for lack of personal involvement.

### c. Sgt. Coonradt

**\*8** Similarly, defendants contend that Sgt. Coonradt's involvement was limited to investigating plaintiff's grievances, which defendants posit is an insufficient basis to establish personal involvement under Section 1983. See Dkt. No. 109-26 at 36. In support of this contention, defendants point to Sgt. Coonradt's declaration, in which he explains that, as part of his "dut[y] as the A-Block supervising area sergeant ... was to investigate complaints regarding [his] area." Dkt. No. 109-14 at 2 ¶ 5. Sgt. Coonradt states that he "was assigned to investigate [p]laintiff's grievance GM-59784-15 by the [IGP] Supervisor on August 4, 2015[,]" and plaintiff's "grievance GM-60782-16 in March 2016." Id. at ¶ 6. Aside from investigating plaintiff's grievances, Sgt. Coonradt declares that he "had no further involvement with respect to the allegations [i]n [p]laintiff's [Amended] Complaint." Id. at 3 ¶ 15. Therefore, defendants aver that the Amended Complaint must be dismissed as to Sgt. Coonradt for lack of personal involvement.

### 3. Merits

### a. First Amendment Establishment Clause

Defendants argue that plaintiff's First Amendment Establishment Clause claim alleging that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, and Scroggy attempted to coerce plaintiff into registering as a member of the Rastafarian faith lacks merit. See Dkt. No. 109-26 at 6. Defendants point out that DOCCS Directive 4914 did not permit inmates to wear their hair in the style desired by plaintiff, that is, with dreadlocks wrapped up on top of their head without an approved fastening device. See id. However, defendants

point out, DOCCS Directive 4914 contained an exception that allowed Rastafarian inmates to "wear their dreadlocks in an approved religious head covering." Id. (quoting DOCCS Directive 4914, reproduced at Dkt. No. 109-14 at 29). Further, citing plaintiff's deposition testimony, defendants note that, although "[p]laintiff was aware that he was able to cut his hair to come into compliance with DOCCS grooming standards[,]" for his "own personal reasons—not due to any decree or action by any named [d]efendant—[plaintiff] refused to cut his hair." Id. at 7 (citing Dkt. No. 109-8 at 36). Moreover, defendants point out that plaintiff testified at deposition that he would have been able to comply with DOCCS Directive 4914 if he had "tie[d] [his] dreads into a ponytail that still went to the back rather than pinned to the top of [his] head," in what he referred to as a "natural crown," then he "would ... have been able to leave [his] cell." Dkt. No. 109-8 at 53. Defendants also point out that plaintiff testified that "the only way that [he] could not have left the cell was if [he] tied [his dreadlocks] up to the back of [his] head without a religious covering." Id. Thus, defendants aver, plaintiff remained in his cell due solely to his refusal to style his hair in compliance with DOCCS Directive 4914 and/or cut his hair. See Dkt. No. 109-26 at 7.

Defendants cite to C.O. Savages declaration in which he states that he did not ever seek to compel plaintiff to register as a Rastafarian. See Dkt. No. 109-26 at 7 (citing Dkt. No. 109-20 at 2 ¶ 7). In his declaration, C.O. Savage states that he was not regularly assigned to plaintiff's housing unit at Great Meadow C.F. and that "[t]he only interaction [he] recall[ed] with [p]laintiff was sometime in June or July 2015, when, after escorting inmates to the mess hall, [p]laintiff sat down and [C.O. Savage] noticed his long dead-locked hair was on the floor." Dkt. No. 109-20 at 2 ¶ 6. C.O. Savage states that he informed plaintiff that "his hair was not allowed to touch the floor" and that, in response, "[p]laintiff asked if he needed to have a religious head covering in order to wear his hair atop his head." Id. C.O. Savage told plaintiff that "per DOCCS Directive 4914, he was required to wear a religious covering in order to wear his hair atop his head." Id. However, C.O. Savage indicates that "[t]he conversation was not confrontational," and states that he "did not issue any direct order that [p]laintiff stay in his cell or otherwise prevent him from leaving his cell." Id. at ¶¶ 6, 9. In addition, C.O. Savage states that he "did not require [p]laintiff to register as a Rastafarian or to cut his hair." Id. at ¶ 7.

**\*9** Defendants also proffer Scroggy's declaration, which states that, "[a]lthough [he] was not [p]laintiff's counselor ...,

as supervising counselor [he] spoke to [p]laintiff at his cell when it was brought to [his] attention that [p]laintiff had questions regarding the inmate grooming standards outlined in DOCCS Directive 4914." Dkt. No. 109-21 at 2 ¶ 5. Scroggy declares that he "advised [p]laintiff that he needed to cut or style his hair in a manner that complied with DOCCS policy." Id. at ¶ 6. In particular, Scroggy states, he "advised [p]laintiff that tying his hair to the top of his head was in violation of DOCCS policy" and "that, in order to comply with DOCCS policy, he had the option to request a waiver, on the basis of a religious accommodation granted to members of the Rastafarian faith, which would allow him to tie his hair to the top of his head, so long as it was covered with an approved religious covering, or to cut his hair." Id. Scroggy denies "require[ing] [p]laintiff to register as a Rastafarian or to cut his hair." Id. at ¶ 7. Further, Scroggy indicates that, despite his advice, "[p]laintiff refused to comply with DOCCS policies regarding the grooming of his hair" and that, "[a]lthough [p]laintiff alleged he was confined to his cell, he was under no disciplinary sanctions and any confinement to his cell was self-imposed." Id. at ¶¶ 8, 9.

Defendants aver that Sgt. Coonradt investigated plaintiff's grievances concerning his dreadlocks and concluded that C.O. Savage was correct that, pursuant to DOCCS Directive No. 4914, plaintiff was not allowed to wear his dreadlocks wrapped on top of his head without a religious covering. See Dkt. No. 109-26 at 9; Dkt. No. 109-14 at 2 ¶ 10. Defendants note that, in his declaration, Sgt. Coonradt states that, based upon his investigation of plaintiff's grievances, "plaintiff was under no disciplinary sanction nor was he confined in any way or unable to attend commissary, recreation, and mental health call outs as he wished, and that any confinement was self-imposed. Dkt. No. 109-14 at 3 ¶ 12, 27; see Dkt. No. 109-26 at 9; Dkt. No. 109-14 at 27. Aside from conducting his investigation and issuing his findings to the IGRC, defendants posit that Sgt. Coonradt had no involvement in the alleged Establishment Clause violation. See Dkt. No. 109-26 at 9.

Defendants contend that Sgt. Hawk's only involvement with plaintiff's grievances consisted of "investigat[ing] the matter by consulting the relevant DOCCS directive and ministerial staff" and issuing plaintiff a report in response to plaintiff's inquiry in which he concluded that "the only way for [plaintiff] to legally possess and wear a Tsalot Kob ... [wa]s for [him] to be a registered member of the Rastafarian religion." Dkt. No. 109-13 at 6. Relying on Sgt. Hawk's declaration, defendants aver that "[a]t no time did [he] issue any order directing that [p]laintiff wear his hair in any

particular manner or remain in his cell." Dkt. No. 109-13 at 2 ¶ 13. Moreover, defendants contend that, insofar as plaintiff claims that Supt. Miller attempted to coerce him into registering as a Rastafarian by denying plaintiff's grievances challenging DOCCS Directive 4914, he fails to establish a First Amendment violation. See Dkt. No. 109-26 at 10. Defendants reassert that plaintiff has failed to establish Supt. Miller's personal involvement. See id. at 11.

### b. First Amendment Retaliation

Defendants contend that plaintiff's First Amendment retaliation claim against C.O.s Savage, Bogardus, and Kaiser lacks merit, as it is speculative and belied by the admissible documentary evidence. See Dkt. No. 109-26 at 11-12. Defendants aver that the record is devoid of evidence establishing that C.O.s Bogardus or Kaiser knew of any grievances filed against C.O. Savage, or that they acted with the intention to retaliate against plaintiff based thereon, and reiterate that the record is devoid of evidence that plaintiff filed any grievance against C.O. Kaiser or C.O. Bogardus. See id. at 11, 12. Pointing to C.O. Savage's, C.O. Kaiser's, and C.O. Bogardus', declarations, defendants note that these defendants deny preventing plaintiff from obtaining nutritionally adequate meals, or retaliating or being instructed to retaliate against plaintiff in any way. See Dkt. No. 109-20 at 3 ¶¶ 13, 15; Dkt. No. 109-16 at 2, 3 ¶¶ 12, 16, 17; Dkt. No. 109-15 at 2, 3 ¶¶ 12, 16, 17.

### c. Eighth Amendment Conditions of Confinement

*10 First, defendants contend that the admissible evidence of record belies plaintiff's unsupported allegations that C.O. Savage confined plaintiff to his cell. See Dkt. No. 109-26 at 12. In particular, defendants point out that plaintiff was under no disciplinary sanction requiring him to remain in his cell. See id. at 13. Defendants note that Supt. Miller and Sgt. Coonradt, as well as the IGRC and CORC, "found that no order had been issued requiring [p]laintiff's confinement in his cell and that such confinement was self-imposed." Id. (citing Dkt. No. 109-19 at 2 ¶ 10; Dkt. No. 109-14 at 3 ¶ 12, 19, 25, 27). Defendants also note that plaintiff was admittedly aware that cutting his hair or tying it in a ponytail without pinning it to his head would have made his dreadlocks compliant with DOCCS Directive 4914 but, instead, chose to remain inside his cell. See id. at 12-13; Dkt. No. 109-8 at 36, 51. Further, defendants cite plaintiff's

2021 WL 5095284

deposition testimony in which plaintiff stated only that C.O. Bogardus and C.O. Kaiser left him in his cell and failed to intervene on his behalf. See id. at 13 (citing Dkt. No. 109-8 at 84). Moreover, defendants cite C.O. Savage's. C.O. Bogardus', and C.O. Kaiser's declarations in which those defendants all deny ordering plaintiff to remain in his cell or denying plaintiff meals. See Dkt. No. 109-20 at 2, 3 ¶¶ 9, 13; Dkt. No. 109-15 at 2 ¶¶ 10, 12; Dkt. No. 109-16 at 2 ¶¶ 10, 12.

#### d. Eighth Amendment Deliberate Medical Indifference

##### i. C.O.s Savage, Kaiser, and Bogardus

Defendants contend that "[t]he admissible evidence indicates that [C.O.s] Savage, Kaiser and Bogardus were not aware that [p]laintiff suffered from any medical condition, or that he was refusing to leave his cell, and that they did not prevent [p]laintiff from attending any mental health call outs." Dkt. No. 109-26 at 14. Defendants cite the portion of C.O. Savage's declaration in which he states that he "did not know of any medical diagnoses [or] medical needs [p]laintiff may have had," and that he "did not deny [p]laintiff any call outs, including mental health call outs." Dkt. No. 109-20 at 2, 3, ¶¶ 10, 14. Defendants also cite the declarations of C.O. Bogardus and C.O. Kaiser, who similarly state that they never denied plaintiff mental health, or any other, callouts and they were unaware of any medical diagnosis or medical needs that plaintiff had. See Dkt. No. 109-15 at 2 ¶¶ 8, 13; Dkt. No. 109-16 at 2 ¶¶ 8, 13. In addition, C.O.s Bogardus and Kaiser both declare that they "have no recollection" of any incident in which they witnessed plaintiff cut himself. Dkt. No. 109-15 at 2 ¶ 14; Dkt. No. 109-16 at 3 ¶ 14. Thus, defendants contend, "there is no admissible evidence to substantiate [plaintiff's] allegations" that C.O. Bogardus and Kaiser observed plaintiff harm himself and failed to provide aid. Dkt. No. 109-26 at 14.

##### ii. OMH Defendants

First, defendants contend that, insofar as plaintiff contends that the OMH defendants failed to provide him with adequate mental health treatment by denying him placement in either ICP or TrICP, plaintiff's claim lacks merit. See Dkt. No. 109-26 at 15. Defendants proffer Dr. McCloskey's declaration, in which he explains that, over the course of his nine visits with plaintiff between June 2015, and August 2016, he provided plaintiff with supportive counseling, listened to

plaintiff and evaluated plaintiff's mental state, and referred him to the medical department where appropriate, and "made decisions as to the appropriate course of treatment using [his] professional judgment." Dkt. No. 109-10 at 7 ¶ 39. Dr. McCloskey indicates that plaintiff's "primary diagnosis [was] of antisocial personality disorder," and explained that "[p]laintiff did not, during the time [he] provided him with therapy, exhibit any symptoms that would have lead [him] to believe that he was suffering from a major mental illness." Id. at 3 ¶¶ 9, 11. Moreover, defendants submit N.P. Meyers' declaration in which she explains that she "would see [plaintiff] once every three months, or as needed" and "would evaluate his mental health status[ ] and assess his need for medication," which she states "is the basic standard of care to be provided to mental health patients without a major mental illness." Dkt. No. 109-18 at 2 ¶¶ 10, 11.

**\*11** Further, in his declaration, Dr. McCloskey explains that placement in the TrICP or ICP was not appropriate for plaintiff because those programs "are for inmate patients with more severe mental health treatment needs than those displayed by [p]laintiff or for inmate patients that require more assistance to adjust to the environment of prison general population than [p]laintiff required." Dkt. No. 109-10 at 6 ¶ 34. Dr. McCloskey further declares that,

> Based on [his] conversations with [p]laintiff, [his] review of the relevant medical notes and [his] experience and training as a licensed psychologist, [his] clinical opinion that placement of [p]laintiff in ICP or TrICP was not appropriate because his mental health symptoms did not required the level of more intensive treatment and, therefore, [he] did not recommend that [p]laintiff be placed in th[o]se programs.

Id. at ¶ 35. Defendants also cite N.P. Meyer's declaration in which she states that, although her treatment notes do not indicate that plaintiff asked her to place him in either the ICP or TrICP, "both ... programs are for inmate patients with more serious mental health treatment needs and for inmate patients that require more assistance adjusting to the environment of prison general population that [p]laintiff required." Dkt. No. 109-18 at 5 ¶ 21. Therefore, N.P. Meyers states, she

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 201 of 261

"would not have made a recommendation for [p]laintiff to be placed in either the ICP or TrICP" because placement in those programs "would be inappropriate for [p]laintiff given his mental health condition and history." Id. at ¶ 22. Moreover, both Dr. McCloskey and N.P. Meyers explain that neither of them had the authority to place plaintiff in TrICP or ICP. See Dkt. No. 109-10 at 6 ¶ 36; Dkt. No. 109-18 at 5 ¶ 23. In addition, defendants proffer the declarations of Bernstein, McCulloch, and Steed who reviewed plaintiff's grievances concerning his desire to be placed in TrICP or ICP and concluded that "the mental health treatment being provided by OMH was clinically appropriate and in accordance with the relevant policy." Dkt. No. 109-11 6 ¶ 23; Dkt. No. 109-17 at 4 ¶ 19; Dkt. No. 109-12 at 4 ¶ 19. Thus, defendants posit, the record establishes that plaintiff received appropriate mental health treatment and the fact that the OMH defendants declined to place him in TrICP or ICP does not evidence indifference to a serious medical need, as plaintiff's mental health did not require such treatment. See Dkt. No. 109-26 at 31. In this regard, defendants also aver that, because the record evidence establishes that plaintiff received appropriate and adequate mental health care, plaintiff cannot establish that the OMH defendants knew of but disregarded a serious risk to plaintiff's health and safety. See id.

Defendants also contend that, to the extent that plaintiff alleges that the OMH defendants failed to refer plaintiff to the Great Meadow C.F. medical department, plaintiff's claim is belied by the record evidence. See Dkt. No. 109-26 at 15. In support of this contention, defendants point to Dr. McCloskey's, N.P. Meyer's, Steed's, McCulloch's, and Bernstein's declarations in which they explain that "[p]laintiff had the ability to request a medical call out and did not require a referral from OMH staff." Dkt. No. 109-10 at 6 ¶ 38; Dkt. No. 109-18 at 5 ¶ 25; Dkt. No. 109-12 at 4 ¶ 18; Dkt. No. 109-17 at 4 ¶ 18; Dkt. No. 109-11 at 6 ¶ 22. As a final matter, defendants reassert their contention that plaintiff has failed to establish Sullivan's personal involvement. See Dkt. No. 109-26 at 32.

### e. Qualified Immunity

**\*12** Citing Bryant v. Capra (No. 18-CV-10198 (KMK), 2020 WL 508843 (S.D.N.Y. Jan. 31, 2020)), defendants contend that Supt. Miller, C.O. Savage, Sgt. Hawk, Sgt. Coonradt, C.O. Kaiser, C.O. Bogardus, and Scroggy are entitled to qualified immunity with respect to plaintiff's First Amendment Establishment Clause claim because, "insofar as

the actions by [those d]efendants ... can be viewed as seeking plaintiff's compliance with Directive 4919, such actions are permissible." Dkt. No. 109-26 at 34 (citing Bryant, 2020 WL 508843, at *6). Therefore, defendants argue, "[p]laintiff ... cannot establish that [d]efendants' actions seeking to promote compliance with Directive 4914 violate [p]laintiff's clearly established rights." Id.

### B. Plaintiff's Submissions in Response to Defendants' Motion (Dkt. Nos. 114 and 115)

#### 1. Plaintiff's Responses in Opposition

Plaintiff's submission at Dkt. No. 114, liberally construed, may be read, in part, as opposing defendants' motion for summary judgment as to the OMH defendants. In particular, plaintiff argues that there are "genuine facts in dispute" with respect to, as relevant here, whether "the OMH [d]efendants [were] legally bound to ensure [he] received suitable out of cell treatment and programming for" given his Mental Health Services Level of 2S; plaintiff was eligible for TrICP or ICP or other housing in therapeutic housing. Dkt. No. 114 at 3 ¶¶ 1, 2, 3, 5, 6. [9]

[9]    As stated above, the remainder of plaintiff's submission at Dkt. No. 114 is a request pursuant to Fed. R. Civ. P. 56(d) to stay resolution of defendants' motion and reopen discovery.

At Dkt. No. 115, plaintiff contends that "[d]efendants are not entitled to [s]ummary [j]udgment because the claims in [his] complaint consist of genuine issues of material facts." Dkt. No. 115-1 at 7. Plaintiff states that the hair covering C.O. Savage referenced was "atasalot-kob (crown)" and, therefore, "his order entailed that [plaintiff] had to register as a member of the Rastafarian faith in order to obtain said crown." Id. at 8. Plaintiff asserts that he was an atheist, that "refraining from religion and religious practices were central aspects to [his] belief," and that he "personally decided to grow and wear" his long dreadlocks "free of religious influences." Id. In support of his argument in this regard, plaintiff proffers 23 affidavits submitted by other inmates from Great Meadow C.F. who were either housed or worked in plaintiff's unit, A-Block. See Dkt. No. 115-3 at 2-20, 22-26. Moreover, plaintiff, states "that there is nothing in DOCCS Directives [4919 and 4202] that required [him] to cover [his] dreadlocks with a crown, nor anything to support [DOCCS defendants] requiring [him] to

change [his] religion to ... Rastafarian ... in order to wear a crown." Id. at 9.

Plaintiff cites Amaker v. Goord (No. 06-CV-490A (HKS), 2010 WL 2595286 (W.D.N.Y. Mar. 25, 2010), report and recommendation adopted, No. 06-CV-490 (RJA), 2010 WL 2572972 (W.D.N.Y. June 23, 2010)), for the proposition that DOCCS modified Directive 4914, "which thereafter reflected that all inmates were allowed to grow their hair to any length desired, all inmates could grow and wear dreadlocks without fear of punishment, and they didn't have to be a registered member of the Rastafarian faith, and the prison population was happily ever after." Dkt. No. 115-1 at 11. Plaintiff also posits that the revised version of Directive 4202 allows "all inmates [to] wear any religious head covering and possess any religious item and they didn't have to be a member of any specific religion[.]" Id. at 12. Plaintiff contends, therefore, that "[w]hen [DOCCS d]efendants requir[ed him], as an atheist, to wear a tsalot-kob they ... impos[ed] a substantial burden on [his] ability to remain free of religion and religious practices[,]" as "Rastafarians wear their crowns for religious purposes," which he "disagree[s] with as an atheist." Id. at 11-12.

*13 Concerning the exhaustion of administrative remedies with respect to his First Amendment retaliation claim insofar as asserted against C.O. Bogardus and C.O. Kaiser, plaintiff states that, C.O. Bogardus and C.O. Kaiser denied him meals in retaliation for filing his grievance, but that he did not learn these officers' names until "later." Dkt. No. 115-1 at 14. He states that he referred to C.O. Bogardus and C.O. Kaiser as "Officers" in his second grievance because he "didn't know them by their names." Id. Plaintiff reasserts his allegations that C.O. Savage, C.O. Bogardus, and C.O. Kaiser denied him meals in retaliation for filing grievances. See id. at 15.

Further, plaintiff avers that genuine issues of fact exist with respect to his Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Bogardus, and C.O. Kaiser. See Dkt. No. 115-1 at 15. Plaintiff contends that C.O. Bogardus and C.O. Kaiser were aware that C.O. Savage confined plaintiff to his cell on the condition that plaintiff could not come out "with [his] dreadlocks wrapped on the top of [his] head unless it was covered with a religious hair covering" and that plaintiff was not leaving his cell to go to the mess hall. Id. at 16. Plaintiff reasserts that his confinement and deprivation of nutritious meals resulted in "substantial ... weight loss, stomach pains, headaches, dizzy spells, rashes, lack of energy and motivation, and depression." Id. Plaintiff

posits that C.O. Bogardus and C.O. Kaiser were also aware of plaintiff's confinement, because they observed plaintiff "not coming out [of his] cell" and, as evidenced by C.O. Bogardus' statement, "[w]hen he's hungry enough, he'll come out of his cell the way we told him." Id.

Moreover, plaintiff opposes defendants' motion to dismiss his Eighth Amendment medical indifference claim insofar as asserted against C.O. Savage, C.O. Bogardus, and C.O. Kaiser. See Dkt. No. 115-1 at 17-19. Plaintiff states that, given his status of a MHSL 2S, he was "entitled to out of cell programming and treatment[,]" and that this designation alerted C.O. Savage, C.O. Bogardus, and C.O. Kaiser that he suffered from " 'S' or 'Serious' " conditions based on his diagnoses of antisocial personality disorder and intermittent explosive disorder. Id. at 17. Plaintiff avers that C.O. Savage, C.O. Bogardus, and C.O. Kaiser refused plaintiff his mental health treatment "by not putting [him] down for [his] scheduled appointments" and not allowing him to "leave [his] cell on [his] own." Id. at 18. He also states that, "[w]hen ever [sic] it was alleged after July 14, 2015 ... that [he] was not going to [his] call outs, it was because these defendants deliberately did not make note of [his] request." Id. In support of this contention, plaintiff cites his own grievances and OMH complaints. See id. Plaintiff reasserts his allegation that C.O. Bogardus and C.O. Kaiser failed to obtain treatment for plaintiff after he cut himself in front of them. See id. at 19.

In addition, plaintiff argues that DOCCS defendants are not entitled to qualified immunity, "because in 2015, DOCCS Directives[ ] 4914 & 4202 had clearly established that [he] could grow [his] dreadlocks to any length desired and did not have to cut them as [d]efendants were requiring" and "it was clearly established that he did not have to wear a tsalot-kob on [his] dreadlocks in order to wear them above shoulder length (wrapped up), and that [he] did not have to change [his] religion to ... Rastafarian ... in order to wear a crown." Dkt. No. 115-1 at 20. He also asserts that "[i]t was clearly established at the time of [his] confinement no inmate/patient with a MHSL ... 2/s can be confined to their cell for more than 30 days without out of cell treatment and programming." Id.

### 2. Plaintiff's Rule 56(d) Request to Reopen Discovery (Dkt. No. 114)

*14 Plaintiff states that his "motion ... is actually a supported affidavit made ... to set aside defendant's [sic] summary judgment motion." Dkt. No. 114 at 2. Although plaintiff

2021 WL 5095284

labels his motion as being made pursuant to Fed. R. Civ. P. 56(f), which he states was "formerly known as Rule 56(d)," id. 114 at 2, it appears that plaintiff has merely reversed the sequence of the 2010 Amendment, pursuant to which "Subdivision (d) carrie[d] forward without substantial change the provisions of former subdivision (f)." FED. R. CIV. P. 56, Advisory Committee Notes to 2010 Amendment of Subsection (d). Indeed, plaintiff requests that the Court "set aside [d]efendants [sic] Summary Judgment Motion that pertains to OMH [d]efendants," because he is "ill prepared to defendant against them due in part, to the complex issues, the multi-faceted entities that [he is] against," including "OMH, CNYPC, DOCCS, GMCF's MHU, and GMCF," which he states "each [has its] own Rules & Regulations, and Policies and Procedures)," and because plaintiff is "a layman to the law and this field of study." Id. at 14 ¶ 49. In particular, plaintiff argues that the Court's dismissal of Corey Jackson as a defendant in this action was premature because "documents would later show that he was more personally involved than previously thought[.]" Id. at 3 ¶ 7. Plaintiff also states that he requested, but was denied, "a complete copy of [his] OMH records," id. at 3 ¶ 4, which he posits is necessary for him to determine whether defendants afforded him adequate mental health treatment. See id. at 5 ¶ 14.

### C. Defendants' Reply to Plaintiff's Opposition and Opposition to Plaintiff's "Cross Motion"

Defendants reassert that it was plaintiff's unwillingness to comply with DOCCS hairstyling and grooming directives, and not C.O. Savage's purported coercion to register as a Rastafarian, that caused plaintiff to stay inside his cell. See Dkt. No. 118 at 4. Defendants note that plaintiff relies solely on his own grievances, OMH complaints, and statements, in opposition to defendants' motion as to his Establishment Clause claim, which defendants aver fails to raise a genuine issue of fact. See id. Moreover, defendants argue that plaintiff's reading of Directive 4914 is mistaken, as "[t]he plain language of [Directive 4914] makes clear that [p]laintiff's preferred hair style was not permitted." Id. at 5. Further, defendants contend that plaintiff's arguments concerning Directive 4202 are erroneous, as that directive makes clear that "tsalot-kobs are 'only authorized for members of the Rastafarian faith.'" Id. at 5-6 (quoting DOCCS Directive 4202, reproduced at Dkt. No. 115-3 at 38).

Defendants further argue that plaintiff has failed to raise a genuine issue of fact concerning his First Amendment retaliation claim. See Dkt. No. 118 at 6. Defendants argue that plaintiff has failed to establish that C.O. Savage took any adverse action against him, as plaintiff acknowledged at deposition that he could have left his cell at any time if he complied with DOCCS hairstyle and grooming directives. See id. Further, defendants contend that plaintiff cannot establish a First Amendment retaliation claim against C.O. Bogardus and C.O. Kaiser because he has not demonstrated that he engaged in any protected conduct against them. See id. at 7. In particular, defendants posit that plaintiff did not file any grievances against C.O. Bogardus and C.O. Kaiser, and neither of those defendants recalled plaintiff filing a grievance against them and deny having been directed to retaliate against plaintiff. See id. at 7-8; Dkt. No. 109-15 at 2 ¶ 15, 3 ¶¶ 16, 17; Dkt. No. 109-16 at 2 ¶¶ 15, 16, 3 ¶ 17.

Concerning plaintiff's Eighth Amendment conditions of confinement claim against C.O. Savage, C.O. Bogardus, and C.O. Kaiser, defendants argue that plaintiff has failed to raise a genuine issue of material fact. See Dkt. No. 115-1 at 8. In particular, defendants posit that "[p]laintiff's submission fails to controvert the key fact conceded in his deposition that he was free to leave his cell if he styled his hair in a manner that complied with DOCCS directives." Id. Defendants contend that plaintiff's refusal to comply with applicable prison rules and self-imposed confinement—not the actions of C.O. Savage, C.O. Bogardus, and C.O. Kaiser—caused plaintiff to miss out on meals. See id. Therefore, defendants argue, plaintiff fails to establish the objective element for an Eighth Amendment claim of unconstitutional conditions of confinement. See id. Moreover, defendants submit that plaintiff has failed to establish the subjective element for an Eighth Amendment claim, as he has not proffered admissible evidence that C.O. Savage, C.O. Bogardus, and C.O. Kaiser were aware that he was suffering a medical condition or that he was refusing to leave his cell. See id. Rather, defendants state, plaintiff has offered only conclusory allegations that defendants knew of but disregarded an excessive risk to his health or safety. See id. at 8-9. Based on the foregoing, defendants contend that plaintiff has also failed to establish a claim of Eighth Amendment medical indifference against C.O. Savage, C.O. Bogardus, and C.O. Kaiser. See id. at 9. Defendants point out that, even assuming C.O. Savage, C.O. Bogardus, and C.O. Kaiser failed to obtain medical treatment for plaintiff, his claim must fail because the evidence in the summary judgment record establishes that plaintiff was able to seek out and obtain medical treatment on his own and did not need DOCCS staff to refer him to the medical department. See id. Moreover, defendants reassert

that plaintiff failed to exhaust administrative remedies with respect to his claims against C.O. Bogardus and C.O. Kaiser, and posit that plaintiff's "generalized statement that 'officers' did not provide him with meals" is insufficient to satisfy the exhaustion requirement. Dkt. No. 118 at 12.

**\*15** Defendants also oppose plaintiff's argument, asserted in Dkt. No. 114, that defendants' motion for summary judgment should be dismissed because he was not provided with his full mental health record. See Dkt. No. 118 at 9. Defendants point out that the Court previously denied plaintiff's request for his entire mental health file in ruling on his first motion to compel. See id. (citing Dkt. No. 75-1 at 14-15). Further, defendants observe that discovery in this action closed on June 26, 2020, and contend that plaintiff has not proffered any proof in support of his assertion that the portions of his medical record that he received were "saturated with inconsistencies[.]" Id. (quoting Dkt. No. 114 at 5 ¶ 9). Moreover, defendants aver that plaintiff has failed to proffer any evidence to establish that a genuine issue of material fact exists with respect to the issue of the adequacy of the mental health treatment provided by the OMH defendants. See id. at 10. In addition, defendants aver that plaintiff's arguments regarding the lack of referrals to ICP and TrICP are refuted by admissible evidence and amount only to a non-actionable disagreement concerning his course of medical treatment. See id.

Defendants reassert their argument that Supt. Miller, C.O. Savage, C.O. Kaiser, C.O. Bogardus, Sgt. Coonradt, Sgt. Hawk, and Scroggy are entitled to qualified immunity. See Dkt. No. 118 at 11. Defendants aver that, insofar as plaintiff argues in opposition that DOCCS directives permitted him to wear his dreadlocks wrapped on top of his head, his assertions are "conclusory" and "controverted by the clear and plain language of Directive 4919." Id. Similarly, defendants aver that plaintiff's own submission in support of his opposition, namely DOCCS Directive 4202, belies his assertion that he was not required to be a Rastafarian in order to wear a tsalot-kob. See id. (citing Dkt. No. 115-3 at 37-38). Moreover, defendants state that, plaintiff's assertion regarding Directive 4202, raised for the first time in opposition, runs "counter to [his] position ... which challenged [d]efendants' restrictions on his ability to wear his dreadlocked hair wrapped or pinned atop his head without a religious covering." Id. (emphasis omitted).

### D. Plaintiff's Reply

Purportedly in reply to defendants' opposition to plaintiff's submission at Dkt. No. 115, plaintiff asserts his contention that Directive 4914 provides him with a "constitutionally protected interest in growing, keeping clean, and protecting [his] dreadlocks." Dkt. No. 119 at 2. Plaintiff avers that Directive 4914 does not govern "how to accommodate inmates who ha[ve] dreadlocks as long as [his,]" and that defendants' interpretation of Directive 4914 is erroneous and based on an outdated "2008 policy found in Directive 4202." Id. Plaintiff contends that the numerous inmate affidavits submitted with his opposition to defendants' motion establish that C.O. Savage issued plaintiff a direct order to remain in his cell unless he covered his dreadlocks with a religious covering, which he posits establishes that he was confined to his cell and coerced to register as a Rastafarian. See id. at 5-6. Moreover, plaintiff reasserts his arguments with respect to exhaustion of administrative remedies and qualified immunity. See id. at 6-7. Finally, plaintiff reasserts, in summary fashion, his Eighth Amendment medical indifference claims against the OMH defendants. See id. at 7-8.

### III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

**\*16** If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 248, 250; see Wright v. Goord,

554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curium)). Furthermore, "mere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Indeed, Fed. R. Civ. P. 56(e) explicitly states that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial."

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance

with relevant rules of procedural and substantive law....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, ... a court is obligated to construe his pleadings liberally." (internal quotation marks and citations omitted)).

## IV. Analysis [10]

[10]     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. See Porter, 534 U.S. at 524. "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

**\*17** While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation

2021 WL 5095284

omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ___ U.S. ___ 136 S. Ct. 1850, 1862 (2016). Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

However, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, ___ U.S. ___, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

There is no genuine dispute that, at all relevant times, DOCCS had in place a well-established three-step administrative procedure for inmate grievances known as the IGP. See N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5. First, the inmate must file a complaint with an IGP clerk within 21 calendar days of the alleged incident. See 7 N.Y.C.R.R. § 701.5(a)(1). An IGP representative has 16 calendar days to informally resolve the issue. See id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. See id. at § 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the

inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. See id. at § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to CORC within seven calendar days after receipt of the superintendent's determination. See id. at § 701.5(d)(1)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty 30 calendar days from the time the appeal was received." Id. at § 701.5(d)(3)(ii).

"Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of [all administrative remedies] may a prisoner seek relief pursuant to section 1983 in a federal court." Murray v. Goord, 668 F. Supp. 2d 344, 355-56 (N.D.N.Y. 2009). On a motion for summary judgment, "[t]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action." McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust Available Administrative Remedies with Respect to His Claims Against C.O. Bogardus and C.O. Kaiser

**\*18** "It is well-settled that a plaintiff does not have to name all the defendants in his grievance in order to exhaust his administrative remedies." Wilson v. Cabrera, No. 9:19-CV-1294 (DNH/ATB), 2020 WL 4678293, at *5 (N.D.N.Y. July 15, 2020), report and recommendation adopted, No. 9:19-CV-1294 (DNH/ATB), 2020 WL 4673941 (N.D.N.Y. Aug. 12, 2020); see Jones v. Bock, 549 U.S. 199, 217, 219 (2007) (holding that "nothing in the [PLRA] imposes a 'name all defendants' requirement" and that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances."). "The court looks to the grievance procedure promulgated by the state in question." Wilson, 2020 WL 4678293, at *5. Under the grievance procedure set forth under 7 N.Y.C.R.R. § 701 *et seq.*, "[a]ll that is necessary is that the grievance contain a 'concise, specific description of the problem.' " Id. (quoting N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)(2)) (additional citations omitted).

Defendants aver that plaintiff's "generalized statement that 'officers' did not provide him with meals" is insufficient to satisfy the exhaustion requirement. Dkt. No. 118 at 12. Plaintiff counters that he did not know the names of the defendants whom he identified only as "officers" at the time he filed the grievance. Dkt. No. 115-1 at 14. Plaintiff filed Grievance No. GM-60782-16 on March 21, 2016. See Dkt. No. 109-14 at 22-23. In Grievance No. GM-60782-16, plaintiff stated that he filed his July 14, 2015 grievance in which he complained of C.O. Savage's purported order to stay inside his cell until unless he wrapped his hair in a religious hair covering. See id. Plaintiff alleged that, "[s]ince July 14, 2015 until present day (March 16, 2016), ... [he] ha[d] been confined to [his] cell because of [C.O.] Savage [sic] direct order. At no time ha[d] [he] been provided meals by any of the officers; and on 9 or 10 different [occasions] was not allowed to go to commissary even thought he had money in [his] account and wasn't on loss of commissary." Id. at 23 (emphases added). Plaintiff also stated that he was "not being allowed to go to [his] M-H-U call outs." Id.

Sgt. Coonradt acknowledges that he "was assigned to investigate plaintiff's "grievance GM-60782-16 in March 2016." 109-14 at 2 ¶ 6. Sgt. Coonradt's report to the IGPS made no mention of either C.O. Bogardus or C.O. Kaiser, and did not discuss the denial of meals or mental health call outs; rather it discussed only whether plaintiff's requested hair style violated Directive 4914 and whether C.O. Savage was harassing him. See id. at 15. Similarly, C.O. Savage's report to the IGPS 26, the Acting Grievance Supervisor's report to the IGRC 28, and the IGPS denial of Grievance No. GM-60782-16 addressed only plaintiff's request to wrap his hair atop his head. See id. at 25, 26, 28. Moreover, although the CORC's decision upholding the denial of Grievance No. GM-60782-16 stated that plaintiff "regularly ma[de] commissary purchases" and "advise[d] [plaintiff] to address mental health concerns to the [OMH]," it did not reference C.O. Bogardus or C.O. Kaiser, or their alleged acts of denying plaintiff meals or mental health callouts. Id. at 19. In addition, C.O. Bogardus and C.O. Kaiser both declare that they had no recollection of plaintiff filing a grievance against them. See Dkt. No. 109-15 at 2 ¶ 15; Dkt. No. 109-16 at 2 ¶ 15.

Although, as stated above, "exhaustion is not per se inadequate" because plaintiff did not name C.O. Bogardus and C.O. Kaiser in his March 21, 2016 grievance, plaintiff offered no description or identifying information about the correction officers who allegedly retaliated against

him for filing his July 14, 2015 grievance, aside from stating that the individuals who did not provide him with meals were "officers." Dkt. No. 109-14 at 23. Plaintiff offered no description whatsoever of the person(s) who allegedly did not "allow[ ]" him to go to his mental health callouts. Id.; cf. Varela v. Demmon, 491 F.2d 442, 449 (S.D.N.Y. 2007) (denying the defendants' motion for summary judgment insofar as they sought dismissal of plaintiff's Eighth Amendment claim for failure to exhaust based on the plaintiff's failure to include the defendants' names in his grievance, where the plaintiff identified the defendants as "the officers escorting me" and "an officer which was posted on building 2 gate."). Indeed, C.O. Kaiser explained in his declaration that, "[d]uring 2015-2017, [he] mainly worked on the A-5 yard supervising inmates while they were in the yard and the A-2 paint gang supervising inmates while they painted" Dkt. No. 109-16 at 2 ¶ 5. C.O. Bogardus also indicated that, "[d]uring 2015-2017, [he] did not have a permanent job posting in A-Block were [p]laintiff was housed, but rather, [he] occasionally worked in A-Block and did chow runs, took counts, and took inmates to the yard." Dkt. No. 109-15 at 2 ¶ 5. Thus, the summary judgment record does not allow the undersigned to infer, that plaintiff's vague reference to "officers" in his March 21, 2016 grievance was intended to allege that two correction officers, who did not hold permanent positions on plaintiff's housing block, denied him meals and mental health callouts over the alleged "8 months" he was "confined to [his] cell because of [C.O.] Savage['s] ... order." Dkt. No. 109-14 at 23.

**\*19** Moreover, although plaintiff asserts that "the grievance supervisor refused to investigate and address th[e] portions of [his] grievance [concerning] not being provided food, being denied MHU callouts, and denied commissary[,]" Dkt. No. 119 at 6, those assertions all hinge on plaintiff's self-imposed confinement to his cell, which was investigated and addressed. See Dkt. No. 109-14 at 19, 24, 25, 26, 28. Therefore, it is recommended that plaintiff's claims against C.O. Bogardus and C.O. Kaiser be dismissed for failure to exhaust available administrative remedies. Alternatively, as discussed below, it is recommended that plaintiff's claims against C.O. Bogardus and C.O. Kaiser be dismissed as meritless.

**B. Personal Involvement—Sullivan,
Supt. Miller, and Sgt. Coonradt**

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." Kinch v. Artuz, No. 97-CV-2419 (LAP), 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995) and Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874 (holding that the fact that the defendant occupied a high-ranking position in the New York prison hierarchy, without more, was insufficient to establish personal involvement). Prior to deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel could be considered "personally involved" if

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation omitted)).

In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. Consistent with other circuits, the Second Circuit concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " Id. at 618.[11] The Second Circuit explained that, " 'the factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary. The violation must be established against the supervisory official directly." Id. (quoting Iqbal, 556 U.S. at 676). "District courts discussing Tangreti agree that the decision invalidated the Colon test and mandates that a plaintiff must establish a violation against the supervisory official directly." Fabrizio v. Smith, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) (collecting cases), report and recommendation adopted, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211023 (N.D.N.Y. June 1, 2021).

[11]    Prior to Tangreti, Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

### 1. Sullivan

**\*20** Defendants have proffered admissible evidence that Sullivan, "[a]s the Commissioner of OMH," Sullivan "has

no personal role in addressing or answering complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's OMH complaint, investigate the allegations made therein, or review the findings or conclusions made by other OMH personnel regarding the said allegations." Dkt. No. 109-22 at 2 ¶¶ 6, 7. Thus, defendants' admissible documentary evidence establishes that Sullivan did not, by her "own individual actions," violate plaintiff's Eighth Amendment rights. Tangreti, 983 F.3d at 616.

Indeed, even applying the now-invalid Colon standard, plaintiff cannot establish Sullivan's personal involvement. As Sullivan explained, "[any] letters of complaint that are addressed to [her] are forwarded to OMH Risk Management for investigation and reply" and that "[i]f a patient disagrees with Risk Managements [sic] findings and is incarcerated and receiving OMH services through a DOCCS facility, the inmate patient may appeal Risk Management's determination to the Executive Director of [CNYPC]." Dkt. No. 109-22 at 2 ¶ 5. Thus, at most, defendants' admissible evidence establishes that Sullivan referred any complaint from plaintiff to OMH Risk Management—which is insufficient to establish her personal involvement for purposes of Section 1983. See Jones v. Fischer, No. 9:11-CV-774 (GLS/CFH), 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013) ("[R]eceipt of a letter ..., without personally investigating or acting on [it], is insufficient to establish personal involvement."); Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *16 (N.D.N.Y. Jan. 24, 2013) ("[M]ere receipt of a report or complaint or request for an investigation ... is insufficient to hold the official liable for the alleged constitutional violations."), report and recommendation adopted, No. 9:11-CV-186 (NAM/TWD), 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013); Walker v. Pataro, No. 99-CV-4607(GBD/AJP), 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."). Plaintiff's conclusory assertion in opposition that there are "genuine facts in dispute" insofar as it relates to Sullivan, Dkt. No. 114 at 3 (capitalization omitted), is insufficient to defeat defendants' documentary case. See Batista v. Union of Needleworkers, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30, 2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the] defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); see also Scott v. Coughlin,

344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Accordingly, it is recommended that plaintiff's Amended Complaint be dismissed insofar as asserted against Sullivan for lack of personal involvement.

### 2. Supt. Miller

As stated above, Tangreti makes it clear that, to establish a constitutional violation against a supervisor, the plaintiff "must plead and prove that [the supervisor-] defendant, through [his] own individual actions, has violated the constitution." Tangreti, 983 F.3d at 618 (internal quotation marks omitted). In light of Tangreti, plaintiff cannot establish Supt. Miller's personal involvement based upon the denial of a grievance and/or appeals, because it does not plausibly suggest "[t]he factors necessary to establish" a First Amendment Establishment Clause claim. Id. Further, even applying the now-invalid Colon standard, as defendants aver, Supt. Miller's review and affirmance of the IGRC's denials of plaintiff's grievances is insufficient to establish personal involvement. See Zielinski v. Annucci, No. 9:17-CV-1087 (GTS/CFH), 2019 WL 2479616, at *12 (N.D.N.Y. Jan. 8, 2019) ("[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."), report and recommendation adopted, No. 9:17-CV-1087 (GTS/CFH), 2019 WL 1305826 (N.D.N.Y. Mar. 22, 2019). Similarly, plaintiff's contention that Supt. Miller did not respond to his letter requesting that C.O. Savages order be revoked, causing him to remain "wrongly confined to his cell," Amen. Compl. at 8 ¶ 41, fails to establish Supt. Miller's personal involvement in the alleged constitutional violations. See Rodriguez v. Rock, No. 9:13-CV-01106 (DNH), 2015 WL 5147045, at *6 (N.D.N.Y. Sept. 1, 2015) ("[I]t is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged."). Plaintiff did not advance any arguments or proffer any evidence in opposition to defendants' motion in this regard. See Dkt. No. 119 at 2-9. Accordingly, it is recommended that the Amended Complaint be dismissed as to Supt. Miller for lack of personal involvement.

### 3. Sgt. Coonradt

**\*21** Plaintiff alleges only that Sgt. Coonradt "issued orders and/or ruled on plaintiff's grievances in a way that would force and/or encourage him to be a member of the Rastafarian religion so he could wear their religious hair covering in order to wrap his dredlocks [sic] up even after becoming aware that plaintiff [was] non-religious and didn't want to practice the tenets of any religion." Amen. Compl. ¶ 114. However, as the record evidence establishes that Sgt. Coonradt's involvement was limited to investigating plaintiff's grievances and issuing reports to the IGRC, see Dkt. No. 109-14 at 15, 27, plaintiff has failed to establish Sgt. Coonradt's personal involvement as to the alleged Establishment Clause violation. See Gomez v. Sepiol, No. 11-CV-1017SR (MAT), 2014 WL 1575872, at \*10 (W.D.N.Y. Apr. 11, 2014) ("[T]he investigation of a grievance alone, is not sufficient to allege personal involvement in the underlying constitutional violation."); see also Rosales v. Kikendall, 677 F. Supp. 2d 643, 649 (W.D.N.Y. 2010) (holding that the plaintiff failed to establish the defendant's personal involvement based on allegations that the defendant investigated the plaintiff's grievance and concluded that there was no evidence that the other defendants had retaliated against the plaintiff). Plaintiff does not proffer any evidence in opposition to defendants' motion in this regard. Accordingly, it is recommended that the Amended Complaint be dismissed as to Sgt. Coonradt for lack of personal involvement.

### C. Merits

### 1. First Amendment Claims

### a. Retaliation

To establish a claim a First Amendment retaliation claim under Section 1983, a prisoner must demonstrate that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well established that the filing of a prisoner grievance constitutes protected conduct under the First Amendment. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("[T]he filing of prison grievances is a constitutionally protected activity."). Next, as to the second factor, adverse action, plaintiff alleges that C.O. Savage, C.O. Bogardus, and C.O. Kaiser "deprived [him] of ... approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and depression[.]" Am. Compl. at 30 ¶ 118. While the denial of meals may constitute adverse action, see Keesh v. Goord, No. 04-CV-271A (RJA), 2007 WL 2903682, at \*10 (W.D.N.Y. Oct. 1, 2007) (holding that the plaintiff's confinement in keeplock for "nearly twenty-four hours," during which he "may have been deprived of meals," constituted sufficient adverse action to support a First Amendment retaliation claim.), the record evidence here establishes that, to the extent plaintiff missed meals at the Green Meadow C.F. mess hall, it was due exclusively to his own personal choice, and not because of C.O. Savage's instruction.

Defendants point out that plaintiff testified at deposition that he would have been able to comply with DOCCS Directive 4914 if he had "tie[d] [his] dreads into a ponytail that still went to the back rather than pinned to the top of [his] head," then he "would ... have been able to leave [his] cell." Dkt. No. 109-8 at 53. Defendants further point to plaintiff's deposition testimony in which he made clear that he was able to come out of his cell at any time with his hair down and that he came out of his cell for commissary because "there's no check points" and he "d[id]n't have to sit down"; at checkpoints and the mess hall, his hair would touch other people and the floor; and that, "[f]or the most part," "[t]he way [he] determined whether or not [he] came out of [his] cell would depend on whether or not [his] hair would come in contact with the other people or the floor." Dkt. No. 109-8 at 82; see id. at 81, 83. In particular, plaintiff explained that he did not want to stop at checkpoints because correction officers would check his hair "with the[ ] same security gloves ... that they use in pat frisk" and to "check inmates [sic] boots ..., that would all be on my hair." Id. at 82-83. He also stated that "these prisons is [sic] dirty, and so who knows what's on the floor that connects to my face where my hair is at...." Id. at 83-84. Plaintiff explained that cutting his hair so that he could comply with inmate hairstyling and grooming policies "was not an option for [him]" and that he "wouldn't even entertain it." Id. at 36. In response to defense counsel's inquiry as to why plaintiff

2021 WL 5095284

did not want to cut his hair, plaintiff testified, "[b]ecause I've been growing [it] for ... 20 something years, it's part of my identity, it's a part of my personality. I didn't want to cut it." Id. at 48. Further, plaintiff acknowledged that, when C.O. Savage informed him that he could only wear his hair wrapped up if it was covered with a religious covering that he "kn[e]w at that point [that he] could also cut [his] hair." Id. at 37.

**\*22** Plaintiff's deposition testimony in this regard is corroborated by defendants' admissible evidence, including Sgt. Coonradt's grievance investigation report, which explained that plaintiff was "under no disciplinary sanction nor ... confined in any way. He is free to attend meals, commissary, rec, and MHU as he wishes. Any confinement has been self-imposed by [plaintiff]." Dkt. No. 109-14 at 27. Plaintiff's inmate declarations submitted in opposition to defendants' motion, to the extent admissible, fail to raise a genuine question of material fact as to whether plaintiff was confined to his cell based on C.O. Savage's instruction; rather, the inmate declarations establish only that C.O. Savage instructed plaintiff not to come out of his cell with his hair wrapped on top of his head in violation of Directive 4914 —but not that plaintiff was confined to his cell such that he was prevented from obtaining meals. See Dkt. No. 115-1 at 2, 4, 7, 8, 10. Indeed, plaintiff chose not to go to the mess hall to receive meals because he did not want to stop at check points or sit down and have his hair touch other people or the floor. See Dkt. No. 109-8 at 81-83. Thus, the record evidence establishes that C.O. Savage did not retaliate against plaintiff by confining him to his cell and, therefore, that plaintiff did not miss any meals because of C.O. Savage's instruction to violate Directive 4914; rather, any missed meals or callouts were solely the result of his decision to remain inside of his cell rather than comply with applicable inmate regulations.

Further, it is well settled that "[a]llegations of adverse actions alone ... are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Indeed, the plaintiff "bears the burden of showing ... that the protected conduct was a substantial or motivating factor in the prison officials' decision to" take the alleged adverse action. Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (internal quotation marks and citation omitted). Circumstantial factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant

concerning his motivation. See Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872-73). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, plaintiff has asserted a close temporal proximity between his protected conduct and the alleged adverse action, as he suggests that the denial of meals began on July 15, 2015, one day after he filed his first grievance against C.O. Savage. See Am. Compl. ¶¶ 33, 38, 74. However, "temporal proximity alone is insufficient to establish an inference of retaliation," Thomas v. Waugh, No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at \*4 (N.D.N.Y. Sept. 30, 2015), and the summary judgment record is devoid any other circumstantial evidence that supports an inference of retaliation. For instance, plaintiff does not allege that C.O. Savage made any statements evidencing a retaliatory motive. See Baskerville, 224 F. Supp. 2d at 732; see also Arce v. Walker, 58 F. Supp. 2d 39, 46 (W.D.N.Y. 1999) (granting summary judgment in favor of the defendants and dismissing the pro se inmate plaintiff's First Amendment retaliation claim where, "[t]here w[a]s no evidence to support [the plaintiff's] bald conclusion that the actions at Attica were retaliatory" and

the plaintiff "d[id] not allege that anyone made any statements to him or that he overhead any comments or observed any acts that suggested an improper motive."). Indeed, plaintiff testified that, before July 14, 2015, he "knew who [C.O. Savage] was but ... hadn't interacted" with him. Dkt. No. 109-8 at 46. Plaintiff explained that, after C.O. Savage told plaintiff that he could not wear his hair wrapped up on July 14, 2015, he told C.O. Savage he would write a grievance, in response, plaintiff testified that C.O. Savage stated, "go ahead, fine. Write the grievance." Id. at 45. Plaintiff testified that he believed C.O. Savage "didn't care" that he was going to write a grievance. Id. Further, aside from alleging that C.O. Savage told him that facility personnel "can't just let inmates do any old thing they want to do," plaintiff stated that he did not "have any further discussions with him about the situation." Id. at 68. Plaintiff also testified "[n]o" in response to defense counsel's question as to whether C.O. Savage "ma[d]e any further comments to [plaintiff] about ... filing a grievance." Id. Moreover, plaintiff stated, "I don't know. I don't know," in response to defense counsel's inquiry as to why he believed C.O. Savage had "singled [him] out" about his hair. Id. at 84. In addition, plaintiff's submissions demonstrate that he has an extensive inmate disciplinary record dating back to 2005, see Dkt. No. 12-1 at 24-28, Dkt. No. 115-2 at 58-16, including at least five Tier II violations for having "unfastened hair." See Dkt. No. 12-1 at 24, 25.

**\*23** In opposition, plaintiff submits the affidavits of 23 separate Great Meadow C.F. inmates. See Dkt. No. 115-3 at 2-28. As defendants contend, see Dkt. No. 118 at 4, many of these affidavits are of no evidentiary value, as they consist exclusively of hearsay and conjecture rather than the inmates' personal observations and/or do not identify C.O. Savage as the officer who allegedly ordered plaintiff not to leave his cell with his hair wrapped up without a religious covering. See, e.g., Dkt. No. 115-3 at 25 (Inmate Robert Brown's declaration, stating that plaintiff "informed [him] that hes [sic] been confined to his cell for approx. 22 months because of a direct order given to him about wearing a religious hair covering on his dreadlocks ... when he wears [them] up, which he refuses to do."). Inmate Balfour Ayala's declaration states that, "[o]n July 14, 2015 [he] witnessed officer Savage give [plaintiff] a [sic] order not to come out [sic] his cell with his hair wrapped up without a religious hair covering." Dkt. No. 115-3 at 7. Similarly, inmate Walter Washington's declaration states that On or about July 14, 2015, ... I observed officer Savage ... ask [plaintiff] about a religious hair covering for his hair. When [plaintiff] told him he didn't have one, officer Savage told [plaintiff] not to come

out of his cell with his hair wrapped up without a religious hair covering on it." Id. at 10. Moreover, inmate Alexander Padilla declares that, "on July 14, 2015[, he] overheard [plaintiff] ask C.O. Savage where [he could] find according to DOC[CS] directives that [he was] not able to leave [his] cell without a religious hair covering for [his] locks," and that he "then heard C.O. Savage repl[y] its stated inside your rule book and I'm telling you to not leave your cell until you follow the directive." Id. at 8. At most, these inmate declarations establish that C.O. Savage instructed plaintiff not to leave his cell with his hair styled in a noncompliant manner. Indeed, the inmate declarations corroborate defendants' admissible evidence, which demonstrates that plaintiff simply chose to remain inside of his cell most of the time and avoid the mess hall because he did not want to comply with Directive 4914 or go through security checkpoints. See Dkt. No. 109-14 at 15, 27, 28; Dkt. No. 109-8 at 81-83.

With respect to C.O. Bogardus and C.O. Kaiser, plaintiff alleges only that those defendants "were aware that [he] wasn't coming out of his cell for chow ... because these ... defendant[s] ... took the 'Go around' acknowledging him not coming out of his cell." Amen. Compl. at 14 ¶ 64. However, at deposition, plaintiff testified only that C.O. Bogardus and C.O. Kaiser "was just leaving [him] in" the cell even when he was "cutting" himself and "getting [him] no medical assistance," but did not mention any issues concerning those defendants and his ability to access food or the mess hall. Dkt. No. 109-8 at 85. Moreover, plaintiff's inmate declarations and grievance records are devoid of any reference to either C.O. Bogardus or C.O. Kaiser. See Dkt. No. 109-14 at 15, 19, 25-28; Dkt. No. 115-3 at 2-28. In addition, C.O. Bogardus and C.O. Kaiser both state in their sworn declarations that they did not prevent plaintiff from obtaining meals or retaliate against plaintiff in any way. See Dkt. No. 109-16 at 2, 3 ¶¶ 12, 16, 17; Dkt. No. 109-15 at 2, 3 ¶¶ 12, 16, 17. Thus, defendants have proffered admissible evidence establishing entitlement to summary judgment dismissing plaintiff's First Amendment retaliation claims, in opposition to which plaintiff has failed to raise a genuine issue of fact. Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O.s Savage, Bogardus, and Kaiser be dismissed with prejudice.

#### b. Establishment Clause

The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment

of religion." U.S. CONST. amend. I. It ensures that the government does not "coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion." Muhammad v. City of New York Dep't of Corrs., 904 F. Supp. 161, 197 (S.D.N.Y. 1995) (internal quotation marks, brackets, and citation omitted). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir. 2006) (internal quotation marks and citation omitted). In Lemon v. Kurtzman, the United States Supreme Court set forth a test to assess whether a government practice satisfies the Establishment Clause. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, reh'g denied 404 U.S. 876 (1971). "The Lemon test requires the Court to consider: (1) whether the government action in question has a secular purpose; (2) whether the primary effect of the action, as seen by a reasonable observer, 'neither advances nor inhibits religion,' and (3) whether the action fosters 'excessive government entanglement with religion.' " Lewis v. Zon, 920 F. Supp. 2d 379, 386 (W.D.N.Y. 2013) (quoting Lemon, 403 U.S. at 612-13). However, "as with the Free Exercise Clause, prison officials are permitted to 'make [ ] difficult judgments concerning institutional operations,' as stricter scrutiny would 'seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.' " Powlette v. Morris, No. 13-CV-7378 (KPF), 2016 WL 3017396, at *8 (S.D.N.Y. May 23, 2016) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

 **\*24** Plaintiff alleges that defendants presented him with a "Hobson's Choice" between registering as a Rastafarian in order to be allowed to wear his hair wrapped up under a hair covering or remain inside his cell, such that defendants pressured him to register as a Rastafarian in violation of his First Amendment rights under the Establishment Clause. Amen. Compl. at ¶ 38. As discussed in detail above, see subsection IV.C.1.a., supra, plaintiff was, in fact, presented with no such predicament. Rather, the admissible evidence makes clear that, at most, C.O. Savage and Scroggy presented plaintiff with a potential solution—in response to his inquiry—for wearing his hair in his desired manner of wrapping it on top of his head without violating applicable DOCCS hairstyling regulations.

DOCCS Directive 4914, which was in effect at all relevant times, provides, in relevant part, that inmate's "[h]air may be permitted to grow over the ears to any length desired by the inmate. The hair must be neatly groomed and kept clean at all times." Dkt. No. 12-1 at 33. Concerning dreadlocks, Directive 4914 provides

> The dreadlock hairstyle is allowed. When worn, dreadlocks must extend naturally from the scalp and may not be woven, twisted, or braided together forming pockets that cannot be effectively searched. Inmates wearing <u>below</u> the shoulder length dreadlocks must tie them back in a ponytail with a barrette, rubber band, or other fastening device approved by the Superintendent.

Id. However, Directive 4914 provides a single religious exemption from the general dreadlock rule, which states that, "[i]nmates of the Rastafarian religious faith may wear their dreadlocks in an approved religious head covering." Id.

As plaintiff's Amended Complaint alleges, in June 2015, he entered the mess hall at Great Meadow C.F. "with his hair in a ponytail." Amen. Compl. at ¶ 30. However, plaintiff explained that, due to the length of his hair, his dreadlocks still touched the floor even when he sat down, so he "placed his hair around his waist and sat it in his lap to avoid it from coming into contact with the ... floor." Id. C.O. Savage, while working in the mess hall on the unspecified date in June 2015, informed plaintiff that he could not sit with his hair touching the floor. See id. at ¶ 31; see Dkt. No. 109-20 at 2 ¶ 6. C.O. Savage explained that, "[p]laintiff asked if he needed to have a religious head covering in order to wear his hair atop his head." Dkt. No. 109-20 at 2 ¶ 6. C.O. Savage told plaintiff that "per DOCCS Directive 4914, he was required to wear a religious covering in order to wear his hair atop his head." Id. Similarly, Scroggy's declaration establishes that—in response to plaintiff's inquiry about wearing a hair covering —he "advised [p]laintiff that tying his hair to the top of his head was in violation of DOCCS policy" and "that, in order to comply with DOCCS policy, he had the option to request a waiver, on the basis of a religious accommodation granted to members of the Rastafarian faith, which would allow him to tie his hair to the top of his head, so long as it was covered with an approved religious covering, or to cut his hair." Dkt. No. 109-21 at 2 ¶ 6. Further, IGRC Acting Grievance Supervisor's April 2016 memorandum and Sgt. Coonradt's October memorandum concluded only that

C.O. Savage was correct that, pursuant to Directive No. 4914, plaintiff was not allowed to wear his dreadlocks wrapped on top of his head without a religious covering; plaintiff was not under any disciplinary sanction as a result of his hair; and that any confinement to his cell was "self-imposed." See Dkt. No. 109-14 at 27; see id. at 2 ¶ 10, 15 28. Thus, the admissible evidence establishes that C.O. Savage and Scroggy did not, as plaintiff claims, attempt to coerce him to register as a Rastafarian; rather, defendants—in response to plaintiff's inquiries regarding his proposed solutions to complying with DOCCS policies without cutting his hair —merely informed plaintiff that he would need a religious exemption to allow him to use a covering if he wished to wear his hair wrapped atop his head. See Dkt. No. 12-1 at 33; Dkt. No. 109-20 at 2 ¶ 6; Dkt. No. 109-14 at 2 ¶ 10, 28.

**\*25** Plaintiff's Establishment Clause claim against Sgt. Coonradt, Sgt. Hawk, and Supt. Miller is even weaker, as those defendants did nothing more than determine that plaintiff was not allowed to wear his hair wrapped up uncovered or wear a covering over his dreadlocks without being a registered member of the Rastafarian faith. See Dkt. No. 109-14 at 5, 15; Dkt. No. 109-13 at 6; Dkt. No. 109-19 at 2 ¶ 6. Indeed, the summary judgment record is devoid of any facts to establish that these defendants instructed or in any way attempted to persuade or coerce plaintiff register as a Rastafarian; rather, the evidence before the undersigned demonstrates that those defendants, at most, applied the plain language of Direct 4914 to plaintiff's grievances and concluded that plaintiff was not entitled to violate DOCCS rules based on his desired, but prohibited, hairstyle. See id.

In opposition, plaintiff fails to establish the existence of a genuine issue of material fact. First, as discussed above, plaintiff's inmate declarations establish only that C.O. Savage directed plaintiff not to exit his cell with his hair styled in a non-compliant manner. See subsection IV.C.1.a, supra. Moreover, plaintiff's assertion—raised for the first time in his opposition to defendants' motion—that, as an atheist, "refraining from religion and religious practices were central aspects to [his] belief," and that he "personally decided to grow and wear" his long dreadlocks "free of religious influences" is of no moment. Dkt. No. 115-1 at 7. As discussed above, neither defendants nor Directive 4914 prohibited plaintiff from wearing his hair down, even given the significant length of plaintiff's hair; rather, plaintiff was merely prohibited from styling his hair in a manner that violated applicable DOCCS policies. See Dkt. No. 12-1 at 33. In this respect, C.O. Savage's purported statement that "we

can't just allow inmates to do what they want" is accurate, as neither he nor any of the other DOCCS defendants have the authority to allow plaintiff to violate prison rules. Amen. Compl. at 9 ¶ 45. In any event, plaintiff made clear during his deposition that his refusal to cut his hair was "because [he has] been growing [it] for ... 20 something years, it's part of [his] identity, it's a part of [his personality. [He] didn't want to cut it." Dkt. No. 109-8 at 48.

In addition, plaintiff's contention that, following Amaker, DOCCS modified Directive 4914, such that "all inmates were allowed to grow their hair to any length desired, all inmates could grow and wear dreadlocks without fear of punishment, and they didn't have to be a registered member of the Rastafarian faith, and the prison population was happily ever after" is demonstrably false. Dkt. No. 115-1 at 11. Contrary to plaintiff's self-serving characterization of the legal issue presented in that case, Amaker, in fact, assessed whether DOCCS could enforce a "policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks." Amaker, 2010 WL 2595286, at \*1. Of course, it is undisputed that Directive 4914 allows non-Rastafarians to wear dreadlocks, which plaintiff does. See Dkt. No. 12-1 at 33. Moreover, as previously discussed, contrary to plaintiff's unsupported assertion in opposition, defendants did not "require [plaintiff], as an atheist, to wear a tsalot-kob," but merely informed him that the only way to wear such a covering was to register as a Rastafarian. Dkt. No. 115-1 at 11; see Dkt. No. 12-1 at 33; Dkt. No. 109-20 at 2 ¶ 6; Dkt. No. 109-14 at 2 ¶ 10, 28. Finally, as his own submissions demonstrate, plaintiff's unsupported assertion that DOCCS Directive 4202 allows all inmates to possess and wear a tsalot-kob is belied by the plaint language of that directive, which clearly states that a tsalot-kob "is approved religious headwear for members of the Rastafarian faith." Dkt. No. 115-3 at 37.

**\*26** In short, the undersigned concludes that instructing plaintiff—in response to his inquiries and requests—that his proposed hairstyle was not permissible under relevant DOCCS grooming and hairstyling policies, and informing him that he could wear a hair covering only if he registered as a Rastafarian—does not violate the Establishment Clause. Accordingly, it is recommended that plaintiff's First Amendment Establishment Clause claim be dismissed with prejudice, as without merit. In light of the foregoing, the undersigned declines to reach defendants' qualified immunity argument.

### 2. Eighth Amendment Claims

#### a. C.O.s Savage, Bogardus, and Kaiser

Plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser violated his Eighth Amendment rights in two ways. First, he alleges that, by confining him to his cell and denying him the ability to go to eat meals in the mess hall, those defendants "deprived [him] of ... approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes...." Am. Compl. at 30 ¶ 118; see Dkt. No. 115-1 at 16. Second, plaintiff claims that C.O.s Savage, Bogardus, and Kaiser confined plaintiff to his cell and denied him the ability to attend mental health callouts and failed to obtain medical assistance when he cut himself, thereby denying plaintiff adequate medical care. See id. at 21 ¶¶ 81, 82. "The relevant legal standard governing both claims is the same." Evans v. Albany Cty. Corr. Facility, No. 9:05-CV-1400 (GTS/DEP), 2009 WL 1401645, at *9, (N.D.N.Y. May 14, 2009).

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was sufficiently serious—and a subjective element—that the officials acted, or omitted to act, with a sufficiently culpable state of mind...." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

#### i. Conditions of Confinement

To prevail on an Eighth Amendment claim for unconstitutional conditions of confinement, a plaintiff must prove that "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and alteration omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) (additional citation omitted)). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d 253, 280 (2d Cir. 2006) (citation omitted).

**\*27** "While no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citations omitted). "To establish a valid claim that the denial of food ... constitutes an Eighth Amendment violation, one must establish that there was a 'sufficiently serious condition' that resulted from the food not being received." Evans, 2009 WL 1401645, at *9. A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

Here, plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser violated his Eighth Amendment rights by "deprivp[ing] [him] of ... approximately 2,059 nutritiously prepared mess[ ]hall meals over a time span of 22 months, causing [plaintiff] to lose a substantial amount of [weight], (suffering) stomach pains, headaches, dizzy spells, lack of energy and motivation, breaking out with rashes and

depression[.]" Am. Compl. at 30 ¶ 118; see Dkt. No. 115-1 at 16. Plaintiff asserts that C.O. Bogardus and C.O. Kaiser were also aware of plaintiff's confinement, because they observed plaintiff "not coming out [of his] cell" and, contends—for the first time in opposition to defendants' motion—that C.O. "Bogardus[ ] state[d] to [C.O.] Kaiser," "[w]hen he's hungry enough, he'll come out of his cell the way we told him." Dkt. No. 115-1 at 16.

First, as discussed in detail above, the record evidence establishes that plaintiff remained in his cell and did not attend meals at the mess hall based on his own preference to avoid checkpoints and sitting at the mess hall tables, and his refusal to wear his hair in a compliant manner. See subsection IV.C.1.a, supra. Further, even assuming that plaintiff lost weight, experienced dizzy spells, and experienced stomach pains, headaches, and lack of motivation and energy, such allegations are insufficient to establish an Eighth Amendment conditions of confinement claim because they do not demonstrate a "sufficiently serious condition." Evans, 2009 WL 1401645, at *10 ("[E]ven assuming that [p]laintiff lost thirty pounds and experienced dizziness and headaches over a four-month period ... 'there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation.' ") (quoting Bost v. Bockelmann, No. 9:04-CV-246 (GLS/DEP), 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)). Plaintiff's claim that the alleged deprivation of food caused him to break out and develop a rash, see Am. Compl. at 30 ¶ 118, is wholly conclusory, unsupported by any facts or evidence contained in the record on summary judgment, and not elaborated on whatsoever by plaintiff in his pleadings. [12] In any event, even if plaintiff could satisfy the objective element, he has not established that C.O.s Savage, Bogardus, and Kaiser "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious ... harm [would] result" to plaintiff. Salahuddin, 467 F.3d at 280 (citation omitted). Defendants have submitted admissible documentary evidence to establish that C.O.s Savage, Bogardus, and Kaiser did not confine or deny plaintiff meals. See Dkt. No. 109-15 at 2 ¶¶ 10, 12; Dkt. No. 109-16 at 2 ¶¶ 10, 12; Dkt. No. 109-20 at 2, 3 ¶¶ 9, 13; Dkt. No. 109-14 at 3 ¶ 12, 27; Dkt. No. 109-8 at 37, 48, 82-84.

[12]    The undersigned will address plaintiff's contention that that the alleged confinement exacerbated his mental health conditions below in subsection IV.C.2.a.ii., infra.

**\*28** Plaintiff's contention that C.O. Bogardus and C.O. Kaiser observed plaintiff "not coming out [of his] cell" to go to the mess hall fails to establish that these defendants intentionally disregarded a risk of significant harm to plaintiff. See Farmer, 511 U.S. at 837 ("[T]he [defendants] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference."). The inmate declarations plaintiff proffers in opposition fail to raise a genuine issue of fact as to the mental states of C.O.s Savage, Bogardus, and Kaiser, as those declarations establish only that plaintiff remained in his cell because he did not want to comply with DOCCS grooming and hairstyling policies. See Dkt. No. 115-1 at 2-28. Moreover, none of the inmate declarations name C.O. Bogardus or C.O. Kaiser. See id. In addition, plaintiff's belated and self-serving allegation that C.O. Bogardus told C.O. Kaiser that plaintiff would "come out of his cell the way we told him" "[w]hen he's hungry enough," Dkt. No. 115-1 at 16, is insufficient to raise a genuine issue of material fact. See Zembko v. Northwestern Mut. Life Ins. Co., No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007) ("[A] nonmovant's self-serving conclusory statements that dispute the movant's evidence cannot create material issues of fact to avoid summary judgment." (internal quotation marks and citation omitted)).

### ii. Deliberate Medical Indifference

Plaintiff alleges that C.O.s Savage, Bogardus, and Kaiser deprived him of adequate medical care by preventing him from attending mental health callouts, which he contends exacerbated his mental health issues and caused him to "mutilate himself." Amen. Compl. at 21 ¶ 84. Plaintiff also posits that he cut himself in front of C.O.s Bogardus and Kaiser, and that both of them "left without getting plaintiff any medical and mental health treatment." Id. at 21 ¶¶ 81, 82.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle, 429 U.S. at 104). Non-medical personnel may only be held liable for deliberate indifference to medical needs upon a showing that they intentionally denied or delayed a plaintiff's access to medical care or intentionally interfered with medical

treatment once it was prescribed. See Banks v. No. 8932 Corr. Officer, No. 11-CV-8359 (LAP), 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); Davidson v. Scully, No. 83-CV-2025, 1994 WL 669549, at *12 (S.D.N.Y. Nov. 30, 1994) ("Evidence of deliberate indifference may be found in: a lengthy delay in arranging for medically indicated treatment for a prisoner's serious medical problem, ... deliberate interference with a prisoner's prescribed treatment, ... the refusal of prison officials to provide necessary medical care as punishment for misconduct unrelated to the prisoner's medical condition, ... and a serious failure to provide needed medical attention when prison officials are fully aware of that need....") (internal quotation marks and citations omitted).

As an initial matter, plaintiff's diagnosis of antisocial personality disorder does not constitute a "serious medical illness." McEachin v. Faruki, No. 9:03-CV-1442 (LEK/DRH), 2006 WL 721570, at *3 (N.D.N.Y. Mar. 20, 2006) ("[The plaintiff] fails to demonstrate that he suffered from a serious medical need. Although [the plaintiff] was diagnosed with antisocial personality disorder, this condition does not constitute a serious medical illness.") (citation omitted). Further, as discussed exhaustively above, even if plaintiff's diagnosis constituted a serious medial illness, the admissible evidence establishes that C.O.s Savage, Bordardus, and Kaiser did not prevent him from requesting or going to medical call outs, as plaintiff was never under any disciplinary sanction or order that required him to stay in his cell. See subsection IV.C.1.a., supra. Moreover, plaintiff's medical records indicate that, although sometimes requiring rescheduling, he did attend his monthly mental health therapy appointments with Dr. McCloskey and his quad-annual appointments with Psychiatric Nurse Practitioner Meyers. See Dkt. No. 109-10 at 59-68, 73-76; 77-88, 90-98. Indeed, plaintiff's July 2017 therapy progress notes, authored by Leta Luguri, Psychologist II at CNYPC ("Luguri"), stated that, "review of [plaintiff's] record indicate[d] that he ha[d] been mostly compliant with MH call outs." Id. at 109, 111. In addition, defendants' admissible evidence establishes that plaintiff's mental health status did not deteriorate during the relevant time period, as evidenced by his numerous progress notes that indicate that plaintiff was, at worst, "mildly depressed" or "mildly anxious,' which he reported as being "due to incarceration." Id. at 83; see id. at 77, 87, 92, 94. However, as Dr. McCloskey explained, plaintiff did not exhibit symptoms

of "major mental illness such as ...major depression." Id. at 3 ¶ 10. Indeed, plaintiff's medical records indicate that he consistently "den[ied] any psychotic symptoms and none were observed." Id. at 77, 79, 81, 83, 87, 91, 92, 94, 96; see id. at 97, 101, 102, 103, 104, 107, 109, 111. In any event, C.O.s Savage, Bordardus, and Kaiser deny having any knowledge of plaintiff's mental health diagnosis, such that plaintiff cannot establish that any of these defendants were deliberately indifferent in that they "knew of and disregarded [plaintiff's] serious medical needs." Chance, 143 F.3d at 703; see Dkt. No. 109-15 at 2 ¶ 13; Dkt. No. 109-16 at 2 ¶ 13; Dkt. No. 109-20 at 3 ¶ 14.

**\*29** With respect to plaintiff's allegations that he cut himself in front of C.O.s Bordardus and Kaiser, and that those defendants failed to obtain medical treatment for him, the record evidence establishes only that, on April 14, 2016, plaintiff "report[ed]" to Dr. McCloskey, that "three to four weeks ago he cut his wrist and arms, not deeply, did not need or receive Medical Dept. treatment." Dkt. No. 109-10 at 91. However, plaintiff's March 8, 2016 progress note authored by Luguri did not indicate any such behavior. See id. at 89. Further, C.O. Bordardus and C.O. Kaiser deny having any recollection of plaintiff cutting himself, and plaintiff's medical records are devoid of any mention of these defendants in relation to such an incident. See id.; Dkt. No. 109-15 at 2 ¶ 14; Dkt. No. 109-16 at 2 ¶ 14. In any event, as stated above, contrary to plaintiff's allegation, plaintiff's medical records indicate that he did not require medical attention for his purported self-cutting. See Dkt. No. 109-10 at 91. Plaintiff's inmate declarations fail to raise a genuine issue of fact in opposition, as none of those declarations name C.O. Bordardus or C.O. Kaiser; rather, the inmate declarations only vaguely attribute the purported failure to obtain medical treatment for plaintiff's self-cutting to an "officer Nelson," Dkt. No. 115-3 at 18, 19, or unnamed "guards." Id. at 23. Consequently, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claims against C.O.s Savage, Bordardus, and Kaiser be dismissed with prejudice as without merit.

### b. OMH Defendants

Insofar as plaintiff contends that OMH defendants failed to provide him with adequate or appropriate mental health treatment, his claim is belied by defendants' admissible evidence. First, Dr. McCloskey declared that "[p]laintiff did not, during the time [he] provided [plaintiff] with therapy,

exhibit any symptoms that would have lead [him] to believe that [plaintiff] was suffering from a major mental illness." Dkt. No. 109-10 at 3 ¶ 11. Further, based on plaintiff's "primary diagnosis of antisocial personality disorder," OMH defendants provided plaintiff with monthly therapy sessions with Dr. McCloskey, supplemented by four annual visits with N.P. Meyers, and further therapy as needed. See Dkt. No. 109-10 at 2-3 ¶¶ 9-10. Dr. McCloskey explained that "[t]his is the basic standard of care to be provided to mental health patients," such as plaintiff, who do not suffer from "a major mental illness." Dkt. No. 109-10 at 2-3 ¶ 10; see id. at 3 ¶ 11. Similarly, N.P. Meyers explained that, as part of plaintiff's treatment plan for managing his antisocial personality disorder, she evaluated plaintiff's medication needs once every three months, which she states "is the basic standard of care to be provided to mental health patients without a major mental illness." Dkt. No. 109-18 at 2 ¶ 11. In addition, both Dr. McCloskey and N.P. Meyers declared that, based on plaintiff's diagnosis and symptoms, ICP and TrICP were not appropriate for plaintiff, as those programs "are for inmate patients with more severe mental health treatment needs than those displayed by [p]laintiff or for inmate patients that require more assistance to adjust to the environment of prison general population than [p]laintiff required." Dkt. No. 109-10 at 6 ¶ 34; Dkt. No. 109-18 at 5 ¶¶ 20-22. In any event, although Dr. McCloskey and N.P. Meyers had the ability to recommend ICP or TrICP in appropriate cases, neither had the ability to unilaterally place plaintiff in such a program. See Dkt. No. 109-10 at 6 ¶ 36; Dkt. No. 109-18 at 5 ¶ 23. Moreover, Bernstein, McCulloch, and Steed, who reviewed plaintiff's grievances concerning his desire to be placed in TrICP or ICP, concluded that "the mental health treatment being provided by OMH was clinically appropriate and in accordance with the relevant policy." Dkt. No. 109-11 6 ¶ 23; Dkt. No. 109-17 at 4 ¶ 19; Dkt. No. 109-12 at 4 ¶ 19. Thus, to the extent that plaintiff contends that his treatment plan, therapy schedule, and lack of placement in ICP or TrICP was improper, plaintiff's argument amounts only to a disagreement with medical treatment—an insufficient basis to establish an Eighth Amendment violation. See Benitez v. Parmer, 654 F. App'x 502, 505 (2d Cir. 2016) (summary order) (" 'It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' (quoting Chance, 143 F.3d at 703)).

**\*30** To the extent that plaintiff contends that his medical records establish that he has a history of suicide attempts

and self-harming behavior such that he suffers from more severe mental health issues than explained by Dr. McCloskey and N.P. Meyers, his records make clear that he "does not endorse a history of suicidal behavior but does have a history of expressing suicidal ideation/intent/plan, typically superficially for secondary gain. Record reflects that he has a [history] of threatening self harm in an attempt to delay/impact transfer." Dkt. No. 109-10 at 37. Said another way, plaintiff's medical records indicate that he has a history of threatening to harm himself in order to get his own way, and plaintiff fails to proffer any evidence to establish that he suffers from more serious mental health issues than those opined to by Dr. McCloskey and N.P. Meyers and supported by his medical records. Moreover, insofar as plaintiff alleges that the OMH defendants failed to refer him to the Great Meadow C.F. medical department, Dr. McCloskey's, Meyer's, Steed's, McCulloch's, and Bernstein's declarations establish that "[p]laintiff had the ability to request a medical call out and did not require a referral from OMH staff." Dkt. No. 109-10 at 6 ¶ 38; Dkt. No. 109-18 at 5 ¶ 25; Dkt. No. 109-12 at 4 ¶ 18; Dkt. No. 109-17 at 4 ¶ 18; Dkt. No. 109-11 at 6 ¶ 22.

In addition, as plaintiff has alleged only that Sullivan failed to respond to his complaints regarding the OMH, the record evidence establishes that Sullivan referred plaintiff's complaints—per OMH policy and procedure—"to OMH Risk Management for investigation and reply." Dkt. No. 109-22 at 2 ¶ 5. Therefore, as Sullivan explained in her declaration, she "has no personal role in addressing or answering complaints filed by OMH patients or inmate patients" and "did not review [p]laintiff's OMH complaint, investigate the allegations made therein, or review the findings or conclusions made by other OMH personnel regarding the said allegations." Id. at ¶¶ 6, 7. Consequently, as discussed above, plaintiff has failed to establish Sullivan's personal involvement in any Eighth Amendment violation. See subsection IV.B.1, supra. Plaintiff's conclusory statements and general denials asserted in opposition fail to overcome defendants' documentary case establishing entitlement to summary judgment as to plaintiff's Eighth Amendment medical indifference claims asserted against the OMH defendants. See Dkt. No. 114 at 3 ¶¶ 1, 2, 3, 5, 6; Dkt. No. 119 at 7-8.

### D. Plaintiff's Rule 56(d) Request to Reopen Discovery (Dkt. No. 114)

Although plaintiff labels his motion as being made pursuant to Fed. R. Civ. P. 56(f), which he states was "formerly known as Rule 56(d)," id. 114 at 2, it appears that plaintiff has merely reversed the sequence of the 2010 Amendment, pursuant to which "Subdivision (d) carrie[d] forward without substantial change the provisions of former subdivision (f)." FED. R. CIV. P. 56, Advisory Committee Notes to 2010 Amendment of Subsection (d). Indeed, plaintiff requests that the Court "set aside [d]efendants [sic] Summary Judgment Motion that pertains to OMH [d]efendants," because he is "ill prepared to defendant against them due in part, to the complex issues, the multi-faceted entities that [he is] against," including "OMH, CNYPC, DOCCS, GMCF's MHU, and GMCF," which he states "each [has its] own Rules & Regulations, and Policies and Procedures)," and because plaintiff is "a layman to the law and this field of study." Id. at 14 ¶ 49. In particular, plaintiff argues that the Court's dismissal of Corey Jackson as a defendant in this action was premature because "documents would later show that he was more personally involved than previously thought[.]" Id. at 3 ¶ 7. In addition, plaintiff states that he requested, but was denied, "a complete copy of [his] OMH records," id. at 3 ¶ 4, which he states is necessary for him to determine whether defendants afforded him adequate mental health treatment. See id. at 5 ¶ 14. Thus, the undersigned will assess plaintiff's requests in this regard as seeking a stay and to supplement the summary judgment record and to reopen discovery as to his claims against the OMH defendants pursuant to Rule 56(d).

Fed. R. Civ. P. 56(d) permits the Court to, among other things, delay consideration of a summary judgment motion and reopen discovery if a "nonmovant," such as plaintiff, "shows by affidavit ... that, for specified reasons, [he] cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Second Circuit has established a four-part test for [assessing] the sufficiency of [the] affidavit": the "affidavit must include [1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; and [4] why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994). "Even if the declaration satisfies the four requirements, this Court may deny a request for 'cumulative' or 'speculative' discovery materials, or a request based solely on 'bare, generalized assertions.'" Desrameaux v. Delta Air Lines Inc., No. 2:15-CV-347 (CBA/VMS), 2018 WL 1224100, at *6 (E.D.N.Y. Mar. 8, 2018) (quoting Alphonse Hotel Corp. v. Tran, 828 F.3d 146,151-52 (2d Cir. 2016)). The decision whether grant relief pursuant to Rule 56(d) is within the discretion of the district court. See Crye Precision LLC v. Duro Textiles, LLC, 689 F. App'x 104, 106 (2d Cir. 2017) (summary order) (citing Alphonse Hotel Corp., 828 F.3d at 151).

**\*31** Although Plaintiff has filed an affidavit attempting to comply with Fed. R. Civ. P. 56(d), that affidavit fails to show his entitlement to the requested relief. First, plaintiff contends that he needs "a complete copy of [his] OMH records," id. at 3 ¶ 4, so that he can assess whether the OMH defendants provided him with adequate mental health care. See id. at 5 ¶ 14. However, as plaintiff acknowledges, see id. at 5 ¶ 8, in ruling on his first motion to compel (see Dkt. No. 60) the undersigned denied plaintiff's request for his entire medical record, which plaintiff explained dated back to the beginning of his incarceration in 2000, as irrelevant. See Dkt. No. 75 at 15. Furthermore, plaintiff concedes that he was "provided with [his medical] documents from the time he was housed in [Great Meadow C.F.]" Dkt. No. 114 at 5 ¶ 8.

In his Rule 56(d) affidavit, plaintiff now avers that he requires his medical records before June 2015 because his "entire file was reviewed by ... [Dr.] McCloskey, Meyers, McCulloch, Bernstein, and Steed" and his "history, in its totality was a key component that they had taken into account when providing treatment." Dkt. No. 114 at 5 ¶ 8. Therefore, plaintiff posits, "because [he] do[esn't] know what was contained in the file that these [d]efendants were utilizing to treat [him], [he is] unable to adequately and fairly assess what they knew about [him] prior to treating him." Id. Plaintiff also insinuates that his records before June 2015 will demonstrate that, contrary to Dr. McCloskey's and Meyer's professional assessments, he had a "serious behavioral/personality illness that made [him] eligible" for TrICP or ICP, and that defendants should have known that "[l]eaving him in [his] cell" would cause him to "act out, i.e. mutilate [himself] in order to effectuate a transfer[.]" Id. at 9 ¶¶ 22, 24.

Plaintiff is incorrect that Dr. McCloskey and Meyers assessed plaintiff's mental health status based on his records prior to June 2015; rather, Dr. McCloskey and Meyers both state in their declarations that, "[p]laintiff did not, during the time I provided him with therapy, exhibit any symptoms that would have lead me to believe that he was suffering from a major mental illness." Dkt. No. 109-10 at 2 ¶ 8; Dkt. No. 109-18 at 3 ¶ 12. Dr. McCloskey began treating plaintiff as his therapist on June 15, 2015, and N.P. Meyers began treating plaintiff on April 27, 2016. See Dkt. No. 109-10 at 3 ¶ 13; Dkt. No. 109-18 at 3 ¶ 13. Further, Dr. McCloskey and Meyers both

state that they based their declarations on their "personal knowledge and review of the records kept in the usual course of business by [OMH]," and indicate that the records relevant to the present motion are "[p]laintiff's mental health records from June 2015 through July 2017," which are attached as exhibit A to Dr. McCloskey's declaration. Dkt. No. 109-10 at 1, 2 ¶¶ 2, 8; Dkt. No. 109-18 at 1, 2 ¶¶ 2, 8. Insofar as plaintiff avers that medical records pre-dating June 2015 are relevant to establish his weight for purposes of his medical indifference claim, as discussed above, even taking plaintiff's allegations concerning his weight loss as true, his claims lack merit. See subsection IV.C.1.a, supra. Thus, plaintiff has again failed to establish the relevance of any medical records pre-dating June 2015. To the extent plaintiff wished to refute any of the OMH defendants' mental health assessments based on DOCCS records from plaintiff's incarceration at Great Meadow C.F., plaintiff has had those documents in his possession since at least March 2020, and, therefore, cannot contend that he was unable to defend against them. See Dkt No. 75 at 14-15. Plaintiff's remaining contention that the medical records he received were "saturated with inconsistencies" is, as defendants aver, unsupported by any facts or evidence. Dkt. No. 114 at 5-¶ 9; Dkt. No. 118 at 10.

**\*32** The undersigned reaches the same conclusion insofar as plaintiff avers that documents revealed through discovery show that previously dismissed defendant Jackson was personally involved and, therefore, "dismissed prematurely." Dkt. No. 114 at 3 ¶ 7. Plaintiff refers to certain email correspondence between Jackson and Bernstein, which he states shows that "Bernstein [was] looking to ... Jackson ... for his template in order to rubber stamp" Bernstein's response to plaintiff's OMH complaints, "which was the same rubber stamp used by McCulloch[ ] and Steed." Id. at 13 ¶ 45. Plaintiff also states that "[d]iscovery would later reveal that [Jackson] was receiving [h]is complaints and those written on [his] behalf, but was intentionally evading [plaintiff] while making ghost decisions ... denying [p]laintiff treatment." Id. at ¶ 46 (parenthesis omitted). Finally, plaintiff states that Jackson failed to intervene to provide mental health treatment for plaintiff despite "walk[ing] to any block [plaintiff] was in, ... and see[ing] [plaintiff] in whatever cell [he] was occupying ... [and] being aware of the ongoing problem, and the alleged harm it was causing [plaintiff]." Id. at 13-14 ¶ 47. To the extent that plaintiff seeks to aver that the Court previously erred in dismissing Jackson as a defendant, he has not established that he is unable to "present facts essential to justify [his] opposition" to defendants' motion for summary judgment.

FED. R. CIV. P. 56(d). In any event, as discussed in detail above, defendants have established that plaintiff received adequate medical care and that plaintiff's claims against the OMH defendants amount to, at most, disagreement with the course of his medical treatment—an insufficient basis to establish an Eighth Amendment claim. See Subsection IV.C.2.b., supra. Therefore, the undersigned concludes, email correspondence between Jackson and Bernstein—which was available to plaintiff to rely on in opposition to defendants' motion—does not raise any question of fact with respect to plaintiff's meritless Eighth Amendment medical indifference claims asserted against the OMH defendants. Consequently, plaintiff's motion pursuant to Fed. R. Civ. P. 56(d) to reopen discovery is denied.

## V. Conclusion

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 109) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that plaintiff's Amended Complaint (Dkt. No. 12) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that plaintiff's motion to reopen discovery pursuant to Fed. R. Civ. P. 56(d) (Dkt. No. 114) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(1); Fed R. Civ. P. 6(a), 6(e), 72. [13]

[13]    If you are proceeding pro se and are served with this Order by mail, three additional days will be

added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 5095284

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4272396
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas BRYANT, Plaintiff,

v.

Christopher MILLER, Super., Great Meadow C.F.;
J. Scroggy, Sr. Counselor, Great Meadow C.F.;
Savage, Corr. Officer, Great Meadow, C.F.; Kaiser,
Corr. Officer, Great Meadow C.F.; Bogardus, Corr.
Officer, Great Meadow C.F.; D. Coonradt, Sgt.,
Great Meadow C.F.; McCloskey, Therapist, MHU,
Great Meadow C.F.; C. Meyers, Nurse Prac., Great
Meadow C.F.; Meaghan Bernstein, Risk Mgmt.
Specialist, CNYPC; Deborah J. McCulloch, Exec.
Dir., CNYPC; James Steed, Clinical Risk Reviewer,
OMH; M. Hawk, Sgt., Great Meadow C.F.; and
Anne Marie Sullivan, Comm'r, OMH, Defendants.

9:18-CV-0494 (GTS/CFH)
|
Signed 09/21/2021

**Attorneys and Law Firms**

THOMAS BRYANT, Plaintiff, Pro Se, 90 Saratoga Avenue,
Apt. #3, Yonkers, New York 10705.

HON. LETITIA JAMES, Attorney General of the Status of
New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ.,
Assistant Attorney General, JORGE A. RODRIGUEZ, ESQ.,
Assistant Attorney General, Counsel for Defendants, The
Capitol, Albany, New York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Thomas Bryant ("Plaintiff") against the
thirteen above-captioned employees of the New York State
Department of Corrections and Community Supervision,
Central New York Psychiatric Center, and New York
State Office of Mental Health ("Defendants"), are (1)
United States Magistrate Judge Christian F. Hummel's
Report-Recommendation recommending that Plaintiff's
Amended Complaint be dismissed in its entirety, (2)

Plaintiff's Objections to the Report-Recommendation, and
(3) Defendants' response to Plaintiff's Objections to the
Report-Recommendation. (Dkt. Nos. 123, 125, 126.) For the
reasons set forth below, Magistrate Judge Hummel's Report-
Recommendation is accepted and adopted in its entirety,
Defendants' motion for summary judgment is granted, and
Plaintiff's Amended Complaint is dismissed.

**I. RELEVANT BACKGROUND**

 **A. Magistrate Judge Hummel's Report-
 Recommendation**
Generally, in his Report-Recommendation, Magistrate Judge
Hummel rendered the following seven findings of fact and
conclusions of law: (1) Plaintiff's claims against Defendants
Bogardus and Kaiser should be dismissed on the threshold
ground that he failed to exhaust his available administrative
remedies with regard to those claims, and on the alternative
ground that those claims are meritless; (2) Plaintiff's claims
against Defendants Sullivan, Miller and Coonradt should be
dismissed for lack of personal involvement; (3) Plaintiff's
First Amendment retaliation claims against Defendants
Savage, Bogardus and Kaiser should be dismissed with
prejudice because (among other reasons) Plaintiff has failed
to adduce evidence showing these Defendants prevented him
from obtaining meals or otherwise retaliated against him;
(4) Plaintiff's First Amendment Establishment Clause claims
against Defendants Savage, Miller, Hawk, Coonradt, and
Scroggy should be dismissed with prejudice because (among
other reasons) Plaintiff has failed to adduce evidence showing
these Defendants coerced Plaintiff into joining a religious
organization; (5) Plaintiff's Eighth Amendment conditions-
of-confinement claim against Defendants Savage, Bogardus,
Kaiser should be dismissed with prejudice because (among
other reasons), even if Plaintiff could satisfy the objective
prong of this claim (which he cannot), he has failed to
satisfy the subjective prong of this claim; (6) Plaintiff's
Eighth Amendment deliberate medical indifference claim
against Defendants Savage, Bogardus, and Kaiser should
be dismissed with prejudice because (among other reasons),
even if Plaintiff could satisfy the objective prong of this claim
(he cannot), he has failed to satisfy the subjective prong of
this claim; and (7) Plaintiff's Eighth Amendment deliberate
medical indifference claim against Defendants McCloskey,
Meyers, Bernstein, McCulloch, Steed and Sullivan should be
dismissed because (among other reasons), even if Plaintiff
could satisfy the objective prong of this claim (he cannot), he
has failed to satisfy the subjective prong of this claim. (Dkt.
No. 123, at Part IV.) [1]

[1]

In addition, Magistrate Judge Hummel denied Plaintiff's motion to reopen discovery pursuant to Fed. R. Civ. P. 56(d) for the following three reasons: (1) Plaintiff was provided all relevant documentation since his incarceration at Great Meadow C.F. and cannot, at this late stage, contend he was unable to defend against the OMH Defendants' mental health assessments of him; (2) Plaintiff's request for records prior to 2015 is both unnecessary and irrelevant because (a) he did not begin mental health treatment until 2015 and (b) Defendants McCloskey's and Meyers' testimony establishes that Plaintiff did not exhibit any symptoms indicating a serious mental illness; and (3) as to the dismissal of Plaintiff's claims against Defendant Jackson, the Court finds Plaintiff's arguments unpersuasive given that evidence has established that he received adequate medical care and any email correspondence between Defendant Jackson and the OMH Defendants does not create a genuine dispute of material fact to support a deliberate medical indifference claim. (Dkt. No. 123, at Part IV.)

**B. Plaintiff's Objections to the Report-Recommendation**

**\*2** Generally, liberally construed, Plaintiff's Objections chiefly assert the following four arguments: (1) Magistrate Judge Hummel erred in recommending the dismissal of Plaintiff's First Amendment retaliation claim and Eighth Amendment conditions-of-confinement claim on the grounds that Plaintiff's cell confinement was self-imposed, because in fact that confinement was imposed by Defendant Savage's order; (2) Magistrate Judge Hummel erred in recommending the dismissal of Plaintiff's Eighth Amendment deliberate medical indifference claims against Defendants Savage, Kaiser and Bogardus, because those Defendants (a) failed to recognize that Plaintiff was not eating and had lost a significant amount of weight and suffered other health conditions, and (b) failed to recognize Plaintiff's abnormal anti-social behaviors and properly alert medical or mental health staff to those behaviors; (3) Magistrate Judge Hummel erred in recommending the dismissal of Plaintiff's Eighth Amendment deliberate medical indifference claims against the OMH Defendants because (a) those Defendants' course of treatment consisting of "talk therapy" was inadequate, (b) Magistrate Judge Hummel incorrectly determined that Plaintiff's personality disorder was not sufficiently serious,

and (c) Magistrate Judge Hummel dismissed Plaintiff's claims against Defendants Steed and Bernstein from this action without providing a basis for that dismissal; and (4) Magistrate Judge Hummel erred in recommending the dismissal of all of Plaintiff's remaining constitutional claims because Magistrate Judge Hummel failed to liberally construe those claims. (Dkt. No. 125.)

**C. Defendants' Response to Plaintiff's Objections**

Generally, Defendants' response to Plaintiff's Objections sets forth the following two arguments: (1) as a threshold matter, the Court should not consider Plaintiff's Objections, because they are untimely and Plaintiff neither received nor even requested an extension of the filing deadline, and (2) in any event, the Report-Recommendation should be adopted in its entirety because Plaintiff has failed to raise any specific objection to its factual findings or otherwise show that Magistrate Judge Hummel's legal conclusions are erroneous. (Dkt. No. 126, Points I-II.)

**II. STANDARD OF REVIEW**

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [2] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [3] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation

that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

2    *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

3    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also*

*Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. 4 Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* 5

4    *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

5    *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**III. ANALYSIS**

After carefully reviewing the relevant papers herein, including Magistrate Judge Hummel's thorough Report-Recommendation, the Court can find no error in the specific portions of the Report-Recommendation to which Plaintiff has specifically objected, and clear-error in the remaining portions of the Report-Recommendation: Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein and for the reasons set forth in Defendant's response to Plaintiff's Objections. *See, supra,* Parts I.A. and I.C. of this Decision and Order. To those reasons, the Court would add only three brief points, which are intended to supplement and not supplant those reasons.

First, the Court notes that the majority of Plaintiff's arguments for rejecting the Report-Recommendation findings and conclusion with regard to Plaintiff's claims of deliberate medical indifferent (described above in Part I.B. of this Decision and Order) consist simply of a reiteration of arguments previous submitted to, and rejected by, Magistrate Judge Hummel. (*Compare* Dkt. No. 125, at Objection 14, 16 [Plf.'s Obj.] *with* Dkt. No. 115, Attach. 1, at 15, 17 [Plf.'s Opp'n Memo. of Law]; *compare* Dkt. No. 125 at Objection 17-18 [Plf.'s Obj.] *with* Dkt. No. 114 [Plf.'s Cross-Motion] *and* Dkt. No. 119 at Part VI [Plf.'s Reply Memo. of Law].) As a result, most of the "challenged" portions of the Report-Recommendation are entitled to only a clear-error review, which they easily survive. In the alternative, those portions of the Report-Recommendation survive a *de novo* review.

 **\*4** Second, although a diagnosis of antisocial personality disorder can in certain circumstances constitute a serious medical condition under the Eighth Amendment (for example, if it is accompanied by other diagnosed conditions and/or by exhibited symptoms despite therapy), the Court agrees with Magistrate Judge Hummel that, based on the admissible record evidence before the Court, no reasonable fact finder could conclude that Plaintiff's condition was sufficiently serious under the Eighth Amendment. [6] Furthermore, even if Magistrate Judge Hummel were mistaken with regard to this issue, he based his recommendation on his alternative finding that, even if Plaintiff could satisfy the objective prong of this claim, he has failed to satisfy the subjective prong of this claim.

[6]    Compare *McEachin v. Faruki*, 03-CV-1442, 2006 WL 721570, at \*3 (N.D.N.Y. Mar. 20, 2006) (Kahn, J.) ("[The plaintiff] fails to demonstrate that he suffered from a serious medical need. Although [the plaintiff] was diagnosed with antisocial personality disorder, this condition does not constitute a serious medical illness.") (citing case from Western District of Wisconsin) *with Young v. Choinski*, 15 F. Supp.3d 172, 184 (D. Conn. 2014) (treating as a serious medical condition plaintiff's "post-traumatic stress disorder, borderline personality disorder and antisocial personality disorder") *and Sims v. Gorman*, 09-CV-6643, 2012 WL 566875, at \*4 (W.D.N.Y. Feb. 21, 2012) ("The Court finds that Sims's diagnosed mental illnesses (bipolar and antisocial personality disorders), and concomitant suicidal ideation and actual suicide attempts, constituted a serious medical need.").

Third, the Court finds no basis for Plaintiff's argument that Magistrate Judge Hummel dismissed Plaintiff's claims against Defendants Steed and Bernstein without providing a reason for that dismissal, because Magistrate Judge Hummel acknowledged that Defendants Steed and Bernstein had reviewed Plaintiff's grievances concerning his mental health treatment and found Plaintiff's treatment complied with facility's guidelines. (*See, e.g.,* Dkt. No. 123, at 25-26.)

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 123) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 109) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED with prejudice**.

The Court certifies that an appeal from this Decision and Order would not be taken in good faith.

**All Citations**

Slip Copy, 2021 WL 4272396

WESTLAW    © 2022 Thomson Reuters. No claim to original U.S. Government Works.    4

2022 WL 523628
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Freddy GUTIERREZ-PINTO, Plaintiff,

v.

Anthony ANNUCCI, Acting Commissioner of
Department of Corrections and Community Supervision;
Robert Rappa, Superintendent of Industry at Green
Haven Correctional Facility; Dan Garcia, Industry
Supervisor; Johnny Rojas, Correction Officer;
Robert Bentivenga, Medical Supervisor of Green
Haven Correctional Facility; and Mary Ashong,
Nurse Practitioner/Family Health, Defendants.

No. 20-CV-4490 (CS)
|
Signed 02/22/2022

**Attorneys and Law Firms**

Freddy Gutierrez-Pinto, Stormville, New York, Pro Se
Plaintiff.

Jessica Acosta-Pettyjohn, Assistant Attorney General, Office
of the Attorney General, State of New York, New York, New
York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, U.S.D.J.

 **\*1** Before the Court is the motion to dismiss of Defendants
Anthony Annucci, Robert Rappa, Dan Garcia, Johnny Rojas,
Robert Bentivenga, and Mary Ashong. (ECF No. 28.) For the
following reasons, the motion is GRANTED.

**I. BACKGROUND**

I accept as true the facts, but not the conclusions, set forth in
Plaintiff's Amended Complaint, (ECF No. 26 ("AC")), Initial
Complaint, (ECF No. 2 ("IC")), and submission in opposition,
(ECF No. 32 ("P's Opp.")). *See Washington v. Westchester
Cnty. Dep't of Corr.*, No. 13-CV-5322, 2015 WL 408941,
at \*1 n.1 (S.D.N.Y. Jan. 30, 2015) (court may give *pro se*
plaintiff the benefit of considering facts in original complaint
even if they have not been repeated in amended complaint);
*Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at

\*1 (S.D.N.Y. Mar. 18, 2010) ("[A]llegations made in *a pro se*
plaintiff's memorandum of law, where they are consistent with
those in the complaint, may also be considered on a motion
to dismiss."). [1]

[1]     The Court will send Plaintiff copies of all
unpublished decisions cited in this Opinion and
Order.

  **A. Factual Background**

Plaintiff is incarcerated at Green Haven Correctional Facility.
On February 18, 2020, Plaintiff was working in the shipping
and receiving sector of "industry," loading coffins onto a van
trailer. (AC at 3.) Another inmate rammed a forklift into a
stack of coffins, which crashed down on Plaintiff, injuring
him and rendering him unconscious. (*Id.*) [2] Defendant
Garcia, the Industry Training Supervisor, and Defendant
Rojas, a correctional officer, were supposed to see "that
proper industrial protocol was being use[d]" while the coffins
were being loaded and stacked, but were twenty-five to thirty
feet away from where the incident occurred, unaware of what
was happening and allowing the inmate workers to supervise
themselves. (*Id.*; *see id.* at 2.) Plaintiff alleges that on the day
of his injury, safety equipment such as hard hats and gloves
were not distributed to all inmate workers, the coffins were
stacked on two-by-fours rather than pallets, and Garcia and
Rojas "failed in their duty of observing and supervising the
task of loading and securing cargo" and "assur[ing] that all
machinery was used properly." (*Id.* at 4-5.)

[2]     Medical records from Plaintiff's hospital treatment
that day state that he denied loss of consciousness
and recalled all events. (ECF No. 26-6 at 3.) I may
consider these records, and the other documents
attached to the AC, on this motion. *See DiFolco v.
MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.
2010).

Defendant Rappa is the Industrial Superintendent at Green
Haven and Garcia's supervisor. (*Id.* at 5.) Plaintiff alleges that
during his daily rounds on the day of the accident, Rappa
noticed several inmates without proper safety equipment and
failed to inform Garcia and Rojas that they were not properly
carrying out their duties. (*Id.*) Further, Rappa "failed [to
check] the listings of safety work gear that is suppose[d]
to be available for all inmates at their work assignments"
and "failed in his duties ... by allowing these infractions to
continue." (*Id.*)

**\*2** Plaintiff was taken by ambulance to Vassar Brothers Medical Center, an outside hospital, (*id.* at 6), where a CAT scan showed "no acute traumatic injuries" and it was determined that "[n]o further trauma surgery intervention" was needed, (ECF No. 26-6 at 3). He was discharged the same day. (*Id.* at 2.) His discharge diagnosis was soft-tissue "[c]ontusion of multiple sites," for which it was recommended that he be given 650mg of Tylenol four times a day if he had pain and that he return to the hospital if he developed a severe headache, weakness in his arms or legs, or other severe symptoms. (ECF No. 26-8 at 2.) After returning to Green Haven, Defendant Ashong, a nurse practitioner, made the "medical decision" not to send Plaintiff back to the hospital or refer him to a doctor. (AC at 7.) She did not provide Plaintiff with a "bonafide medical doctor" or devices such as a walking cane or brace, because she deemed them unnecessary, and told Plaintiff instead "to walk it off, it will take care of itself." (*Id.*) After complaining of severe pain, Plaintiff was admitted to the prison hospital in late February, but Ashong refused to send him back to the outside hospital. (*Id.*) Plaintiff alleges that he went to sick call nearly every day and was eventually told by Ashong to "stop putting in for sick call" and "if you're coming down here to complain about your pain, you can leave right now." (*Id.* at 7-8.) Six months after the incident, Ashong requested X-rays and physical therapy for Plaintiff, and after seven sessions, the therapist canceled them because Plaintiff was in such pain and the therapist felt that the therapy was doing more harm than good. (*Id.* at 8.) Ashong read the X-rays taken in August 2020 to be "normal" and also read an EMG nerve exam performed in December 2020 to be "negative." (*Id.*)

In May 2020, in response to a letter from Plaintiff, Defendant Bentivenga, the Facility Health Services Director, wrote Plaintiff a memorandum stating that his provider did not find a back brace to be medically necessary. (ECF No. 26-7 at 4.) In late June, in response to another letter from Plaintiff, Bentivenga by memorandum reviewed Plaintiff's situation and concluded, "As far as I can see you are receiving appropriate medical care, and I see no sign of 'indifference.' " (ECF No. 26-9 at 2.)

**B. Procedural History**
On June 11, 2020, Plaintiff filed a complaint in this court, alleging that Defendants Rappa, Garcia, Rojas, and Ashong treated him with deliberate indifference that constitutes cruel and unusual punishment in violation of the Eight Amendment. (IC at 4.)

On November 23, 2020, Defendants[3] filed a pre-motion letter in anticipation of their motion to dismiss, (ECF No. 17); Plaintiff responded on December 2, (ECF No. 19); and on January 6, 2021, at a pre-motion conference, I granted Plaintiff's leave to amend the Complaint, (*see* Minute Entry dated Jan. 6, 2021). Plaintiff filed the Amended Complaint on March 1, 2021, adding Anthony Annucci, the Acting Commissioner of the Department of Corrections and Community Supervision, and Dr. Bentivenga as Defendants. (AC at 2.) The instant motion followed.

[3]   This pre-motion letter was on behalf of Defendants Rappa, Garcia, Rojas, and Ashong – the named Defendants at the time. (ECF No. 17.)

## II. LEGAL STANDARDS

**A. Motion to Dismiss for Failure to State a Claim**
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown'

– 'that the pleader is entitled to relief.' " *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. *Pro Se* Plaintiffs

**\*3** Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curium*) (cleaned up). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (cleaned up).

## III. DISCUSSION

### A. Eighth Amendment Claims

### 1. Deliberate Indifference to Conditions of Confinement

I first consider whether Plaintiff has adequately stated an Eighth Amendment claim for deliberate indifference to his conditions of his confinement.

> To state an Eighth Amendment claim against a prison official based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety.

*McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (cleaned up); *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "When a prisoner asserts a claim predicated on an unsafe condition, the court must determine 'whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone*

unwillingly to such a risk.' " *McCray*, 963 F.3d at 120 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)) (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* (cleaned up). The objective element depends on both "the seriousness of the potential harm and the likelihood that such injury to health will actually be caused." *Helling*, 509 U.S. at 36.

#### a. Personal Involvement

Defendants first argue that Plaintiff's AC must be dismissed because he failed to plead facts showing the personal involvement of Defendants Annucci, Rappa, Garcia, Rojas, and Bentivenga. (ECF No. 29 ("Ds' Mem.") at 4-5.) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (cleaned up). While *Colon* laid out a special test for supervisory liability outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit recently clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Simply put, there's no special rule of liability for supervisors." *Id.* While " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676) (second alteration in original), "[t]he violation must be established against the supervisory official *directly*," *id.* (emphasis added).

**\*4** Plaintiff has not pleaded enough for me to conclude that Defendant Annucci was personally involved in any alleged constitutional violations. Plaintiff argues that his serious injuries are evidence enough for his Eighth Amendment claim, (P's Opp. at 5-6),[4] citing *Edwards v. Quiros*, 986 F.3d 187 (2d. Cir. 2021), for the proposition that "evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk," *id.* at 194. But here Plaintiff has not set forth facts plausibly suggesting that the risk that the other inmate would plow the forklift into the stack of coffins was obvious, or even foreseeable.

Nor could injury alone show that a particular defendant is responsible for the injury, as Defendants point out. (ECF No. 33 ("Ds' Reply Mem.") at 2.) Additionally, unlike in *Edwards*, where the defendant personally was aware of not only the relevant policy but also of the alleged conduct toward the plaintiff, 986 F.3d at 192-93, here Plaintiff provides no facts plausibly showing that Annucci knew anything about the coffin job or any risk posed to Plaintiff by the other inmate, or was in a position to prevent an accident like the one that occurred. Indeed, in the AC Plaintiff does not mention Defendant Annucci anywhere outside of the case caption. *See Boykin v. Moreno*, No. 17-CV-6869, 2020 WL 882195, at *3 (S.D.N.Y. Feb. 24, 2020); *King v. Falco*, No. 16-CV-6315, 2018 WL 6510809, at *7 (S.D.N.Y. Dec. 11, 2018).

> 4       Citations to Plaintiff's opposition refer to the page numbers generated by the Court's Electronic Case Filing ("ECF") System.

In his opposition, Plaintiff states that Defendant Annucci is liable because "it is his policies and procedure that made this incident possible. It is Acting Commissioner Annucci's policies ... that are duly responsible for accidents that occur due to improper training, as well as inadequate supervision...." (P's Opp. at 6.) This, however, is a conclusory allegation; Plaintiff fails to describe an actual policy of Annucci's that could be construed as evidence of his individual action. And obviously Annucci cannot be deliberately indifferent to events of which he is unaware. It is plain that Annucci is being sued merely based on his supervisory position, which even before *Tangreti* would not suffice to show personal involvement for purposes under § 1983. *See, e.g., Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2004) ("Where a defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct.") (cleaned up).

Accordingly, the Eighth Amendment claim against Annucci is dismissed.

With respect to Rappa, Garcia, and Rojas, Plaintiff pleads that they were on the site where he was injured and failed to prevent the injury, so I analyze whether the personal involvement pleaded suffices to state an Eight Amendment claim.

b. Analysis

In *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987), the Second Circuit held that a *pro se* prisoner stated a claim by alleging that a prison official ordered him to continue working on a ladder he had told the official was unsafe. The court held that such an order " 'involve[s] more than ordinary lack of due care for the prisoner's interests or safety.' " *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). After *Gill*, courts in this Circuit have found that significant injuries caused by hazardous prison workplace conditions can satisfy the objective element of an Eighth Amendment inquiry. *See, e.g., Kenyon v. Weber*, No. 16-CV-6510, 2017 WL 1078620, at *4 (W.D.N.Y. Mar. 20, 2017); *Walker v. Vargas*, No. 11-CV-9034, 2013 WL 4792765, at *7 (S.D.N.Y. Aug. 26, 2013); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 513-14 (N.D.N.Y. 1999).

But here Plaintiff fails to allege a hazardous workplace condition or other sufficiently serious deprivation under the objective prong. While I assume that Plaintiff's injuries were serious, they arose from an unforeseen and unforeseeable accident, where another inmate rammed a forklift into a stack of coffins, which then crashed down onto Plaintiff. (AC at 3.) The incident was not due to ongoing unsafe or hazardous physical conditions in the prison, but rather was a one-off, unintentional misfortune. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."). "[T]o succeed in establishing a constitutional deprivation in a setting such as that now presented the plaintiff must prove additional facts such as a history of accidents or a previous request for repairs that had fallen on deaf ears." *Monroe v. Mullen*, No. 06-CV-144, 2007 WL 2874435, at *5 (N.D.N.Y Sept. 27, 2007) (cleaned up).

**\*5** Courts in this Circuit routinely find that an accident, even if arising from a risky condition, does not rise to the level of a sufficiently serious deprivation. *See, e.g., Martin v. City of N.Y.*, No. 11-CV-600, 2012 WL 1392648, at *10 (S.D.N.Y. Apr. 12, 2012) ("Courts in this Circuit agree that bodily injuries sustained from a slip-and-fall on a wet floor simply do not rise to the level of a constitutional violation."); *Harris v. N.C.P. Dep't., Detective Div.*, No. 06-CV-5586, 2007 WL 1540232, at *2 (E.D.N.Y. May 24, 2007) (distinguishing "isolated instances of negligence that cause unintended injury" from repeated accidents where

"nothing was done after [the first accident] to prevent similar accidents"); *Hylton v. Fed. Bureau of Prisons*, No. 00-CV-5747, 2002 WL 720605, at *3 (E.D.N.Y. Mar. 11, 2002) ("To meet this high objective standard, [the defendant] must plead more than the fact that he was injured in [an] accident. He must plead circumstances – for example, recurring serious injuries to prisoners ... – sufficient to support an inference that the challenged conditions were so obviously hazardous as to constitute cruel and unusual punishment."). Here, Plaintiff has not pleaded any facts suggesting that Defendants had any reason to expect the other inmate to drive the forklift carelessly. Nor has he plausibly alleged facts that would distinguish his situation from that of any worker who faces the risk that a coworker might operate machinery dangerously. *See McCray*, 963 F.3d at 120 ("[Plaintiff's] Complaint did not make any claims of exceptional circumstances that would elevate the Green Haven yard conditions beyond the typical level of danger presented by a slippery sidewalk or a wet floor."). Plaintiff's allegations do not amount to a denial of "the minimal civilized measure of life's necessities" or a violation of "contemporary standards of decency." *Id.* at 117, 120.

Even if Plaintiff somehow satisfied the objective prong, the same reasoning would dictate that he also fails to satisfy the subjective prong, as no Defendant acted with deliberate indifference toward Plaintiff's health or safety. The subjective prong requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Tangreti*, 983 F.3d at 619. This requires "more than mere negligence"; instead, "the prison official must know of, and disregard, an excessive risk to inmate health and safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (cleaned up). Without reason to believe that the other inmate would drive the forklift into the stack of coffins, or that Defendants had the ability to stop it, the conduct of Rappa, Garcia, and Rojas cannot be said to rise to that level. Indeed, Plaintiff himself characterizes their behavior as "negligent," (AC at 5), but "mere negligence will not suffice" to show deliberate indifference, *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see Cotto v. Dee 1-5*, No. 18-CV-2130, 2018 WL 10140180, at *2 (S.D.N.Y. Apr. 17, 2018) ("The negligence of a correction official is not a basis for a claim of a federal constitutional deprivation under § 1983.").

Plaintiff alleges that Defendants Garcia and Rojas stood twenty-five to thirty feet away from where the incident

occurred and did not distribute safety equipment, and that Rappa did not tell them to do otherwise. (AC. at 3-5.) But this does not demonstrate prior knowledge of or deliberate indifference to a hazardous condition. Plaintiff does not allege that the forklift operator had any history of negligence; that any of these Defendants could have controlled the forklift if they stood more closely; that they knew the way the coffins were stacked was dangerous; or that the coffins falling would have been prevented, or would not have caused his contusions, if he had had goggles, gloves, or a hard hat. There are simply no facts in the Amended Complaint from which to plausibly infer that Rappa, Garcia, and Rojas were in possession of facts suggesting that Plaintiff's work assignment put him at substantial risk of serious harm, let alone that they drew the inference that he was at such risk and nevertheless failed to act. *See Farmer*, 511 U.S. at 837, 847.

Accordingly, Plaintiff's Eighth Amendment claim for deliberate indifference to the conditions of his confinement against Defendants Rappa, Garcia, and Rojas is dismissed.

### 2. Deliberate Indifference to Medical Needs

Next, I address whether Plaintiff has adequately stated a claim for deliberate indifference to his medical needs. The Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care. *See id.* at 832. "Yet not every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when two requirements" – one objective and one subjective – "are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (cleaned up).

**\*6** The objective element requires "the alleged deprivation of adequate medical care must be sufficiently serious." *Id.* (cleaned up). Under this element of the test, I must determine (a) "whether the prisoner was actually deprived of adequate medical care" and (b) if so, "whether the inadequacy in medical care is sufficiently serious." *Id.* at 279-80. Prison officials are required to provide "reasonable care." *Id.* at 279 (citing *Farmer*, 511 U.S. at 844-47). "Because prison officials' duty is only to provide reasonable care, prison officials are liable only if they fail to take reasonable measures in response to a medical condition." *Rutherford v. Correct Care Sols., LLC*, No. 18-CV-12049, 2020 WL 550701, at *5 (S.D.N.Y. Feb. 4, 2020) (cleaned up).

The subjective component requires a plaintiff to plausibly allege that the official acted with deliberate indifference to the inmate's health. *Salahuddin*, 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* "The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Id.* at 281.

"[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Deliberate indifference is more than an "inadvertent failure to provide adequate medical care." *Estelle*, 429 U.S. at 105. While deliberate indifference is not established merely because a provider concludes "no 'medical treatment' [is] necessary," *Jordan v. Fischer*, 773 F. Supp. 2d 255, 276-77 (N.D.N.Y. 2011), the personnel in question must actually evaluate the patient's condition and make a determination, *see Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *4 (S.D.N.Y. Sept. 30, 2017) (plaintiff who alleged he complained of chest pains and was sent back to his cell without examination or treatment before having a heart attack had pleaded deliberate indifference); *Gilliam v. Hamula*, No. 06-CV-6351, 2011 WL 6148943, at *16 (W.D.N.Y. Dec. 12, 2011) (alleged refusal to examine Plaintiff could support finding of deliberate indifference); *cf. Powell v. Cusimano*, 326 F. Supp. 2d 322, 338-39 (D. Conn. 2004) (plaintiff was not denied medical care because evidence clearly showed he was in fact examined by a nurse).

### a. Personal Involvement

Defendant Bentivenga argues that Plaintiff has not sufficiently alleged his personal involvement. (Ds' Mem. at 4; Ds' Reply at 2.) It is true that most of the medical allegations in the AC relate to Nurse Ashong, but Plaintiff attaches two memoranda in which Bentivenga reviews and approves of Ashong's treatment. If Ashong's treatment violated the Eighth Amendment and Bentivenga reviewed that care as part of his duties, knew it was unconstitutional, and did nothing about it, that could constitute sufficient deliberate indifference and personal involvement on his part. Accordingly, I analyze whether an underlying violation exists.

### b. Analysis

The objective element "contemplates a condition of urgency that may result in degeneration or extreme pain." *Chance*, 143 F.3d at 702 (cleaned up). "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (cleaned up). Although it does not appear that soft-tissue contusions would be the sort of injury that would require any long-term treatment, Plaintiff alleges that his injuries make it difficult for him to walk and that he is in excruciating pain. (AC at 7.) Taking those allegations as true, as I must at this stage, I will assume that he sufficiently alleges a serious deprivation.

**\*7** But he has not met the subjective test. Plaintiff takes issue with not seeing a "bonafide medical doctor," not getting a brace or cane, not being examined by a specialist, Ashong assessing his X-ray and nerve test results as normal, and not getting adequate pain medication. (AC at 7; P's Opp. at 6, 12.) But his allegations show that he was seeing Ashong regularly and that she ordered tests and therapy. (AC at 7-8; ECF No. 26-7 at 4; ECF No. 26-9 at 2.) His claim amounts to a disagreement over the proper course of treatment, which does not give rise to a constitutional violation. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). It is well settled that

> disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgment and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

*Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *Rutherford*, 2020 WL 550701, at *6. Accordingly, complaints alleging inadequate pain medication and disagreement with the course of treatment, like this one, are routinely dismissed in this Circuit, at least where some medical assessment is done. *See, e.g., Jacks v. Annucci*, No.

18-CV-3291, 2019 WL 3239256, at *4 (S.D.N.Y. July 18, 2019) (collecting cases); *Washington v. Westchester Cnty. Dep't of Correction*, No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference.").

Even if Defendant Ashong incorrectly assessed Plaintiff's condition, misread the scans, or should have provided additional treatment, this conduct would amount to nothing more than negligence or medical malpractice, and "[h]arm to a prisoner caused by accident, negligence or medical malpractice do not alone constitute the necessary deliberate indifference." *Hogan v. Russ*, 890 F. Supp. 146, 149 (N.D.N.Y. 1995). Plaintiff presents no facts plausibly suggesting that Ashong (or Bentivenga) believed that Plaintiff's care was inadequate but chose to do nothing. Plaintiff alleges that Ashong accused Plaintiff of lying about his pain, (P's Opp. at 6), but does not suggest that she did not believe that to be true. To the contrary, he alleges that she "believes Plaintiff is 'faking his injury.'" (*Id.* at 7.) Whether that belief is right or wrong, it does not amount to deliberate indifference. *See Salahuddin*, 467 F.3d at 281; *see also McClinton v. Connolly*, No. 13-CV-2375, 2014 WL 5020593, at *5 (S.D.N.Y. Oct. 8, 2014) ("[A]ccording to Plaintiff, Officers Lynch and Smith stated that they believed Plaintiff 'was faking an asthma attack.' If the officers believed Plaintiff's asthma attack was a mere ruse, they could not have been aware of a substantial risk that Plaintiff would suffer serious harm.") (cleaned up); *Hamilton v. Fisher*, No. 10-CV-1066, 2012 WL 987374, at *7 (N.D.N.Y. Feb. 29, 2012) ("[D]ischarging Plaintiff – after a lengthy hospital stay – under the suspicion that Plaintiff faked a suicide attempt in order to be removed from SHU might be considered negligent conduct under certain circumstances, but that finding, at best, is not sufficient to state an Eighth Amendment claim.") (cleaned up), *report and recommendation adopted*, 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012). [5]

[5]     In his opposition, Plaintiff describes events occurring in 2021 that he alleges constitute continued deliberate indifference. (*Id.* at 4, 11-12, 18, 20.) These allegations are not in the AC and Plaintiff never sought or obtained permission to amend to add them. In any event, they are of the same ilk as the pleaded facts and would not change the outcome.

**\*8**  Accordingly, Plaintiff's Eighth Amendment claim against Ashong and Bentivenga for deliberate indifference to medical needs is dismissed. [6]

[6]     As I do not find that Plaintiff has plausibly pleaded that Defendants displayed deliberate indifference to his conditions of confinement or medical needs, I need not address Defendants' argument that they are entitled to dismissal on qualified immunity grounds.

**B. Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (cleaned up). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended his complaint, (*see* AC), after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 17), and the discussion at the January 6, 2021 pre-motion conference, (Minute Entry dated Jan. 6, 2021). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled

2022 WL 523628

to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (cleaned up).

Moreover, Plaintiff has not asked to amend again or otherwise suggested that he is in possession of facts that would cure the deficiencies identified in this opinion.[7] Accordingly, the Court declines to grant leave to amend *sua sponte. See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

[7]    Further, at least some of "[t]he problem[s] with [Plaintiff's] causes of action [are] substantive," and "better pleading will not cure [them]." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## IV. CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to send a copy of this Opinion and Order to Plaintiff, terminate the pending motion, (ECF No. 28), and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 523628

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2894646
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Keith HALL, Plaintiff,

v.

DEPARTMENT OF CORRECTIONS MEDICAL
DEPARTMENT, Sing Sing Corr. Facility; Central
Office: Felix Ezekwe, M.D. Provider, Sing Sing
Corr. Facility; Ms. Rasia Ferdous, Medical Director,
Sing Sing Corr. Facility; F.M.D. Dana Gage;
Central Office Medical Department, Defendants.

No. 18-cv-6892 (NSR)
|
Signed 07/08/2021

**Attorneys and Law Firms**

Keith Hall, Ossining, NY, Pro Se.

Bruce J. Turkle, New York State Office of the Attorney
General, New York, NY, for Defendants Central Office Medic
Felix Ezekwe, M.D., F.M.D. Dana Gage, Rasia Ferdous,
Department of Corrections Medical Department Sing Sing
Corr. Facility.

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Keith Hall ("Plaintiff"), a *pro se* litigant
incarcerated at Sing Sing Correctional Facility ("Sing Sing")
and proceeding *in forma pauperis,* commenced this action
by the filing of his Complaint on July 31, 2018 pursuant
to 42 U.S.C. § 1983 ("Section 1983") against the New
York State Department of Corrections and Community
Supervision Central Office Medical Department ("Central
Office Medical Department"), the Medical Department
at Sing Sing Correctional Facility ("Sing Sing Medical
Department"), Dr. Felix Ezekwe, Medical Provider at Sing
Sing ("Ezekwe"), Ms. Rasia Ferdous, Medical Director at
Sing Sing ("Ferdous"), and F.M.D. Dana Gage, Central Office
Medical Department ("Gage"). (*See* ECF No. 2.) Plaintiff
alleges violations of his rights under the Eighth Amendment
to the United States Constitution arising from Defendants'
failure to provide adequate medical care for a condition
involving Plaintiff's prosthetic eye. Presently before the Court

is the motion of remaining defendants Ezekwe, Ferdous, and
Gage (collectively, "Defendants") to dismiss the Amended
Complaint pursuant to Federal Rules of Civil Procedure 12(b)
(6). (ECF No. 33.) Plaintiff did not submit any opposition to
the motion. For the following reasons, Defendants' motion is
GRANTED, and Plaintiff's Amended Complaint is dismissed
*without prejudice.*

**BACKGROUND**

**I. Factual Allegations**
The following facts are derived from the Amended Complaint
or matters of which the Court may take judicial notice, are
taken as true, and constructed in the light most favorable to
*pro se* Plaintiff for the purposes of this motion. *See Ashcroft
v. Iqbal,* 556 U.S. 662, 678 (2009); *Nicosia v. Amazon.com,
Inc.,* 834 F.3d 220, 230 (2d Cir. 2016).

Plaintiff is a prisoner in the custody of the New York State
Department of Corrections and at all relevant times was
incarcerated at Sing Sing Correctional Facility. (Amended
Complaint ("Am. Compl.") (ECF No. 28) at 6.) [1] During his
incarceration, Plaintiff was afflicted with eye-related health
issues which necessitated the installation of a prosthetic left
eye in or around 2006. (*Id.* at 14.) The installation of the
prosthesis did not end his troubles as it proved to be ill-
fitting, and, in or around 2011, non-party Dr. Samuel Wright
recommended that a new custom prosthesis be fashioned
and installed in order to maintain the integrity of Plaintiff's
eye-socket. (*Id.* at 16-17.) Ultimately, Plaintiff suffered
discomfort in, and discharge from, his eye for approximately
nine years (*i.e.,* from 2006 through 2015) due to the poorly
fitting prosthesis. (*Id.* at 10.) Discomfort notwithstanding,
there is no record or allegation of Plaintiff complaining to any
medical staff regarding these issues between April 2011 and
October 2015.

| [1] | Numbers cited in reference to Am. Compl. refer to page numbers. The Am. Compl. contains and incorporates various forms of documentary evidence that are also cited herein as Am. Compl. |

On November 10, 2015, Plaintiff allegedly told Defendant
Ezekwe—one of his medical providers at Sing Sing—that
his prosthetic eye was ill-fitting, his eye-socket produced
discharge and secretions, and his prosthetic eye would fall out
at night while he slept. (*Id.* at 7-8.) Moreover, he explained to
Ezekwe that he frequently had to reposition his prosthetic eye

2021 WL 2894646

and carry tissues to clean the discharge from the same eye-socket. (*Id.*) On November 25, 2015, [2] after being apprised of Plaintiff's symptoms, Ezekwe referred Plaintiff to nonparty Dr. Wandeb Charles at the Ophthalmology Department at Fishkill Correctional Facility. (*Id.*)

2       Plaintiff alleges that Ezekwe referred Plaintiff on November 25, 2015, however, the consultant report dated December 3, 2015 lists November 10, 2015 as the referral date. (Am. Compl. at 13.) The distinction is of no difference to the resolution of the instant motion.

**\*2** On December 3, 2015, during an appointment with Dr. Charles and nonparty Dr. John G. Bortz, surgery was recommended to remedy Plaintiff's eye socket problems. (*Id.*) Plaintiff's allegation regarding the timing of the surgery is reinforced by a Consultant report dated December 3, 2015 and incorporated into Plaintiff's Am. Compl. which notes that Dr. Bortz recommended "Oculoplastics for new prosthesis." (*Id.* at 13 (emphasis in original).) In other words, Dr. Bortz recommended ocular surgery to enable the installation of a better fitting prosthetic eye. Notably, there is also a blank field on the form wherein the consultant (*i.e.*, Dr. Bortz) was directed to enter the recommended date for any follow up procedure. (*See id.*) Dr. Bortz failed to include any timeframe in which ocular surgery was to take place. (*Id.*)

Though Plaintiff does not explicitly say so, it appears that he visited with Dr. Bortz again on August 5, 2016. (*Id.* at 8–9.) On that date, Dr. Bortz told Plaintiff that he had a collapsed eye socket with chronic anophthalmic conjunctivitis and discharge due to an excessive superior forniceal recess. (*Id.*) Dr. Bortz recommended that a metal plate be installed under Plaintiff's eye-socket along the orbital floor to fill the collapsed area. (*Id.*) On August 7, 2016, Dr. Bortz sent Ezekwe and Ferdous his recommendation for ocular surgery, *i.e.*, that a procedure be performed installing "an enophthalmos implant along [Plaintiff's] orbital floor in an attempt to decrease[ ] the dead space in his superior forniceal recess, and possibly improve the deepening of the left superior sulcus." (Am. Compl. at 14.)

Sometime later, on an indeterminate date, the "Central Office Medical Department" deferred the recommended procedure. (*Id.*) Plaintiff found out about the deferral on August 7, 2017, at which point he filed a grievance, which he reports he exhausted. (*Id.* at 7–8.) Almost two months later, on September 27, 2017, Sing Sing Correctional Facility

issued a denial of Plaintiff's grievance signed by non-party Superintendent Michael Capra. (*Id.* at 15.)

Between August 2016 and May 2018, Ferdous and Ezekwe allegedly "stood silent and did not let Albany or the Regional Director of Medical know there [sic] denial and defer[ral] was wrong" and that they "denied [his] surgery by staying silent and not remedy[ing] the wrong." (*Id.* at 18–19.) Likewise, neither Ferdous nor Ezekwe acted to expedite the recommended ocular surgery after Plaintiff's grievance was denied. (*Id.* at 20.) Plaintiff submits that this failure to expedite his surgery was consequential because, as doctors, Defendants Ferdous and Ezekwe "should have known [that] a collapse[d] eye socket is very seriouse [sic]," and "when the orbital ball was sinking needless or mild pain my eye situation was very seriouse [sic] and discomfort [twenty-four] hours a day, sticky discharge coming out." (*Id.* at 19.) Plaintiff ultimately underwent surgery with Dr. Bortz on May 16, 2018 at the Westchester Medical Center in Valhalla, N.Y. (*Id.* at 9.)

Less than one year after the initial surgery was performed, sometime between January and February 2019, Plaintiff went to see Dr. Bortz who informed him that a second surgery was needed due to the initial "delay to get surgery" on Plaintiff's left eye. (*Id.* at 5.) As a result of the delayed surgery, Plaintiff states: "the orbital ball has sunken deeper causing my eye lid to become weak and not go all the way above my eye ball like a normal eye lid. The [second] surgery would fix the eye lid muscle to go up and down normally." (*Id.*) Dr. Bortz performed a second surgery to repair Plaintiff's eye lid sometime afterwards in 2019. (*Id.*)

After Plaintiff received one of the two surgeries, Dr. Bortz ordered Plaintiff a special eye patch. (*Id.* at 21.) Although it was supposed to arrive one-week later, it took the Medical Department four months to get the eye patch. (*Id.*) It appears that in the interim, Plaintiff received a temporary "flat" eye patch which stuck to Plaintiff's eye ball and caused him pain and swelling in his eye for four months and each time the nurse changed the patch and cleaned his eye. (*Id.* at 22–23.) As a result, Plaintiff stopped wearing the flat eye patch because he feared that infection would set in. (*Id.*) Plaintiff states that he walked around the prison for four months with no eye patch. (*Id.* at 23.) During this time, he repeatedly asked Ezekwe for the eye patch and was told it was being ordered. (*Id.*)

**II. Procedural History**

**\*3**  Plaintiff Keith Hall filed his Complaint on July 31, 2018 against the Central Office Medical Department, the Sing Sing Medical Department, Ezekwe, Ferdous, and Gage. (*See* ECF No. 2.) By Order dated November 2, 2018, the Court, sua sponte, dismissed all claims against the Central Office Medical Department and the Sing Sing Medical Department on Eleventh Amendment grounds holding that "it is well-settled that the Eleventh Amendment bars claims for monetary damages against state officials acting in their official capacities." (ECF No. 6.)

Subsequently, by Opinion & Order dated July 21, 2020, the Court dismissed Plaintiff's claims against Defendants in their official capacities with prejudice and dismissed Plaintiff's claims against Defendants in their individual capacities without prejudice and with leave to replead. (Opinion & Order dated July 21, 2020 ("Opinion") (ECF No. 24).) Plaintiff filed his Amended Complaint on August 20, 2020. Presently before the Court is the motion of Defendants to dismiss the remaining claims against them in their entirety pursuant to Federal Rules of Civil Procedure 12(b)(6). (ECF No. 33.) Plaintiff does not oppose the motion. This Opinion follows.

### LEGAL STANDARD

#### I. Fed. R. Civ. P. 12(b)(6)
On a Fed. R. Civ. P. 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. When a motion to dismiss a complaint is unopposed, a court should nevertheless "assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000).

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

*Pro se* complaints are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle*, 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

#### II. 42 U.S.C. § 1983 Claims
Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

### DISCUSSION

**\*4**  Read liberally, Plaintiff's Amended Complaint asserts that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by delaying Plaintiff's eye socket surgery for an extensive period of time resulting in a worsening of his underlying eye socket deformity. Though Plaintiff did not submit any opposition to the instant motion, it appears from his Amended Complaint that he is advancing a theory that the delay in his surgery constituted deliberate indifference to his serious medical needs. Defendants aver that Plaintiff's claims must be dismissed because (1) Plaintiff's allegations about a delay in

treatment do not amount to actionable medical indifference; (2) Plaintiff does not sufficiently plead that any of the Defendants were personally involved in deferring treatment; (3) Defendants are entitled to qualified immunity; and (4) Plaintiff's affirmative abandonment of claims against Gage warrant dismissal. The Court addresses each argument in turn.

**I. Eighth Amendment Claim**

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Therefore, the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions." *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). The right emanates from the basic precept of justice that punishment for crime should be graduated and proportioned to [the] offense. *Roper*, 543 U.S. at 560 (citations and internal quotations omitted). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Id.*

In order to assert an Eighth Amendment claim for medical indifference, a plaintiff must plausibly allege that a defendant acted with "deliberate indifference to serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Estelle*, 429 U.S. at 103); *see also Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). It is well-established that "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, [and that] not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003); *see Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Salahuddin v. Goord*, 467 F.3d 279 (2d Cir. 2006) (internal quotations omitted).

Medical indifference claims under the Eighth Amendment of the U.S. Constitution and Section 1983 require courts to engage in a two-part inquiry, one objective and the other subjective. The objective inquiry focuses on the effect of a defendant's conduct and the subjective inquiry focuses on the defendant's motive. *Chance*, 143 F.3d at 702. "First, the alleged deprivation must be, in objective terms, sufficiently

serious. Second, the defendant must act with a sufficiently culpable state of mind." *Id.*

In the context of medical care, two inquiries determine whether a deprivation is objectively serious. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail " 'to take reasonable measures' in response to a medical condition." *Id.* at 279–80 (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). Accordingly, prison officials fulfill their obligations when the care provided is "reasonable." *Id.* at 280. If the care provided is unreasonable, a second inquiry is needed and courts ask "whether the inadequacy in medical care is sufficiently serious." *Id.*

**\*5** If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* In general, a "sufficiently serious" medical need is a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Moreover, a "sufficiently serious" deprivation occurs when "a prison official's act[ ] or omission ... result[s] in the denial of 'the minimal civilized measures of life's necessities.' " *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

If the offending conduct is the "medical treatment given," however, "the seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280. When "the prisoner is receiving appropriate on-going treatment for his condition," and brings a "denial of medical care claim based on a temporary delay or interruption in treatment," courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." *Smith*, 316 F.3d at 186; *see Sledge v. Fein*, No. 11-CV-7450 (PKC), 2013 WL 1288133, at \*5 (S.D.N.Y. Mar. 28, 2013) ("[I]n cases of delayed or inadequate care, 'it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant....' ") (quoting *Smith*, 316 F.3d at 186); *see also Bellotto v. Cnty. of Orange*, 248 Fed. App'x 232, 236 (2d Cir. 2007) ("When a prisoner alleges denial of adequate medical care, we evaluate the seriousness of the prisoner's underlying medical condition. When a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical

treatment,' we focus on the seriousness of the particular risk of harm that resulted from 'the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' ") (quoting *Smith*, 316 F.3d at 185) (internal citation omitted).

As to the subjective prong, a prison official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety ..." *Chance*, 143 F.3d at 702 (citing *Farmer*, 511 U.S. at 837); *see Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."). Additionally, "deliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 834.

For the reasons that follow, the Court determines that Plaintiff has adequately pleaded an objectively serious harm but has not adequately pleaded subjective intent.

### A. Objective Harm

Defendant moves to dismiss on the ground that objective harm has not been sufficiently alleged in the Amended Complaint because Plaintiff has not alleged a sufficiently serious medical condition that was life threatening, or that worsened because of the alleged delay, or that the delay was punitive. Though Plaintiff failed to submit opposition papers, the Court disagrees with Defendants as the Amended Complaint alleges the existence of a sufficiently serious degenerative condition.

As discussed in this Court's previous Opinion, the gravamen of Plaintiff's initial Complaint was that adequate treatment was ultimately provided when he received a surgery on or around May 16, 2018, but it was unreasonably delayed considering that the initial recommendation for surgery was made on December 3, 2015, and Defendant Ezekwe was made aware of this recommendation no later than August 7, 2016. (*See* Opinion at 8.) The Court previously held that Plaintiff's delay in treatment claim failed because he made no allegation that "his condition was life-threatening and fast degenerating, that it worsened because of the delay, or that the delay was punitive." (*See* Opinion at 9.) Plaintiff's failure to plead any allegations relating to, *inter alia*, the worsening of his condition, was dispositive because, courts typically find that a sufficiently serious objective harm exists where a

plaintiff alleges that he suffered from a degenerative condition as a result of a delay in medical treatment, or the worsening of an existing medical condition. *See, e.g., Chance*, 143 F.3d at 698 (2d Cir. 1998) (reversing a motion to dismiss where a plaintiff alleged at least one and possibly three of his teeth degenerated to the point of requiring extraction due to a one year and three month delay in filling plaintiff's cavities); *c.f. Samuels v. Jackson*, No. 97 CIV. 2420 (MBM), 1999 WL 92617 (S.D.N.Y. Feb. 22, 1999) (dismissing a complaint where a plaintiff did not allege chronic and substantial pain, deterioration, or permanent injury).

**\*6** Plaintiff's Amended Complaint now directly asserts that the decision to delay his ocular surgery by, at a minimum, 20 months "caused the orbital ball to sink deeper which caused [his] left eye lid muscle to become weaker and not be able to go fully above [his] eye ball like a normal person [sic] eye lid." (Am. Compl. at 22.) As a result of the worsening of his condition, a second surgery was necessitated and eventually performed in 2019 by Dr. Bortz. (*Id.*) On the basis of these new allegations (which Defendants ignore) the Court easily finds that Plaintiff has adequately alleged a degenerative condition that worsened as a result of the delay in treatment. *See Snyder v. Alam*, No. 15 CV 4033 (VB), 2016 WL 2642226 (S.D.N.Y. May 6, 2016) (holding that a plaintiff who alleged permanent swelling of his foot and leg due to a delay in hospitalization and surgery adequately satisfied the objective prong of deliberate indifference). Accordingly, Plaintiff has plausibly asserted that the alleged delay in his surgical treatment was serious enough to violate Plaintiff's constitutional rights.

### B. Subjective Intent

Defendants argue that Plaintiff failed to allege facts showing that Defendants had the requisite culpable state of mind. They assert the very fact that Defendants referred Plaintiff to a specialist who operated on Plaintiff's eye negates the claim that Defendants were deliberately indifferent. Moreover, Defendants argue that Plaintiff was not denied medical treatment entirely; but rather that his surgery was merely delayed. The Court concludes that Plaintiff failed to plausibly state an Eighth Amendment claim because he did not present any facts tending to support an inference of deliberate indifference on the part of Defendants.

In order to adequately plead subjective intent, a Plaintiff must allege that defendants "know of and disregard[ ] an excessive risk to inmate health." *Farmer*, 511 U.S. at 837; *see also James v. Correct Care Sols.*, No. 13-CV-0019(NSR), 2013

WL 5730176, at *6–7 (S.D.N.Y. Oct. 21, 2013) (noting that deliberate indifference requires more than allegations about a delay in treatment). By contrast, "mere negligence" does not suffice to allege deliberate indifference. *See Farmer*, 511 U.S. at 834; *see also Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) (holding that a plaintiff might conceivably show medical malpractice but fails to satisfy the subjective prong of an Eighth Amendment claim where he alleged that the nurses and doctor misdiagnosed his injuries, and failed to recognize the severity of those injuries); *c.f. Chance*, 143 F.3d at 702 (sufficiently culpable mental state existed where defendant-doctors recommended extraction of plaintiff-inmate's teeth not on the basis of their medical views, but because of monetary incentives). As in the instant case, where a party alleges that a delay in treatment, subjective intent is not satisfied unless Plaintiff further alleges that the delay was "either intentional or reckless." *Bell v. Jendell*, 980 F. Supp. 2d 555, 562 (S.D.N.Y. 2013) (dismissal proper in absence of allegations that "the delay was either intentional or reckless"). At bottom, a misdiagnosis or failure to apprehend the urgency of a medical intervention is tantamount to mere negligence, and is not actionable. *See Hogan v. Russ*, 890 F. Supp. 146 (N.D.N.Y. 1995) (holding that where a plaintiff's only allegation is that the defendant-doctor made a wrongful diagnosis and recommendation, defendant's actions fail to constitute deliberate indifference and at best, would rise only to the level of negligence); *see also Thomas v. Nassau Cty. Corr. Ctr.*, 288 F. Supp. 2d 333 (E.D.N.Y. 2003) (noting that a "medical decision not to order an [x]-ray, or like measures does not represent cruel and unusual punishment. At most it is medical malpractice ...") (quoting *Estelle*, 429 U.S. at 107).

Here, Plaintiff does not contend that he complained to any of the Defendants about any adverse medical effects from the delay of his surgery or that Defendants ignored his complaints. Indeed, the only Defendant Plaintiff specifically alleges even knew about his underlying medical complaints is Ezekwe. Plaintiff states that Ezekwe referred him to an ophthalmologist within a month of his examination of Plaintiff, that Dr. Bortz sent his recommendations to Ezekwe and Ferdous, and that Ezekwe later advised Plaintiff that his surgery had been deferred. (*Id.* at 7–8.) Plaintiff further alleges that Ezekwe and Ferdous "should of [sic] known" the seriousness of his medical condition based on their medical training. (*Id.* at 18.) Plaintiff's allegations and exhibits show that Ferdous and Ezekwe knew that Plaintiff was recommended for surgery, that Central Office Medical Department deferred the surgery, and that the superintendent at Sing Sing Correctional Facility denied Plaintiff's grievance.

*7 Defendants' actions, standing alone, do not evince a disregard of a substantial risk to Plaintiff's health or safety. Instead, at best, it indicates that Ezekwe and Ferdous *should have* known (but did not know) there was a substantial risk to Plaintiff's health based on the Dr. Bortz's recommendation that Plaintiff receive an ocular surgery. At bottom, Plaintiff alleged that Defendants failed to properly diagnose him or appreciate the urgency of the recommended medical intervention. Without more suggesting that Defendants were aware of necessity and urgency of ocular surgery, Plaintiff has alleged no more than mere negligence, which may be actionable in a medical malpractice claim but is insufficient to give rise to an Eighth Amendment claim.

If Plaintiff was a pretrial detainee under the Fourteenth Amendment's Due Process Clause, he likely would have satisfied deliberate indifference as pretrial detainees need only show that a defendant "should have known," that a condition posed an "excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). However, as described above, the deliberate indifference standard for an inmate under the Eighth Amendment's Cruel and Unusual Punishment's Clause is the defendant "knows of and disregards an excessive risk to inmate health or safety." *James*, 2013 WL 5730176, at *6–7. Thus, while the Fourteenth Amendment's deliberate indifference standard includes an objective component, the Eighth Amendment's deliberate indifference standard is purely subjective. *Darnell*, 849 F.3d at 37. Accordingly, it is irrelevant whether Ferdous or Ezkwe "should [have] known" that Plaintiff's condition was serious or that surgery was urgent; it is only relevant whether Ferdous or Ezkwe actually knew and disregarded such information. Plaintiff does not allege that Defendants had actual knowledge and consequently fails to allege deliberate indifference.

* * *

Although Plaintiff has alleged objective harm, his Eighth Amendment claim against Defendants fails because he failed to adequately plead subjective intent. Accordingly, his Eighth Amendment claims are dismissed without prejudice. To the extent that Plaintiff can provide factual allegations curing the foregoing deficiencies, Plaintiff is granted leave to replead his claim. Because Plaintiff's amended complaint will completely replace, not supplement, the original complaint, any facts or claims that Plaintiff wishes to remain must be included in the amended complaint.

## II. Personal Involvement

Defendants argue that Plaintiff's Eighth Amendment claim fails for the additional reason that Plaintiff did not allege personal involvement on the part of any Defendant in the decision to defer his surgery. The Court agrees.

In general, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he [or she] held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). Personal involvement of a supervisory defendant may be shown by evidence of any of the following factors (the "*Colon* factors"):

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*8** *Grullon*, 720 F.3d at 139 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Notably, "mere 'knowledge and acquiescence' " to unconstitutional conduct, or mere failure to act on a complaint, without more, fails to state a claim under Section 1983. *Faulk v. N.Y.C. Dep't of Cor.*, No. 08-CV-1668(LGS), 2014 WL 239708, at \*10 (S.D.N.Y. Jan. 21, 2014); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) ("[T]he receipt of letters or grievances, by itself, does not amount to personal involvement.").

Here, Plaintiff repeatedly claims that "Medical Central Office" was responsible for the determination to defer Plaintiff's surgical procedure. (Am. Compl. at 7–10.) As previously discussed, Plaintiff does not describe any actions at all taken by Defendants Ferdous and Gage with respect to deferring the surgery, and only states that Defendant Ezekwe referred him to an ophthalmologist and passed on information about the surgery deferral to Plaintiff. Nor does Plaintiff describe any actions taken by Defendants Ferdous or Ezekwe with respect to the grievance denial. Instead, Plaintiff affirmatively alleges that Defendants did not engage in any actions related to the denial of his grievance—*i.e.*, he alleges that Defendants "stood silent" and did not do anything to "remedy the wrong" after his grievance was denied by the superintendent. (*Id.* at 18–19.) At best, Plaintiff alleges that Defendants Ferdous and Ezekwe could have engaged in actions to expedite his surgery. However, such allegations are insufficient to plausibly allege personal involvement. *See Benjamin v. Schwartz*, 299 F. Supp. 2d 196 (S.D.N.Y. 2004) (holding that medical director was not personally involved in complained-of constitutional violation where the only allegation against him was that he "could have" intervened to encourage subordinate doctor to expedite plaintiff's surgery because he was the doctor's supervisor), *aff'd sub nom. Benjamin v. Koeningsmann*, 204 F.App'x 979 (2d Cir. 2006).

Accordingly, the facts are far from sufficient to support Defendants' personal involvement in a constitutional deprivation. Even if Plaintiff had adequately pleaded a constitutional violation, the Complaint would have to be dismissed on this additional ground. Should Plaintiff elect to file an amended complaint, this deficiency must be cured.

## III. Qualified Immunity

Defendants argue in the alternative that Plaintiff's Eighth Amendment claim must be dismissed based on the defense of qualified immunity. Because the Court has dismissed the Eighth Amendment claim as insufficiently pleaded on the grounds described above, it declines to address Defendants' qualified immunity defense at this juncture.

## IV. Abandoned Claims

Lastly, Defendants argue that Plaintiff's claim against Gage should be dismissed as abandoned. Where a plaintiff "fail[s] to address Defendants' arguments in support of dismissing [a] claim, it is deemed withdrawn or dismissed as abandoned." *See Baptiste v. Griffin*, No. 18 CV 7274 (NSR), 2019 WL

5635808, at *5 (S.D.N.Y. Oct. 31, 2019) (quoting *Johnson v. City of New York*, No. 1:15-CV-8195-GHW, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017)). Here, Plaintiff expressly and affirmatively states in his Amended Complaint that he no longer wishes to pursue charges against Defendant Gage who he claims was only minimally involved: "I'm asking to dismiss my claim against Dana Gage she only play[ed] a small role and I no longer want her in this complaint." (Am. Compl. at 22.) Accordingly, the Court dismisses all claims with prejudice against Defendant Gage as abandoned.

## CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Plaintiff's claims against Defendant Gage are dismissed with prejudice. Plaintiff's claims against Defendants Ferdous and Ezekwe are dismissed without prejudice and with leave to replead. Plaintiff may file an Amended Complaint consistent with this Opinion on or before August 19, 2021. An Amended Civil Rights Complaint form is attached to this Order. Failure to file an Amended Complaint within the time allowed, and without good cause to excuse such failure, will result in dismissal of Plaintiff's Complaint with prejudice.

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
Write the full name of each plaintiff.

___ CV _____
(Include case number if one has been assigned)

-against-

**SECOND AMENDED COMPLAINT**
(Prisoner)

Do you want a jury trial?
☐ Yes   ☐ No

_____
Write the full name of each defendant. If you cannot fit the names of all the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section IV.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not contain:* an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 5/20/16

2021 WL 2894646

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "Bivens" action (against federal defendants).

☐  Violation of my federal constitutional rights

☐  Other: _____

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

_____
First Name          Middle Initial          Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

_____
Current Place of Detention

_____
Institutional Address

_____
County, City          State          Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 2:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 3:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Defendant 4:

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

Page 2

Page 3

V.    STATEMENT OF CLAIM

Place(s) of occurrence: _____

Date(s) of occurrence: _____

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were
harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach
additional pages as necessary.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
_____
_____
_____
_____
_____
_____
_____

INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment,
if any, you required and received.

_____
_____
_____
_____
_____

VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

_____
_____
_____
_____
_____
_____
_____

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | | Plaintiff's Signature |
| --- | --- | --- |
| First Name | Middle Initial | Last Name |
| Prison Address | | |
| County, City | State | Zip Code |

Date on which I am delivering this complaint to prison authorities for mailing:

Page 6

**All Citations**

Slip Copy, 2021 WL 2894646

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Allen v. Stringer, Not Reported in Fed. Rptr. (2021)

2021 WL 4472667

Case 9:20-cv-01503-DNH-TWD   Document 34   Filed 06/21/22   Page 245 of 261

2021 WL 4472667
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Doran ALLEN, Plaintiff-Appellant,

v.

Scott M. STRINGER, New York City Comptroller,
Warden AMKC-C-95, Defendants-Appellees.

20-3953
|
September 30, 2021

Appeal from a judgment of the United States District Court for the Southern District of New York (Stanton, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Doran Allen, pro se, Ossining NY.

FOR DEFENDANTS-APPELLEES: No appearance.

PRESENT: RICHARD C. WESLEY, RICHARD J. SULLIVAN, Circuit Judges, JOHN G. KOELTL, District Judge. *

---

\*     Judge John G. Koeltl of the United States District Court for the Southern District of New York, sitting by designation.

---

**SUMMARY ORDER**

Appellant Doran Allen, proceeding pro se, sued Scott M. Stringer, in his capacity as New York City Comptroller, and the unnamed warden of the Rikers Island Anna M. Kross Center ("AMKC") under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment. Allen alleges that, while he was detained at AMKC, a corrections officer refused to help him carry breakfast trays, causing him to slip and fall on broken stairs, injuring himself. The district court dismissed the complaint sua sponte for failure to state a claim. We assume the parties' familiarity with the underlying

facts, the procedural history of the case, and the issues on appeal.

We review de novo a district court's sua sponte dismissal of a complaint under 28 U.S.C. § 1915(e)(2). *Zaleski v. Burns*, 606 F.3d 51, 52 (2d Cir. 2010). Under that statute, the district court must dismiss a complaint filed in forma pauperis if it determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). To avoid dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (recognizing that "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a viable claim). Pro se submissions are reviewed with "special solicitude," and "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (internal quotation marks and emphasis omitted).

Conditions-of-confinement claims brought by pretrial detainees are analyzed under the Fourteenth Amendment's Due Process clause. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To state such a claim, a plaintiff must satisfy both an objective prong and a subjective prong. *See id.* The objective prong requires "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," while the subjective prong requires "showing that [an] officer acted with at least deliberate indifference to the challenged conditions." *Id.* (internal quotation marks omitted). If a conditions-of-confinement claim is predicated on an unsafe condition, a court will analyze "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Allen alleges that he slipped or tripped on broken stairs, causing him to fall. But while the existence of broken stairs could be deemed to constitute negligence on the part of the prison, broken stairs alone cannot satisfy the objective prong of a conditions-of-confinement claim. *See McCray v. Lee*, 963 F.3d 110, 120 (2d Cir. 2020) (explaining that the defendant's complaint alleging unconstitutional conditions of

2021 WL 4472667

confinement after a slip and fall in an icy prison yard did not show "exceptional circumstances" that would "elevate" the conditions "beyond the typical level of danger presented by a slippery sidewalk or a wet floor"). Because broken stairs cannot be considered a risk that is "so grave that it violates contemporary standards of decency," Allen's conditions-of-confinement claim was properly dismissed. *Helling,* 509 U.S. at 36.

**\*2** But even if it could be argued that Allen alleged an objectively serious condition, the district court properly dismissed Allen's claims against Stringer and the AMKC warden due to the obvious deficiencies in Allen's complaint. As the district court concluded, the suit against the warden in his official capacity was more properly a suit against the City of New York because Allen did not allege that the warden personally had done or failed to do anything that violated his rights. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity... should be treated as suits against the State."). Similarly, Stringer, as the New York City Comptroller, is sued in his official capacity. Allen was therefore obligated to allege sufficient facts showing that the Fourteenth Amendment violation occurred "pursuant to a municipal policy or custom," *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 226 (2d Cir. 2004) (citing, inter alia, *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692–94 (1978)), or was caused by a "failure to train," *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell,* 436 U.S. at 694). Allen did not allege any facts showing that the corrections officer acted pursuant to an unconstitutional policy or custom, or that the City of New York failed to train its corrections officers, as required for such a claim.

The district court also did not abuse its discretion by declining to exercise supplemental jurisdiction over any state-law claims because the district court properly dismissed Allen's § 1983 claim, the only claim over which it had original jurisdiction. *See Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." (internal quotation marks omitted)).

Finally, the district court did not err by denying Allen leave to amend his complaint. A district court should not dismiss a pro se plaintiff's complaint without granting leave to amend "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation marks omitted). As discussed above, the incident involving the corrections officer and the broken steps did not amount to a due process violation, and that deficiency in the complaint cannot not be cured. Accordingly, amendment would have been futile.

We have considered all of Allen's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

Not Reported in Fed. Rptr., 2021 WL 4472667

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 247 of 261

Martinez v. Schriro, Not Reported in Fed. Supp. (2017)

2017 WL 87049

2017 WL 87049
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Johnny MARTINEZ, Plaintiff,

v.

Commissioner Dora B. SCHRIRO, Warden
Katie Mulvey, M.D.C., Bruno, Maintenance
Worker M.D.C., Brown, Grievance Supervisor
M.D.C., City of New York, Defendants.

14 Civ. 3965 (KMW) (RLE)
|
Signed 01/09/2017

**Attorneys and Law Firms**

Johnny Martinez, Comstock, NY, pro se.

Jeffrey Scott Dantowitz, Office of Corporation Counsel NYC,
New York, NY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

KIMBA M. WOOD, District Judge:

**\*1** Plaintiff *pro se*, Johnny Martinez, an inmate previously in
the custody of the New York City Department of Corrections
("DOC"), brings this action pursuant to 42 U.S.C. § 1983
against the City of New York; Dora B. Schriro, former
New York City Commissioner of Correction; Katie Mulvey,
Warden of the Manhattan Detention Center ("M.D.C.");
Bruno, a maintenance worker employed by M.D.C.; and Sean
Brown, a grievance supervisor at the M.D.C. (collectively,
"Defendants"). ECF No. 20 at 1-2 ("Am. Compl."). Plaintiff
alleges that, while in custody at the M.D.C., he slipped
and fell on a puddle of water caused by a leaking air
conditioning duct pipe and suffered extensive injuries to
his head and back. *Id.* at 2-3. Defendants move to dismiss
the Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). ECF No. 21. After Defendants' motion
was fully submitted, Plaintiff moved to file a second amended
complaint, ECF No. 47, and sought an order, pursuant to
*Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), for assistance
in identifying a "John Doe" defendant identified in Plaintiff's
proposed second amended complaint, ECF No. 49. For the
reasons stated below, Defendants' motion is GRANTED and
Plaintiff's motions are DENIED.

**I. BACKGROUND** [1]

[1]  The following facts are taken from the Amended
Complaint and are assumed to be true for purposes
of Defendants' motion to dismiss. *See Tellabs, Inc.
v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,
322 (2007); *see also Shipping Fin. Servs. Corp. v
Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("When
considering a motion to dismiss ... for failure to
state a cause of action, a court must accept as true
all material factual allegations in the complaint.").

On September 5, 2011, Plaintiff was walking to the showers of
the M.D.C. housing unit when he slipped and fell "with [g]reat
[f]orce." Am. Compl. at 3. Plaintiff sustained injuries to his
head, which "split open" with a three-inch cut, and his lower
back. *Id.* Plaintiff received emergency medical treatment at
Bellevue Hospital, and underwent physical therapy at the
West Facility on Rikers Island for nearly half a year. *Id.*
Plaintiff's slip was caused by a puddle of water from a leaking
air duct pipe connected to the M.D.C.'s air conditioning
ventilation system. *Id.* at 4. The air duct piping had been
leaking for some time, and corrections officers had made
several complaints about the leaking pipe and submitted work
orders to replace it prior to Plaintiff's injury. *Id.* Although
Defendants were aware of the problem prior to Plaintiff's
injury, they took no steps to fix the leak. *Id.* at 5.

On September 9, 2011, Plaintiff filed a grievance about the
DOC's failure to fix the leaking pipe. *Id.* at 7-8 & Ex.
A. Plaintiff never received a response to his grievance or
an acknowledgement that it was received, despite multiple
requests to Defendant Brown, the grievance supervisor. *Id.*
at 9. To Plaintiff's knowledge, Defendant Brown did not
conduct an investigation into Plaintiff's grievance. *Id.* Plaintiff
wrote to Defendant Brown to inquire about the status of his
grievance on October 10, 2011, *id.* Ex. B, and sent a notice
of intention to file a claim to the Corporation Counsel of the
City of New York on November 4, 2011, *id.* Ex. C. The City
acknowledged receipt of Plaintiff's claim on November 15,
2011, and stated it would investigate. *Id.* Ex. D. On April 15,
2013, Plaintiff wrote to the City to ask for an update about the
status of his claim and the investigation. *Id.* Ex. E.

**\*2** Plaintiff filed this action on May 21, 2014, ECF No. 2,
and the Amended Complaint on November 19, 2014, ECF
No. 20. Defendants filed their motion to dismiss on December

Martinez v. Schriro, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 248 of 261

2017 WL 87049

4, 2014. ECF No. 21. After some delay, Plaintiff filed his opposition to Defendants' motion on October 21, 2015. Pl. Opp., ECF No. 43. Plaintiff filed his motion seeking leave to file a second amended complaint and his *Valentin* motion on August 1, 2016. ECF Nos. 47, 49. The case was transferred to the undersigned on November 22, 2016.

## II. LEGAL STANDARD

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010).

In construing complaints by plaintiffs proceeding *pro se*, the Court applies a "more flexible standard to evaluate their sufficiency than [it] would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections in New York*, 232 F.3d 135, 140 (2d Cir. 2000); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Court, therefore, is obligated to construe *pro se* pleadings with " 'special solicitude,' interpreting the complaint to raise the 'strongest [claims] that [it] suggest[s].' " *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (alterations in original) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)).

## III. DISCUSSION

Defendants cite a number of grounds on which Plaintiff's amended complaint should be dismissed: (1) failure to exhaust administrative remedies; (2) failure to state a cognizable constitutional claim for deliberate indifference; (3) failure to state a claim for municipal liability; (4) failure to allege personal involvement of the individually named defendants; and (5) statute of limitations for state tort claims. Def. Mem. at 5-20, ECF No. 22. As discussed below,

the Court cannot conclude that none of the exceptions to the exhaustion requirement apply, and cannot dismiss the Amended Complaint on that basis. However, the Court finds that Plaintiff has failed to allege a § 1983 claim and that any state-law negligence claims are barred by the statute of limitations, and accordingly grants Defendants' motion.

### A. Failure to Exhaust Administrative Remedies

Defendants argue that Plaintiff failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.* Def. Mem. at 5-10. The DOC dictates procedures for filing a grievance that include a multi-step process, which is set forth in the DOC's Inmate Grievance Resolution Program ("IGRP"). [2] An inmate must exhaust all steps before he may pursue litigation in federal court, including filing an administrative appeal, even when he does not receive a response to his initial grievance. *Tyler v. Argo*, No. 14 Civ. 2049, 2014 WL 5374248, at *4 (S.D.N.Y. Oct. 10, 2014). Plaintiff admits that he failed to exhaust administrative remedies. Pl. Opp. at 22.

[2]    The Court takes judicial notice of the IGRP, as courts regularly do in this district. *See, e.g., Myers v. City of New York*, No. 11 Civ. 8525, 2012 WL 3776707, at *4 n.6 (S.D.N.Y. Aug. 29, 2012). The IGRP directive that governed administrative exhaustion in this case is available on the DOC's website. *See* DOC, Directive 3375R-A (effective March 13, 2008), http://www.nyc.gov/html/doc/downloads/pdf73375R-A.pdf.

 **\*3**  However, certain caveats apply: "when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as [sic] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). Because nonexhaustion is an affirmative defense, "a plaintiff is not required to plead or demonstrate exhaustion in a complaint." *Seymore v. City of New York*, No. 12 Civ. 6870, 2014 WL 1259563, at *3 (S.D.N.Y. Mar. 26, 2014) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007)). "It follows that a claim should be dismissed for failure to exhaust only if 'nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane.' " *Henning v. N. Y.C. Dep't of Correction*, No. 14 Civ. 9798, 2016 WL 297725,

at *2 (S.D.N.Y. Jan. 22, 2016) (quoting *Lovick v. Schriro*, No. 12 Civ. 7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014)).

In his opposition to Defendants' motion to dismiss, Plaintiff states that he does not have access to the IGRP directive or an Internet connection with which to view it, Pl. Opp. at 23, and that prison officials "intentionally, deliberately and maliciously prevented [him] from exhausting his administrative remedies," *id.* at 27. Although these allegations appear in Plaintiff's opposition papers, rather than on the face of the complaint, the Court, construing *pro se* pleadings liberally, "may rely on any opposition papers in assessing the legal sufficiency of the plaintiff's claims." *Henning*, 2016 WL 297725, at *3 (quoting *Rosado v. Herard*, No. 12 Civ. 8943, 2013 WL 6170631, at *2 (S.D.N.Y. Nov. 25, 2013)). Taking these allegations as true, the Court cannot conclude that "nonexhaustion is clear from the face of the complaint, and none of the exceptions outlined by the Second Circuit are germane." *Id.* (quoting *Lovick*, 2014 WL 3778184, at *4).

## B. Section 1983 Claims

In order to state a claim under § 1983, a plaintiff must show a deprivation of a right, privilege, or immunity under the Constitution or federal statute, and that the deprivation occurred under the color of state law. 42 U.S.C. § 1983; *see West v. Atkins*, 487 U.S. 42, 48 (1988); *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004); *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 does not itself create any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes*, 13 F.3d at 519 (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). Here, Plaintiff alleges violations of the First Amendment, related to Defendants' handling of Plaintiff's grievance, and the Eighth Amendment, related to the leak that led to Plaintiff's slip and fall. *See* Am. Compl. at 6, 9. The Court holds that neither allegation amounts to a deprivation of a constitutional right.

### 1. First Amendment

Plaintiff alleges that his rights were violated when Defendant Brown failed to follow proper procedures regarding Plaintiff's grievance by "repeatedly disregard[ing] plaintiff's First Amendment Right to seek Redress of Grievance and to petition the Court for redress of grievance,"

which prevented Plaintiff from properly exhausting his administrative remedies. Am. Compl. at 9. The First Amendment protects the right to meaningful access to the courts as part of the right to petition the government for redress of grievances. *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983). However, "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim." *Njasang Nji v. Heath*, No. 13 Civ. 200, 2013 WL 6250298, at *6 (S.D.N.Y. Dec. 2, 2013) (quoting *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005)); *see also, e.g., Mimms v. Carr*, No. 09 Civ. 5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) ("The First Amendment is not implicated, however, where prison officials deny an inmate access to grievance procedures."), *aff'd*, 548 Fed.Appx. 29 (2d Cir. 2013); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate...."). Accordingly, "[c]ourts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures." *Alsaifullah v. Furco*, No. 12 Civ. 2907, 2013 WL 3972514, at *13 (S.D.N.Y. Aug. 2, 2013) (alteration in original) (quoting *Edwards v. Horn*, 10 Civ. 6194, 2012 WL 473481, at *11 (S.D.N.Y. Feb. 14, 2012), *report and recommendation adopted*, 2012 WL 760172 (S.D.N.Y. Mar. 8, 2012)). The Court holds that Plaintiff's claim that Defendant Brown mishandled Plaintiff's grievance cannot, as a matter of law, support a § 1983 claim. Therefore, Plaintiff's First Amendment claims are dismissed with prejudice.

### 2. Eighth Amendment

**\*4** Plaintiff's Eighth Amendment claims are for "Deliberate Indifference; Negligence;[ ] Failure to Act; [and] Cruel & [Unusual] Punishment" related to the alleged hazardous condition of confinement caused by the leaking air duct pipe.[3] Am. Compl. at 6. "The conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). "In such cases, a prisoner may prevail only where he proves both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.' " *Id.* (quoting *Farmer*,

Case 9:20-cv-01503-DNH-TWD    Document 34    Filed 06/21/22    Page 250 of 261

Martinez v. Schiriro, Not Reported in Fed. Supp. (2017)

2017 WL 87049

511 U.S. at 834); *see also, e.g., Garcia v. Fischer*, No. 13 Civ. 8196, 2016 WL 297729, at *4 (S.D.N.Y. Jan. 22, 2016).

3       The Court assumes that Plaintiff is protected by the Eighth Amendment's prohibition of cruel and unusual punishment, which protects sentenced prisoners, rather than the Fourteenth Amendment's due process protection, which protects pre-trial detainees. The distinction, however, is immaterial here, because the two Constitutional provisions afford the same protection from deliberate indifference. *See, e.g., Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("Claims for deliberate indifference to a ... serious threat to the health or safety of a person in custody should be analyzed under the same Standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").

To satisfy the "objective" element, "a plaintiff must show that 'the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [an inmate's] health,' which can be satisfied if an inmate is deprived of 'basic human needs such as food, clothing, medical care, and safe and sanitary living conditions.' " *Aikens v. Royce*, No. 14 Civ. 663, 2016 WL 5720792, at *6 n.10 (S.D.N.Y. Sept. 30, 2016) (alteration in original) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps*, 308 F.3d at 185. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citation omitted) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992))).

Under the "subjective" element, "a defendant 'cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Aikens*, 2016 WL 5720792, at *6 n.10 (quoting *Phelps*, 308 F.3d

at 185). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Id.* (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)). Allegations of negligence by prison officials will not support a claim under the Eighth Amendment. *Edwards v. City of New York*, No. 08 Civ. 05787, 2009 WL 2596595, at *2 (S.D.N.Y. Aug. 24, 2009) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Farmer*, 511 U.S. at 836; *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

**\*5** Plaintiff's Amended Complaint fails to satisfy the objective element. As courts in this circuit have regularly found, wet floor conditions that cause a prisoner to slip and fall do not constitute an Eighth Amendment violation. *See, e.g., Martin v. City of New York*, No. 11 Civ. 600, 2012 WL 1392648, at *9 (S.D.N.Y. Apr. 20, 2012) (dismissing complaint that alleged that plaintiff slipped and fell on a wet floor while wearing ill-fitting shoes); *Hawkins v. Nassau Cnty. Corr. Facility*, 781 F. Supp. 2d 107, 113 (E.D.N.Y. 2011) ("[T]he alleged water in the shower area does not deprive plaintiff of a basic human need and, thus, cannot as a matter of law give rise to a constitutional violation that can be brought under Section 1983."); *Flowers v. City of New York*, 668 F. Supp. 2d 574, 578 (S.D.N.Y. 2009) ("Any claim against the City for the slip and fall that resulted in plaintiff's ankle injury—a garden variety tort—is not cognizable under Section 1983 ...."); *Edwards*, 2009 WL 2596595, at *2-3 (granting motion to dismiss where plaintiff slipped and fell on wet hallway floor, and collecting cases); *see also, e.g., Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) (holding that plaintiff's slip and fall in prison shower was not a sufficiently serious condition to state a § 1983 claim); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) ("Even if the floors of the shower are slippery ..., 'slippery prison floors ... do not state even an arguable claim for cruel and unusual punishment.' " (quoting *Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989))). Because Plaintiff's complaint fails to allege a "sufficiently serious" deprivation, *Wilson*, 501 U.S. at 298, Plaintiff's Eighth Amendment claims are dismissed with prejudice.

**C. State Law Claims**

Although the Amended Complaint does not state so explicitly, the Court reads it to also state a tort claim against Defendants. *See* Am. Compl. at 6 (including "Negligence" as one of

Plaintiff's causes of action); Def. Mem. at 19 (addressing Plaintiff's state law claims); *cf. Hill*, 657 F.3d at 122. However, the tort claims must be dismissed as untimely. Plaintiff's injury occurred on September 5, 2011. Am. Compl. at 3. An action for personal injury against the City of New York or its employees must be commenced within one year and ninety days after the claim arose. N.Y. Gen. Mun. Law § 50-i(1)(c). Indeed, Plaintiff was notified about the statute of limitations in a letter from the City acknowledging his notice of intention to file a claim. *See* Am. Compl. Ex. D. Plaintiff's Complaint was filed May 21, 2014, ECF No. 2, over two years after the incident, and is thus time-barred. *See, e.g., Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088, at *6 (S.D.N.Y. Dec. 12, 2016).

### D. Plaintiff's Motion to Amend and Request for a *Valentin* Order

Although Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend a pleading should be freely granted "when justice so requires," Fed. R. Civ. P. 15(a)(2), such a motion may be denied if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile, *see Foman v. Davis*, 371 U.S. 178, 182 (1962). As discussed above, it is clear from the Amended Complaint that Plaintiff is unable to state a claim under § 1983 or state law for his slip and fall, and the proposed second amended complaint, ECF No. 47, is unable to cure the deficiencies. Because "[t]he problem with [Plaintiff's] causes of action is substantive[,] better pleading will not cure it. Repleading would thus be futile." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Accordingly, Plaintiff's motion to file a second amended complaint is denied, and his request for a *Valentin* order is denied as moot.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED, Plaintiff's motion for leave to file a second amended complaint is DENIED, and Plaintiff's motion for a *Valentin* order is DENIED as moot. The Clerk of Court is directed to terminate the motions at ECF Nos. 21, 47, and 49, mail a copy of this order to Plaintiff *pro se*, and close the case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 87049

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 563860
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Andre PATTERSON, Plaintiff,
v.
Francisco J. COLON, Defendant.

No. 20-CV-9317 (CS)
|
Signed 02/24/2022

**Attorneys and Law Firms**

Andre Patterson, Bronx, New York, Pro Se Plaintiff.

Neil Shevlin, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, U.S.D.J.

**\*1** Before the Court is the motion to dismiss of Defendant Francisco J. Colon. (ECF No. 18.) For the following reasons, the motion is GRANTED.

**I. BACKGROUND**

I accept as true the facts, but not the conclusions, set forth in Plaintiff's Amended Complaint, (ECF No. 15 ("AC")), Initial Complaint, (ECF No. 2 ("IC")), and submissions in opposition, (ECF No. 22 ("P's Decl."); ECF No. 23 ("P's Mem.")). *See Washington v. Westchester Cnty. Dep't of Corr.*, No. 13-CV-5322, 2015 WL 408941, at \*1 n.1 (S.D.N.Y. Jan. 30, 2015) (court may give *pro se* plaintiff the benefit of considering facts in original complaint even if they have not been repeated in amended complaint); *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at \*1 (S.D.N.Y. Mar. 18, 2010) ("[A]llegations made in a pro se plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss."). [1]

[1]    The Court will send Plaintiff copies of all unpublished decisions cited in this Opinion and Order.

**A. Factual Background**

At all relevant times, Plaintiff was a state prison inmate at the Otisville Correctional Facility, and Defendant was a correctional officer there. (AC ¶¶ 1-2.) On July 6, 2020, Defendant assigned Plaintiff to tear down the plywood ceiling of the pavilion in the recreational area of the prison yard, (IC at 4; *see* AC ¶ 4), and "remove bird feces, carcass, a great amount of dust and other asbestos related materials," (AC ¶ 5), that had accumulated there over the years, (P's Mem. at 2). [2] Defendant did "not have the slightest knowledge in removal of such health hazardous material," (AC ¶ 5), and Plaintiff was "not trained in appropriate safety precautions in the removal of hazardous material," (*id.* ¶ 6). Plaintiff protested the assignment, but Defendant threatened him with a misbehavior report if he did not comply with the order. (*Id.* ¶ 7.) Plaintiff objected that such a report could jeopardize his upcoming parole hearing, (*id.* ¶ 8), but Defendant yelled at Plaintiff to proceed, (*id.* ¶ 9).

[2]    The IC refers to "dead carcasses, dried feces and urine," (IC at 4), but not "asbestos related materials."

Defendant gave Plaintiff a broom, dust pan and garbage bags. (*Id.* ¶ 10.) Plaintiff asked what kind of protective gear he should wear, and Defendant responded, "I don't know but we'll find something." (*Id.* ¶ 11.) Defendant gave Plaintiff a jumpsuit and dust mask. (*Id.* ¶ 12.) Taking down the ceiling caused an "avalanche," (P's Decl. ¶ 4), of dust, bird feces, feathers and other hazardous materials to fall on Plaintiff's face, shoulders and clothing, (AC ¶ 13; P's Mem. at 8). Plaintiff inhaled this material, (P's Mem. at 3), causing him to cough uncontrollably and painfully, and causing his eyes to burn and water, (AC ¶ 14). Defendant, who was "some distance away," joked, "I guess sweeping ain't the best way to do the job." (*Id.* ¶ 15.) Plaintiff alleges that he continues to experience pain when coughing, as well as shortness of breath, fatigue, irregular heart rhythm, eye watering, severe headaches and vision impairment. (*Id.* at 3; P's Decl. ¶ 2.) He further alleges that Defendant "was keenly aware" that "such hazardous conditions ... posed an unreasonable risk of serious damages to [P]laintiff's present and future health." (AC ¶ 16; *see* P's Mem. at 2.)

**B. Procedural History**

**\*2** On November 5, 2020, Plaintiff filed a complaint in this court, which the Court interprets as alleging that Defendant treated him with deliberate indifference to a safety and health

2022 WL 563860

risk, amounting to cruel and unusual punishment in violation of the Eighth Amendment.

By letter dated May 13, 2021, Defendant sought a pre-motion conference in connection with his anticipated motion to dismiss. (ECF No. 12.) Plaintiff responded as directed, (ECF No. 14), and on June 11, 2021, at the pre-motion conference, I granted Plaintiff leave to amend the Complaint, (*see* Minute Entry dated June 11, 2021). Plaintiff filed the Amended Complaint on June 25, 2021. The instant motion followed.

## II. LEGAL STANDARDS

### A. Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (cleaned up) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. *Pro Se* Plaintiffs

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (cleaned up). Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (cleaned up).

## III. DISCUSSION

### A. Eighth Amendment Claim

**\*3** The Second Circuit holds that

> [t]o state an Eighth Amendment claim against a prison official based on conditions of confinement, an inmate must allege: that (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety.

*McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (cleaned up); *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

"When a prisoner asserts a claim predicated on an unsafe condition, the court must determine 'whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.' " *McCray*, 963 F.3d at 120 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)) (emphasis in original). "In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* (cleaned up). The objective element depends on both the "seriousness of the

2022 WL 563860

potential harm" and "the likelihood that such injury to health will actually be caused." *Helling*, 509 U.S. at 36.

The subjective prong requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020). This requires "more than mere negligence"; instead, "the prison official must know of, and disregard, an excessive risk to inmate health and safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (cleaned up).

## 1. Objective Prong

In *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987), the Second Circuit held that a *pro se* prisoner stated a claim by alleging that a prison official ordered him to continue working on a ladder he had told the official was unsafe. The court held that such an order " 'involve[s] more than ordinary lack of due care for the prisoner's interests or safety.' " *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). After *Gill*, courts in this circuit have found that significant injuries caused by hazardous prison workplace conditions can satisfy the objective element of an Eighth Amendment inquiry. *See, e.g.*, *Kenyon v. Weber*, No. 16-CV-6510, 2017 WL 1078620, at *4 (W.D.N.Y. Mar. 20, 2017); *Walker v. Vargas*, No. 11-CV-9034, 2013 WL 4792765, at *7 (S.D.N.Y. Aug. 26, 2013); *Baumann v. Walsh*, 36 F. Supp. 2d 508, 513-14 (N.D.N.Y. 1999).

Plaintiff describes an assignment that sounds unpleasant – perhaps even gross – but it is not at all clear that the material that Plaintiff was assigned to remove posed an unreasonable danger. The cleaning of detritus that has accumulated in an attic – even the remains of birds or rodents – is a chore many people perform. Plaintiff alleges that the material in the pavilion ceiling included "asbestos related material," (AC ¶ 5), but he does not say what it was, or whether it was hazardous, or what made it so. One may infer that it was not asbestos itself, but even if it were, that would not be sufficient to show a condition meeting the objective prong, because asbestos is not hazardous unless it is friable, *Pack v. Artuz*, 348 F. Supp. 2d 63, 79 n.13 (S.D.N.Y. 2004); *see LaBounty v. Coughlin*, 137 F.3d 68, 72-73 (2d Cir.1998) (inmate can state claim for exposure to friable asbestos exposed to air), [3] and Plaintiff has not stated that the material here – whatever it was – was friable.

[3]     "Friable" describes "a state of decay in which asbestos fibers or dust are released from [asbestos containing materials] when disturbed. Friable asbestos poses a health risk because airborne fibers can become lodged in the lungs and respiratory tract, and over time may lead to asbestosis, mesothelioma and lung cancer." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 606 (2d Cir. 1996).

**\*4** Assuming the material at issue was friable will not save Plaintiff's claim. While exposure to an "unreasonably high concentration" of airborne asbestos can state an Eighth Amendment claim, *see Reid v. City of N.Y.*, No. 20-CV-644, 2021 WL 4177756, at *4 (S.D.N.Y. Sept. 14, 2021); *Pack*, 348 F. Supp. 2d at 79, courts in this Circuit have recognized that a significant level of exposure is required for relief, *Moton v. City of N.Y.*, No. 15-CV-6485, 2016 WL 3554993, at *2 (S.D.N.Y. June 24, 2016). The concentration of asbestos must be unreasonably high, *Reid*, 2021 WL 4177756, at *4; *Johnakin v. NYC Dep't of Corr.*, No. 11-CV-4807, 2013 WL 5519998, at *17 (E.D.N.Y. Sept. 30, 2013), meaning " 'the intensity and duration of the exposure must both be significant,' " *McDaniel v. City of N.Y.*, No. 20-CV-8348, 2021 WL 797655, at *4 (S.D.N.Y. Feb. 26, 2021) (cleaned up), *appeal dismissed*, No. 21-607 (2d Cir. June 2, 2021); *Walker v. LaValley*, No. 2-CV-807, 2014 WL 4744735, at *18 (N.D.N.Y. Sept. 23, 2014) (cleaned up).

Plaintiff's allegations fall short of these standards. He provides no facts plausibly suggesting any concentration of asbestos, let alone an unreasonably high one. The "asbestos-related material" – whatever they were – were mixed with other attic-type detritus, and while his exposure to the detritus may have been intense, in that the dust and debris fell on him, the proportion of asbestos is unknown, and in any event the exposure could not have been of significant duration. *See Moton v. City of N.Y.*, No. 15-CV-6485, 2016 WL 1729046, at *3 (S.D.N.Y. Apr. 29, 2016) (inmate scraping "asbestos-filled dormitory ceilings" for no more than two days did not present an objectively serious harm), *report and recommendation adopted*, 2016 WL 3554993 (S.D.N.Y. June 24, 2016); *Simmons v. Gowanda Corr. Facility*, No. 13-CV-047, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013) (one-time potential exposure did not create unreasonable risk); *Bush v. Horn*, No. 07-CV-3231, 2010 WL 1712024, at *6 (S.D.N.Y. Mar. 2, 2010) ("[I]ncidental exposure ... while unfortunate, can hardly be said to violate contemporary standards of decency."); *see also Solomon v. Nassau Cnty.*, 759 F. Supp. 2d

251, 258 (E.D.N.Y. 2011) ("[C]onditions that are temporary or occasional ... without more have been found not to constitute 'a sufficiently serious deprivation' to sustain a Section 1983 deliberate indifference claim."). Cases that have found asbestos exposure to be sufficiently serious involved significantly greater exposure than is alleged here. *See Moton v. City of N.Y.*, No. 15-CV-6485, 2016 WL 7175287, at *3 (S.D.N.Y. Dec. 8, 2016) (eighty days living in a housing unit with peeling asbestos paint "all over" and working scraping detail in another unit sufficiently alleged objectively serious harm), *report and recommendation adopted*, 2017 WL 2779784 (S.D.N.Y. June 15, 2017); *Johnakin*, 2013 WL 5519998, at *18 (sixty days in a dormitory with friable asbestos met the objective prong). [4]

[4]    I do not know why the Assistant Attorney General here relied on general Eighth Amendment cases, rather than the numerous cases involving inmates exposed to asbestos – many of them litigated by the New York State Attorney General's Office – that assist Defendant's cause.

Because Plaintiff has not plausibly alleged exposure to friable asbestos of unreasonably high concentration, he has not met the objective prong, and his Eighth Amendment claim must be dismissed.

### 2. Subjective Prong

**\*5** Even if Plaintiff somehow satisfied the objective prong, he also fails to satisfy the subjective prong, as he presents no facts plausibly suggesting that Defendant knew that the "asbestos-related material" or other material was hazardous. His allegation that Defendant was "keenly aware" of the danger is wholly conclusory and, indeed, contradicted by his allegation that Defendant did not have "the slightest knowledge" about hazardous waste removal. Plaintiff argues that Defendant's knowledge of the danger may be inferred from his ordering Plaintiff to proceed despite Plaintiff's protests, but a correction officer ordering an inmate to complete a task that the inmate does not want to complete hardly shows that the officer was aware that the order would present a substantial risk of serious harm. Likewise, that Defendant obtained some gear for Plaintiff does not suggest such knowledge, as a jumpsuit and mask are appropriate for any dusty or dirty job. Finally, Defendant's amusement when the material fell on Plaintiff, while insensitive, does not suffice to show that Defendant understood that he had

put Plaintiff in a hazardous position. At most Plaintiff shows that Defendant was negligent in not appreciating that the job might be hazardous, but "mere negligence will not suffice" to show deliberate indifference. *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see Cotto v. Dee 1-5*, No. 18-CV-2130, 2018 WL 10140180, at *2 (S.D.N.Y. Apr. 17, 2018) ("The negligence of a correction official is not a basis for a claim of a federal constitutional deprivation under § 1983.").

Accordingly, Plaintiff's Eighth Amendment claim is dismissed.

### B. Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (cleaned up). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended his complaint, (*see* ECF No. 15), after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 12), and the discussion at the June 11, 2021 pre-motion conference, (Minute Entry dated June 11, 2021). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*,

**Patterson v. Cofon, Slip Copy (2022)**

2022 WL 563860

481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (cleaned up).

Moreover, Plaintiff has not asked to amend again or otherwise suggested that he is in possession of facts that would cure the deficiencies identified in this opinion. Accordingly, the Court declines to grant leave to amend *sua sponte. See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248,

249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

## IV. **CONCLUSION**

**\*6** For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to send a copy of this Opinion and Order to Plaintiff, terminate the pending motion, (ECF No. 18), and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 563860

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5097566
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Eddie ABERNATHY, Plaintiff,

v.

COMMISSIONER OF CORRECTION, Warden
at Cheshire Correctional Institution ("C.C.I."), &
John Doe Officer(s) at South Block, Defendants.

No. 3:20-cv-628 (VAB)
|
Signed 08/28/2020

**Attorneys and Law Firms**

Eddie Abernathy, Cheshire, CT, pro se.

**INITIAL REVIEW ORDER**

VICTOR A. BOLDEN, UNITED STATES DISTRICT
JUDGE

**\*1** On May 6, 2020, Eddie Abernathy ("Plaintiff"), a
sentenced inmate [1] proceeding *pro se* and currently in the
custody of the Department of Correction ("DOC"), filed a
Complaint under 42 U.S.C. § 1983, concerning an incident
in which Mr. Abernathy slipped and fell on a wet floor. [2]
Compl., ECF No. 1 (May 6, 2020).

[1] The Court takes judicial notice of the public
record on the Department of Correction ("DOC")
website showing Mr. Abernathy was sentenced
to fifty years of incarceration on June 6,
2020. *See Giraldo v. Kessler,* 694 F.3d
161, 164 (2d Cir. 2012) (court may "take
judicial notice of relevant matters of public
record."); http://www.ctinmateinfo.state.ct.us/
detailsupv.asp?id_inmt_num=239453.

[2] On June 8, 2020, Magistrate Judge William I.
Garfinkel granted Mr. Abernathy's motion to
proceed *in forma pauperis.* Order, ECF No. 11
(June 8, 2020).

He brings claims under the Fifth, Fourteenth, and Eighth
Amendment for deliberate indifference to his conditions of
confinement against the DOC Commissioner, the Cheshire

Correctional Institution ("C.C.I.") Warden, and John Doe
Officers, who were in charge of his housing in the South
Block-2 at C.C.I.

Mr. Abernathy seeks damages and injunctive and declaratory
relief. [3] Mr. Abernathy has also filed a motion for summary
judgment. Mot. for Summ. J., ECF No. 12 (June 15, 2020).

[3] The Court construes Mr. Abernathy's claims as
being brought against the defendants in their
individual and official capacities.

After initial review of the Complaint, the Court will
**DISMISS** the Complaint without prejudice.

**I. FACTUAL BACKGROUND** [4]

[4] All factual allegations are drawn from the
Complaint. Compl. ECF No. 1 (May 7, 2020).

On August 22, 2019, while at C.C.I., Mr. Abernathy allegedly
left his cell in South Block-2 to report to his assigned work
detail. Compl. ¶ 7. Upon leaving his cell, he allegedly slipped
and fell on a floor saturated with water. *Id.* ¶ 8.

On that day, the heating, ventilation, and air conditioning
("HVAC") system, which keeps the C.C.I. environment dry,
allegedly had not been working. *Id.* at ¶ 17. As a result of
the inoperative HVAC, the floor in Mr. Abernathy's housing
unit allegedly became wet with condensation. *Id.* at ¶ 18. The
HVAC system at C.C.I. allegedly malfunctions frequently. *Id.*
at ¶ 22. John Doe Officer[s] allegedly tour the housing unit at
fifteen-minute intervals and allegedly should have been aware
of the condition of the wet floor. *Id.* at ¶ 23.

On September 2, 2019, Mr. Abernathy allegedly filed a
request for treatment for his lower back and shoulder from
the medical unit at C.C.I. *Id.* at ¶ 9. He allegedly received the
response: "seen by APRN 9/5." *Id.* at 16 ¶ 10.

On September 6, 2019, Mr. Abernathy allegedly filed another
request for treatment for his pain with the medical unit. *Id.* ¶
11. On September 8, 2020, he allegedly received a response,
stating: "Give the medication that was prescribed time to
work." *Id.* at 17 ¶ 12.

On September 17, 2019, Mr. Abernathy allegedly filed a third
request for treatment for his ongoing pain with the medical
unit. *Id.* ¶ 13. On September 21, 2019, Mr. Abernathy's third

request was allegedly answered with: "Seen by medical 9/18." *Id.* at 18 ¶ 14.

## II. STANDARD OF REVIEW

**\*2** Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia*, the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.' " (quoting 28 U.S.C. § 1915A)).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the ... claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and ... recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

## III. DISCUSSION

Mr. Abernathy alleges claims of deliberate indifference to the conditions of confinement under the Fifth, Eighth, and Fourteenth Amendments.

As Mr. Abernathy is a sentenced prisoner, his conditions of confinement claims are analyzed under the Eighth Amendment rather than the Fourteenth Amendment, which applies to claims brought by pretrial detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees.... A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).

The Fifth Amendment, meanwhile, applies to the federal government, not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.' "); *Ambrose v. City of New York*, 623 F. Supp.2d 454, 466–67 (S.D.N.Y. 2009).

**\*3** Accordingly, because Mr. Abernathy is not a pretrial detainee and is alleging his claims against employees of the State of Connecticut, the Court will dismiss his Fifth and Fourteenth Amendment claims.

The Court first will consider whether Mr. Abernathy may assert his Eighth Amendment official capacity claims against the Defendants. Mr. Abernathy's Complaint requests damages, injunctive relief and a declaratory judgment. ECF No. 1 at 7-9.

### A. Official Capacity Claims

As a preliminary matter, any claims for money damages against the defendants, who are state employees, in their official capacities are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—not with standing the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007).

Mr. Abernathy seeks a declaratory judgment stating that he was subjected to the Defendants' deliberate indifference to his safety in violation of his constitutional rights. Compl. ¶ 33. The exception to Eleventh Amendment immunity, however, "does not permit judgments against state officers declaring that they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993). Because Mr. Abernathy is seeking declaratory relief premised on the Defendants' past conduct, his claims are not plausible, as they are barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* ... to claims for retrospective relief.").

With respect to his claims for injunctive relief, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer*, 511 U.S. at 846-47) (other citations omitted). Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a).

Injunctive relief afforded by a court must be narrowly tailored or proportional to the scope of the violation and extend no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). Thus, the court should reject "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id.* Moreover, a claim for injunctive relief may only proceed against a defendant to the extent that a

defendant has the power to remedy the alleged on-going constitutional violation. *See Scozzari v. Santiago*, No. 3:19-CV-00229 (JAM), 2019 WL 1921858, at *6 (D. Conn. Apr. 29, 2019) ("A request for prospective relief is only cognizable if an ongoing constitutional violation is taking place[.]"); *Loren v. Levy*, No. 00 Civ. 7687(DC), 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003) ("actions involving claims for prospective ... injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action").

**\*4** Here, Mr. Abernathy asks the Court to order the Defendants to provide him medical procedures "not presently administered at C.C.I., e.g., Magnetic Resonance Imaging ("MRI"), Computed Tomography ("CT"), inter alia[,] to determine the injury/or injuries that cannot be diagnosed by medical procedures presently administered at C.C.I., i.e., x-ray." Compl. ¶ 34. Because this request would require the Court to order medical relief beyond the scope of remedying his conditions of confinement claim based on deliberate indifference to his safety at C.C.I., this claim for injunctive relief is not plausible. Nor has Mr. Abernathy alleged an ongoing constitutional violation, as his claim is based upon the conditions at C.C.I. on August 22, 2019.

Accordingly, the Court will dismiss Mr. Abernathy's official capacity claims against the Defendants.

### B. Individual Capacity Claims

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). The Second Circuit has defined "personal involvement" as direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted).

Mr. Abernathy has alleged his Eighth Amendment claims for damages against unnamed John Doe Officer[s] who were allegedly in charge of Mr. Abernathy's housing unit; the C.C.I. Warden, who was allegedly in charge of all operations at C.C.I.; and the DOC Commissioner, who was allegedly in charge of the operation of the DOC.

With respect to his claims against the DOC Commissioner and the C.C.I. Warden, Mr. Abernathy cannot sue these defendants for damages solely because of their supervisory position. *See Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983). He may only recover damages against a supervisory official by showing that the official was "personally involved" in the constitutional deprivation in one of five ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the official failed to take action in response to information regarding the unconstitutional conduct. *Wright*, 21 F.3d at 501; *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (accord).

In addition to satisfying one of these requirements, a plaintiff also must establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014); *see also Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) (plaintiff must show "an affirmative causal link" between the supervisor's involvement and the constitutional injury.). A general allegation that a defendant failed to supervise subordinates is insufficient to establish personal involvement without a factual connection between that supervisory defendant's alleged failure and the alleged resulting harm to the plaintiff. *See Samuels v. Fischer*, 168 F. Supp. 3d 625, 639 (S.D.N.Y. 2016) ("a general allegation that [defendants] ... failed to train subordinates, however, is insufficient to establish personal involvement, absent some factual connection between their failure to train and the harm that eventually befell [p]laintiff") (collecting cases).

**\*5** Mr. Abernathy has not alleged how either the DOC Commissioner or the Warden were personally involved in the incident on August 22, 2019. He has not alleged that either the Warden or the Commissioner (1) were directly involved with inspecting and remedying the conditions of the South-Block-2 unit; (2) had perpetuated a custom or policy that resulted in Mr. Abernathy's injury due to the slippery floor; (3) were grossly negligent in supervising any John Doe Officer[s]; or (4) were aware that that a portion of the floor in South Block-2 had become saturated with water but failed to remedy the condition posing a risk to Mr. Abernathy's safety.

Accordingly, these claims will be dismissed as not plausible under 28 U.S.C. § 1915A(b)(1).

### 1. Eighth Amendment Conditions of Confinement

The Eighth Amendment's prohibition against cruel and unusual punishment "places restraints" and imposes duties on prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). Thus, the Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment requires prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care," and to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832–33.

To state a deliberate indifference to health or safety claim under the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element. To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm." *Id.* at 834 (internal quotation marks and citations omitted).

To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006).

Relevant to the claims of Eighth Amendment deliberate indifference by the John Doe Officer[s], the Second Circuit has recently confirmed, "slip-and-fall claims are seldom viewed as having constitutional dimension" and allegations of a slippery wet prison floor resulting in a plaintiff's fall do not raise an Eighth amendment claim about an unsafe condition that violates contemporary standards of decency. *McCray v. Lee*, 963 F.3d 110, 115, 120 (2d Cir. 2020) ("As the district court noted, McCray's Complaint did not make any claims of exceptional circumstances that would elevate the Green

Haven yard conditions beyond the typical level of danger presented by a slippery sidewalk or a wet floor."); *see also Martinez v. Schriro*, No. 14-CV-3965, 2017 WL 87049, at *5 (S.D.N.Y. Jan. 9, 2017) ("As courts in this circuit have regularly found, wet floor conditions that cause a prisoner to slip and fall do not constitute an Eighth Amendment violation.") (collecting cases).

Because Mr. Abernathy's allegations do not raise any exceptional circumstances indicating that he was exposed to a risk of harm "beyond the typical level of danger presented by *a ... wet* floor[,]" the Court concludes that he has not established the objective requirement of the Eighth Amendment analysis. *McCray*, 963 F.3d at 120.

 **\*6** Even if he could satisfy the objective component, Mr. Abernathy's allegations suggest that the John Doe Officer[s] acted negligently because they should have noticed that the wet floor during their alleged tours of the unit every fifteen minutes. ECF No. 1 at ¶ 23. He has stated in conclusory terms that the John Doe Officer[s] "were, or should have been, aware" of the unsafe condition. *Id.* These allegations, however, do not show that the John Doe Officer[s] consciously disregarded a known risk to Mr. Abernathy's health and safety. *See Conley v. Brysgel*, No. 3:17-CV-322 (VAB), 2020 WL 3619921, at *9 (D. Conn. July 2, 2020) (citing *Rangolan v. Cty. of Nassau*, 217 F.3d 77, 79 (2d Cir. 2000)) (finding plaintiff had not shown deliberate indifference where evidence showed County had taken steps to protect him but had "mistakenly failed to implement them"); *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (noting conclusory allegations or

legal conclusions are insufficient to state a claim) (citation omitted).

Accordingly, the Court concludes that Mr. Abernathy has not stated a plausible Eighth Amendment claim based on the condition of the wet prison floor. [5]

[5]    Moreover, even if the Court had determined that Mr. Abernathy raised a plausible claim against the Doe Officer[s], the Court could not order them served with the Complaint in their individual capacities as they are unidentified defendants.

### ORDERS

The claims against all Defendants in their official and individual capacities are **DISMISSED without prejudice.** If Mr. Abernathy believes that he can correct the deficiencies with his Eighth Amendment claim as identified in this Initial Review Order, he may file an Amended Complaint by **September** 25, 2020.

The motion for summary judgment [**ECF No. 12**] is **DENIED without prejudice** as it was prematurely filed before this Court's initial review under 28 U.S.C. § 1915A(b).

**SO ORDERED** at Bridgeport, Connecticut, this 28th day of August, 2020.

**All Citations**

Slip Copy, 2020 WL 5097566

---

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.